## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **Joleen K. Youngers**, | ) | |
| as the Personal Representative of the | ) | |
| Wrongful Death Estate of Roxsana | ) | |
| Hernandez, | ) | |
| | ) | **COMPLAINT** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  20-cv-00465 |
| | ) | |
| **Management & Training Corporation,** | ) | |
| **LaSalle Corrections Transport LLC,** | ) | |
| **Global Precision Systems LLC,** | ) | |
| **TransCor America LLC,** | ) | |
| **CoreCivic, Inc.,** | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.  This action involves the egregious and unconscionably negligent or willful failure of several private federal government contractors to safely care for Roxsana Hernandez ("Roxsana"), an HIV-positive transgender asylum-seeker, while transporting her from San Diego, California to Milan, New Mexico.  Roxsana was seeking asylum in the United States after being brutally raped and targeted by gangs in her home country of Honduras.

2.  Despite Roxsana visibly exhibiting symptoms of distress associated with her serious medical condition throughout her four-state journey – including nausea, vomiting, fever, diarrhea, and severe fatigue – and the persistent entreaties by Roxsana and those with whom Roxsana travelled, these contractors charged with her custody failed or refused to render her the timely care and intervention she required.

3.  Instead, Defendants Management & Training Corporation ("MTC"), "LaSalle Corrections

Transport, LLC ("LaSalle"), Global Precision Systems, LLC ("GPS"), TransCor America, LLC ("TransCor"), and CoreCivic, Inc. ("CoreCivic") (collectively, "Defendants,") allowed Roxsana to literally waste away: she weighed only 89 pounds upon arriving at CoreCivic's Cibola County Correctional Center in Milan, New Mexico ("Cibola").

4.  Defendants ignored the persistent demands by Roxsana and the transgender asylum-seekers with whom Roxsana travelled and denied her access to reasonable accommodations for her disability, adequate medical care, sufficient food, water, access to a restroom, and an opportunity to sleep.

5.  By doing so, Defendants violated Roxana's rights under Section 504 of the Rehabilitation Act. They also violated their federal agency contracts, the agencies' own standards for care and transportation of detained immigrants, and the prevailing standards of care in California, Arizona, Texas, and New Mexico.

6.  Because Defendants ignored the persistent pleas for help from Roxsana and for intervention by the transgender women with whom Roxsana travelled, she arrived at Cibola in septic shock, dehydrated, severely tachycardic, medically starving, febrile, and in the early stages of multiple organ failure.

7.  Simply put: Roxsana was in no condition to be transported or temporarily detained anywhere, and Defendants are liable for the suffering and death they caused as a result of choosing to do so notwithstanding her obvious, serious, and emergent medical needs.

8.  Roxsana lost out on a chance for timely, potentially life-saving medical intervention and suffered severe emotional distress while in Defendants' care as a consequence of their discriminatory, negligent and reckless acts and omissions.

## JURISDICTION AND VENUE

9.  This Court has subject-matter jurisdiction over the state law claims against Defendants in this case based on 28 U.S.C. § 1332 (diversity) because the amount in controversy exceeds $75,000.00,

exclusive of costs, and no Defendant is a citizen of New Mexico, and under 28 U.S.C. § 1331 (federal question) as to the claims against all Defendants under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1392(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

11.  Plaintiff **Joleen K. Youngers** is an adult resident of the State of **New Mexico**.

12.  On January 15, 2019, the First Judicial District Court of New Mexico appointed Plaintiff the Personal Representative of the Wrongful Death Estate of Roxsana Hernandez pursuant to 1978 NMSA, § 41-2-3. *In the Matter of the Wrongful Death Action on Behalf of the Survivors of Roxsana Hernandez, Deceased,* No. D-101-CV-2019-00075.

13.  Plaintiff Youngers sues in her capacity as Personal Representative of Roxsana's Wrongful Death Estate for all damages arising from Roxsana's pre-death suffering and injuries and her wrongful death.

14.  Defendant **Management & Training Corporation** ("MTC") is a foreign, for-profit corporation originally incorporated in **Delaware** and maintaining its headquarters at 500 N. Marketplace Drive Centerville, UT 84014.

15.  At all times material to this Complaint MTC contracted with the United States Immigration and Customs Enforcement ("ICE") to manage immigration detention facilities in Texas, New Mexico and California, including the Imperial Regional Detention Center in Calexico, California, and to operate the Otero Processing Center in Chaparral, New Mexico.

16.  Pursuant to these contracts, MTC employees transported Roxana from Imperial Regional Detention Center to San Luis Regional Detention Center in Arizona ("SLRDC") on May 14, 2018 and was thereby responsible for her custody and care during that time.

3

17.  MTC maintains a registered agent within New Mexico to accept service of process.[1]

18.  MTC received federal funds for these services.

19.  **LaSalle Corrections Transport L.L.C.** ("LaSalle") is a corporation maintaining a corporate office located at 26228 Ranch Road 12 Dripping Springs, **Texas** 78620-4903.

20.  At all times material to this Complaint LaSalle contracted with ICE to manage immigration detention facilities in Arizona, Texas and Georgia, including SLRDC located in San Luis, Arizona.

21.  Pursuant to this contract, LaSalle employees were charged with the custody and care of Roxsana while she was detained at SLRDC from May 14, 2018 to May 15, 2018 and transported her from SLRDC to the Mesa, Arizona airport on May 15, 2018.

22.  LaSalle received federal funds for these services. LaSalle maintains a registered agent within New Mexico to accept service within the state.[2]

23.  LaSalle's website lists New Mexico as a state in which it maintains bed capacity for immigration detention.[3]

24.  **Global Precision Systems LLC** ("GPS") is a limited liability company organized in Alaska and is a wholly-owned subsidiary of Bering Straits Native Corporation (BSNC), an Alaska Native Regional Corporation, with a business address at: 3301 C Street, Suite 400 Anchorage, **Alaska** 99503.

25.  At all times material to this Complaint GPS contracted with ICE to provide food and transportation services at El Paso Service Processing Center in El Paso, Texas ("El Paso SPC").

---

[1] Located at 10 McGregor Range Road, Chaparral, NM 88081 date of appointment 12/18/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

[2] Located at 206 S. Coronado Ave, Espanola, NM 87532 date of appointment 04/26/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

[3] *See* http://www.lasallecorrections.com/our-locations-table/ (last visited May 12, 2020).

26. Pursuant to this contract GPS transported Roxsana from the El Paso SPC to Albuquerque, New Mexico on May 16, 2018.

27. GPS received federal funds for these services.

28. **TransCor America LLC** ("TransCor") is a limited liability company formed in **Tennessee** and wholly owned subsidiary of Defendant CoreCivic.

29. At all times material to this Complaint TransCor contracted with CoreCivic to perform transportation services for CoreCivic in fulfillment of CoreCivic's contract with ICE to manage immigration detention centers across the United States including Cibola in Milan, New Mexico.

30. Pursuant to this contract, TransCor transported Roxsana from Albuquerque, New Mexico to Cibola on May 16, 2018, and thereby was responsible for her custody and care during that time. TransCor received federal funds for these services.

31. **CoreCivic, Inc.** ("CoreCivic") (formerly known as Corrections Corporation of American) is a corporation formed in **Maryland** maintaining its headquarters at 5501 Virginia Way, Brentwood, Tennessee 37027-7680.

32. At all times material to this Complaint CoreCivic contracted with ICE to manage immigration detention facilities across the United States, including Cibola.

33. Pursuant to this contract CoreCivic maintained custody of Roxsana while she was detained at Cibola from May 16, 2018 until she died at Lovelace Medical Center in Albuquerque, New Mexico on May 25, 2018.

34. CoreCivic received federal funds for these services.

## FACTS

### A. The Federal Programs Underlying Roxsana's Detention and Transportation

35. At all times material to this Complaint, Roxsana was confined subject to the civil detention authority of the Immigration and Nationality Act ("INA"). 8 U.S.C. §§ 1001 *et seq.*.

5

36.  Roxsana was never charged with nor imprisoned for any criminal offense between the time she arrived at the San Ysidro Port-of-Entry on May 9, 2018 and the time she was pronounced dead in Albuquerque, New Mexico on May 25, 2018.

37.  Roxsana's detention and transportation by agency components of the Department of Homeland Security ("DHS") and their private contractors occurred to facilitate the federal civil adjudication programs that would hear her claims for relief under the nation's asylum and torture protection laws.

38.  When she lawfully presented herself at the Port-of-Entry in San Ysidro, Roxsana told officers of DHS agency component U.S. Customs and Border Protection ("CBP") that she had experienced past persecution in the form of sexual harassment, rape, and physical abuse by MS-13 gang leaders in Honduras, and she feared persecution, torture, or death if forced to return there.

39.  Roxsana's statements to CBP officials triggered a federal legal obligation by DHS agency components CBP, ICE, and United States Citizenship and Immigration Services ("USCIS") to provide her with a Credible Fear Interview, or, at a minimum, a Reasonable Fear Interview, within ten days. *See* 8 C.F.R. §§ 208.30 208.31(b).[4]

40.  Within a short period after a DHS asylum officer made an initial determination of whether Roxsana's claims were likely to entitle her to legal protection under the INA, the Department of Justice ("DOJ") Executive Office for Immigration Review ("EOIR") was required to provide Roxsana with a prompt hearing on the merits of her claim, in the event the asylum officer found she stated a credible or reasonable fear of persecution or torture, or a prompt review by an EOIR Immigration Judge ("IJ") of any negative decision by an asylum officer.

---

[4] Because Roxsana had a prior order of removal from the United States, DHS and EOIR likely would have taken the position that she was ineligible for a Credible Fear Interview or asylum, and was only eligible for a Reasonable Fear Interview and relief in the form of withholding of her removal under 8 U.S.C. § 1231(b)(3) or protection under the Convention Against Torture ("CAT").

41.  From May 14, 2018 through May 17, 2018, Defendants shuttled Roxsana and more than a dozen other transgender asylum-seekers on a multi-leg journey that stretched from San Ysidro, California to Arizona to El Paso to Milan, New Mexico via ICE's "Streamlined Transfer Process"[5] ("STP").

42.  According to ICE, the STP is an "established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities"[6] and "requires coordination across several ERO field offices but results in efficient processing and transport of the large number of Aliens entering the U.S. at the San Ysidro POE."  [7]

43.  The purpose of the detention facilitated by ICE's STP is to allow subjects' participation in federal adjudicative programs including the fear-based interview process and EOIR adjudication of claims for fear-based protection from deportation.

44.  Each Defendant knew that it participated in one portion of the STP to transport Roxsana to her final destination in Milan, New Mexico.

45.  ICE ERO identified Cibola as the "appropriate" facility for Roxsana as part of the STP because of its dedicated transgender housing unit.

**B.  MTC Bus Ride from San Ysidro, California to San Luis, Arizona**

46.  On or about May 14, 2018, Roxsana left a U.S. Customs and Border protection ("CBP") lockup in San Ysidro, California and entered the custody of U.S. Immigration and Customs Enforcement ("ICE"), which is the federal Department of Homeland Security ("DHS") agency component responsible for civil detention and administrative processing of asylum-seekers for deportation.

---

[5] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT OFFICE OF PROFESSIONAL RESPONSIBILITY *Detainee Death Review of Jeffry HERNANDEZ (JICMS #201807481)* at 4 footnote 34.
[6] *Id.*
[7] *Id.*

47. The same day – May 14, 2018 – Defendant MTC took Roxsana and 12 other caravanners by bus from the San Ysidro Port of Entry lockup to Imperial Regional Detention Facility in Calexico, California, arriving at around 2:30 p.m. The drive took approximately two hours.

48. About an hour later, at around 3:30 p.m., MTC employees loaded Roxsana and the caravanners back onto a bus and drove them to San Luis Regional Detention Center (SLRDC) in San Luis, Arizona, which is operated by Defendant LaSalle.

49. They arrived at SLRDC around 5:30 p.m. local time.

50. Throughout her journey in MTC's care from San Ysidro to Calexico, while in Calexico, and during her journey from Calexico to San Luis, Roxsana exhibited visible signs of deterioration requiring immediate medical intervention.

51. MTC denied Roxsana and her fellow detainees food, water, and restroom access throughout their transfer.

52. At one point during the MTC transfer, Roxsana asked the MTC officers to use the restroom and to remove her handcuffs in order to do so; they refused.

53. Another person MTC transported alongside Roxsana advocated for officers to remove Roxsana's handcuffs so she could use the restroom, but MTC officers again denied the request.

54. If anyone needed to use the restroom, the MTC officers responsible for transporting Roxsana and others instructed her and her fellow asylum-seekers that they should urinate on themselves.

55. The seats MTC used to transport Roxsana and her fellow asylum-seekers were stained and smelled like urine.

56. Despite knowing that Roxsana urgently needed medical assistance, MTC failed to provide Roxsana with medical care or assistance to alleviate her suffering.

## C. Detention at LaSalle's San Luis Regional Detention Facility

57. When the MTC bus arrived at Defendant LaSalle's SLRDC in Arizona, LaSalle took

responsibility for the well-being of Roxsana and the people travelling with her.

58. At the SLRDC, several of Roxsana's fellow asylum-seekers who had been separated earlier in their journey to the United States found themselves reunited on the way to Cibola.

59. One asylum-seeker who had last seen Roxsana in Tijuana a few days earlier was shocked by how much Roxsana's health and spirits had declined.

60. She described Roxsana's condition in San Luis as appearing very weak and pale, almost yellow in pallor, with dark circles under her eyes.

61. During the few hours that Roxsana was at SLRDC, Roxsana used the bathroom several times to vomit or spit up phlegm.

62. Roxsana was so weak from fever that she spent most of her time at SLRDC laying on the floor, coughing.

63. Officers of Defendant LaSalle Corrections witnessed Roxsana's obvious state of medical need and failed to offer her emergency medical assistance.

64. Eventually during her time at SLRDC Roxsana was so ill she could not eat and had to use the restroom approximately every fifteen minutes because she had such bad diarrhea.

65. She confided to a fellow asylum-seeker that she felt like she was going to die, or words to similar effect.

66. Despite observing her manifest symptoms and knowing that she had an urgent need for medical care, Roxsana received no medical attention from LaSalle or assistance to alleviate her suffering while at SLRDC.

**D. LaSalle Bus Ride from San Luis, Arizona to the Mesa, Arizona Airport**

67. At or around midnight on May 15, 2018, officers from Defendant LaSalle loaded Roxsana and approximately 25 other transgender asylum-seekers bound for Cibola onto a bus and drove them to the Mesa, Arizona airport, arriving around 4:00 a.m.

68. Roxsana was very ill during the four-hour bus ride and pleaded for help to a person who sat with her, saying words to the effect of, "Help me! I don't know if I'm going to survive."

69. During the bus ride a LaSalle corrections officer threatened Roxsana and her fellow asylum-seekers, saying words to the effect of, "Behave, because if you don't something bad is going to happen."

70. During the bus ride another asylum-seeker specifically asked LaSalle officers for medical help for Roxsana in both English and Spanish. The officers ignored her.

71. When they arrived at the airport, one of the people being transported by LaSalle alongside Roxsana told an officer with beige pants and long red hair that Roxsana was very sick and needed immediate medical attention. The officer refused to respond to her. During her five hour stay in the Mesa airport Roxsana remained in LaSalle's custody and was provided no medical care or assistance for her sickness.

72. The flight arrived at approximately 2:48 p.m., local time in El Paso, Texas. ICE officers and/or those contracted by ICE took Roxsana and the rest of the passengers by bus to the ICE El Paso Service Processing Center ("SPC"), arriving around 3:15 p.m.

73. Roxsana remained at the SPC until the morning of May 16, 2018, when she and her fellow asylum-seekers woke up to ICE officers presenting them food that they were instructed to eat for breakfast at around 5:00 a.m.

74. Roxsana attempted to eat the meal provided, but ended up vomiting and then going back to sleep.

75. By this time, Roxsana appeared to all around her to be gravely ill. Despite LaSalle's knowledge of Roxsana's urgent need for medical care, during the entire time Roxsana was in LaSalle's custody LaSalle did not provide her with medical care or assistance to alleviate her suffering.

**E.   GPS Bus Ride from El Paso, Texas to Albuquerque, New Mexico**

76.   On May 16, 2018 at around 9:00 a.m., officers from Defendant GPS loaded Roxsana and approximately 29 other detained immigrants onto a GPS bus for transport from El Paso to Cibola.

77.   That day the temperature reached 97 degrees before noon in El Paso.

78.   Each person was provided an 8-ounce bottle of water and sandwich to last the entire five-and-half hour journey to the Cibola detention center in New Mexico.

79.   Roxsana sat by herself in the back of the bus.

80.   The detained passengers of GPS's bus became very thirsty and hungry and repeatedly asked for water.

81.   The first two times they asked for water the GPS officers transporting them ignored them.

82.   The third time, an officer with grey hair said in Spanish: "ya callanse" which means "shut up." At one point the GPS employees stopped at a fast food restaurant and ate their food on the bus in front of the hungry and thirsty detainees they transported.

83.   If any of the detainees transported needed to use the restroom they had to plead with the officers to allow them to do so. The officers frequently ignored their requests and occasionally escorted them to a toilet bowl in the back of the bus that was only covered by a curtain. There was no toilet paper and they would not remove detainees' handcuffs to use it. When the bus swayed the waste in the toilet would spill and the whole bus stank of sewage.

84.   At some point during this trip Roxsana asked an officer for water, but the officer told her he did not speak Spanish.

85.   At another point the same officer asked why Roxsana and others on the bus left their country if they were sick, in reference to Roxsana's visible illness.

86.   Roxsana had a fever and produced a significant amount of phlegm during this trip.

87.   Roxsana carried tissue or toilet paper to blow her nose. Sometimes her sputum was bloody.

88.   Roxsana felt dizzy and extremely exhausted, and her stomach hurt badly.

89.   During this bus ride another person requested medical attention for Roxsana from at least two different GPS officers approximately five times.

90.   One GPS officer did not understand Spanish and the other officer did not respond to any of her requests for assistance for Roxsana.

91.   At approximately 2:30 p.m., the bus arrived at an ICE Criminal Alien Program ("CAP") facility in Albuquerque, New Mexico, where officers from various detention facilities assumed custody for those transported, including Roxsana.   Despite GPS's knowledge of Roxsana's urgent need for medical care, during the entire time Roxsana was in GPS's custody GPS did not provide her with medical care or assistance to alleviate her suffering.

**F.   TransCor Trip from Albuquerque to Cibola**

92.   Officers from Defendant TransCor took Roxsana and 28 other transgender asylum-seekers by bus from the ICE CAP facility in Albuquerque to Defendant CoreCivic's Cibola County Correctional Center, arriving around 8:13 p.m. on May 16, 2018.

93.   Throughout this trip, Roxsana continued to appear gravely ill.

94.   She remained unable to eat.

95.   Roxsana required immediate medical assistance that TransCor employees neglected to provide.

96.   From approximately 8:13 p.m until no later than 1:15 a.m., Roxsana awaited booking while in TransCor's care at Cibola. Despite TransCor's knowledge of Roxsana's urgent need for medical care, during the entire time Roxsana was in TransCor's custody TransCor did not provide her with medical care or assistance to alleviate her suffering.

**G.   Detention by CoreCivic at Cibola**

97.   On or around May 17, 2018 at around 1:15 a.m. officers from Defendant CoreCivic, the

company that contracted with ICE to run Cibola, booked Roxsana into the facility.

98.   At approximately 2:23 a.m., CoreCivic employees took Roxsana and others to a medical waiting room to spend the night.

99.   Roxsana lay on the floor, only getting up to use the restroom or drink a beverage officers brought around 4:00am.

100.   Roxsana was so weak and ill that she became delirious.

101.   It became apparent to those around her that she was beginning to lose her mental capacity.

102.   Nevertheless, CoreCivic officials in the medical unit failed to promptly render her medical care from 2:23 a.m. to 7:25 a.m.

103.   At around 7:25 a.m., CoreCivic officials finally presented Roxsana to an onsite medical provider who conducted an intake screening.

104.   Roxsana was given electrolytes and Ensure at or around 8:08 a.m., and then was returned to the holding cell, where she rested on the floor.

105.   At 8:58 a.m. another medical staff person entered the waiting area used as a holding cell and assisted Roxsana to her feet.

106.   At 9:00 a.m. CoreCivic's medical providers documented that Roxsana was running a 102-degree fever.

107.   CoreCivic officers transferred Roxsana to a medical isolation room while she waited for treatment because they suspected she had tuberculosis.

108.   Around 10:00 a.m., an onsite medical provider examined Roxsana.

109.   She weighed 89 pounds at the time of her exam.

110.   The provider diagnosed her with dehydration, starvation, extreme weight loss, muscle wasting, untreated HIV, fever and cough.

111.   The examining medical provider noted Roxsana's tremor, low blood pressure of 81/61,

rough breathing sounds and increased amount of white phlegm mucus excreted in abnormally large quantities.

112.  The medical provider ordered Roxsana's immediate transport to the Cibola General Emergency Room to determine whether she was suffering from pneumonia or some other infection and to provide her with intravenous fluids.

113.  At 11:08 a.m. CoreCivic officers transported Roxsana in a wheelchair to an ambulance.

114.  She arrived at Cibola General Hospital around 11:44 a.m.

**H.  Roxsana Perishes After Nearly a Week in the Hospital**

115.  Based on physical examination findings by providers at Cibola General, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock (a life-threatening condition), dehydration, HIV infection, nodular pulmonary disease, lymphadenopathy, anemia, and thrombocytopenia.

116.  At around 6:25 p.m. Cibola General requested transfer of Roxsana to Lovelace Medical Center in Albuquerque, New Mexico because Roxsana required a higher level of care than Cibola General could provide.

117.  Three hours later, at approximately 9:38 p.m., Roxsana was airlifted by helicopter ambulance to Lovelace Medical Center because ground transport would take significantly longer and medical staff deemed it essential to provide Roxsana immediate medical care because of her low blood pressure, low bodyweight, and septic shock diagnosis.

118.  Thus, within ten hours of first being seen on an emergency basis at Cibola General for the symptoms she suffered while Defendants transported her, Roxsana was airlifted to a trauma center for emergency medical treatment for her life-threatening illnesses.

119.  Roxsana was eventually diagnosed with Multi-Centric Castleman's Disease, on May 22, 2018, a rare and aggressive disease that affects the lymph nodes and related tissues, treatable with a

variety of therapies including anti-viral medication, chemotherapy and immunotherapy.

120.   She was pronounced dead at 3:32 a.m. on May 25, 2018.

121.   Throughout her hospitalization, CoreCivic officers shackled Roxsana at her wrists and both ankles to her hospital bed except when medical personnel needed to remove them for certain medical procedures.

122.   At least one armed CoreCivic officer guarded Roxsana at all times and checked that her restraints were secured at least every 20 minutes.

123.   Each time medical staff needed CoreCivic officers to remove her restraints, the officer on duty made a call to "central" to receive approval to remove them, delaying Roxsana's receipt of medical care.

124.   CoreCivic officers kept Roxsana shackled even after her treating medical providers medically paralyzed her and when she first went into cardiac arrest.

125.   A preliminary autopsy report showed extensive regions of deep soft tissue and musculature hemorrhage on the wrists, not externally visible, which are typical of handcuff injuries.

126.   According to the applicable Performance Based National Detention Standards: "As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions."[8] Furthermore, these standards require that: "Detainees shall receive continuity of care from the time of admission to time of transfer, release or removal.  Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary

---

[8] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011* at 4.3 https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf (last visited May 13, 2020).

medication and referrals to community-based providers as medically-appropriate."[9]

127.   Had Roxsana received the proper health care screening within 12 hours of entering custody as required by ICE policy and prevailing standards of medical care, she, more likely than not, would have had a greater chance of survival. Defendants are jointly and severally liable for her death and for the pre-death pain and suffering they caused Roxsana.

## CLAIMS FOR RELIEF

### COUNT ONE AGAINST ALL DEFENDANTS
#### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

128.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

129. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in: (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the U.S. Postal Service. 29 U.S.C. § 794.

130.   Under Section 504, "[n]o qualified individual with a disability in the United States shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department [of Homeland Security.]" 6 C.F.R. § 15.30(a); *accord* 28 C.F.R. § 39.130 (covering EOIR); *see also* 29 U.S.C. § 794.

131.   Section 504 not only forbids facial discrimination against individuals with disabilities, but also requires executive agencies such as DHS to ensure that its agency components and their contractors alter their policies and practices to ensure individuals with disabilities do not suffer discrimination as a result of their disability. *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 n.17 (1987); *Alexander v. Choate*, 469 U.S. 287, 300 (1985); *see also* 28 C.F.R. § 35.130(b)(7) ("A public

---

[9] *Id.*

entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

132.  Section 504 requires DHS and Defendants to make reasonable modifications to their programs, services, or activities unless such modifications would constitute a fundamental alteration or undue hardship.

133.  Section 504 imposes an affirmative obligation on DHS and Defendants to ensure their programs and services are accessible to people with disabilities, including by providing reasonable modifications. *Pierce v. D.C.,* 128 F. Supp. 3d 250, 266 (D.D.C. 2015) ("[B]ecause Congress was concerned that '[d]iscrimination against [people with disabilities] was . . . most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect[,]' the express prohibitions against disability-based discrimination in Section 504 and Title II include an affirmative obligation to make benefits, services, and programs accessible to disabled people.") (citing and quoting from *Alexander v. Choate*, 469 U.S. 287, 295 (1985)); *id.* at 269 ("[N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned.").

134.  The requirements of Section 504 apply to the immigration benefits and proceedings that noncitizens may seek under the INA. *See Galvez-Letona v. Kirkpatrick*, 54 F.Supp.2d 1218, 1224–25 (D. Utah 1999), *aff'd on other grounds*, 3 F. App'x 829 (10th Cir. 2001) (holding the INS violated the Rehabilitation Act when it denied naturalization to an individual who, due to the disability of Down Syndrome, could not meet the attachment and oath requirements of citizenship set out in the naturalization statute); *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1053, 1056 (C.D. Cal. 2010) (finding that disabled plaintiffs in immigration detention "were not provided with even the most

minimal of existing safeguards under [8 C.F.R. §] 1240.4, let alone more robust accommodations required under the Rehabilitation Act," and ordering the appointment of a "qualified representative" for detainees with serious mental illness).

135.  As a DHS agency component and according to a DHS agency self-assessment for Rehabilitation Act compliance, ICE's contracted activities and those of its contractors are subject to the Rehabilitation Act's non-discrimination provision under Section 504.[10]  *See also* Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements.").

136.  Roxsana was an individual with a disability: Human Immunodeficiency Virus. *See* 29 U.S.C. § 705(9)(B) 28 C.F.R. § 35.108(d)(2)(iii)(J).

137.  Roxsana was entitled to the benefit of a fair and safe fear-based interview process through USCIS – a federal immigration adjudicative program – and adjudicative proceeding to either pursue her claims for relief as substantiated by an asylum officer or obtain IJ review of a negative determination, and to the fair and safe participation in ICE's STP, which was created to facilitate access to these programs.

138.  ICE contracted with all Defendants for secure transportation and/or detention of Roxsana as part of the STP to facilitate access to the USCIS fear-based interview program and the EOIR adjudicative program required by law.

139.  All Defendants operated detention transportation programs that transported Roxsana or detention centers that housed her for ICE, and all received federal funds for doing so.

---

[10] DEPARTMENT OF HOMELAND SECURITY, *Instruction On Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment)*, https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited May 13, 2020).

140. Defendants each discriminated against Roxsana because of her disability by failing to make reasonable accommodations for her disability.

141. Defendants failed to ensure their transportation and detention staff had adequate training to respond to and care for the needs of people living with HIV.

142. On repeated occasions, employees or agents of each Defendant refused requests from Roxsana and her fellow detained asylum-seekers to provide Roxsana the medical assistance and disability accommodations she sought and obviously needed.

143. Defendants failed to make reasonable accommodations in the form of medical care or specialized transport in violation of the Rehabilitation Act.

144. Because of her disability, Roxsana was denied services by Defendants for which she was otherwise qualified.

145. As a result of Defendants' violations of the Rehabilitation Act, Plaintiff is entitled to compensatory and punitive damages.

## COUNT TWO AGAINST DEFENDANT MTC
### NEGLIGENCE UNDER CALIFORNIA LAW

146. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

147. Roxsana's aggressively developing illness while in the care of Defendant MTC presented a serious and obvious medical need.

148. Her persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss were visibly apparent from the time she was taken into MTC's care until the time she left it, including to people who are not medically trained.

149. MTC was made aware by DHS paperwork that Roxsana had untreated HIV and had just been seen by an Emergency Department physician, discharged, and provided with antibiotics.

150. MTC was charged with Roxsana's custody and care pursuant to its contracts with ICE, and had a duty to ensure Roxsana was free from imminent risks of foreseeable harm.

151.  MTC owed Roxsana a special duty of care as she was in their custody. MTC also owed her a duty as common carrier pursuant to Civil Code section 2100, and as an entity involved in government prisoner transport pursuant to California Government Code section 845.6.

152.  Roxsana's illness was obvious even to a lay person because her symptoms of cough, fatigue, weakness, phlegm vomiting and fever were so severe. Furthermore, Roxsana and the caravanners' repeated requests for medical help to Defendant MTC's employees evidenced the urgency of Roxsana's declining health.

153.  MTC breached its duty of care when its employees repeatedly refused and failed to provide Roxsana with medical care and failed to exercise ordinary care, as described above.

154.  MTC further breached its duty of care by refusing to allow Roxsana to use the restroom throughout the journey and instructing the caravanners to urinate on themselves, thereby exacerbating Roxsana's physical pain and mental anguish.  MTC also breached its duty of care by failing to provide sufficient water and food to Roxsana during this transfer, exacerbating her weakness and illness.

155.  These repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life.

156.  As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health, and, ultimately, death.

157.  MTC's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

158.  In the alternative, Defendant MTC's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

20

## COUNT THREE AGAINST DEFENDANT LASALLE
### NEGLIGENCE UNDER ARIZONA LAW

159.  Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

160.  Roxsana's aggressively developing illness while in the care of Defendant LaSalle presented a serious medical need that was obvious to any layperson with whom she came into contact, including LaSalle transportation staff.

161.  LaSalle, which was charged with Roxsana's custody and care pursuant to its contracts with ICE, had a duty to ensure Roxsana was free from imminent risk of foreseeable harm, and to prevent her needless and wanton suffering in the absence of immediate medical attention.

162.  LaSalle owed Roxsana a special duty of care as Roxsana was in the company's physical custody.

163.  Roxsana and her fellow asylum-seekers' repeated requests for medical help to LaSalle employees evidenced the urgency of Roxsana's rapidly deteriorating health.

164.  LaSalle breached its duty of care by failing to provide Roxsana with emergent medical care on May 14 and 15, 2018, when it detained her at SLRDC and its employees witnessed Roxsana laying on the floor, coughing and frequently using the restroom because she was suffering from severe diarrhea and vomiting. LaSalle's failure to provide Roxsana with medical care was a blatant violation of the standards required for treatment of detainees within ICE custody to provide a medical screening within 12 hours of being taken into custody and Arizona law including Title 31 of Arizona's revised statutes.

165.  LaSalle breached its duty of care when its employees transported Roxsana on May 15, 2018, to the airport in Mesa, Arizona and, despite multiple requests for medical care for Roxsana, refused to provide her with medical treatment and one employee threatened the caravanners saying words to the effect of: "behave because if you don't something bad is going to happen."

166.  These repeated refusals to provide medical care and the basic necessities for Roxsana's

safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life.

167.  As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of LaSalle's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health, and, ultimately, death.

168.  LaSalle's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

169.  In the alternative, Defendant LaSalle's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

**COUNT FOUR AGAINST DEFENDANT GPS**
**NEGLIGENCE UNDER NEW MEXICO LAW**

170.  Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

171.  Defendant GPS was charged with Roxsana's custody and care pursuant to its contracts with ICE and had a duty to ensure Roxsana was free from imminent risks of foreseeable harm.

172.  GPS owed Roxsana a special duty of care as Roxsana was in the company's physical custody.

173.  Because Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe her illness was obvious even to a lay person. Furthermore, Roxsana and her fellow asylum-seekers' repeated requests for medical help to GPS employees evidenced the urgency of Roxsana's deteriorating health.

174.  GPS breached its duty of care for failing to provide Roxsana with medical care when its employees transported Roxsana from SPC on May 16, 2018 to the ICE CAP facility in Albuquerque, New Mexico without affording her emergency medical care despite Roxsana's visible illness and multiple requests for medical attention.

175. GPS' employees also breached their duty of care by providing insufficient food and water and restroom access during the long bus ride resulting in Roxsana's mental anguish, pain and suffering and exacerbation of her illness.

176. As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health, and, ultimately, death.

177. GPS' employees acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

178. In the alternative, Defendant GPS's employees' acts and omissions constitute circumstantial evidence of negligence because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

## COUNT FIVE AGAINST DEFENDANT TRANSCOR
### NEGLIGENCE UNDER NEW MEXICO LAW

179. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

180. Roxsana's aggressively developing illness while in the care of Defendant TransCor presented a serious medical need that was obvious to any layperson with whom she came into contact, including TransCor transportation staff.

181. TransCor, which was charged with Roxsana's custody and care pursuant to its contracts with ICE, had a duty to ensure Roxsana was free from imminent risk of foreseeable harm, and to prevent her needless and wanton suffering in the absence of immediate medical attention.

182. TransCor owed Roxsana a special duty of care as Roxsana was in the company's physical custody.

183. Roxsana and her fellow asylum-seekers' repeated requests for medical help to TransCor employees evidenced the urgency of Roxsana's rapidly deteriorating health.

184. TransCor breached its duty of care by failing to provide Roxsana with emergency medical care on May 16, 2018 when its employees transported Roxsana from the ICE CAP facility in Albuquerque, to Cibola New Mexico, and, despite multiple requests for medical care for Roxsana, refused to provide her with medical treatment.

185. These repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life.

186. As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of TransCor's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health, and, ultimately, death.

187. TransCor's employees' acts and omissions were intentional, wanton, malicious and/o exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

188. In the alternative, Defendant TransCor's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

## COUNT SIX AGAINST DEFENDANT CORECIVIC
### NEGLIGENCE UNDER NEW MEXICO LAW

189. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

190. Roxsana's aggressively developing illness while in the care of Defendant CoreCivic presented a serious medical need that was obvious to any layperson with whom she came into contact, including CoreCivic staff.

191. CoreCivic, which was charged with Roxsana's custody and care pursuant to its contracts with ICE, had a duty to ensure Roxsana was free from imminent risk of foreseeable harm, and to prevent her needless and wanton suffering in the absence of immediate medical attention.

192. CoreCivic owed Roxsana a special duty of care as Roxsana was in the company's physical

custody.

193.   Roxsana and her fellow asylum-seekers' repeated requests for medical help to CoreCivic employees evidenced the urgency of Roxsana's rapidly deteriorating health.

194.   CoreCivic breached its duty of care by making Roxsana sleep in the medical waiting wing until the onsite physician came to work the next day rather than provide her with immediate medical care on May 16, 2018, despite the fact that she was experiencing the early stages of multiple organ failure.

195.   Defendant CoreCivic further breached its duty of care to Roxsana by keeping her shackled throughout her hospitalization, delaying medical providers' provision of care, and causing her injuries to her wrists and ankles. CoreCivic employees even kept Roxsana shackled after she was sedated, unconscious and went into cardiac arrest on May 24, 2018.

196.   CoreCivic's unreasonable delay in providing Roxsana with medical care and its shackling her and consequent delaying her receipt of medical care, constituted intentional, reckless and negligent disregard for Roxsana's life and well-being.

197.   As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of CoreCivic's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health, and, ultimately, death.

198.   CoreCivic's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

199.   In the alternative, Defendant CoreCivic's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

## COUNT SEVEN AGAINST DEFENDANT MTC
### UNDER CAL. GOV. CODE § 845.6 FAILURE TO SUMMON MEDICAL CARE FOR PRISONERS

200. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

201. Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need. Her persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss, were visibly apparent from the time she was taken into CBP custody until her death, including to people who are not medically trained.

202. Employees of Defendant MTC, who were charged with Roxsana's custody and care, were acting within the scope of their employment when they transported her from California to SLRDC on May 14, 2018 and failed to summon medical care despite her alarming and visible symptoms. Because Roxsana's symptoms of cough, fatigue, weakness, vomiting, phlegm and fever were so severe her illness was obvious even to a lay person. Furthermore, Roxsana and the caravanners' repeated requests for medical help to employees of defendant's employees evidenced the urgency of Roxsana's health.

203. These repeated refusals to provide medical care to Roxsana constituted intentional, reckless and negligent disregard for Roxsana's life.

204. As a direct and proximate cause of the intentional, malicious, reckless, negligent and criminal acts and omissions of Defendants' employees, Roxsana experienced foreseeable severe physical and emotional pain and suffering and lost her chance to live in violation of California law.

205. Defendants' employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT EIGHT AGAINST DEFENDANT MTC
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER CALIFORNIA LAW

206. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

26

207.    Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need. Roxsana's illness was obvious even to a lay person, exhibiting symptoms of cough, fatigue, weakness, vomiting phlegm and fever. Furthermore, Roxsana and the caravanners' repeated requests for medical help to employees of defendant's employees evidenced the urgency of Roxsana's health.

208.    Defendant MTC, who was charged with Roxsana's custody and care pursuant to its contracts with ICE, had a duty to ensure Roxsana was free from imminent risks of serious harm. MTC owed Roxsana a special duty of care as she was in their custody. MTC also owed her a duty as common carrier pursuant to California's Civil Code section 2100.

209.    Defendant MTC breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana on May 14, 2018 by bus from California to SLRDC and who failed to provide her with immediate medical assistance despite her urgent symptoms of illness. Defendant MTC either failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE and negligently retained them, or MTC failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana. These employees not only failed to summon medical care, but they also cruelly refused to allow Roxsana to use the restroom during the journey and instructed the caravanners to urinate on themselves, exacerbating Roxsana's mental anguish and suffering. Further, these MTC employees failed to provide sufficient water and food to Roxsana during this transfer, exacerbating her weakness, illness and suffering.

210.    MTC knew or had reason to know that such acts and omissions were unlawful, and that employees who would ignore medical emergencies and instruct the people they transport to urinate on themselves, were unfit to safely perform their employment duties.  The fact the buses were already stained with urine prior to Roxsana's transport put MTC on notice that their employees may be abusing their authority, and by failing to take any action they ratified such cruel, inhumane behavior.

27

Not a single employee who transported Roxsana provided her with medical care or adequate food, water and restroom access.

211.   These repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendant's employees who were charged with Roxsana's custody and care was the actual and proximate cause of Roxsana's foreseeable and severe pain, suffering, rapidly declining health, and, ultimately, death.

212.   Defendant's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages. Upon information and belief, Defendant MTC has not disciplined nor taken any corrective action against these employees for these unlawful acts and omissions.

213.   In the alternative, Defendant, MTC's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

## COUNT NINE AGAINST DEFENDANT LASALLE
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER ARIZONA LAW

214.   Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

215.   Roxsana's aggressively developing illness while in the custody of Defendant LaSalle presented a serious medical need.  Roxsana's illness was obvious even to a lay person, exhibiting symptoms of cough, fatigue, weakness, vomiting, phlegm and fever.

216.  Defendant LaSalle who were charged with Roxsana's custody and care pursuant to their contracts with ICE, had a duty to ensure Roxsana was free from imminent risks of serious harm including. Employees of LaSalle were acting within the scope of their employment when on May 14, 2018, Roxsana was in their custody and they witnessed her lying on the floor coughing at SLRDC and frequently using the restroom they failed to provide immediate medical attention. Employees were

acting within the scope of their employment when, on May 15, 2018, they transported Roxsana to the airport and one employee threatened the caravanners saying words to the effect of: "behave because if you don't something bad is going to happen" and they refused to provide her with medical care despite multiple requests from Roxsana and other caravanners.

217.   Defendant LaSalle breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance despite her urgent symptoms of illness. Defendant LaSalle either failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE and negligently retained them, or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

218.   LaSalle knew or had reason to know that such acts and omissions were unlawful.  Not a single employee who witnessed Roxsana lying on the ground with fatigue at SLRDC or ignored her pleas for care when they transported her to the airport provided her with medical care.

219.   These repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendant's employees who were charged with Roxsana's custody and care was the actual and proximate cause of Roxsana's foreseeable and severe pain, suffering, rapidly declining health, and, ultimately, death.

220.   Upon information and belief, Defendant LaSalle has not disciplined nor taken any corrective action against these employees for these unlawful acts and omissions.

221.   Defendant's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

222.   In the alternative, Defendant LaSalle's employees' acts and omissions constitute negligence

per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

**COUNT TEN AGAINST DEFENDANT GPS**
**NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER ARIZONA LAW**

223.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

224.    Roxsana's aggressively developing illness while in the custody of CBP, ICE and Defendant GPS presented a serious medical need.  Roxsana's illness was obvious event to a lay person, exhibiting symptoms of cough, fatigue, weakness, vomiting, phlegm and fever.

225.    Employees of Defendant GPS, who were charged with Roxsana's custody and care pursuant to their contracts with ICE, had a duty to ensure Roxsana was free from imminent risks of serious harm when they transported her on May 16, 2018 from SPC to the ICE CAP facility in Albuquerque, New Mexico. GPS owed Roxsana a special duty of care because Roxsana was in their custody.

226.    Defendant GPS breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance despite her urgent symptoms of illness. Defendant GPS either failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE and negligently retained them, or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

227.    Defendant GPS breached its duty of care for failing to provide Roxsana with immediate medical care during that time despite Roxsana's and the caravanners' repeated requests for medical attention for her.

228.    GPS's employees also breached their duty of care by providing insufficient food and water—providing only an 8-ounce bottle of water for a journey that lasted almost six hours on a day that reached 97 degrees— and restroom access to restrooms, resulting in Roxsana's mental anguish,

30

Case 1:20-cv-00465-SCY-CG   Document 1   Filed 05/13/20   Page 31 of 39

pain and suffering and exacerbation of her illness.

229.    The GPS employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care and denied her sufficient food, water and restroom access as they were contracted to transport her.

230.    GPS knew or had reason to know that such acts and omissions were unlawful under ICE rules and Arizona law and that the employees who transported them were likely to cause harm to those they transported because GPS provided insufficient food and water for the trip and knew how many people they were responsible to transport.  Not a single employee who transported Roxsana provided medical care or adequate food, water and restroom access.

231.    These repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendant's employees who were charged with Roxsana's custody and care was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

232.    Upon information and belief, Defendant GPS has not disciplined nor taken any corrective action against these employees for these unlawful acts and omissions. GPS knew or had reason to know that such acts and omissions were unlawful.

233.    Defendant's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

234.    In the alternative, Defendant GPS's employees' acts and omissions constitute negligence per se because they violated the legally binding standards of care and statutory and constitutional rights to which Roxsana was entitled.

31

## COUNT ELEVEN AGAINST DEFENDANT TRANSCOR
### NEGLIGENT HIRING, RETENTION, TRAINING & SUPERVISION UNDER NEW MEXICO LAW

235.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

236.    Roxsana's aggressively developing illness while in the custody of Defendant TransCor presented a serious medical need.  Her persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss, were visibly apparent including to people who are not medically trained.

237.    Defendant TransCor, who was charged with Roxsana's custody and care pursuant to their contracts with ICE, had a duty to ensure Roxsana was free from imminent risks of foreseeable harm. TransCor owed Roxsana a special duty of care as Roxsana was in their custody pursuant to *Doe v. City of Albuquerque*, 96 N.M. 433, 438 (N.M. Ct. App. 1981). Roxsana's illness was obvious even to a lay person because her symptoms of cough, fatigue, weakness, phlegm and fever were so severe and persistent.

238.    Defendant TransCor breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance despite her urgent symptoms of illness. Defendant TransCor either failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE and negligently retained them, or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

239.    Defendant TransCor breached its duty of care to Roxsana when its employees transported her on May 16, 2018 from the ICE CAP facility in Albuquerque, New Mexico to Cibola and failed to provide her with medical care despite her visible illness and multiple requests for medical attention. Roxsana and the other caravanners arrived at the ICE CAP facility at approximately 2:30 p.m. and did not arrive at Cibola until 8:13 pm. During those almost six hours Roxsana was critically ill. Other caravanners reported it was unclear whether she was asleep or simply unconscious during the bus trip to the ICE CAP facility. When she arrived at Cibola other caravanners reported she was losing her

32

mental capacity because of her illness. Despite this, no TransCor employee sought medical help for Roxsana during the six hours she was in their custody and care.

240.    The TransCor employees were acting within the scope of their employment when they transported Roxsana and failed to provide Roxsana with immediate medical care.

241.    As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering and rapidly declining health, and, ultimately, death.

## COUNT TWELVE AGAINST DEFENDANT CORECIVIC
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER NEW MEXICO LAW

242.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

243.    Roxsana's aggressively developing illness while in the custody of CoreCivic presented a serious medical need.  Her persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss, were visibly apparent including to people who are not medically trained.

244.    Defendant CoreCivic, who was charged with Roxsana's custody and care pursuant to their contracts with ICE, had a duty to ensure Roxsana was free from imminent risks of foreseeable harm. CoreCivic owed Roxsana a special duty of care as Roxsana was in their custody pursuant to *Doe v. City of Albuquerque*, 96 N.M. 433, 438 (N.M. Ct. App. 1981). Roxsana's illness was obvious even to a lay person because her symptoms of cough, fatigue, weakness, phlegm and fever were so severe and persistent.

245.    Defendant CoreCivic breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance despite her urgent symptoms of illness. Defendant CoreCivic either failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE and negligently retained them, or failed to adequately train and supervise the employees who repeatedly

breached their duty of care to Roxsana.

246.    Defendant CoreCivic breached its duty of care to Roxsana when its employees made Roxsana sleep in the medical waiting wing until the onsite physician came to work the next day rather than provide her with immediate medical care on May 16, 2018, despite the fact that she was experiencing the early stages of multiple organ failure. Defendant CoreCivic further breached its duty of care to Roxsana by keeping her shackled throughout her hospitalization, delaying medical providers' provision of care, and causing her injuries to her wrists and ankles. CoreCivic employees even kept Roxsana shackled after she was sedated, unconscious and went into cardiac arrest on May 24, 2018.

247.    CoreCivic employees were acting within the scope of their employment when they detained Roxsana and failed to provide Roxsana with immediate medical care, and, when they kept Roxsana shackled throughout her hospitalization, delaying her receipt of medical care.

248.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering and rapidly declining health and death.

### COUNT THIRTEEN AGAINST DEFENDANT MTC
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER CALIFORNIA LAW

249.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

250.    Defendant MTC's employees outrageously denied Roxsana the basic necessities of food, water and restroom access for the entire bus ride from California until they reached SLRDC lasting from approximately 12:30 p.m. until 5:30 p.m. Roxsana, who was gravely ill and experiencing recurring vomiting and diarrhea, asked the officers wearing beige color uniforms to use the restroom and to remove the handcuffs in order to do so; MTC's employees refused and instructed the caravanners to urinate on themselves. The seats were stained and smelled like urine.

251.    The extreme and outrageous conduct by MTC employees constituted reckless disregard for

34

the severe emotional distress they caused Roxsana.

252.   When they arrived at SLRDC Roxsana used the restroom approximately every fifteen minutes. When she was not using the restroom she lay on the floor from fatigue, coughing.

253.   Caravanners requested medical care for Roxsana from the employees transporting them several times. The employees ignored their pleas and one responded "shut up!" None of the officers responsible for transporting them provided Roxsana with medical care.

254.   When Roxsana arrived at SLRDC several caravan members who had been separated at the border were reunited and many were shocked by Roxsana's ill appearance and how quickly her health had declined.

255.   As a direct and proximate cause of MTC's employees malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish. On multiple occasion Roxsana confided in other caravan members that she did not believe she would survive in CBP and ICE custody.

## COUNT FOURTEEN AGAINST DEFENDANT LASALLE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER ARIZONA LAW

256.   Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

257.   Defendant LaSalle's employees outrageously ignored Roxsana's dire health when they detained her at SLRDC on May 14 and 15, 2018. Not a single officer who witnessed Roxsana lying on the floor and coughing and using the restroom approximately every fifteen minutes to vomit sought out medical care for the several hours she was in their custody in blatant disregard for her life and the severe emotional distress it caused Roxsana.

258.   Defendant LaSalle's employees ignored Roxsana's pleas for medical care on May 15, 2018 when they transported her on a four-hour bus ride to the airport in Mesa Arizona, and one threatened the detainees they transported saying words to the effect of "Behave, because if you don't something bad is going to happen."

259.    LaSalle' employees' outrageous failure to seek medical care and threats were in conscious disregard of Roxsana's severe emotional distress and fear for her life. During this bus ride Roxsana pleaded for help to a person who sat with her, saying words to the effect of, "Help me! I don't know if I'm going to survive."

260.    As a direct and proximate cause of LaSalle's employees' malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.

## COUNT FIFTEEN AGAINST DEFENDANT GPS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

261.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

262.    Defendant GPS's employees, denied Roxsana food or water or restroom access for the entire bus ride from SPC at approximately 9:00am until they reached the ICE CAP facility in Albuquerque, New Mexico around 2:30 p.m. GPS' employees gave each person transported, including Roxsana an 8-ounce bottle of water and one sandwich to last the entire five-and-half hour journey on the bus without air conditioning on a day that reached 97 degrees Fahrenheit.. The caravanners were very thirsty and hungry. They repeatedly asked for water and food. The first two times the officers transporting them ignored them. The third time, an officer with grey hair said in Spanish: "ya callanse" which means "shut up." At some point during this trip Roxsana asked an officer for water, but the officer told her he did not speak Spanish. At one point the employees stopped at a fast food restaurant and ate on the bus in front of all of the hungry and thirsty caravanners.

263.    If the caravanners had to use the restroom, they had to plead with the GPS employees repeatedly who largely ignored their requests and occasionally escorted them to a toilet bowl without any water in it, at the back of the bus. There was no door, only a curtain separating it from the rest of the bus. There was no toilet paper and the employees refused to uncuff the caravanners to use it. When the bus would sway the waste in the toilet would spill and the whole bus stank of sewage.

264.    Roxsana sat by herself in the back. At another point the same officer asked why the caravanners left their country if they were sick, in reference to Roxsana's visible illness. She had a fever and lots of phlegm and carried tissue or toilet paper to blow her nose. Sometimes her sputum was bloody. Roxsana felt dizzy and extremely exhausted, and she was so despondent it was unclear whether she had fainted or she was sleeping.

265.    During this bus ride another caravanner requested medical attention for Roxsana from at least two different officers approximately five times. One officer did not understand the Spanish and the other officer did not respond to any of her requests.

266.    The extreme and outrageous conduct by GPS employees, namely failure to seek medical care, refusal to provide adequate food, water and restroom access, constituted a conscious or reckless disregard for the severe emotional distress they caused Roxsana.

267.    As a direct and proximate cause of GPS's employees' malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish. On multiple occasions Roxsana confided in other caravan members that she did not believe she would survive in CBP and ICE custody.

268.    When Roxsana finally arrived at Cibola County Correctional on May 16, 2018 she was experiencing multiple organ failure. The following morning when she was finally medically screened Roxsana weighed 89 pounds and was diagnosed with muscle wasting, severe dehydration, untreated HIV, fever and cough. The examining medical provider noted Roxsana's tremor, low blood pressure of 81/61, rough breathing sounds and increased amount of white phlegm (mucus excreted in abnormally large quantities). Roxsana died on May 25, 2018 and a doctor from Cibola General hospital told investigators that the actions taken by the time Roxsana arrived at Cibola County Correctional Center were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

## COUNT SIXTEEN AGAINST DEFENDANT CORECIVIC
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

269.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

270.    Defendant CoreCivic's employees, outrageously ignored Roxsana's dire health when they detained her at Cibola on May 16, making her spend the night in the waiting area of the medical wing when she was experiencing the early stages of multiple organ failure and losing her mental capacity rather than immediately provide her with emergent medical are. Furthermore, CoreCivic's employees cruelly kept Roxsana, who weighed 89 pounds, was extremely weak and emaciated, shackled in handcuffs throughout her hospitalization from May 17 through May 24th. They kept Roxsana handcuffed even after she was medically paralyzed and went into cardiac arrest on May 24, 2018 hours before her death. CoreCivic's officers who guarded her around the clock called "central" every time medical providers needed to remove her hand and ankle cuffs to administer medical care, delaying her receipt of care. This cruel treatment caused Roxsana deep tissue injuries on her wrists and extreme emotional and physical suffering and mental anguish in conscious or reckless disregard for the severe emotional distress it caused Roxsana.

271.    As a direct and proximate cause of LaSalle's employees malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.  Enter judgment in favor of Plaintiff and against all Defendants;

2.  Award Plaintiff damages in an amount to be determined at trial;

3.  Award Plaintiff reasonable attorneys' fees and costs; and

4.  Award Plaintiff such further relief as the Court deems just, equitable, and appropriate.

**JURY DEMAND**

Plaintiff hereby demands that the claims in this matter be tried before a jury.


Date: May 13, 2020          Respectfully submitted,


                                          /s/ DANIEL YOHALEM
                                          Daniel Yohalem
                                          Attorney at Law
                                          1121 Paseo de Peralta
                                          Santa Fe, New Mexico  87501
                                          Phone: 505-983-9433  Fax 505-989-4844

                                          Dale Melchert  *Pro Hac Vice Application Forthcoming*
                                          Lynly Egyes *Pro Hac Vice Application Forthcoming*
                                          Transgender Law Center
                                          P.O. Box 70976
                                          Oakland, CA 94612


                                          R. Andrew Free
                                          The Law Office of R. Andrew Free
                                          P.O. Box 90568 Nashville, TN 37209
                                          Tel: (844) 321-3221 Fax: (615) 829-8959