## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**Joleen K. Youngers**,
as the Personal Representative of the
Wrongful Death Estate of Roxsana
Hernandez,

Plaintiff,

                                                  Civil Action No. 20-cv-00465-SCY-JHR

v.

**Management & Training Corporation,
LaSalle Corrections Transport LLC,
LaSalle Corrections West LLC,
LaSalle Management Company LLC,
Global Precision Systems LLC,
TransCor America LLC,
CoreCivic, Inc.,**

Defendants.

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      This action involves the egregious and unconscionably negligent or willful failure of several private federal government contractors to safely care for Roxsana Hernandez ("Roxsana"), an HIV-positive transgender asylum-seeker, while transporting her from San Diego, California to Milan, New Mexico. Roxsana was seeking asylum in the United States after being brutally raped and targeted by gangs in her home country of Honduras.

2.      Despite Roxsana visibly exhibiting symptoms of distress associated with her serious medical condition throughout her four-state journey – including nausea, vomiting, fever, diarrhea, and severe fatigue – and the persistent entreaties by Roxsana and those with whom Roxsana travelled,

1

Defendant contractors charged with her custody failed or refused to render her the timely care and intervention she required.

3.     Employees of Defendants Management & Training Corporation ("MTC"), LaSalle Corrections West, LLC, LaSalle Corrections Transport, LLC, LaSalle Mangement Company, LLC, (collectively "LaSalle"), Global Precision Systems, LLC ("GPS"), TransCor America, LLC ("TransCor"), and CoreCivic, Inc. ("CoreCivic") (collectively, "Defendants") were acting within the scope of their employment throughout the time that Roxsana was in their respective custody and control.

4.     Defendants MTC, LaSalle, GPS, TransCor, and CoreCivic are each vicariously liable for the negligent per se, negligent, intentional, and reckless acts and omissions committed by their employees who were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her vulnerability while in their respective custody and control.

5.     Defendants allowed Roxsana to literally waste away: she weighed only 89 pounds upon arriving at CoreCivic's Cibola County Correctional Center in Milan, New Mexico ("Cibola").

6.     Defendants ignored the persistent demands for help and medical assistance by Roxsana and the transgender asylum-seekers with whom Roxsana travelled and denied her access to reasonable accommodations for her disability, adequate medical care, sufficient food, water, access to a restroom, and an opportunity to sleep.

7.     By doing so, Defendants violated Roxana's rights under Section 504 of the Rehabilitation Act.  They also violated their federal agency contracts, the agencies' own standards for care and transportation of detained immigrants, and the prevailing standards of care in California, Arizona, Texas, and New Mexico.

8.     Each Defendant failed to provide an adequate medical assessment of Roxsana before transporting her, and Defendants further failed to provide Roxsana with medication and adequate

food, water, adequate access to bathroom facilities, and medical care, despite her known HIV-positive status and rapidly deteriorating physical condition.

9.      It was foreseeable that Defendants' acts and omissions would increase the risk of Roxsana becoming ill, exacerbate her rapidly deteriorating medical condition, cause her extreme emotional distress, and reduce her chance of surviving.

10.     Because Defendants ignored the persistent pleas for help from Roxsana and for intervention by the transgender women with whom Roxsana travelled, she arrived at Cibola in septic shock, dehydrated, severely tachycardic, medically starving, febrile, and in the early stages of multiple organ failure.

11.     Simply put: Roxsana was in no condition to be transported or temporarily detained outside a medical facility.  Defendants acted unreasonably and are liable for the suffering and death they caused Roxsana as a result of choosing to transport her, failing to provide her with adequate medical assessments prior to transport, and denying her access to medication, adequate food, water, bathroom facilities, and medical care during transport despite her obvious, serious, and emergent medical needs.

12.     Defendants' discriminatory, negligent, and reckless acts and omissions caused Roxsana to suffer severe emotional and physical distress.

13.     Defendants' discriminatory, negligent, and reckless acts and omissions created an unreasonable risk that Roxsana's condition would deteriorate, especially in light of her known HIV-positive status.

14.     Defendants' discriminatory, negligent, and reckless acts and omissions caused Roxsana's condition to deteriorate, diminished the opportunity for Roxsana's condition to improve, caused her to lose her chance to survive, and, ultimately, caused her death.

**JURISDICTION AND VENUE**

15.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity) over the state law claims against Defendants because the amount in controversy exceeds $75,000, exclusive of costs, and no Defendant is a citizen of New Mexico; and under 28 U.S.C. § 1331 (federal question) as to the claims against all Defendants under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1392(b)(2) because a substantial part of the acts, events or omissions giving rise to the claims occurred within this judicial district.

**PARTIES**

17.    Plaintiff **Joleen K. Youngers** ("Youngers" or "Plaintiff") is an adult resident of the State of **New Mexico**.

18.    On January 15, 2019, the First Judicial District Court of New Mexico appointed Plaintiff the Personal Representative of the Wrongful Death Estate of Roxsana Hernandez pursuant to 1978 NMSA, § 41-2-3. *In the Matter of the Wrongful Death Action on Behalf of the Survivors of Roxsana Hernandez, Deceased,* No. D-101-CV-2019-00075.

19.    Plaintiff Youngers sues in her capacity as Personal Representative of Roxsana's Wrongful Death Estate for all damages arising from Roxsana's pre-death suffering and injuries and her wrongful death.

20.    Defendant **Management & Training Corporation** ("MTC") is a foreign, for-profit corporation originally incorporated in Delaware and maintaining its headquarters at 500 N. Marketplace Drive, Centerville, Utah 84014.

21.    At all times material to this Complaint, MTC contracted with the United States Immigration and Customs Enforcement ("ICE") to manage immigration detention facilities in Texas, New Mexico and California, including the Imperial Regional Detention Center in Calexico, California, and to operate the Otero Processing Center in Chaparral, New Mexico.

4

22.     Pursuant to its contracts with ICE, MTC employees and/or agents ("employees") transported Roxsana from Imperial Regional Detention Center to San Luis Regional Detention Center in Arizona ("SLRDC") on May 14, 2018, and thereby MTC was responsible for her custody and care during that time.

23.     MTC received federal funds for these services pursuant to its contracts with ICE.

24.     MTC maintains a registered agent within New Mexico to accept service of process.[1]

25.     **LaSalle Corrections West, LLC** is a corporation maintaining a corporate office located at 26228 Ranch Road 12 Dripping Springs, Texas 78620-4903 and, on information and belief, is a wholly owned subsidiary of LaSalle Management Company LLC. At all times material to this Complaint, LaSalle contracted with ICE to manage immigration detention facilities in Arizona, Texas and Georgia, including SLRDC located in San Luis, Arizona.

26.     Pursuant to its contracts with ICE, LaSalle Corrections West, LLC employees were charged with the custody and care of Roxsana while she was detained at SLRDC from May 14, 2018 to May 15, 2018.

27.     LaSalle Corrections West, LLC received federal funds for these services pursuant to its contracts with ICE.

28.     LaSalle Corrections West, LLC maintains a registered agent within New Mexico to accept service within the state.[2]

---

[1] Located at 10 McGregor Range Road, Chaparral, NM 88081 date of appointment 12/18/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

[2] Located at 206 S. Coronado Ave, Espanola, NM 87532 date of appointment 04/26/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

29.     LaSalle Corrections West LLC's website lists New Mexico as a state in which it maintains bed capacity for immigration detention.[3]

30.     Defendant **LaSalle Corrections Transport L.L.C.** is a corporation maintaining a corporate office located at 26228 Ranch Road 12 Dripping Springs, Texas 78620-4903 and, on information and belief, an affiliate of LaSalle Corrections, LLC.

31.     At all times material to this Complaint, LaSalle Corrections Transport LLC contracted with ICE to provide transportation services to detention facilities, including SLRDC located in San Luis, Arizona.

32.     Pursuant to its contracts with ICE, LaSalle Transport employees were charged with the custody and care of Roxsana while they transported her from SLRDC to the Mesa, Arizona airport on May 15, 2018.

33.     LaSalle Transport received federal funds for these services pursuant to its contracts with ICE.

34.     **LaSalle Management Company, LLC** is a corporation incorporated in Louisiana with a corporate office located at 810 Louisa ST Rayville, LA 71269 United States. Upon information and belief LaSalle Management Company LLC is the parent company of LaSalle Corrections West, LLC and LaSalle Corrections Transport, LLC and received contracts with ICE to run detention facilities and provide staffing and transportation to ICE detention facilities through its subsidiaries including Defendants LaSalle Corrections West, LLC and LaSalle Corrections Transport, LLC . Employees of Defendants LaSalle Corrections West, LLC, LaSalle Corrections Transport, LLC and LaSalle Management (collectively "LaSalle") were charged with the custody and care of Roxsana from May 14, 2018 to May 15, 2018 pursuant to their contracts with ICE.

---

[3] *See* http://www.lasallecorrections.com/our-locations-table/ (last visited May 12, 2020).

35.     Defendant **Global Precision Systems LLC** ("GPS") is a limited liability company organized in Alaska and is a wholly-owned subsidiary of Bering Straits Native Corporation ("BSNC"), an Alaska Native Regional Corporation, with a business address located at 3301 C Street, Suite 400, Anchorage, Alaska 99503.

36.     At all times material to this Complaint, GPS contracted with ICE to provide food and transportation services at El Paso Service Processing Center in El Paso, Texas ("El Paso SPC").

37.     Pursuant to its contracts with ICE, GPS employees were charged with transporting Roxsana from the El Paso SPC to Albuquerque, New Mexico on May 16, 2018, and thereby GPS was responsible for her custody and care during that time.

38.     GPS received federal funds for these services pursuant to its contracts with ICE.

39.     Defendant **TransCor America LLC** ("TransCor") is a limited liability company formed in Tennessee and a wholly owned subsidiary of Defendant CoreCivic.

40.     At all times material to this Complaint, TransCor contracted with CoreCivic to perform transportation services for CoreCivic in fulfillment of CoreCivic's contract with ICE to manage immigration detention centers across the United States, including Cibola in Milan, New Mexico.

41.     Pursuant to its contracts with ICE, TransCor was charged with transporting Roxsana from Albuquerque, New Mexico to Cibola on May 16, 2018, and thereby TransCor was responsible for her custody and care during that time.

42.     TransCor received federal funds for these services pursuant to its contracts with ICE.

43.     Defendant **CoreCivic, Inc.** ("CoreCivic") (formerly known as Corrections Corporation of America) is a corporation formed in Maryland maintaining its headquarters at 5501 Virginia Way, Brentwood, Tennessee 37027-7680.

44.     At all times material to this Complaint, CoreCivic contracted with ICE to manage immigration detention facilities across the United States, including Cibola.

45.     Pursuant to its contracts with ICE, CoreCivic employees were charged with custody of Roxsana while she was detained at Cibola from May 16, 2018 until she died at Lovelace Medical Center in Albuquerque, New Mexico on May 25, 2018, and thereby CoreCivic was responsible for her custody and care during that time.

46.     CoreCivic received federal funds for these services pursuant to its contracts with ICE.

## FACTS

### A.     ROXSANA'S CONDITION SHORTLY AFTER ARRIVAL IN THE UNITED STATES

47.     Shortly after Roxsana arrived at the San Ysidro Port-of-Entry, medical staff at the facility found Roxsana to be in weak physical condition and unfit for travel. The treating physician based this determination on Roxsana's medical history of untreated HIV and on her current symptoms of frequent productive cough, elevated temperature, emaciation, and elevated heart rate.

48.     The doctor ordered Roxsana be taken to the emergency room because her symptoms were consistent with various life threatening conditions. Treating medical staff at the emergency room confirmed Roxsana's diagnosis of untreated HIV and ordered that U.S. Customs and Border Protection ("CBP") and/or ICE medical providers supply her with medication to treat it. Despite Roxsana's weak physical condition and inadequate medical testing to determine the full nature and extent of her illness, CBP secured Roxsana's release from medical care and returned her to lockup. CBP transferred Roxsana to ICE custody without providing her with medication to treat her HIV.

49.     It was foreseeable that the failure to provide Roxsana with HIV medication, adequate food, water, bathroom access, and medical care would create an unreasonable risk that Roxsana would contract an additional illness or develop complications of her existing medical conditions and that her

8

physical condition would worsen and deteriorate, resulting in severe emotional and physical distress, a diminished chance of her health improving, a lost chance of survival, and, ultimately, her death.

**B.**      **The Federal Programs Underlying Roxsana's Detention and Transportation**

50.      At all times material to this Complaint, Roxsana was confined subject to the civil detention authority of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1001 *et seq.*

51.      Roxsana was never charged with nor imprisoned for any criminal offense between the time she arrived at the San Ysidro Port-of-Entry on May 9, 2018 and the time she was pronounced dead in Albuquerque, New Mexico on May 25, 2018.

52.      Roxsana's detention and transportation by agency components of the Department of Homeland Security ("DHS") and their private contractors occurred to facilitate the federal civil adjudication programs that would hear her claims for relief under the nation's asylum and torture protection laws.

53.      When she lawfully presented herself at the Port-of-Entry in San Ysidro, Roxsana told officers of DHS agency component CBP that she had experienced past persecution in the form of sexual harassment, rape, and physical abuse by MS-13 gang leaders in Honduras, and she feared persecution, torture, or death if forced to return there.

54.      Roxsana's statements to CBP officials triggered a federal legal obligation by DHS agency components CBP, ICE, and United States Citizenship and Immigration Services ("USCIS") to provide her with a Credible Fear Interview, or, at a minimum, a Reasonable Fear Interview, within ten days.  *See* 8 C.F.R. §§ 208.30, 208.31(b), *Alfaro Garcia v. Johnson*, No. 14-cv-01775-YGR, 2014 WL 6657591 (N.D. Cal. Nov. 21, 2014).[4]

---

[4] Because Roxsana had a prior order of removal from the United States, DHS and the Executive Office of Immigration Review ("EOIR") likely would have taken the position that she was ineligible for a Credible Fear Interview or asylum, and was only eligible for a Reasonable Fear Interview and relief in the form of withholding her removal under 8 U.S.C. § 1231(b)(3) or protection under the Convention Against Torture ("CAT").

55.     Within a short period after a DHS asylum officer made an initial determination of whether Roxsana's claims were likely to entitle her to legal protection under the INA, the Department of Justice ("DOJ") EOIR was required to provide Roxsana with a prompt hearing on the merits of her claim in the event the asylum officer found she stated a credible or reasonable fear of persecution or torture, or a prompt review by an EOIR Immigration Judge ("IJ") of any negative decision by an asylum officer.

56.     From May 14, 2018 through May 17, 2018, Defendants shuttled Roxsana and more than a dozen other transgender asylum-seekers on a multi-leg journey that stretched from San Ysidro, California to San Luis, Arizona to El Paso, Texas to Milan, New Mexico via ICE's "Streamlined Transfer Process" ("STP").[5]

57.     According to ICE, the STP is an "established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities"[6] and "requires coordination across several ERO field offices but results in efficient processing and transport of the large number of Aliens entering the U.S. at the San Ysidro POE."[7]

58.     The purpose of the detention facilitated by ICE's STP is to allow subjects' participation in federal adjudicative programs, including the fear-based interview process and EOIR adjudication of claims for fear-based protection from deportation.

59.     Each Defendant knew that it participated in a portion of the STP to transport Roxsana to her final destination in Milan, New Mexico.

---

[5] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT OFFICE OF PROFESSIONAL RESPONSIBILITY *Detainee Death Review of Jeffry [sic] HERNANDEZ (JICMS #201807481)* at 4 footnote 34.

[6] *Id.*

[7] *Id.*

60.     ICE ERO identified Cibola as the "appropriate" facility for Roxsana as part of the STP because of its dedicated transgender housing unit there.[8]

**C.     MTC Bus Ride from San Ysidro, California to San Luis, Arizona**

61.     On or about May 14, 2018, Roxsana left a CBP lockup in San Ysidro, California and entered the custody of ICE, which is the federal DHS agency component responsible for civil detention and administrative processing of asylum-seekers for deportation.

62.     The same day – May 14, 2018 – Defendant MTC took Roxsana and 12 other asylum-seekers (detainees) by bus from the San Ysidro Port-of-Entry lockup to Imperial Regional Detention Facility in Calexico, California, arriving at approximately 2:30 p.m. The drive took approximately two hours.

63.     About an hour later, at approximately 3:30 p.m., MTC employees loaded Roxsana and the other detainees back onto a bus and drove them to San Luis Regional Detention Center (SLRDC) in San Luis, Arizona, which is operated by Defendants LaSalle.

64.     They arrived at SLRDC at approximately 5:30 p.m. local time.

65.     Throughout her journey in MTC's care from San Ysidro to Calexico, while in Calexico, and during her journey from Calexico to San Luis, Arizona, Roxsana exhibited visible signs of deterioration requiring immediate medical intervention.

66.     MTC denied Roxsana and her fellow detainees food, water, and restroom access throughout their transfer.

---

[8] *But see* Mica Rosenberg & Ted Hasson, "Exclusive: Serious health care lapses found in U.S. detention center housing transgender migrants," Reuters (Mar. 2, 2020) ("Federal inspections of the U.S. government's only dedicated detention unit for transgender immigrants last year found hundreds of unanswered requests for medical attention, poor quarantine procedures and deficient treatment for mental illnesses and other chronic diseases, Reuters has learned. . . . The problems, [ ] led to the transfer of all detainees to other facilities in January[.]") *available at* https://tinyurl.com/ReutersCibola (last visited Jul. 28, 2020).

67.     At one point during the MTC transfer, Roxsana asked MTC employees to use the restroom and to remove her handcuffs in order to do so. The MTC employees denied both requests.

68.     Another person MTC transported alongside Roxsana advocated for MTC's employees to remove Roxsana's handcuffs so she could use the restroom, but MTC again denied the request.

69.     MTC officers responsible for transporting Roxsana and others instructed her and her fellow asylum-seekers that if they need to use the restroom while in transit, they should simply urinate on themselves.

70.     The seats on the bus that MTC used to transport Roxsana and her fellow asylum-seekers were stained and smelled like urine.

71.     Despite knowing of Roxsana's obvious, serious, and emergent medical needs during the entire time she was in MTC's custody, MTC failed to provide her with medical care or assistance to alleviate her suffering.

72.     MTC chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

**D.     Detention at LaSalle's San Luis Regional Detention Facility**

73.     When the MTC bus arrived at Defendants LaSalle's SLRDC in Arizona, LaSalle took responsibility for the well-being of Roxsana and the people travelling with her.

74.     At the SLRDC, several of Roxsana's fellow asylum-seekers, who had been separated earlier in their journey to the United States, found themselves reunited on the way to Cibola.

75.     One asylum-seeker who had last seen Roxsana in Tijuana a few days earlier was shocked by how much Roxsana's health and well-being had declined.

76.     This asylum-seeker described Roxsana's condition in San Luis as appearing very weak and pale, almost yellow in pallor, with dark circles under her eyes.

77.     During the few hours that Roxsana was at SLRDC, Roxsana used the bathroom several times to vomit or spit up phlegm.

78.     Roxsana was so weak from fever that she spent most of her time at SLRDC lying on the floor, coughing.

79.     During her time at SLRDC, Roxsana became so ill she could not eat and had to use the restroom approximately every fifteen minutes because she had such bad diarrhea.

80.     Roxsana told a fellow asylum-seeker that she felt like she was going to die.

81.     Despite knowing of and observing her obvious, serious, and emergent medical needs, LaSalle failed to provide Roxsana with medical care or assistance to alleviate her suffering while at SLRDC.

**E.      LaSalle Bus Ride from San Luis, Arizona to the Mesa, Arizona Airport**

82.     At or around midnight on May 15, 2018, officers from Defendants LaSalle loaded Roxsana and approximately 25 other transgender asylum-seekers bound for Cibola onto a bus and drove them to the Mesa, Arizona airport, arriving around 4:00 a.m. local time.

83.     Roxsana was very ill during the four-hour bus ride and pleaded for help to another asylum-seeker who sat with her, telling her that she didn't know if she was going to survive.

84.     During the bus ride, a LaSalle employee threatened Roxsana and her fellow asylum-seekers, saying words to the effect of, "Behave, because if you don't something bad is going to happen."

85.     During the bus ride another asylum-seeker specifically asked LaSalle employees for medical help for Roxsana in both English and Spanish. LaSalle's employees ignored her.

86.     When they arrived at the airport, one of the other asylum-seekers being transported by LaSalle Transport alongside Roxsana told a LaSalle employee with beige pants and long red hair that Roxsana was very sick and needed immediate medical attention. This LaSalle employee refused to respond to her.  During her approximately five-hour stay in the Mesa airport, Roxsana remained in LaSalle's custody and LaSalle failed to provide Roxsana with any medical care or any assistance to alleviate her obvious, severe suffering.

87.     Despite LaSalle's knowledge of Roxsana's obvious, serious, and emergent medical needs, during the entire time Roxsana was in LaSalle's custody and control, LaSalle did not provide her with medical care or assistance to alleviate her suffering.

88.     LaSalle chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

89.     The flight arrived at approximately 2:48 p.m., local time in El Paso, Texas. ICE officers and/or those contracted by ICE took Roxsana and the rest of the passengers by bus to the ICE El Paso Service Processing Center ("El Paso SPC"), arriving around 3:15 p.m. local time.

90.     Roxsana remained at the El Paso SPC during the morning of May 16, 2018. At approximately 5:00 a.m., Roxsana and her fellow asylum-seekers were awakened by ICE officers or their contract staff and told to eat breakfast.

91.     Roxsana attempted to eat the meal provided, but ended up vomiting and then going back to sleep.

92.     By this time, Roxsana appeared gravely ill to all around her.

F.   **GPS Bus Ride from El Paso, Texas to Albuquerque, New Mexico**

93.   On May 16, 2018 at around 9:00 a.m. local time, officers from Defendant GPS loaded Roxsana and approximately 29 other detained immigrants onto a GPS bus for transport from El Paso to Albuquerque, New Mexico.

94.   That day the temperature reached 97 degrees before noon in El Paso.

95.   Each person was provided an 8-ounce bottle of water and a sandwich to last the entire five-and-half hour journey.

96.   Roxsana sat by herself in the back of the bus.

97.   The detained passengers of GPS's bus became very thirsty and hungry and repeatedly asked GPS employees for water.

98.   The first two times the detainees asked for water GPS's employees ignored them.

99.   The third time, a GPS employee with grey hair said in Spanish: "ya callanse" which means "shut up." At one point, the GPS employees stopped at a fast food restaurant, obtained food for themselves, and then ate their food on the bus in front of the hungry and thirsty detainees they transported.

100.   If any of the people GPS transported needed to use the restroom, they had to plead with GPS's employees to allow them to do so.  GPS employees frequently ignored these requests and only occasionally escorted them to a toilet bowl in the back of the bus that was covered only by a curtain.  There was no toilet paper. The GPS employees would not remove detainees' handcuffs to use the toilet.  When the bus swayed, the waste in the toilet would spill out of the bowl so that the whole bus reeked of urine and feces.

101.   During this trip, Roxsana asked a GPS employee for water, but the employee told her he did not speak Spanish.

102.     At another point, the same GPS employee asked why Roxsana and others on the bus left their country if they were sick, in reference to Roxsana's visible illness.

103.     During this trip, Roxsana had a fever and produced a significant amount of phlegm.

104.     Roxsana carried some tissue or toilet paper to blow her nose. Sometimes her sputum was bloody.

105.     Roxsana felt dizzy and extremely exhausted, and her stomach hurt badly.

106.     During this bus ride, another detained passenger asked at least two different GPS employees for medical assistance for Roxsana approximately five times.

107.     One GPS employee claimed they did not understand Spanish; and the other employees did not respond to any of these requests for medical assistance for Roxsana.

108.     At approximately 2:30 p.m. local time, the bus arrived at an ICE Criminal Alien Program ("CAP") facility in Albuquerque, New Mexico, where employees from various detention facilities assumed custody for those GPS transported, including Roxsana.

109.     Despite GPS's knowledge of Roxsana's obvious, serious, and emergent medical needs during the entire time Roxsana was in GPS's custody and control, GPS did not provide her with medical care or assistance to alleviate her suffering.

110.     GPS chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

**G.     TransCor Trip from Albuquerque to Cibola**

111.     Defendant TransCor's employees took Roxsana and 28 other transgender asylum-seekers by bus from the ICE CAP facility in Albuquerque to Defendant CoreCivic's Cibola County detention center, arriving around 8:13 p.m. local time on May 16, 2018.

112.    Throughout this trip, Roxsana continued to be visibly and gravely ill and suffering.

113.    Roxsana remained unable to eat.

114.    Roxsana required immediate medical assistance that TransCor employees failed to provide.

115.    From approximately 8:13 p.m until no later than 1:15 a.m., Roxsana awaited booking while in TransCor's custody and care at Cibola.

116.    Despite TransCor's knowledge of Roxsana's obvious, serious, and emergent medical needs during the entire time Roxsana was in TransCor's custody and control, TransCor did not provide her with medical care or assistance to alleviate her suffering.

117.    TransCor chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

**H.    Detention by CoreCivic at Cibola**

118.    On or around May 17, 2018, at approximately 1:15 a.m., employees from Defendant CoreCivic, the company that contracted with Cibola County, New Mexico to run the Cibola facility for ICE, booked Roxsana into the facility.

119.    At approximately 2:23 a.m., CoreCivic employees took Roxsana and others to a medical waiting room to spend the night.

120.    Roxsana lay on the floor, only getting up to use the restroom or drink a beverage officers brought around 4:00 a.m.

121.    Roxsana was so weak and ill that she became delirious.

122.    It became apparent to those around her that she was beginning to lose her mental capacity.

123.     Nevertheless, CoreCivic employees and contractors in the medical unit failed to promptly render her medical care from 2:23 a.m. to 7:25 a.m.

124.     At approximately 7:25 a.m., CoreCivic employees finally presented Roxsana to an onsite medical provider who conducted an intake screening.

125.     Roxsana received electrolytes and Ensure at approximately 8:08 a.m.. CoreCivic then returned her to a holding cell, where she rested on the floor, unable to sit up.

126.     At approximately 8:58 a.m., another medical staff person entered the waiting area used as a holding cell and assisted Roxsana to her feet.

127.     At approximately 9:00 a.m., CoreCivic's medical providers documented that Roxsana was running a 102-degree fever.

128.     CoreCivic employees transferred Roxsana to a medical isolation room while she waited for treatment because they suspected she had tuberculosis.

129.     Around 10:00 a.m., an onsite medical provider examined Roxsana.

130.     She weighed 89 pounds at the time of her exam.

131.     The CoreCivic-contracted medical provider diagnosed Roxsana with dehydration, starvation, extreme weight loss, muscle wasting, untreated HIV, fever and cough.

132.     The CoreCivic-contracted medical provider noted Roxsana's physical tremor, low blood pressure of 81/61, rough breathing sounds, and increased white phlegm mucus excreted in abnormally large quantities.

133.     The CoreCivic-contracted medical provider ordered Roxsana's immediate transport to the Cibola General Hospital Emergency Room to determine whether she was suffering from pneumonia or some other infection and to provide her with intravenous fluids.

134.     At approximately 11:08 a.m., CoreCivic employees transported Roxsana in a wheelchair to an ambulance.

18

135.    She arrived at Cibola General Hospital around 11:44 a.m.

**I.      Roxsana Succumbs to Illness After Nearly a Week in the Hospital**

136.    Based on physical examination findings by providers at Cibola General Hospital, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock (a life-threatening condition), dehydration, HIV infection, nodular pulmonary disease, lymphadenopathy, anemia, and thrombocytopenia.

137.    At approximately 6:25 p.m., Cibola General Hospital requested transfer of Roxsana to Lovelace Medical Center in Albuquerque, New Mexico because Roxsana required a higher level of care than Cibola General could provide.

138.    Three hours later, at approximately 9:38 p.m., Roxsana was airlifted by helicopter ambulance to Lovelace Medical Center because ground transport would take significantly longer and medical staff deemed it essential to provide Roxsana immediate medical care because of her low blood pressure, low bodyweight, and septic shock diagnosis.

139.    Within ten hours of first being seen on an emergency basis at Cibola General Hospital for the symptoms she suffered while Defendants transported her across four states, Roxsana was airlifted to a trauma center for emergency medical treatment for her life-threatening illnesses.

140.    Seven days later she was pronounced dead at 3:32 a.m. on May 25, 2018.

141.    After she died, Roxsana was diagnosed with Multi-Centric Castleman's Disease, an aggressive disease that affects the lymph nodes and related tissues, but is treatable with a variety of therapies including anti-viral medication, chemotherapy and immunotherapy.

142.    When Roxsana died on May 25, 2018, a doctor from Cibola General Hospital told investigators that the actions taken by the time Roxsana arrived at Cibola were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

143.    Roxsana spent her final days of life chained to the Lovelace Hospital bed by CoreCivic guards.

144.    Throughout her hospitalization, CoreCivic employees kept Roxsana shackled to her hospital at her wrists and both ankles bed except when medical personnel needed them to be removed for certain medical procedures.

145.    At least one armed CoreCivic employee guarded Roxsana at all times and checked at least every 20 minutes to be sure her restraints were secured.

146.    Each time medical staff needed CoreCivic employees to remove Roxsana's restraints, the CoreCivic employee on duty made a call to "central" to receive approval to remove them, delaying Roxsana's medical care.

147.    CoreCivic employees kept Roxsana shackled even after her treating medical providers medically paralyzed her and even when she first went into cardiac arrest.

148.    A preliminary autopsy report showed extensive regions of deep soft tissue and musculature hemorrhage on the wrists, not externally visible, which are typical of handcuff injuries.

149.    Despite CoreCivic's knowledge of Roxsana's obvious, serious, and emergent medical needs, CoreCivic delayed for over 10 hours providing Roxsana with medical care she desperately needed and sufficient assistance to alleviate her suffering.

150.    Despite the absence of any legitimate security justification, CoreCivic unnecessarily condemned Roxsana to spend her last waking hours of life on this earth in chains.

151.    CoreCivic employees used unreasonable force on Roxsana by maintaining her in shackles when she was not a threat to officers or a flight risk, and repeatedly delayed her medical treatment at the hospital while obtaining permission from superiors for her shackles to be removed.

J.      **Applicable Duties and Standards of Care**

152.    According to the applicable Performance Based National Detention Standards: "As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions."[9] Furthermore, these standards require that: "Detainees shall receive continuity of care from the time of admission to time of transfer, release or removal.  Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based providers as medically-appropriate."[10]

153.    Had Roxsana received the proper health care screening within 12 hours of entering custody as required by ICE policy, the controlling regulations and licensing standards, the terms of Defendants' contracts and Defendants' duty of care, she, more likely than not, would have had a greater chance of survival. Defendants are jointly and severally liable for her death and for the pre-death pain and suffering they caused Roxsana. In the alternative, Defendants are each liable for their negligent and reckless acts and omissions, and those of their respective employees, which increased the risk that Roxsana's condition would deteriorate and diminished her chance of survival.

154.    The Performance Based National Detention Standards and ICE Air Operations Handbook require that detainees be assessed for their medical fitness for travel before being transported, that each detainee be transported with at least 7 days' worth of all prescribed medications (30 days' worth of HIV medication), and that detainees be given adequate food and water and access

---

[9] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011* at 4.3 https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf (last visited May 13, 2020).

[10] *Id.*

to medical care, including prescribed medications and medical treatment for acute and emergent medical conditions.

155.   The Performance Based National Detention Standards further provide:

If a detainee becomes ill while in transit, the assigned transportation staff shall take appropriate action and alert the receiving office in order to prepare to handle the situation. If a detainee becomes ill while in transit and the illness requires immediate medical treatment (e.g., in the event of a heart attack), assigned transportation staff shall request assistance from the nearest medical facility, local law enforcement agencies and emergency services. The transportation staff shall initiate life-saving procedures as time-appropriate, proceeding if security permits. The closest ICE/ERO office shall prepare procurement paperwork and make arrangements for hospitalization, security, etc.[11]

156.   This Standard also requires that officers adhere to the regular detention nutrition standards and provide meals on trips longer than 6 hours.[12] Further, "Officers shall consider when the detainees last ate before serving meals and snacks. Special considerations shall be given to […] detainees who have medical conditions."[13] This standard mandates that "[t]he crew shall maintain a constant supply of drinking water and ice in the water container(s), along with paper cups."[14] They further require that all staff transporting people in ICE custody maintain the "utmost professionalism" and the sanitation of the vehicle.[15]

157.   IHSC directives also required that Roxsana receive a medical assessment prior to travel, medication and appropriate treatment, continuity of care, and a medical escort for her travel, all of which Defendants failed to provide. Moreover, IHSC Directive re Special Needs Patients requires that people transferred with HIV, such as Roxsana, receive a suitability assessment for transfer

---

[11] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards 1-3 Transportation By Land*, at 46 (2011), https://www.ice.gov/doclib/detention-standards/2011/1-3.pdf.

[12] *Id.* at 43.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 44.

based upon their medical record, receipt of a 30-day supply of HIV medication, and scheduled appropriate follow-up medical appointments.[16] This Directive also requires that when staff identify a person to be transferred who has a special need, such as HIV, that the staff person notify ICE. Defendants, who were subject to this directive as contracted "custody officers,"[17] failed to provide Roxsana with any of these safety measures prior to transporting her.

158.    IHSC Directive re Care of Chronic Conditions outlines the requirements of ICE and ICE-contracted facilities to care for people in their custody living with chronic conditions.[18] This Directive requires that health staff refer detainees with chronic health conditions to an appropriate medical provider and for the medical provider to enroll the detainee in a chronic care program to "decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function"[19] and to "assure stability."[20]

159.    IHSC Directive 03-32 / ERO Directive No. 11853.33 outlines the obligations of ICE and ICE contractors to identify and respond to significant detainee illnesses.[21] This Directive requires staff to place any qualifying people in their custody on the Significant Detainee Illness ("SDI") list and immediately bring any emergent conditions to the attention of appropriate medical providers.[22] Qualifying conditions to be placed on the SDI list include but are not limited to people diagnosed with life threatening conditions including sepsis and severe complications from AIDS.[23]

---

[16] IHSC Directive 03/11 / ERO Directive NO 11742.2 re Special Needs Patients 4.5.

[17] *Id.* at ¶7.

[18] IHSC Directive 03-03, ERO Directive Number 11737.3

[19] *Id.* at ¶4

[20] *Id.* at 4-3.

[21] IHSC Directive 03-32 / ERO Directive No. 11853.33 – Significant Detainee Illness.

[22] *Id.* at ¶4.

[23] *Id.* at ¶ 4-3(a),(g).

160.     ICE Policy 11022.1 requires that the complete medical record, medical summary and at least 7 days of medication accompany any person transferred within ICE custody. [24]

161.     Section 5-11 provides: "[t]he transporting officer may not transport a detainee without the Medical Transfer Summary. The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary."[25]

162.     At all relevant times, Defendants were also subject to the DHS Directive for Rehabilitation Act compliance and the Rehabilitation Act's non-discrimination provision under Section 504.[26]

163.     Defendants had a duty under the applicable Performance Based National Detention Standards, the regulations and licensing standards, IHSC Directives, the DHS Directive on compliance with Section 504 of the Rehabilitation Act, and the terms of their contracts with ICE to meet these standards.

164.     Because Roxsana was in Defendants' complete custody and control at all times and did not have the authority or the ability to provide for her own basic needs, including food, water, restroom access, medication, or access to medical care, Defendants had a heightened duty to provide these necessities to Roxsana and to prevent unreasonable risk of harm to her.

165.     Each Defendant acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and

---

[24] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *ICE Policy 11022.1, 10-11*, (Jan. 4, 2012).

[25] *Id.*

[26] DEPARTMENT OF HOMELAND SECURITY, *Instruction On Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment),* https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited May 13, 2020).

access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

166.    Defendants' discriminatory, negligent and reckless acts and omissions increased the risk that Roxsana would contract additional illnesses or develop complications of her existing medical conditions, particularly in light of her known HIV-positive status, and caused her condition to deteriorate, diminishing her chance of improved health and causing her to lose her chance to survive.

167.    Even in the absence of these federally imposed standards, each Defendant had a non-discretionary and non-delegable duty under the laws of each state to render emergency medical aid for a person in their care, regardless whether it was for transportation or detention.[27]

## CLAIMS FOR RELIEF

### COUNT ONE AGAINST ALL DEFENDANTS
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

168.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

169.    Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in: (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the U.S. Postal Service. 29 U.S.C. § 794.

170.    Under Section 504, "[n]o qualified individual with a disability in the United States shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department [of Homeland Security.]" 6 C.F.R. § 15.30(a); *accord* 28 C.F.R. § 39.130 (covering EOIR); *see also* 29 U.S.C. § 794.

---

[27] Cal. Civ. Code § 2100 (West); N.M. Stat. Ann. § 55-7-309 (West); Tex. Transp. Code Ann. § 5.001 (West).

171.     Section 504 not only forbids facial discrimination against individuals with disabilities, but also requires executive agencies such as DHS to ensure that its agency components and their contractors alter their policies and practices to ensure individuals with disabilities do not suffer discrimination as a result of their disability. *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 n.17 (1987); *Alexander v. Choate*, 469 U.S. 287, 300 (1985); *see also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

172.     Section 504 requires DHS and Defendants to make reasonable accommodations (modifications) to their programs, services, or activities unless such accommodations would constitute a fundamental alteration or undue hardship.

173.     Section 504 imposes an affirmative obligation on DHS and Defendants to ensure their programs and services are accessible to people with disabilities, including by providing reasonable accommodations.

174.     The requirements of Section 504 apply to the immigration benefits and proceedings that noncitizens may seek under the INA

175.     As a DHS agency component and according to a DHS agency self-assessment for Rehabilitation Act compliance, ICE's contracted activities and those of its contractors are subject to the Rehabilitation Act's non-discrimination provision under Section 504.[28]   *See also* Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities

---

[28] DEPARTMENT OF HOMELAND SECURITY, *Instruction On Nondiscrimination For Individuals With Disabilities In DHS-Conducted        Programs        And        Activities        (Non-Employment),* https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited May 13, 2020).

(Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements.").

176.    Roxsana was an individual with a disability: Human Immunodeficiency Virus ("HIV"). *See* 29 U.S.C. § 705(9)(B); 28 C.F.R. § 35.108(d)(2)(iii)(J) and the severe medical complications of HIV. Defendants knew she was disabled or recklessly disregarded her disability.

177.    Roxsana was entitled to the benefit of a fair and safe fear-based interview process through USCIS and an adjudicative proceeding to either pursue her claims for relief as substantiated by an asylum officer or obtain IJ review of a negative determination. She was also entitled to the benefit of safe transportation and detention through participation in ICE's STP, which was created to facilitate access to these immigration interview and adjudicative programs.

178.    ICE contracted with all Defendants for secure transportation and/or detention of Roxsana as part of the STP to facilitate access to the USCIS fear-based interview program and the EOIR adjudicative program required by law.

179.    All Defendants operated detention transportation programs that transported Roxsana or detention centers that housed her for ICE, and all received federal funds for doing so.

180.    Defendants each discriminated against Roxsana because of her disability by failing to make reasonable accommodations for her disability.

181.    Defendants failed to ensure their transportation and detention staff had adequate training to respond to and care for the needs of people living with HIV.

182.    Defendants knew or should have known that their staff needed more or different training because of multiple prior incidents where people within their custody had died or were severely injured because of their employees' failure to provide them timely and adequate medical care.[29]

---

[29] *See for e.g.,* IMMIGRATION CUSTOMS ENFORCEMENT, Detainee Death Review – Rafael Barcenas Padilla.

183.     On repeated occasions, employees or agents of each Defendant refused requests from Roxsana and her fellow detained asylum-seekers to provide Roxsana the medical assistance and other disability accommodations she sought and obviously needed, evincing deliberate indifference to her serious and evident medical and other survival needs.

184.     Defendants failed to make reasonable accommodations in the form of medical care or specialized transport in violation of the Rehabilitation Act.

185.     Because of her disability, Defendants denied Roxsana the transportation, detention, and fear-based determination and review services for which she was otherwise qualified.

JICMS#201605426, https://www.ice.gov/doclib/foia/reports/ddr-Barcenas.pdf (last visited July 31, 2020) (reporting the death of a man detained at Otero Processing Center, run by defendant, MTC, from bronchopneumonia after he requested medical attention on multiple occasions to beginning on March 7th, 2016 and MTC employees failed to order necessary medication and equipment); HUMAN RIGHTS WATCH, Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention, (June 20, 2018),     https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration#_ftn222 (last visited July 31, 2020) (reporting the death of a Igor Zyazin who died on May 1, 2016 at Otay Mesa detention center, run by defendant,  CoreCivic, after being held at San Luis Regional Detention Center run by defendant, LaSalle, where employees at both facilities failed to provide him with medical care despite his documented heart condition and repeated complaints of chest pains and feeling ill.); *Estate of Cruz-Sanchez by & through Rivera v. United States*, No. 17-CV-569-AJB-NLS, 2019 WL 4508571, at *6 (S.D. Cal. Sept. 17, 2019), reconsideration denied, No. 17-CV-569-AJB-NLS, 2020 WL 3868495 (S.D. Cal. July 9, 2020) (denying defendants motion for summary judgment of surviving wife's wrongful death claim for the death of her former husband, Gerardo Cruz-Sanchez, who died at Otay Mesa Detention Center March 1, 2016, from pneumonia after staff failed to provide him with medical care despite his inability to eat for a week and vomiting blood and repeated requests for medical attention. The Southern District Court of California found that CoreCivic had a duty to provide medical care to those in its custody and found that a material issue of fact existed as to whether CoreCivic's employee had received training to respond to medical emergencies because he admitted he could not remember); THE AMERICAN CIVIL LIBERTIES UNION, *Fatal Neglect: How ICE Ignores Deaths in Detention*, (February 2016), https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf (last visited July 31, 2020) (reporting the death of Mauro Rivera, a man living with HIV, while in custody at El Paso Processing Center, where defendant, GPS maintains a contract with ICE to staff the facility. Mr. Rivera died from disseminated cryptococcosis, an infection associated with immune-suppressed individuals, following staff's inadequate medical screenings of Mr. Rivera, failure to transfer Mr. Rivera's critical medical information, and their failure to timely address Mr. Rivera's emergent medical needs.); *Curtis v. TransCor Am., LLC*, 877 F. Supp. 2d 578, 579 (N.D. Ill. 2012)(the wrongful death lawsuit for the death of Joseph Curtis who died in June 2009 from heat stroke after defendant, TransCor transported him in 95 degree weather without air conditioning); *Kinslow v. Transcor Am., LLC*, No. CIV A 06 C 4023, 2006 WL 3486866, at *1 (N.D. Ill. Dec. 1, 2006), aff'd sub nom. *Kinslow v. Pullara*, 538 F.3d 687 (7th Cir. 2008) (dismissed *pro se* complaint of Jimmy Kinslow for failing to properly plead section 1983 claim, who sued defendant, TransCor, for rendering his Hepatitis C treatment ineffective after its employees failed to provide him with medical attention during his transportation over 6 days causing him severe pain and deterioration of his condition.)

186.     As a result of Defendants' violations of the Rehabilitation Act, Plaintiff is entitled to compensatory and punitive damages.

## COUNT TWO AGAINST ALL DEFENDANTS
### NEGLIGENCE PER SE

187.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

188.     Pursuant to their contracts with ICE, all six Defendants were responsible for Roxsana's custody, control and care and had a duty to ensure Roxsana was free from unreasonable risk of harm.

189.     Each Defendant owed Roxsana a heightened duty of care to protect her from foreseeable harm because of the special relationship created when Roxsana was placed in each Defendant's physical custody and control.

190.     Each Defendant was required by IHSC Directives, Performance Based National Detention Standards, the applicable regulations and licensing requirements, and the terms of its contract(s) with ICE to assess Roxsana's medical fitness for travel before she was transported.

191.     The IHSC Directive pertaining to the treatment of Special Needs Patients requires that people who are in custody, such as Roxsana, receive an assessment of their medical suitability for transfer prior to being transported based upon their medical record. And, for those living with HIV, that they receive a 30-day supply of HIV medication and scheduled appropriate follow up medical appointments.[30] This Directive also requires that when staff identify a person to be transferred who has a special need that the staff person notify ICE. Defendants, who were subject to this directive as

---

[30] ICE HEALTH SERVICES CORPS, *IHSC Directive 03/11 / ERO Directive NO 11742.2 re Special Needs Patients,* ¶4-5 at 5 (March 24, 2016).

contracted "custody officers,"[31] failed to provide Roxsana with any of these safety measures prior to transporting her.

192.    Roxsana was within the class of persons intended to be protected by this directive. The stated purpose of the directive is to "set forth the policies and procedures for determining and providing care for U.S. Immigration and Customs Enforcement (ICE) detainees determined to have special needs who are housed in ICE-owned or contracted detention facilities."[32] The Directive's definition of a "Special Need" includes a detainee that is "chronically ill" or "acutely ill".[33] Roxsana was a person in ICE detention living with the chronic illness of HIV. Additionally, she was accutely ill at the time she was transported by defendants. It was foreseeable that Roxsana's health would sharply deteriorate as a result of Defendants' failure to alert requisite personnel of her special needs or provide her with a suitability assessment, HIV medication, and appropriate medical appointments to ensure continuity of care.

193.    The IHSC Directive pertaining to Care of Chronic Conditions outlines the requirements of ICE and ICE contracted facilities to care for people in their custody living with chronic conditions.[34] It requires that health staff refer detainees with chronic health conditions to an appropriate medical provider and the medical provider to enroll the detainee in a chronic care program to "decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function"[35] and to "assure stability,".[36] HIV is defined as a chronic condition for

---

[31] *Id.*, at ¶7 p. 6.

[32] *Id.* at ¶1 p. 1.

[33] *Id.* at ¶4-1 p. 1.

[34] ICE HEALTH SERVICES CORPS, *IHSC Directive 03-03, ERO Directive Number 11737.3,* (March 25, 2016).

[35] *Id.* at ¶4 p.1-2,

[36] *Id.* at 4-3, p. 2.

purposes of this directive.[37] Roxsana was a person living with a chronic condition and Defendants failed to provide Roxsana with an appropriate medical provider.

194.      Roxsana was within the class of persons that this directive was intended to protect as she was a person living with HIV, and it is foreseeable that defendants' failure to provide her with appropriate care to treat her HIV would result in the deterioration of her health.

195.      The IHSC Directive 03-32 / ERO Directive No. 11853.33 – Significant Detainee Illness outlines the obligations of ICE and ICE contractors to identify and respond to significant detainee illnesses.[38] This Directive requires that staff place any person within their custody identified as living with a significant illness on the Significant Detainee Illness ("SDI") list, and immediately bring any emergent conditions to the attention of appropriate medical providers.[39] Qualifying conditions to be placed on the SDI list include but not are not limited to people diagnosed with life threatening conditions including sepsis and severe complications from AIDS.[40] Roxsana was a person with a significant illness because prior to her transport, she was diagnosed with sepsis. Upon her hospitalization Roxsana was diagnosed with AIDS. Her medical records reveal she was living with co-infections including Multi-Centric Castleman's disease and early signs of Kaposi sarcoma. Defendants failed to notify any required personnel or provide her with immediate medical attention despite her rapidly deteriorating health.

196.      The Performance Based National Detention Standards provide:

> If a detainee becomes ill while in transit, the assigned transportation staff shall take appropriate action and alert the receiving office in order to prepare to handle the situation. If a detainee becomes ill while in transit and the illness requires immediate medical treatment (e.g., in the event of a heart attack), assigned transportation staff

---

[37] *Id.* at ¶4-2, p. 2.

[38] ICE HEALTH SERVICES CORPS, *IHSC Directive 03-32 / ERO Directive No. 11853.33 – Significant Detainee Illness*, (Dec. 1, 2015).

[39] *Id.* at ¶4 p. 1-2.

[40] *Id.* at ¶ 4-3(a),(g).

shall request assistance from the nearest medical facility, local law enforcement agencies and emergency services. The transportation staff shall initiate life-saving procedures as time- appropriate, proceeding if security permits. The closest ICE/ERO office shall prepare procurement paperwork and make arrangements for hospitalization, security, etc.[41]

197.    This Standard also requires that officers adhere to the regular detention nutrition standards and provide meals on trips longer than 6 hours.[42] Further, "Officers shall consider when the detainees last ate before serving meals and snacks. Special considerations shall be given to […] detainees who have medical conditions."[43] This standard mandates that "[t]he crew shall maintain a constant supply of drinking water and ice in the water container(s), along with paper cups."[44] They further require that all staff transporting people in ICE custody maintain the "utmost professionalism" and the sanitation fo the vehicle.[45]

198.    Roxsana was within the class of people this standard was intended to protect because its stated purpose is "to prevent harm to […] detainees […] by ensuring that […] detainees are transported in a secure, safe and humane manner, under the supervision of trained and experienced staff."[46]

199.    ICE Policy 11022.1 requires that the complete medical record, medical summary and at least 7 days of medication accompany any person transferred within ICE custody.[47]

---

[41] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards 1-3 Transportation By Land*, at 46 (2011), https://www.ice.gov/doclib/detention-standards/2011/1-3.pdf

[42] *Id.* at 43.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 44.

[46] *Id.* at ¶1 p. 36.

[47] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *ICE Policy 11022.1, 10-11*, (Jan. 4, 2012).

200.    Section 5-11 provides: "[t]he transporting officer may not transport a detainee without the Medical Transfer Summary. The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary."[48]

201.    Defendants did not have any of the required documentation or medication required by this policy and nevertheless, each transported her in violation of this unequivocal policy.

202.    The Performance Based National Detention Standards also provide: "Detainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment."[49]    These binding, non-discretionary standards also require the timely provision of medication, prompt response to medical emergencies and timely follow up on requests for medical attention by detainees.[50]   If a detainee becomes gravely ill, Standard 4.7 requires "transfer of the detainee to an appropriate off-site medical or community facility if appropriate and medically necessary" and immediate notification of the facility administrator and/or ICE/ERO field office.[51]

203.    Each Defendant violated the Performance Based National Detention Standards, the IHSC Directives, the applicable regulations and licensing requirements, and the terms of its contract(s) with ICE when its employees failed to assess Roxsana's medical fitness for travel before she was transported, failed to notify appropriate personnel or follow the above outlined policies intended to ensure the safety of people in detention, failed to provide her adequate food, water, restroom access,

---

[48] *Id.*

[49] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards 4.3 Medical Care*, at 257 (2011), https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf.

[50] *Id.,* at 259, 257.

[51] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards 4.7 Terminal Illness, Advance Directives and Death,* at 339 (2011), https://www.ice.gov/doclib/detention-standards/2011/4-7.pdf

and access to medical care, including HIV medication and medical treatment for her emergent medical conditions.

204.     Roxsana was in the class of persons sought to be protected by the Performance Based National Detention Standards, the applicable regulations and licensing requirements, and the terms of Defendants' contract(s) with ICE.  As ICE's preamble to these standards states on its website: "PBNDS 2011 reflects ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for […] detainees" and "is crafted to improve medical and mental health services."[52]

205.     The increased risk that Roxsana would become ill and her physical condition would deteriorate resulting in her death are the types of harms that the Performance Based National Detention Standards, the applicable regulations and licensing requirements, and the aforementioned terms of each Defendant's contract(s) with ICE are meant to prevent. As ICE's website states pertaining to its medical standards: "This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services."[53]

206.     Each Defendant's employees were acting in the scope of their employment and/or aided in agency by the authority conferred by each Defendant throughout the time that Roxsana was in their respective custody and control.

207.     As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of each Defendant's employees, Roxsana suffered severe and foreseeable harm, including rapid deterioration of her physical condition, physical pain and distress, emotional distress, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

---

[52] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards,* (2011), https://www.ice.gov/detention-standards/2011.

[53] *Id.,* at 257.

208.     Each Defendant acted unreasonably and in violation of applicable standards, rules, regulations and contract provisions when it chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her access to medication, adequate food, water, bathroom facilities, and access to medical care during transport and detention despite her obvious, serious, and emergent suffering and medical needs.

209.     These acts and omissions by each Defendant's employees were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

210.     Each Defendant is vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of its employees throughout the time that Roxsana was in each Defendant's respective custody and control. Each Defendant's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by the danger each Defendant placed her in as a result of her extreme physical and emotional vulnerability while in their respective custody and control.

## COUNT THREE AGAINST DEFENDANT MTC
### NEGLIGENCE UNDER CALIFORNIA LAW

211.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

212.     Defendant MTC was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

213.     Defendant MTC owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control.  Defendant MTC further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

214.    Defendant MTC also owed her a duty of care as a common carrier pursuant to California Civil Code Section 2100, and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

215.    Defendant MTC's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody and control of MTC.  Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe that her illness was obvious to Defendant MTC's employees. Defendant MTC's employees knew or should have known that Roxsana was HIV-positive and at risk for contracting additional illnesses, developing complications of her existing medical condition, and deteriorating physical health.  Furthermore, Roxsana and her fellow asylum-seekers' repeated requests for medical help to MTC employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance. It was foreseeable that failing to provide Roxsana an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

216.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant MTC presented a serious and obvious medical need.

217.    Defendant MTC acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, transported her despite lacking the required medical documentation, denied her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs, denied her access to adequate food, water, bathroom facilities, instructed Roxsana and the other detainees to urinate on themselves, and failed to comply with applicable federal rules, regulations and contract requirements for the treatment of detainees when its employees transported Roxsana from San Ysidro, California to SLRDC in San Luis, Arizona.

218.     It was foreseeable that these acts and omissions of Defendant MTC's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

219.     As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant MTC's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

220.     Defendant MTC's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

221.     Defendant MTC is vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of Defendant MTC's employees throughout the time that Roxsana was in the custody and control of Defendant MTC. Defendant MTC's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

## COUNT FOUR AGAINST DEFENDANT MTC
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION
### UNDER CALIFORNIA LAW

222.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

223.     Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need.  Roxsana's illness was obvious to Defendant MTC's employees because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, phlegm and fever, and because Roxsana's and her fellow asylum-seekers' repeated requests for medical

help to MTC's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance.

224. Employees of Defendant MTC, who were charged with Roxsana's custody and care pursuant to Defendant MTC's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm when they detained her and then on May 14, 2018 transported her by bus from California to SLRDC. Defendant MTC's employees also owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendant MTC's physical custody and control. In addition, Defendant MTC owed Roxsana a heightened duty of care because MTC placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition. Defendant MTC also owed her a duty of care as a common carrier pursuant to California Civil Code Section 2100, and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

225. Defendant's negligence included the failure to adequately hire, train, supervise and correct its employees on conducting fitness for travel screening before transporting such detainees, on the necessity of providing adequate food, water, medication and restroom access, on the documentation required to transfer her, and on responding to emergent medical problems during transport. Defendant MTC failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE, negligently retained them, and/or failed to adequately train, manage, supervise and discipline the employees who repeatedly breached their duty of care to Roxsana. These employees failed to summon medical care despite her illness and deteriorating physical condition. They also cruelly refused to allow Roxsana to use the restroom during the journey and instructed the detainees, including Roxsana, to urinate on themselves, exacerbating Roxsana's mental anguish and suffering. Further, these MTC employees failed to provide sufficient water and food to Roxsana during this transfer, exacerbating her weakness, illness and suffering.

226.    Defendant MTC breached its duty of care to Roxsana by failing to use ordinary care in hiring, training, managing, and supervising its employees who transported Roxsana.  Defendant MTC also failed to use ordinary care in enforcing the regulations, policies and contract provisions described above in this Amended Complaint regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees' medical needs during transport.

227.    Defendant MTC's employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care, denied her sufficient food, water and restroom access, and forced Roxsana and the other detainees to urinate in their bus seats when they performed their contracted duties to transport Roxsana.

228.    It was foreseeable and Defendant MTC knew or should have known that its inadequate hiring, training, supervision, and policy enforcement would create an unreasonable risk of harm to detainees, like Roxsana, in its custody and control.

229.    Defendant MTC knew or should have known that such acts and omissions were unlawful under ICE policies and California law.  Defendant MTC knew or should have known that the employees who transported the detainees were likely to cause harm to them because MTC failed to provide sufficient food and water for the trip, failed to sufficiently train and supervise these employees, failed to address the conduct of its employees that caused the bus seats to be stained with urine prior to Roxsana's transport, and failed to address the obvious fact that its employees were abusing their authority.  By failing to take any action, MTC ratified such cruel, inhumane behavior. Not a single employee who transported Roxsana provided her with medical care or adequate food, water and restroom access.

230.    Defendant MTC's repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life.

The unlawful and repeated denial of medical care by Defendant MTC's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

231.    Defendant MTC had a practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detainee's health deteriorated while in Defendant's custody and control.

232.    Upon information and belief, Defendant MTC has not disciplined nor taken any corrective action against these employees for these unreasonable and unlawful acts and omissions. Defendant MTC knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detainees in its custody and control.

233.    Defendant MTC's  acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT FIVE AGAINST DEFENDANT MTC
### FAILURE TO SUMMON MEDICAL CARE FOR PRISONERS, UNDER Cal. Gov. Code § 845.6

234.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

235.    Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need.  Her persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss were visibly apparent from the time she was taken into CBP custody until her death, including to people who are not medically trained.

236.    Employees of Defendant MTC, who were charged with Roxsana's custody and care, were acting within the scope of their employment when they transported her from California to SLRDC on May 14, 2018 and failed to summon medical care despite her alarming and visible

symptoms. Because Roxsana's symptoms of cough, fatigue, weakness, vomiting, phlegm and fever were so severe her illness was obvious even to a lay person. Furthermore, Roxsana's and the caravanners' repeated requests for medical help to Defendant MTC's employees evidenced the urgency of Roxsana's health.

237.    These repeated refusals to provide medical care to Roxsana constituted intentional, reckless and negligent disregard for Roxsana's life.

238.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant MTC's employees, Roxsana experienced foreseeable severe physical and emotional pain and suffering and lost her chance to live, in violation of California law.

239.    Defendant MTC's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

### COUNT SIX AGAINST DEFENDANT MTC
#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER CALIFORNIA LAW

240.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

241.    Defendant MTC's employees outrageously denied Roxsana the basic necessities of medical care, food, water and restroom access for the entire bus ride from California until they reached SLRDC lasting from approximately 12:30 p.m. until 5:30 p.m. Roxsana, who was gravely ill and experiencing recurring vomiting and diarrhea, asked the officers wearing beige color uniforms to use the restroom and to remove the handcuffs in order to do so; MTC's employees refused and instructed the detainees to urinate on themselves. The bus seats were stained and smelled like urine.

242.    The extreme and outrageous conduct by MTC employees constituted reckless disregard for the severe emotional distress they caused Roxsana.

243.    When they arrived at SLRDC, Roxsana used the restroom approximately every fifteen minutes. When she was not using the restroom, she laid on the floor from fatigue, coughing.

244.    Multiple times Roxana and other detainees requested medical care for Roxsana from the MTC employees transporting them. The employees ignored their pleas and one responded "shut up!" None of the officers responsible for transporting them arranged for or provided Roxsana with any medical care.

245.    When Roxsana arrived at SLRDC several detainees who had been separated at the border were reunited and many were shocked by Roxsana's ill appearance and how quickly her health had declined.

246.    As a direct and proximate cause of MTC's employees' malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.  On multiple occasions, Roxsana confided in other caravan members that she did not believe she would survive in CBP and ICE custody.

247.    MTC is vicariously liable for the intentional infliction of emotional distress caused by its employees.  At all material times, MTC's employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

## COUNT SEVEN AGAINST DEFENDANTS LASALLE
### NEGLIGENCE UNDER ARIZONA LAW

248.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

249.    Defendants LaSalle were charged with Roxsana's custody and care pursuant to their contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

250.    Defendants LaSalle owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the companies' physical

custody and control.  Defendants LaSalle further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

251.    Defendants LaSalle's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody and control of LaSalle.  Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe that her illness was obvious to Defendant's employees. Defendants LaSalle's employees knew or should have known that Roxsana was HIV-positive and at risk for contracting additional illnesses, developing complications of her existing medical condition, and deteriorating physical health.  Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests for medical help to LaSalle's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance.

252.    It was foreseeable that failing to provide Roxsana with an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

253.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendants LaSalle presented a serious and obvious medical need.

254.    Defendants LaSalle breached their duty of care by failing to provide Roxsana with emergent medical care on May 14 and 15, 2018, when it transported Roxsana and detained her at SLRDC and their employees witnessed Roxsana laying on the floor, coughing, and frequently using the restroom because she was suffering from severe diarrhea and vomiting. LaSalle's failure to provide Roxsana with medical care was a blatant violation of the standards required for treatment of detainees within ICE custody to provide a medical screening within 12 hours of being taken into custody and Arizona law, including Title 31 of Arizona's revised statutes. Defendants LaSalle acted unreasonably

and breached their duty of care when their employees chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, transported her despite lacking the required medical documentation, denied her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs.

255.   It was foreseeable that these acts and omissions of Defendants LaSalle's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

256.   As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendants LaSalle's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

257.   Defendants LaSalle's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

258.   Defendants LaSalle are vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of Defendants LaSalle's employees throughout the time that Roxsana was in the custody and control of Defendant. Defendants LaSalle's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendants LaSalle's custody and control.

## COUNT EIGHT AGAINST DEFENDANTS LASALLE
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER ARIZONA LAW

259.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

260.    Roxsana's aggressively developing illness while in the custody of Defendants LaSalle presented a serious medical need.  Roxsana's illness was obvious to Defendants LaSalle's employees, because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, phlegm and fever, and because Roxsana's and her fellow asylum-seekers' repeated requests for medical help to LaSalle's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance.

261.    Employees of Defendants LaSalle, who were charged with Roxsana's custody and care pursuant to Defendants LaSalle's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm on May 14, 2018 when she was detained at SLRDC and on May 15, 2018, when they transported Roxsana to the airport.  Defendants LaSalle's employees also owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendants' physical custody and control. In addition, Defendants LaSalle owed Roxsana a heightened duty of care because LaSalle placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

262.    Defendants LaSalle's negligence included the failure to adequately hire, train, supervise and correct its employees on conducting fitness for travel screening before transporting such detainees, reviewing and providing required medical documentation, on the necessity of providing medication, adequate food, water and restroom access, and on responding to emergent medical problems.  Defendants LaSalle failed to hire competent employees who followed the safety guidelines required of all federal contractors with ICE, negligently retained them, and/or failed to adequately train, manage, supervise and discipline the employees who repeatedly breached their duty of care to Roxsana.  Further, these LaSalle employees failed to provide sufficient water and food to Roxsana during this transfer, exacerbating her weakness, illness and suffering.

45

263.    Defendants LaSalle breached their duty of care to Roxsana by failing to use ordinary care in hiring, training, managing, and supervising its employees who detained and transported Roxsana.  Defendants LaSalle also failed to use ordinary care in enforcing the regulations, policies and contract provisions described above in this Amended Complaint regarding the detention, transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and responding to detainees' medical needs.

264.    Defendants LaSalle's employees were acting within the scope of their employment when, on May 14, 2018, Roxsana was in their custody, and they failed to provide immediate medical attention when they witnessed her lying on the floor coughing at SLRDC and frequently using the restroom due to vomiting and diarrhea.  Defendants LaSalle's employees were also acting within the scope of their employment when and, on May 15, 2018, they transported Roxsana to the airport and they refused to provide her with medical care despite her obvious need for medical assistance and multiple requests for help from Roxsana and other detainees. They were also acting within the scope of their employment when they denied Roxsana sufficient food, water and restroom access and one LaSalle Transport employee threatened the detainees, saying words to the effect of: "behave because if you don't something bad is going to happen."

265.    It was foreseeable and Defendants LaSalle knew or should have known that its inadequate hiring, training, supervision, and policy enforcement would create an unreasonable risk of harm to detainees, like Roxsana, in their custody and control.

266.    Defendants LaSalle knew or should have known that such acts and omissions were unlawful under ICE rules and Arizona law.  Defendant knew or should have known that the employees who held Roxsana in custody and transported her were likely to cause harm to Roxsana when they failed to provide her with medical care because there were high level officials onsite at SLRDC when Roxsana was refused care. LaSalle failed to sufficiently train and supervise these employees, and failed

to address the obvious fact that their employees were abusing their authority.  By failing to take any action, LaSalle ratified such cruel, inhumane behavior.  Not a single employee who transported Roxsana or witnessed her lying on the ground with fatigue at SLRDC provided her with medical care, medications or relief from her suffering, despite her pleas for care and assistance.

267.    Defendants LaSalle's repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendants LaSalle's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

268.    Defendants LaSalle had a practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detainee's health deteriorated while in Defendants LaSalle's custody and control.

269.    Upon information and belief, Defendants LaSalle have not disciplined nor taken any corrective action against these employees for these unreasonable and unlawful acts and omissions. Defendants LaSalle knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detainees in its custody and control.

270.    Defendants LaSalle's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT NINE AGAINST DEFENDANTS LASALLE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER ARIZONA LAW

271.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

272.    Defendants LaSalle's employees outrageously ignored Roxsana's dire health condition when they detained her at SLRDC on May 14 and 15, 2018 and transported her to the airport on May

15, 2018. Not a single officer who witnessed Roxsana lying on the floor and coughing and using the restroom approximately every fifteen minutes to vomit sought out medical care for the several hours she was in their custody in blatant disregard for her life and the severe emotional distress it caused Roxsana.

273.     Defendant LaSalle's employees ignored Roxsana's pleas for medical care on May 15, 2018 when they transported her on a four-hour bus ride to the airport in Mesa Arizona, and one threatened the detainees they transported saying words to the effect of "Behave, because if you don't something bad is going to happen."

274.     LaSalle's employees' outrageous failure to seek medical care and threats were in conscious disregard of Roxsana's severe emotional distress and fear for her life.  During this bus ride Roxsana pleaded for help to a person who sat with her, saying words to the effect of, "Help me! I don't know if I'm going to survive."

275.     As a direct and proximate cause of LaSalle's employees' malicious, wanton, reckless and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.

## COUNT TEN AGAINST DEFENDANT GPS
### NEGLIGENCE UNDER NEW MEXICO AND TEXAS LAW

276.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

277.     Defendant GPS was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

278.     Defendant GPS owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control.  Defendant GPS further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

279.    Defendant's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody and control of GPS.  Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe that her illness was obvious to Defendant's employees. Defendant GPS's employees knew or should have known that Roxsana was HIV-positive and at risk for contracting additional illnesses, developing complications of her existing medical condition, and deteriorating physical health. Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests for medical help to GPS's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance. It was foreseeable that failing to provide Roxsana an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

280.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant GPS presented a serious and obvious medical need.

281.    Defendant acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in despite lacking the required medical documentation to, failed to provide her with adequate medical assessments prior to transport, denied her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs, denied her access to adequate food, water, bathroom facilities, instructed Roxsana and the other detainees to urinate on themselves, and failed to comply with applicable federal rules, regulations and contract requirements for the treatment of detainees when its employees transported Roxsana from El Paso SPC on May 16, 2018 to the ICE CAP facility in Albuquerque, New Mexico.

282.    It was foreseeable that these acts and omissions of Defendant GPS's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

283.     As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant GPS's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

284.     Defendant GPS's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

285.     Defendant GPS is vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of Defendant GPS's employees throughout the time that Roxsana was in the custody and control of Defendant. Defendant's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

## COUNT ELEVEN AGAINST DEFENDANT GPS
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION
### UNDER NEW MEXICO AND TEXAS LAW

286.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

287.     Roxsana's aggressively developing illness while in the custody of Defendant GPS presented a serious medical need.  Roxsana's illness was obvious to Defendant's employees, because she was exhibiting symptoms of cough, fatigue, weakness, vomiting, phlegm and fever.

288.     Employees of Defendant GPS, who were charged with Roxsana's custody and care pursuant to Defendant's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm when they transported her on May 16, 2018 from El Paso SPC to the ICE CAP facility in Albuquerque, New Mexico. Defendant GPS owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in

Defendant's physical custody and control. In addition, Defendant owed Roxsana a heightened duty of care because it placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

289.    Defendant GPS breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance despite her illness and deteriorating physical condition. Defendant GPS failed to hire competent employees, hired incompetent employees who failed to follow the safety guidelines required of all federal contractors with ICE, negligently retained these employees, and/or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

290.    Defendant GPS's negligence included the failure to adequately hire, train, supervise and correct its employees on conducting fitness for travel screening before transporting such detainees, on the necessity of providing adequate food, water, medication and restroom access, reviewing and providing necessary medical documentation, and responding to emergent medical problems during transport.

291.    Defendant GPS failed to hire competent staff, failed to adequately train its staff to render aid to detainees with emergent medical issues, and failed to follow through and/or enforce its policies related to detainees with medical needs.

292.    Defendant GPS conducted inadequate management, training, supervision and enforcement of regulations, policies and contract provisions regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees with medical needs during transport.

293.     It was foreseeable and Defendant GPS knew or should have known that its inadequate hiring, training, supervision, and policy enforcement would create an unreasonable risk of harm to detainees, like Roxsana, in its custody and control.

294.     Defendant GPS failed to use ordinary care in hiring, training, managing, and supervising its employees who transported Roxsana, and Defendant failed to use ordinary care in enforcing the regulations, policies and contract provisions described above in this Amended Complaint regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees' medical needs during transport.

295.     Defendant GPS breached its duty of care by failing to provide Roxsana with immediate medical care during transport, despite Roxsana's and the other detainees' repeated requests for medical attention for her.

296.     Defendant GPS's employees also breached their duty of care by failing to provide sufficient food and water—providing only an 8-ounce bottle of water for a journey that lasted almost six hours on a day that reached 97 degrees—medications and access to restrooms, resulting in Roxsana's mental anguish, pain and suffering, exacerbation of her illness and lost chance of survival.

297.     Defendant GPS's employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care and denied her sufficient food, water and restroom access as they were contracted to transport her.

298.     Defendant GPS knew or should have known that such acts and omissions were unlawful under ICE rules and New Mexico and Texas law and that the GPS employees who transported the detainees were likely to cause harm to them because GPS failed to provide sufficient food and water for the trip and knew how many people they were responsible to transport.  GPS knew or should have known that adequate food was not provided considering that GPS employees stopped

52

to eat lunch themselves while not providing any food for Roxsana and the other detainees. Not a single GPS employee who transported Roxsana provided medications, medical care, or adequate food, water and restroom access.

299.     Defendant GPS's repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendant GPS's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

300.     Upon information and belief, Defendant GPS has not disciplined nor taken any corrective action against these employees for these unreasonable and unlawful acts and omissions. Defendant GPS knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detainees in its custody and control.

301.     Defendant GPS had a practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detainee's health deteriorated while in Defendant's custody and control.

302.     Defendant GPS's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

### COUNT TWELVE AGAINST DEFENDANT GPS
#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### UNDER NEW MEXICO AND TEXAS LAW

303.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

304.     Defendant GPS's employees, denied Roxsana food or water or restroom access for the entire bus ride from El Paso SPC at approximately 9:00 a.m. until they reached the ICE CAP

facility in Albuquerque, New Mexico around 2:30 p.m. GPS's employees gave each person transported, including Roxsana, an 8-ounce bottle of water and one sandwich to last the entire five-and-half hour journey on the bus without air conditioning on a day that reached 97 degrees Fahrenheit. The detainees were very thirsty and hungry. They repeatedly asked for water and food. The first two times the officers transporting them ignored them. The third time, an officer with grey hair said in Spanish: "ya callanse" which means "shut up." At some point during this trip Roxsana asked an officer for water, but the officer told her he did not speak Spanish. At one point the GPS employees stopped at a fast food restaurant to get themselves food and then ate on the bus in front of all of the hungry and thirsty detainees.

305.    If the detainees had to use the restroom, they had to plead with the GPS employees repeatedly who largely ignored their requests and occasionally escorted them to a toilet bowl without any water in it, at the back of the bus. There was no door, only a curtain separating the toilet from the rest of the bus. There was no toilet paper and GPS's employees refused to uncuff the detainees to use it. When the bus would sway the waste in the toilet would spill and the whole bus stank of sewage.

306.    Roxsana sat by herself in the back of the bus. At another point the same GPS employee who told the detainees to "shut up" asked why they left their country if they were sick, in reference to and acknowledging Roxsana's visible illness. Roxsana had a fever and lots of phlegm and carried tissue or toilet paper to blow her nose. Sometimes her sputum was bloody. Roxsana felt dizzy and extremely exhausted, and she was so despondent it was unclear whether she had fainted or she was sleeping.

307.    During this bus ride another detainee requested medical attention for Roxsana from at least two different GPS employees approximately five times. One GPS employee claimed to not understand the requests for assistance which were communicated in Spanish and the other GPS employee refused to respond to any request for assistance for Roxsana from this detainee.

308.   These acts and omissions of Defendant GPS's employees were extreme and outrageous under the circumstances.

309.   The extreme and outrageous conduct by Defendant GPS's employees, namely failure to seek medical care and refusal to provide adequate food, water and restroom access, constituted a conscious or reckless disregard for the severe emotional distress they caused Roxsana.

310.   As a direct and proximate cause of the malicious, wanton, reckless and negligent acts and omissions of Defendant GPS's employees, Roxsana experienced severe physical and emotional pain and suffering and mental anguish. On multiple occasions Roxsana confided to other detainees that she did not believe she would survive in CBP and ICE custody.

311.   Defendant GPS is vicariously liable for the intentional infliction of emotional distress caused by its employees. At all material times, GPS employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

312.   When Roxsana finally arrived at Cibola on May 16, 2018 she was experiencing multiple organ failure. The following morning when she was finally medically screened Roxsana weighed a mere 89 pounds and was diagnosed with muscle wasting, severe dehydration, untreated HIV, fever and cough. The examining medical provider noted Roxsana's physical tremor, low blood pressure of 81/61, rough breathing sounds and increased white phlegm excreted in abnormally large quantities. Roxsana died on May 25, 2018 and a doctor from Cibola General Hospital told investigators that the actions taken by the time Roxsana arrived at Cibola were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

## COUNT THIRTEEN AGAINST DEFENDANT TRANSCOR
### NEGLIGENCE UNDER NEW MEXICO LAW

313.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

314.    Defendant TransCor was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

315.    Defendant TransCor owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control.  Defendant TransCor further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

316.    Defendant's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody and control of TransCor.  Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe that her illness was obvious to Defendant TransCor's employees. Defendant's employees knew or should have known that Roxsana was HIV-positive and at risk for contracting additional illnesses, developing complications of her existing medical condition, and deteriorating physical health. Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests for medical help to TransCor's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance. It was foreseeable that failing to provide Roxsana an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

317.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant TransCor presented a serious and obvious medical need.

318.    Defendant TransCor acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in despite lacking the required medical documentation to, failed to provide her with adequate medical assessments prior to transport, denied her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs,

denied her access to adequate food, water, and bathroom facilities, instructed Roxsana and the other detainees to urinate on themselves, and failed to comply with applicable federal rules, regulations and contract requirements for the treatment of detainees when its employees transported Roxsana from the ICE CAP facility in Albuquerque, New Mexico to Cibola despite Roxsana's visible illness.

319. It was foreseeable that these acts and omissions of Defendant TransCor's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

320. As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant TransCor's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

321. Defendant TransCor's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

322. Defendant TransCor is vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of Defendant's employees throughout the time that Roxsana was in the custody and control of Defendant. Defendant TransCor's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant TransCor's custody and control.

## COUNT FOURTEEN AGAINST DEFENDANT TRANSCOR
### NEGLIGENT HIRING, RETENTION, TRAINING & SUPERVISION UNDER NEW MEXICO LAW

323. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

324.    Roxsana's aggressively developing illness while in the custody of Defendant TransCor presented a serious medical need.  Roxsana's persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss, were visibly apparent including to people who are not medically trained and Defendant TransCor's employees.

325.    Employees of Defendant TransCor, who were charged with Roxsana's custody and care pursuant to Defendant TransCor's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm when they transported her from the ICE CAP facility in Albuquerque, New Mexico to Cibola. Defendant TransCor owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendant's physical custody and control. In addition, Defendant TransCor had a heightened duty of care because it placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

326.    Defendant TransCor breached its duty of care to Roxsana when its employees transported her on May 16, 2018 from the ICE CAP facility in Albuquerque, New Mexico to Cibola despite lacking the required medical documentation to and failed to provide her with medical care despite her visible illness and multiple requests for medical attention. Roxsana and the other detainees arrived at the ICE CAP facility at approximately 2:30 p.m. and did not arrive at Cibola until 8:13 p.m. During those almost six hours, Roxsana was critically ill. Other detainees reported it was unclear whether she was asleep or simply unconscious during the trip to Cibola. When she arrived at Cibola other asylum-seekers reported she was losing her mental capacity because of her illness. Despite this, no TransCor employee sought medical help for Roxsana during the six hours she was in their custody and care.

327.    Defendant TransCor breached its duty by negligently hiring, retaining, training and supervising the employees who transported Roxsana and who failed to provide her with immediate

medical assistance despite her illness and deteriorating physical condition. Defendant TransCor failed to hire competent employees, hired incompetent employees who failed to follow the safety guidelines required of all federal contractors with ICE, negligently retained these employees, and/or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

328.    Defendant TransCor's negligence included the failure to adequately hire, train, supervise and correct its employees on conducting fitness for travel screening before transporting such detainees, on the necessity of providing adequate food, water, medication and restroom access, and on responding to emergent medical problems during transport.

329.    Defendant TransCor failed to hire competent staff, failed to adequately train its staff to render aid to detainees with emergent medical issues, and failed to follow through and/or enforce its policies related to detainees with medical needs.

330.    Defendant TransCor conducted inadequate management, training, supervision and enforcement of regulations, policies and contract provisions regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees with medical needs during transport.

331.    It was foreseeable and Defendant TransCor knew or should have known that its inadequate hiring, training, supervision, and policy enforcement would create an unreasonable risk of harm to detainees, like Roxsana, in its custody and control.

332.    Defendant TransCor failed to use ordinary care in hiring, training, managing, and supervising its employees who transported Roxsana, and Defendant failed to use ordinary care in enforcing the regulations, policies and contract provisions described above in this Amended Complaint regarding transfer and transport of detainees, including pre-transport fitness for travel

assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees' medical needs during transport.

333.    Defendant TransCor's employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care and denied her sufficient food, water and restroom access as they were contracted to transport her.

334.    Defendant TransCor knew or should have known that such acts and omissions were unlawful under ICE rules and New Mexico law.

335.    The unlawful and repeated denial of medical care by Defendant TransCor's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

336.    Upon information and belief, Defendant TransCor has not disciplined nor taken any corrective action against these employees for these unreasonable and unlawful acts and omissions. It was foreseeable and Defendant TransCor knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detainees in its custody and control.

337.    Defendant TransCor had a practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detainee's health deteriorated while in Defendant's custody and control.

338.    Defendant TransCor's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT FIFTEEN AGAINST DEFENDANT CORECIVIC
### NEGLIGENCE UNDER NEW MEXICO LAW

339.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

340.     Defendant CoreCivic was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

341.     Defendant CoreCivic owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control.  Defendant further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

342.     Defendant CoreCivic's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody and control of CoreCivic.  Roxsana's symptoms of cough, fatigue, weakness, phlegm and fever were so severe that her illness was obvious to Defendant CoreCivic's employees. Defendant's employees knew or should have known that Roxsana was HIV-positive and at risk for contracting additional illnesses, developing complications of her existing medical condition, and deteriorating physical health. Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests for medical help to CoreCivic's employees further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance.

343.     It was foreseeable that failing to provide Roxsana with an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

344.     Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant CoreCivic presented a serious and obvious medical need.

345.     Defendant CoreCivic breached its duty of care by making Roxsana sleep in the medical waiting wing until the onsite physician came to work the next day rather than provide her with

61

immediate medical care on May 16, 2018, despite the fact that she was experiencing the early stages of multiple organ failure.

346.     **Defendant** CoreCivic further breached its duty of care to Roxsana by keeping her shackled throughout her hospitalization, delaying medical providers' provision of care, and causing injuries to her wrists and ankles. CoreCivic employees even kept Roxsana shackled after she was sedated, unconscious and went into cardiac arrest on May 24, 2018.

347.     The acts and omissions of Defendant CoreCivic, including but not limited to failing to provide Roxsana an adequate medical assessment, failing to provide her prescribed medication, failing to provide Roxsana with medical care and failing to comply with applicable federal rules, regulations and contract requirements for the treatment of detainees, despite Roxsana's visible illness and multiple requests for medical attention, breached its duty of care.

348.     It was foreseeable that failing to provide Roxsana her prescribed medication and failing to provide her with immediate medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

349.     As a direct and proximate cause of the intentional, malicious, reckless and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

350.     Defendant CoreCivic's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

351.     Defendant CoreCivic is vicariously liable for the intentional, malicious, reckless and negligent acts and omissions of Defendant's employees throughout the time that Roxsana was in the

custody and control of Defendant. Defendant CoreCivic's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

## COUNT SIXTEEN AGAINST DEFENDANT CORECIVIC
### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION UNDER NEW MEXICO LAW

352. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

353. Roxsana's aggressively developing illness while in the custody of CoreCivic presented a serious medical need. Roxsana's persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea and weight loss, were visibly apparent people who are not medically trained, including to Defendant's employees.

354. Employees of Defendant CoreCivic, who were charged with Roxsana's custody and care pursuant to Defendant's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm. Defendant CoreCivic owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control. In addition, Defendant CoreCivic owed Roxsana a heightened duty of care because it placed Roxsana in danger by failing to promptly conduct a medical assessment and provide medical care when she was in a severely vulnerable physical and emotional condition.

355. Defendant CoreCivic breached its duty of care to Roxsana when its employees made Roxsana sleep in the medical waiting wing until the onsite physician came to work the next day rather than provide her with immediate medical care on May 16, 2018, despite the fact that she was experiencing the early stages of multiple organ failure. Defendant CoreCivic further breached its duty of care to Roxsana by keeping her shackled throughout her hospitalization, delaying medical providers'

provision of care, and causing her injuries to her wrists and ankles.  CoreCivic employees even kept Roxsana shackled after she was sedated, unconscious and went into cardiac arrest on May 24, 2018.

356.   CoreCivic employees were acting within the scope of their employment when they detained Roxsana and failed to provide Roxsana with immediate medical care, and when they kept Roxsana shackled throughout her hospitalization, causing her physical injury and delaying her receipt of medical care.

357.   Defendant CoreCivic breached its duty by negligently hiring, retaining, training and supervising the employees who failed to provide Roxsana with immediate medical assistance despite her illness and deteriorating physical condition and who kept her shackled during her hospitalization, even when she was completely incapacitated.  Defendant CoreCivic failed to hire competent employees, hired incompetent employees who failed to follow the safety guidelines required of all federal contractors with ICE, negligently retained these employees, and/or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

358.   Defendant CoreCivic conducted inadequate management, training, supervision and enforcement of regulations, policies and contract provisions regarding the treatment and medical care of detainees.

359.   It was foreseeable and Defendant CoreCivic knew or should have known that its inadequate hiring, training, supervision, and policy enforcement would create an unreasonable risk of harm to detainees, like Roxsana, in its custody and control.

360.   CoreCivic knew or should have known that such acts and omissions were unlawful under ICE rules and New Mexico law.

361.   Defendant CoreCivic's unlawful and repeated denial of medical care and unnecessary shackling of Roxsana by Defendant's employees who were charged with Roxsana's custody and care

were the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

362.     As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana experienced severe and foreseeable physical and emotional pain and suffering, rapidly declining health lost chance of survival, and death.

363.     Upon information and belief, Defendant CoreCivic has not disciplined nor taken any corrective action against these employees for these unreasonable and unlawful acts and omissions. It was foreseeable and Defendant CoreCivic knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detainees in its custody and control.

364.     Defendant CoreCivic had a practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detainee's health deteriorated while in Defendant's custody and control.

365.     Defendant CoreCivic's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT SEVENTEEN AGAINST DEFENDANT CORECIVIC
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER NEW MEXICO LAW

366.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

367.     When Roxsana finally arrived at Cibola on May 16, 2018, she was experiencing multiple organ failure. The following morning when she was finally medically screened, Roxsana weighed a mere 89 pounds and was diagnosed with muscle wasting, severe dehydration, untreated HIV, fever and cough. The examining medical provider noted Roxsana's tremor, low blood pressure of 81/61, rough breathing sounds and increased white phlegm excreted in abnormally large quantities. Roxsana died on May 25, 2018, and a doctor from Cibola General hospital told investigators that the

actions taken by the time Roxsana arrived at Cibola were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

368.     Defendant CoreCivic's employees outrageously ignored Roxsana's dire health condition when they detained her at Cibola on May 16, 2018, making her spend the night in the waiting area of the medical wing when she was experiencing the early stages of multiple organ failure and losing her mental capacity, rather than immediately provide her with urgent medical care while she was in the medical wing.  In addition, CoreCivic's employees cruelly kept Roxsana, who weighed 89 pounds and was extremely weak and emaciated, shackled in handcuffs throughout her hospitalization from May 17 through May 24, 2018.  Defendant kept Roxsana handcuffed even after she was medically paralyzed and went into cardiac arrest on May 24, 2018, hours before her death. CoreCivic's employees who guarded Roxsana around the clock called "central" every time medical providers needed to remove her shackles to administer medical care, delaying her receipt of care.

369.     Defendant CoreCivic's cruel treatment caused Roxsana deep tissue injuries on her wrists and extreme emotional and physical suffering and mental anguish..

370.     These acts and omissions by CoreCivic's employees were extreme and outrageous under the circumstances and constituted a conscious or reckless disregard for the severe emotional distress they caused Roxsana.

371.     As a direct and proximate cause of the malicious, wanton, reckless and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.

372.     Defendant CoreCivic is vicariously liable for the intentional infliction of emotional distress caused by its employees.  At all material times, CoreCivic employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.  Enter judgment in favor of Plaintiff and against all Defendants;

2.  Award Plaintiff damages in an amount to be determined at trial;

3.  Award Plaintiff reasonable attorneys' fees and costs; and

4.  Award Plaintiff such further relief as the Court deems just, equitable, and appropriate.

## JURY DEMAND

Plaintiff hereby demands that the claims in this matter be tried before a jury.

Date: August 13, 2020                    Respectfully submitted,

*/s/ DANIEL YOHALEM*
Daniel Yohalem
Attorney at Law
1121 Paseo de Peralta
Santa Fe, New Mexico  87501
Phone: 505-983-9433  Fax 505-989-4844

Katherine Murray
Attorney at Law
P.O. Box 5266
Santa Fe, New Mexico 87502
Phone: 505-670-3943

Dale Melchert *Pro Hac Vice*
Lynly Egyes *Pro Hac Vice*
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612

R. Andrew Free *Pro Hac Vice*
The Law Office of R. Andrew Free
P.O. Box 90568 Nashville, TN 37209
Tel: (844) 321-3221 Fax: (615) 829-8959

Kimberly A. Evans *Pro Hac Vice Forthcoming*
Irene Lax *Pro Hac Vice Forthcoming*
Grant & Eisenhofer P.A.
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7086