**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**JOLEEN K. YOUNGERS, as the Personal**
**Representative of the Wrongful Death**
**Estate of Roxsana Hernandez,**

        **Plaintiff,**

**v.**                                    **Civil Action No. 20-cv-00465 JAP-JHR**

**MANAGEMENT & TRAINING CORPORATION,**
**LLC,** *et al.,*

        **Defendants.**

**PLAINTIFF'S OPPOSITION**
**TO TRANSCOR'S AND CORECIVIC'S MOTION FOR PARTIAL DISMISSAL**

Plaintiff, by and through her counsel, hereby submits this Opposition to Transcor's and Corecivic's ("Defendants") joint Motion for Partial Dismissal (the "Motion") of Plaintiff's First Amended Complaint ("FAC") (Doc. 9). The Motion seeks to dismiss Count One (Section 504 of the Rehabilitation Act), Count Two (negligence per se), and Counts Fourteen and Sixteen (negligent hiring, retention, training and supervision). For the reasons set forth below, the Motion should be denied.

**I.**     **ARGUMENT**

     **A.**     **STANDARD OF REVIEW**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must determine whether the complaint sufficiently alleges facts to support the elements of the legal theories proposed. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). "A pleading 'must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Hurd v. Novartis Pharmaceuticals Corp.*, No. 20-CV-262 JAP/GBW, 2020

WL 3101019, at *2 (D.N.M. June 11, 2020) (quoting Fed. R. Civ. P. 8(a)).  All well-pleaded factual

allegations should be taken as true and should be viewed in the light most favorable to the plaintiff.

*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002); *Hurd*, 2020 WL 3101019, at *2 (same).

"The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but

whether the plaintiff is entitled to offer evidence to support her claims."  *Ruiz,* 299 F.3d at 1181

(citation omitted).  Allegations must "state a claim to relief that is plausible on its face."  *Hurd*,

2020 WL 3101019, at *2 (quoting *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  "A claim

is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.'  The factual

allegations must 'raise a right to relief above the speculative level.'"  *Id.* (quoting *Robbins v. Okla.*,

519 F.3d 1242, 1247 (10th Cir. 2018); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### B.  THE FAC STATES A CLAIM AGAINST DEFENDANTS FOR VIOLATING THE REHABILITATION ACT

A prima facie case of discrimination in violation of the Rehabilitation Act "requires proof

that (1) plaintiff is [disabled] under the Act; (2) [plaintiff] is 'otherwise qualified' to participate in

the program; (3) the program ***receives federal financial assistance***; and (4) the program

discriminates against plaintiff."  *Hollonbeck v. U.S. Olympic Committee*, 513 F.3d 1191, 1194

(10th Cir. 2008) (citing *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1151 (10th Cir. 1999))

(emphasis added); *see* 29 U.S.C. § 794(a).  Here, the FAC sufficiently alleges facts to survive a

motion to dismiss on Count One.  FAC at ¶¶42, 46, 168-186; *see Shaw v. Cherokee Meadows, LP*,

No. 17-CV-610-GKF-JFJ, 2018 WL 2770200, at *4 (N.D. Okla. June 8, 2018) (holding that

plaintiff sufficiently pleaded federal financial assistance to deny motion to dismiss).  Defendants'

Motion contests only the third element of this claim, arguing that CoreCivic and TransCor did not

receive federal financial assistance in connection with their transportation and detention of

Immigration and Customs Enforcement ("ICE") detainees at CoreCivic's Cibola County Correctional Center ("Cibola").  *See* Motion at 4-7.

The question of whether Defendants received federal financial assistance is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss.[1]  *PAS Commc'ns, Inc. v. U.S. Sprint, Inc.*, 112 F. Supp. 2d 1106, 1111 (D. Kan. 2000).  The "vast majority of courts faced with the issue of whether an entity receives federal financial assistance within the meaning of the civil rights law have concluded that the resolution of the issue ***requires inquiry into factual matters outside the complaint*** and, accordingly***, is a matter better suited for resolution after both sides have conducted discovery on the issue.*"  *Id.* (emphasis added) (gathering supporting cases: *Shepherd v. U.S. Olympic Committee*, 94 F. Supp. 2d 1136, 1146-47 (D. Colo. 2000); *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 26 F. Supp. 2d 1001, 1008 (W.D. Mich. 1998); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 492 (D.N.J. 1998); *Gazouski v. City of Belvidere*, No. 93-C-20157, 1993 WL 515858, at *3 (N.D. Ill. Dec. 13, 1993); *Gonzalez v. Dev. Assistance Corp.*, No. 88-0191-LFO, 1989 WL 205634, at *3 (D.D.C. June 21, 1989); *Bellamy v. Roadway Express, Inc.*, 668 F. Supp. 615, 618 (N.D. Ohio 1987); *Squire v. United Airlines, Inc.*, 973 F. Supp. 1004, 1009 (D. Colo. 1997)).

A particularized record on federal funding is especially important in Section 504 cases that involve ***private*** entities—including this action—because Section 504's coverage is ***program-specific*** with respect to a private entity that "receives federal funds for a specific and limited purpose."  *Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002); *see* 29 U.S.C. § 794(b)(3)(B).  Thus, the question of whether Defendants received federal financial assistance is a fact-intensive inquiry that is not appropriate for resolution on this Motion.

_____

[1] Congress did not define the term "federal financial assistance" in the Rehabilitation Act. *DeVargas v. Mason & Hangar-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990).

3

Defendants argue that their "contractual arrangements" with ICE are not federal financial assistance because these arrangements "are not subsidies." Motion at 6. Defendants are wrong. This argument is a gross oversimplification of how courts determine what constitutes "federal financial assistance." *See Moreno v. Consol. Rail Corp.*, 99 F.3d 782, 787 (6th Cir. 1996) ("Congress may not have chosen to say in so many words that it was subsidizing Conrail and other railroads, but actions sometimes speak louder than words . . .."). The Tenth Circuit has adopted a "government intention" test to assess whether a particular piece of funding qualifies as federal financial assistance. *DeVargas v. Mason & Hangar-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990) (citing *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208-10 (9th Cir. 1984)). The Ninth Circuit's decision in *Jacobson*, upon which *DeVargas* relies, further explains the government-intention test, instructing:

> [I]n determining which programs are subject to the civil rights laws . . . Courts should determine whether the government intended to provide assistance or merely to compensate. The relevant intention is that of Congress or that of the administrative agency to which Congress has delegated the power to determine whether assistance should be provided.

742 F.2d at 1210; *see Shepherd*, 94 F. Supp. 2d at 1146-47 (considering *Jacobson* for guidance in light of the controlling *DeVargas* decision's reliance on it). In discerning governmental intent, courts refer "to the statutory authority for the particular disbursements at issue," including legislative history, as well as "relevant administrative documents" and regulations, among other sources. *Jacobson*, 742 F.2d at 1210, 1213-15; *see, e.g.*, *U.S. Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 604 (1986) (looking at "underlying grant statutes" to determine whether airlines received federal assistance); *DeVargas*, 911 F.2d at 1382 (weighing agency study and competitive bidding process for government contracts).

The FAC sufficiently pleads facts to warrant discovery on this issue. Plaintiff's allegations that CoreCivic and TransCor "received federal funds for [their] services pursuant to [their]

contracts with ICE" (FAC at ¶¶ 42, 46)—which Defendants "do not dispute" (Motion at 6)—are

sufficient to state a claim for relief. *See PAS Commc'ns*, 112 F. Supp. 2d at 1111 (holding that

complaint's allegation "that defendant receives 'federal financial assistance subject to institution-

wide coverage'" sufficiently stated a claim under Title VI of the Civil Rights Act of 1964, which

uses "federal financial assistance" in an analogous context to Section 504).  The FAC alleges that

Defendants' contracted activities were subject to agency directives that evidence the Department

of Homeland Security's ("DHS") intent to hold Defendants accountable to Rehabilitation Act

standards.  FAC at ¶¶ 162, 163, 175; *see Moreno*, 99 F.3d at 787 (provision in defendant railroad's

"master agreement" with state highway commission for federal funding, in which defendant

"promise[d] to comply with the nondiscrimination regulations for federally assisted programs,"

supported holding that defendant received federal financial assistance).  For instance, DHS's

*Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs*

*and Activities (Non-Employment)*[2] implements federal disability rights laws, including the

Rehabilitation Act, and defines the agency's "conducted programs and activities" to "***include[e]***

***those carried out through contractual or licensing agreements***."[3]

---

[2] DEP'T OF HOMELAND SECURITY, INSTRUCTION NO. 065-01-001: INSTRUCTION ON
NONDISCRIMINATION FOR INDIVIDUALS WITH DISABILITIES IN DHS-CONDUCTED PROGRAMS AND
ACTIVITIES (NON-EMPLOYMENT), *available at*
https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-
individuals-disabilities_03-07-15.pdf (last visited Dec. 1, 2020); *see also* DEP'T OF HOMELAND
SECURITY, DIRECTIVE NO. 065-01: NONDISCRIMINATION FOR INDIVIDUALS WITH DISABILITIES IN
DHS-CONDUCTED PROGRAMS AND ACTIVITIES (NON-EMPLOYMENT) (2013) (the DHS Directive
implemented by the foregoing Instruction), *available at*
https://www.dhs.gov/sites/default/files/publications/dhs-management-directive-disability-
access_0_0.pdf.

[3] INSTRUCTION NO. 065-01-001, *supra* note 2, at § IV.D (emphasis added); *see also id.* at § IV.F
(defining ***facility*** as "[a]ll or any portion of a building, structure, equipment, road, walk, parking
lot, rolling stock (e.g., buses, vans, cars, railcars, or other conveyances), or other real or personal
property that owned, leased, or used by DHS or its contractors".).

Additionally, in their Answer to Paragraph 118 of the FAC, "Defendants admit and affirmatively allege . . . that CoreCivic houses immigration detainees at [Cibola] pursuant to an Intergovernmental Service Agreement [("IGSA")] between ICE and Cibola County and a Management Agreement between Cibola County and CoreCivic." Doc. 28 at ¶ 118. Standard 4.8 of ICE's 2011 *Performance-Based National Detentions Standards* ("PBNDS") ("Disability Identification, Assessment, and Accommodation")[4] affirms that the standard applies to IGSA facilities, as well as Contract Detention Facilities ("CDFs"),[5] and requires such facilities to, *inter alia*, "comply with Section 504 of the Rehabilitation Act of 1973."[6]  *See* FAC at ¶¶ 152-163 (alleging that 2011 PBNDS, among other agency directives, governed Defendants' activities). Imposition of Section 504 liability on IGSA facilities and CDFs is consistent with *Paralyzed Veterans*' stated rationale for Section 504 coverage as being "a form of contractual cost of the recipient's agreement to accept the federal funds," and supports the conclusion that DHS and ICE intended to provide Defendants federal financial assistance. 477 U.S. at 605.

The statutory authority for the Secretary of Homeland Security[7] to enter into IGSAs like the one at issue here lies at 8 U.S.C. § 1103(a)(11).  *See also* 8 U.S.C. § 1231(g) (providing the Secretary power to "arrange for appropriate places of detention for [non-citizens] detained pending removal or a decision on removal").  Subsection (A) of § 1103(a)(11) authorizes DHS "to make

---

[4] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011, *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (last visited Dec. 1, 2020).

[5] *Id.* at § 4.8.I, p. 344.

[6] *Id.* at § 4.8.II, p. 344.

[7] While 8 U.S.C. § 1103(a)(11) refers to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the Attorney General's duties and "the functions of the Immigration and Naturalization Service to the Department of Homeland Security." Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68. Fed. Reg. 9824, 9824 (Feb. 28, 2003). *Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005).

6

payments . . . for necessary clothing, medical care, necessary guard hire, and the housing, care, and security" of immigration detainees "under an agreement with a State or political subdivision" thereof. 8 U.S.C. § 1103(a)(11)(A). Subsection (B) empowers DHS "to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services . . . ." 8 U.S.C. § 1103(a)(11)(B). These "cooperative agreements" sound less in terms of procurement than subsidy. *See* 31 U.S.C. § 6305 ("Using cooperative agreements"); 2 C.F.R. § 200.24 ("Cooperative agreement means a legal instrument of *financial assistance* between a Federal awarding agency or pass-through entity and a non-Federal entity . . .") (emphasis added). Moreover, assuming some portion of the federal funds that CoreCivic and TransCor receive from ICE are used to ***improve*** property these entities own (*see* Answer, Doc. 28 at ¶¶ 44, 118), the funds were intended as financial assistance that goes beyond mere compensation and would bring Defendants within the coverage of Section 504. *See Moreno*, 99 F.3d at 788. And, to the extent that compensation is defined as payment for services rendered, *see Jacobson*, 742 F.2d at 1209, ICE provides Defendants a subsidy if the Cibola contracts include a local detention bed minimum, by which the agency would in fact be paying for services ***not rendered*** in order to ensure available beds when and if the agency needs them.

The FAC, moreover, specifically does ***not*** allege that these contracts were procurement contracts. Defendants point to the Section 504 implementing regulation issued by the Department of Health and Human Services (formerly the Department of Health, Education, and Welfare) that interprets federal financial assistance as excluding procurement contracts (Motion at 5), but Defendants ignore that this provision, 45 C.F.R. § 84.3(h), ***includes*** "any grant, loan, ***contract***, ... or any other arrangement by which the Department provides or otherwise makes available

assistance . . . ." *Id.* (emphasis added).[8]   Defendants' characterization of these contracts as procurement contracts improperly relies on claimed facts outside the pleadings.

Given that Defendants are private entities which received federal funding for specific purposes, discovery of at least the contracts at issue, as well as information concerning the contract bidding, negotiation, monitoring, and inspection processes, is necessary to determine whether Defendants received federal financial assistance under Section 504.   *See, e.g.*, *Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1092 (10th Cir. 2020) (looking at term in community corrections program contract between county and state agency that bound the former's subcontractors to agency's standards); *Moreno*, 99 F.3d at 785-86 (reviewing defendant railroad's contract with state highway department and observing that the district court even heard testimony from a former state official with regard to the financial assistance issue); *DeVargas*, 911 F.2d at 1382 (giving weight to contract's bidding process in determining federal financial assistance issue); *Mullen v. S. Denver Rehab., LLC*, No. 18-cv-01552-MEH, 2020 WL 2557501, at *26 (D. Colo. May 20, 2020) (engaging in detailed analysis of defendant's management contract to determine whether it received federal financial assistance); *Tanberg v. Weld Cty. Sheriff*, 787 F. Supp. 970, 974 (D. Colo. 1992) (holding as a matter of law that sheriff's department received federal financial assistance after reviewing its annual financial reports).   For these reasons, Defendants' Motion should be denied as to Plaintiff's Section 504 claim.

---

[8] The equivalent implementing regulation by the Department of Homeland Security—the executive agency providing Defendants federal funding here—nowhere defines federal financial assistance.  6 C.F.R. § 15.3; *cf., e.g.*, *DeVargas*, 911 F.2d at 1383 (citing 10 C.F.R. § 1040.2(b)(3)) (underscoring Department of Energy regulation excluding procurement contracts from Section 504 coverage); *Cook v. Budget Rent-A-Car Corp.*, 502 F. Supp. 494, 497 n.5 (S.D.N.Y. 1980) (citing regulations from six agencies that define federal financial assistance to exclude procurement contracts).

C.      THE FAC STATES A CLAIM FOR NEGLIGENCE PER SE

Defendants agree that in order for a negligence per se claim to survive a motion to dismiss, a complaint must sufficiently allege that "(1) there is a statute which prescribes certain actions or defines a standard of conduct; (2) the defendant violates the statute; (3) the plaintiff is in the class of persons sought to be protected by the statute; and (4) the harm or injury to the plaintiff is generally of the type that the legislature, through the statute, sought to prevent."  Motion at 7; *Ward v. Presbyterian Healthcare Servs.*, 79 F. Supp. 2d 1276, 1278 (D.N.M. 1999) (citing *Castillo v. United States*, 552 F.2d 1385, 1388 (10th Cir. 1977)); *Heath v. La Mariana Apartments*, 180 P.3d 664, 666 (N.M. 2008) (quoting *Archibeque v. Homrich*, 543 P.2d 820, 825 (N.M. 1975)). Federal standards, directives, or policies may have "the force and effect of statute" for purposes of this test where they are adopted or promulgated by or pursuant to federal or state law.  *See Ray v. Aztec Well Service Co.*, 748 F.2d 888, 889 (10th Cir. 1984) (holding the National Fire Prevention Association Standards had the "force and effect of statute" because they were adopted and promulgated by a state committee); *Apodaca v. AAA Gas Co.*, 73 P.3d 215, 233 (N.M. App. 2003), *cert. quashed* 88 P.3d 263 (N.M. 2004) (TABLE) ("Rules and regulations adopted by city ordinance have the force and effect of law" and holding the National Fire Prevention Association guidelines for fire prevention, which are not themselves a statute or regulation but were adopted by city ordinance, support a claim for negligence per se); *see also Heath*, 180 P.3d at 668 n.1 ("The question is simply whether the legislature or other enacting body has defined a standard of care such that the jury may be instructed on that standard in lieu of the common law standard.").

The FAC has sufficiently alleged the elements of a negligence per se claim.  The FAC alleges that Plaintiff's negligence per se claim is based upon Defendants' violation of various rules and regulations adopted or promulgated by federal law or statute and other standards explicitly provided by federal regulations.  FAC at ¶¶ 152-167, 187-201.  The FAC further alleges that

Plaintiff's negligence per se claim is based on IHSC Directives, the PBNDS, the applicable regulations and licensing requirements, and the terms of Defendants' contracts with ICE.  FAC at ¶ 190 ("Each Defendant was required by IHSC Directives, [the PBNDS], the applicable regulations and licensing requirements, and the terms of its contract(s) with ICE to assess Roxsana's medical fitness for travel before she was transported."); *see, generally, id.* at ¶¶ 187-201.  In contradiction of Defendants' arguments (Motion at 9), the FAC specifically identifies and explains in detail the duties and standards of care which are applicable to the Defendants and support Plaintiff's claim of negligence per se.  FAC at ¶¶ 152-167.  Plaintiff further alleges that Roxsana was in the class of persons that was intended to be protected by these applicable duties and standards of care, that Defendants breached these duties and standards of care, and that the harm and injury to Roxsana was precisely the harm and injury intended to be prevented by these standards.  *Id.* at ¶¶ 187-210.  These allegations are plainly sufficient to survive a motion to dismiss.

Defendants argue that "[n]egligence per se is not applicable to 'an entity's alleged failure to comply with internal rules or policies'" and "violation of the terms of a contract does not establish negligence per se."  Motion at 8 (internal citations omitted).  Defendants' arguments are inapplicable.  A far cry from Transcor's or Corecivic's own "internal rules or policies" or simple violations of their contracts, the applicable standards of care and duties identified by Plaintiff here have the force and effective of law, either through federal regulation or through statute.[9]

---

[9] For this reason, the cases that Defendants cite are either inapposite or support the validity of Plaintiff's claims here.  *See* Motion at 8: *Valdez-Barela v. Corr. Corp. of Am. and Corizon Health Inc.*, No. A-1-CA-37384, 2019 WL 3766391, at *2 (N.M. App. July 16, 2019) (rejecting negligence per se argument based upon defendant's failure to comply with *defendant's own internal policies* regarding segregation of inmates); *Grassie v. Roswell Hosp. Corp.*, 258 P.3d 1075, 1091-93 (N.M. App. 2010) (in deciding whether expert testimony is required to demonstrate hospital liability for corporate negligence in hiring and managing, the Court rejected plaintiff's argument that an "[a]greement by itself can or should be used to set the definitive standard of conduct against which the Hospital's action must be measured"); *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 750 P.2d 118, 124 (N.M. 1988) (holding a "private action for the breach

Congress mandated ICE to require federal contractors, including these Defendants, to comply with the PBNDS pursuant to an Appropriations Bill, 114 H. Rpt. 668 at 35 (adopted July 6, 2016), which gives the PBNDS the "force and effect of statute" for purposes of the four-part test. *See Ray*, 748 F.2d at 889 (holding that the National Fire Prevention Association Standards, which "were adopted by the New Mexico Construction Industries Committee pursuant to its authority to 'adopt and promulgate such rules and regulations as are necessary to carry out the purposes' of the Liquid Petroleum Gas Act" had "the force and effect of statute for purposes of the [four-part] test," while also taking judicial notice of a handbook the Committee had adopted as part of its regulations) (internal citations omitted). The PBNDS require all government contracts with any private detention facilities and transport companies to adhere to these requirements. As the 2017 Department of Homeland Security Appropriations Bill, adopted on July 6, 2016, provides:

Within 45 days after the date of enactment of this Act, ICE shall report on its

---

of an oath taken by an attorney will also not lie[]" because no action for negligence existed in the case thus negligence per se "a method of proving negligence where a cause of action already exists" also cannot lie); *Titchnell v. Unites States*, 681 F.2d 165, 169-173 (3rd Cir. 1982) (decision "determining whether expert testimony presented at trial was sufficient to establish the standard of care required of [clinic] personnel in administering the swine flu vaccine" and nowhere discussing negligence per se); *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004) (decision nowhere addressing negligence per se but again addressing whether expert testimony was necessary to establish applicable standard of care, and in determining that plaintiff therein did not offer probative expert testimony on the applicable standard of care notes that the trucking company defendant's "self-imposed policy with regard to inspection of its trailers" does not establish the standard of care as a "company's internal policies 'alone do not determine the governing standard of care.'") (quoting *Fenley v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex. App. 1999)); *Pedroza v. Bryant*, 677 P.2d 166, 170-71 (Wash. 1984) (holding the accreditation standards of the Joint Commission on Accreditation of Hospitals and the hospital's own bylaws, which the Hospital is required to adopt by statute and regulation, can serve as the source of the standard of care applicable to hiring doctors); *Sapp v. W.T. Grant Co.*, 341 P.2d 826, 828 (Cal. App. 1959) (internal operating rules of a railway company can be used as evidence bearing on the standard of care appropriate for truck crossings); *Bryan v. S. Pac. Co.*, 286 P.2d 761, 765 (Ariz. 1955) (noting "the rules of an employer adopted for the safe operation of its business have probative value in establishing" the standard of care in a negligence action, but violation of such rule would not constitute negligence per se).

progress in implementing the 2011 Prison Based National Detention Standards (PBNDS) and requirements related to the Prison Rape Elimination Act (PREA), including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance. ***The Committee expects ICE to refrain from entering into new contracts or IGSAs that do not require adherence to the PREA and 2011 PBNDS standards.***"

114 H. Rpt. 668 at 35 (adopted July 6, 2016) (emphasis added).  Moreover, the PBNDS incorporate applicable regulations, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and require private contractors retained by ICE, like the Defendants, to comply with Section 504.[10]

Private detention facilities and transport companies that detain and transport migrants and asylum-seekers are also bound by federal regulations.  For example, 8 C.F.R. § 287.8(d) states: "[a]ll persons will be transported in a manner that ensures the safety of the persons being transported." *Id.*  Also, 8 C.F.R. § 235.3(e), entitled "Detention in non-Service facility," provides:

Whenever a[ ] [non-citizen] is taken into Service custody and detained at a facility other than at a Service Processing Center, ***the public or private entities contracted to perform such service*** shall have been approved for such use by the Service's Jail Inspection Program ***or shall be performing such service under contract*** in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the [non-citizen's] place of detention. ***Under no circumstances shall a[] [non-citizen] be detained in facilities not meeting the four mandatory criteria for usage. These are: (1) 24-Hour supervision, (2) Conformance with safety and emergency codes, (3) Food service, and (4) Availability of emergency medical care***.

*Id.* (emphasis added).   These subchapters apply to the Defendants both explicitly and by incorporation into the contracts they entered with ICE to detain and transport Roxsana.  *See* 114 H. Rpt. 668 at 35.  The requirements of the standards relied upon by Plaintiff are highly specific

---

[10] *See* Department of Homeland Security, U.S. Immigration and Customs Enforcement, "Progress in Implementing 2011 PBNDS Standards and DHS PREA Requirements at Detention Facilities, Fiscal Year 2017 Report to Congress," dated March 19, 2018, *available at* https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Progress%20in%20Implementing%202011%20PBNDS%20Standards%20and%20DHS%20PREA%20Requirements_0.pdf.

and must be complied with under federal law.  *Heath*, 543 P.2d at 666 (holding any statute used for a negligence per se instruction must "define[ ] the duty with specificity."); *see* FAC at ¶¶ 152-167, 187-202 (explanation of duties and standards of care).

Defendants also contend, in a footnote, that Plaintiff's negligence per se claim is "unnecessary" because "negligence per se is not technically a separate cause of action[,]" citing *Rawers v. United States*, 2020 WL 5663427, at \*39 (D.N.M. Sept. 23, 2020).  Motion at 9, n.3. *Rawers*, in fact, stands for the proposition that a plaintiff is ***not required*** to identify specific statutory or regulatory provisions to support a negligence per se claim where the complaint, like here, sufficiently places a defendant on notice that negligence per se may be the method used by the plaintiff to prove a negligence claim.  *Id.* at \*40.  In fact, the Court in *Rawers* goes on to hold that the plaintiff could prosecute and prove a negligence per se claim ***even though that claim was not even alleged in that plaintiff's complaint.*** *Id.* at \*40 ("Rawers has not . . . included the magic language 'negligence per se' in the Complaint.  Still Rawer's Complaint has sufficient details to put the United States on notice of this 'method of proving negligence.'") (quoting *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 750 P.2d 118, 124 (N.M. 1988)).  Because the FAC sufficiently alleges all elements of a negligence per se claim, the Motion should be denied.

### D.   THE FAC SUFFICIENTLY ALLEGES DEFENDANTS FAILED TO EXERCISE DUE CARE IN HIRING, RETAINING, TRAINING, AND/OR SUPERVISING THEIR EMPLOYEES WHO WERE CHARGED WITH ROXSANA'S CUSTODY

In order to state a claim for negligent training or supervision, Plaintiff must allege that Roxsana was harmed by Defendants' negligence in training, supervising, or otherwise controlling its employees.  *F & T Co. v. Woods,* 1979-NMSC-030, ¶ 10, 92 92 N.M. 697, 699, (N.M. 1979). Defendants argue that Counts Fourteen and Sixteen should be dismissed because the totality of Plaintiff's allegations amount to a "single incident" and that Plaintiff fails to identify any specific

deficiencies in Defendants' training programs or the fitness of its employees.  Motion at 10-11.

Defendants misstate the law and mischaracterize the facts.

First, the FAC sufficiently pleads Defendants' negligence.  Under New Mexico law, a

plaintiff must establish four elements to prevail on a claim of negligence: "(1) defendant's duty to

the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to

the plaintiff, and (4) the breach of duty as cause of the injury." *Zamora v. St. Vincent Hosp.*, 335

P.3d 1243, 1249 (N.M. 2014).  "The proper standard for determining whether an employer should

be held liable for negligent supervision or retention of an employee [is]. . . whether the employer

knew or reasonably should have known that some harm might be caused by the acts or omissions

of the employee who is entrusted with such position." *Cain v. Champion Window Co. of*

*Albuquerque, LLC*, 2007-NMCA-085, ¶ 18, 142 N.M. 209, 215 (2007).  Here, the FAC adequately

pleads all four elements relating to Counts Fourteen and Sixteen.  *See* FAC ¶¶ 143-162, 164-167,

323-338, 352-365.

With respect to the element of duty, New Mexico has adopted the Restatement (Third) of

Torts, which employs a policy-driven approach rather than focusing on the foreseeability of the

plaintiff's harm.  *See Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.,* 2014-NMSC-014, ¶ 1, 326

P.3d 465, 467.  Here, Plaintiff pleaded that Defendants and their employees owed Roxsana the

duty to exercise reasonable care under the circumstances.  Specifically, the FAC alleges that:

- Roxsana was in Defendants' physical custody (FAC ¶¶325, 354);

- "Employees of Defendant TransCor, who were charged with Roxsana's custody and care pursuant to Defendant TransCor's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm" (FAC ¶325);

- That TransCor owed her the duty to "hire competent employees," who "follow the safety guidelines required of all federal contractors with ICE" (FAC ¶327);

- TransCor "negligently retained these employees, and/or failed to adequately train and supervise the employees who repeatedly breached their duty of care to

Roxsana" (FAC ¶ 327); and

- "TransCor's negligence included the failure to adequately hire, train, supervise and correct its employees on conducting fitness for travel screening before transporting such detainees, on the necessity of providing adequate food, water, medication and restroom access, and on responding to emergent medical problems during transport." FAC ¶328.

Plaintiff, likewise, pleaded that CoreCivic owed Roxsana the same duty of care. *Id.* at ¶¶ 354, 356-360.

New Mexico courts look to laws that regulate conduct to determine the existence and scope of duty. *See Narney v. Daniels*, 1992-NMCA-133, ¶ 41, 115 N.M. 41, 51, (finding that defendants' police department had a duty to hire and retain only mentally fit officers based on the statutory requirements for permanent employment). Here, Plaintiff supports her assertions that Defendants owed Roxsana a duty of care by citing several applicable laws and policies that Defendants were bound to follow and were enacted to ensure people in Defendants' custody, like Roxsana, were free from imminent risks of harm. FAC at ¶¶ 152-163 (describing 13 mandatory laws and policies that required Defendants to provide Roxsana with a medical screening within 12 hours of being taken into custody, 30 days of HIV medication prior to transport, emergency medical care, continuity of care, transfer of her medical records, as well as the regular provision of food, water and restroom access).[11] The FAC alleges that Defendants' employees, who were charged with Roxsana's custody, violated these laws and policies by denying Roxsana access to emergency medical care and basic necessities of living, despite Roxsana's visible illness the entire duration

---

[11] While the absence of such laws and protocols outlining the duty of care owed does not foreclose a plaintiff's ability to recover, where the legislative authorities have provided such guidance, as here, they are evidence of what constitutes the exercise of ordinary care and are precisely the policy considerations that the Supreme Court of New Mexico has held instructive in determining the existence of the duty element. *Rodriguez v. Del Sol Shopping Ctr. Assocs.*, 2014-NMSC-014 at 472. Moreover, "[f]oreseeability and breach ***are questions that a jury considers*** when it decides whether a defendant acted reasonably under the circumstances of a case or legally caused injury to a particular plaintiff." *Id.* at 468 (emphasis added).

of time Defendants were responsible for her care.  FAC at ¶¶ 324-326, 353-355. Plaintiff further

alleges that, over the course of eight days while Roxsana was hospitalized and in the custody of

Defendant CoreCivic, at least one of its employees stood guard around the clock shackling her,

only removing her restraints when medical providers needed them to do so, and only after calling

"central," which further delayed medical providers' emergency care to Roxsana at this critical

time.  *Id.* at ¶¶ 144-151, 355-356.  As a result of these acts and omissions, Roxsana's physical

condition deteriorated and she suffered physical and emotional pain and ultimately death.  *Id.* at

¶¶335, 362.  Such facts "permit the court to infer more than the mere possibility of misconduct"

as required.  *Iqbal*, 556 U.S. at 679.

Defendants' Motion attempts to chalk up all of Plaintiff's allegations to a "single incident,"

which they argue is insufficient to establish her claims of negligent hiring, retention, training and

supervision, relying on *Linkewitz v. Robert Heath Trucking, Inc.*, No. CV 13-0420 WPL/RHS,

2013 WL 12138884, and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), to support this

position.  Motion at 10.  Defendants are incorrect.

In fact, this Court has previously rejected a similar argument made by CoreCivic, where it

relied on *Linkewitz* to support the same incorrect interpretation the company advances here.  In

*Lucero v. CoreCivic, Inc.,* No. 1:19-cv-620-WJ-KK,  WL 4918780, at *2 (D.N.M. Oct. 4, 2019),

the Court denied defendant/employer CoreCivic's motion to dismiss its plaintiff/employee's

claims of failure to train and supervise after the plaintiff was assaulted on the job by a detainee

and her coworkers failed to respond to her request to open a door to allow her escape.  This Court

rejected CoreCivic's argument that this one instance was insufficient, holding that allegations that

"defendants' negligence in failing to exercise reasonable care and diligence in the control room,

supervise the inmate, secure the hallway, and provide adequate training and staff to supervise and

manage the inmate population caused her injuries" were sufficient at the pleadings stage.  *Id.* at

*1.  The Court further rejected Corecivic's reliance on *Linkewitz*, where it stated:

> Defendants misread that case. The claims were dismissed not because the plaintiff did not allege more than a single incident, but because the facts alleged made 'it no more than possible, rather than plausible' that the defendant's negligence could be attributed to improper training or supervision.

*Id.* at *2 (internal citation omitted).

Moreover, even if there were a bright-line rule that a single incident of wrongdoing is insufficient to make out a cause of action under negligence, which there is not, Defendants cannot collapse all the facts alleged in the FAC as the isolated acts of one bad apple.  *See* Motion at 10. Defendants' reliance on *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), is misplaced, not only because that decision addresses the standard for a completely different cause of action,[12] but also because it suggests that only one officer failed to exercise due care.  However, the FAC alleges facts regarding the repeated and multiple instances of wrongful conduct by multiple employees over the course of several days.  The FAC states that multiple TransCor employees (1) transported Roxsana on May 16, 2018, despite lacking the required medical documentation and medications to do so, (2) ignored the pleas from other detainees to provide Roxsana with immediate medical care, and (3) failed to provide sufficient food, water, and restroom access.  FAC ¶¶ 111-123, 324-326, 333, 335.  Likewise, the FAC alleges that multiple CoreCivic employees were charged with Roxsana's care failed to render immediate medical care and rotated their guard at her bedside 24 hours a day from May 17 through May 25, 2018.  *Id.* at ¶¶ 118-134, 143-151.  For the last eight days of her life, CoreCivic's employees shackled Roxsana, who weighed a mere 89 pounds, by her wrists and ankles to a hospital bed, only removing them when medical providers needed to

---

[12] *City of Canton* addresses the standard under a theory of municipal liability for constitutional deprivations of individual actors pursuant to 42 U.S.C. § 1983, not New Mexico's cause of action for negligent hiring, retention, training and supervision.  *See City of Canton, Ohio*, 489 U.S. at 380.

administer care, and only after Defendants' employees called "central" for approval, which delayed the administration of emergency medical care to Roxsana.  *Id.* at ¶¶ 143-151.  These employees cruelly continued to do so even after Roxsana went into cardiac arrest and medical providers medically paralyzed Roxsana during their attempts to resuscitate her.  *Id.*  Defendants' premise that Plaintiff's allegations relate to a single incident ignore the reality of the facts as pleaded, which must be taken as true:  an unbroken sequence of TransCor and CoreCivic employees consistently breached the applicable standards of care over a period of ten days.  *See* FAC ¶¶ 143-161, 164-167, 323-338, 353-365.  As a factual matter, the "single incident" Defendants describe is actually an extended pattern of tortious acts and omissions by their employees, and Defendants' failure to interrupt and remediate this conduct plausibly states a claim.

Defendants' argument that the FAC does not plead any specific deficiencies in Defendants' training of its employees or lack of fitness of particular employees responsible for Roxsana's care, Motion at 16, also fails.[13]  Plaintiff has alleged ample facts supporting the plausible inference that Defendants failed to exercise reasonable care in hiring, retaining, training, and/or supervising the multiple employees who in multiple instances failed to adhere to legally binding standards for Roxsana's care.  For example, the fact that the CoreCivic employees who monitored Roxsana around the clock called "central" every time she needed to be unshackled so that medical providers could administer care undermines any argument that their superiors were unaware of the practice— indeed, they supervised and approved of it.  FAC at ¶¶ 143-151.

Furthermore, Defendants knew or should have known about Roxsana's serious medical

---

[13] In *Lucero*, the plaintiff similarly did not assert any facts of this nature, yet the Court held that "the alleged facts allow the Court to draw a reasonable inference that Defendants failed to properly supervise an inmate, provide adequate staff to supervise and manage the inmate population, and properly train employees and staff to support and manage the inmate population." *Lucero,* 2019 WL 4918780, at *2.

condition.   The FAC alleges that Defendants had custody of Roxsana by virtue of their participation in ICE's "streamlined transfer process," which is the "established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities" and "requires coordination across several ERO field offices but results in efficient processing and transport of the large number of [non-citizens] entering the U.S. at the San Ysidro POE." *Id.* at ¶¶ 56-59.   Because TransCor was contracted by ICE to transport Roxsana and CoreCivic was contracted to run the facility that was Roxsana's final destination, both were required by law to have Roxsana's complete medical records and know of her medical condition to lawfully transport and detain her:

> ICE Policy 11022.1 requires that the complete medical record, medical summary and at least 7 days of medication accompany any person transferred within ICE custody.  Section 5-11 provides: "[t]he transporting officer may not transport a detainee without the Medical Transfer Summary.  The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary."

*Id.* at ¶¶ 160-161 (internal citation omitted).

 In short, the FAC alleges that both Defendants knew or should have known about Roxsana's medical condition, including the fact that she was found medically unfit for transportation and detention days prior.  FAC at ¶¶ 41, 45, 47, 160-161.  Such inferred knowledge is all that is required when the facts make clear that the exercise of ordinary care should have led the defendant to become aware of misconduct and appropriately intervene.  *See, e.g., Methola v. Eddy Cty.,* 1981-NMCA-048, ¶ 17, 96 N.M. 274, 278, 629 P.2d 350, 354 (affirming the trial court's finding that jail personnel breached their duty of care to a prisoner who was beaten for three nights and failed to intervene where the noise of the beating was so loud that it was heard by other people in custody: "[t]he trial judge's decision makes it clear that he was not primarily concerned with what the jailers knew about the prisoners in the cell where plaintiff [ ] was placed; he was

convinced that, in the exercise of due care, the jailers would and should have learned of the assault and protected the incompetent's safety.  Instead, they 'negligently failed [in] their duty to come to the aid or to rescue him.'"); *see also Simon v. Akin*, 79 N.M. 689, 448 P.2d 795 (1968); *Williams v. Herrera*, 83 N.M. 680, 496 P.2d 740 (Ct. App. 1972); *F & T Co. v. Woods,* 1979-NMSC-030, ¶ 10, 92 N.M. 697, 699.

Similar to the facts in *Methola,* Plaintiff has alleged sufficient facts to support the plausible inference that Defendants acted with negligent or reckless disregard for Roxsana's life by repeatedly failing to enforce the compliance of its staff with multiple laws and standards intended to protect her.  Because Roxsana was visibly and dangerously ill, the widespread and repeated acts and omissions of Defendants' employees over the span of days (in the case of CoreCivic) and several hours (in the case of TransCor) allow a fact finder to reasonably conclude that Defendants would and should have discovered their employees' misconduct had they exercised due care, without the necessity of naming specific training deficiencies or the unfitness of the individual employees.  The facts asserted by the FAC are more than sufficient to "nudge" Plaintiff's claims "across the line from conceivable to plausible" that Defendants breached their duty of care to Roxsana by either hiring or retaining incompetent employees, and/or by failing to provide adequate training and supervision to control those employees responsible for her care, resulting in Roxsana's hastening demise and ultimate death.  *Iqbal*, 556 U.S. at 680 (internal citation omitted).

In addition, Plaintiff also cites prior instances where Defendants' employees failed to provide timely or adequate medical care to other ill detainees resulting in injury or death.  *See* FAC at ¶182 n. 29.[14]  Two of these prior instances include eerily similar facts as this case.  First, on

---

[14] Although these prior instances were included in the FAC under a different cause of action, the Court may consider them when assessing the sufficiency of Plaintiff's assertions under Counts Fourteen and Sixteen.  *See Doe v. Albuquerque Pub. Sch.*, No. 18-CV-00085 WP/KK, 2018 WL

March 1, 2016, Gerardo Cruz-Sanchez died in Defendant CoreCivic's custody from pneumonia after staff failed to provide him with medical care despite his inability to eat for a week, vomiting blood, and repeated requests for medical attention. *Id.*  In the surviving spouse's wrongful death suit, the Southern District of California denied CoreCivic's motion for summary judgment and found that CoreCivic had a duty to provide medical care to those in its custody and that a material issue of fact existed as to whether CoreCivic had trained its employees to respond to medical emergencies. *Estate of Cruz-Sanchez by & through Rivera v. United States*, No. 17-CV-569-AJB-NLS, 2019 WL 4508571, at *6 (S.D. Cal. Sept. 17, 2019), *reconsideration denied*, No. 17-CV-569-AJB-NLS, 2020 WL 3868495 (S.D. Cal. July 9, 2020).  Second, on May 1, 2016, Igor Zyazin also died in Defendant CoreCivic's custody when its employees failed to provide him with medical care, despite his documented heart condition and repeated complaints of chest pains and feeling ill.  *See* FAC at ¶ 182 n. 29.  Finally, the FAC also references *Curtis v. TransCor Am., LLC*, 877 F. Supp.2d 578, 579 (N.D. Ill. 2012), a wrongful death suit against TransCor, for transporting Joseph Curtis in 95-degree weather without air conditioning who died as a result; as well as *Kinslow v. Transcor Am., LLC*, No. CIV A 06 C 4023, 2006 WL 3486866, at *1 (N.D. Ill. Dec. 1, 2006), *aff'd sub nom*. *Kinslow v. Pullara*, 538 F.3d 687 (7th Cir. 2008), a *pro se* lawsuit in which TransCor's employees failed to provide a person in their custody with medical transportation for over 6 days causing him severe pain, deterioration of his condition, and rendering his Hepatitis C treatment ineffective.[15]

In sum, the FAC has alleged sufficient facts to support Plaintiff's claims against both CoreCivic and TransCor for negligent hiring, retention, training, and/or supervision and

2422013, at *8 (D. N.M. May 29, 2018) (relying on factual allegations from different parts of the complaint to assess the sufficiency of another claim pleaded).

[15] The case was dismissed for failure to assert a claim under Section 1983.

Defendants' Motion should be denied.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' Motion should be denied.  To the extent the Court finds any deficiencies in the pleadings, Plaintiff respectively seeks leave to amend the FAC in order to address any such deficiencies.

Dated:  December 7, 2020

Respectfully submitted,

*/s/ DANIEL YOHALEM*
Daniel Yohalem, Attorney at Law
1121 Paseo de Peralta
Santa Fe, New Mexico 87501
Tel: (505)983-9433
**During Covid-19: (505) 690-2193**
daniel.yohalem@gmail.com

Dale Melchert (*Pro Hac Vice*)
Lynly Egyes (*Pro Hac Vice*)
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612
Tel: (510)587-9696
dale@transgenderlawcenter.org
lynly@transgenderlawcenter.org

R. Andrew Free (*Pro Hac Vice*)
The Law Office of R. Andrew Free
P.O. Box 90568 Nashville, TN 37209
Tel: (844) 321-3221
andrew@immigrantcivilrights.com

Kimberly A. Evans (*Pro Hac Vice*)
Grant & Eisenhofer P.A.
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7086
kevans@gelaw.com

Irene Lax (*Pro Hac Vice*)
Grant & Eisenhofer P.A.
485 Lexington Avenue

New York, NY 10017
Tel: (646) 722-8512
ilax@gelaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on December 7, 2020, I filed the foregoing electronically through the CM/ECF system, which caused all Defendants' counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ DANIEL YOHALEM*
Daniel Yohalem