## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JOLEEN K. YOUNGERS, as the Personal
Representative of the Wrongful Death
Estate of Roxsana Hernandez,

     Plaintiff,

     vs.                                  Civ. No. 20-465 JAP/JHR

MANAGEMENT & TRAINING
CORPORATION *et al.*,

     Defendants.

## **MEMORANDUM OPINION AND ORDER**

On October 23, 2020, Defendants TransCor America, LLC ("TransCor") and CoreCivic, Inc. ("CoreCivic") (collectively "NM Defendants") filed a MOTION FOR PARTIAL DISMISSAL (Doc.32) ("Motion") seeking to dismiss Counts I (Section 504 of the Rehabilitation Act, 29 U.S.C. § 794), II (negligence per se), XIV (negligent hiring, retention, training, and supervision against TransCor), and XVI (same against CoreCivic).  The Court will GRANT IN PART and DENY IN PART the Motion for the following reasons.

## I.    FACTUAL BACKGROUND[1]

### *A.  Entities at Issues in this Motion*

CoreCivic is a private, for-profit corporation that manages detention facilities, including Cibola County Corrections Center ("CCCC") in Milan, New Mexico.  FIRST AMENDED COMPLAINT ¶ 44 (Doc. 9) ("FAC").  The United States Immigration and Customs Enforcement

---

[1] The Court accepts as true the factual allegations in the FAC for the purposes of deciding a motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court does not, however, accept as true any legal conclusions within the FAC.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

("ICE") contracts with CoreCivic detention facilities, including CCCC, to house immigration detainees. *Id*. ¶ 45. TransCor in turn transports immigration detainees to CCCC under a contract with CoreCivic. *Id*. ¶¶ 40–41.[2][3]

**B.  *ICE's Streamlined Transfer Process***

On May 9, 2018, Roxsana Hernandez ("Hernandez"), an HIV positive Honduran citizen seeking asylum, crossed into the United States at the San Ysidro Port-of-Entry in San Ysidro, California. *Id*. ¶¶ 1, 47.[4] Upon arrival, Hernandez exhibited symptoms of distress from the illness. *Id*. ¶ 47. Nonetheless, on May 14, 2018, in accordance with ICE's Streamlined Transfer Process, non-movant Defendants transported Hernandez over the course of two days from San Ysidro, California, to an Albuquerque, New Mexico-based ICE Criminal Alien Program ("CAP") facility. *Id*. ¶¶ 47–110.

Shortly after arriving at the Albuquerque CAP facility on May 16, 2018, TransCor bussed Hernandez approximately eighty miles from Albuquerque to CCCC. *Id*. ¶¶ 111–14. After arriving at CCCC, Hernandez remained in TransCor's custody for approximately five hours while waiting to be booked into the facility. *Id*. ¶ 115. Plaintiff alleges that during this short period of time, and "[d]espite TransCor's knowledge of Hernandez's obvious, serious, and emergent medical needs," it nonetheless "chose to transport [Hernandez]," "failed to provide [Hernandez] with adequate

---

[2] TransCor is a wholly owned subsidiary of CoreCivic. *Id*. ¶ 39.
[3] The Court observes that, as pleaded in the FAC, TransCor contracted only with CoreCivic to provide transportation for immigration detainees. That is, the Court rejects Plaintiff attempts to re-characterize TransCor's contract with CoreCivic as an ICE contract. Compare FAC ¶ 40 ("At all times material to this Complaint, TransCor *contracted with CoreCivic to perform transportation services for CoreCivic* in fulfillment of CoreCivic's contract with ICE") (emphasis added) with ¶ 41 ("Pursuant to its contracts with ICE, TransCor was charged with transporting Roxsana from Albuquerque, New Mexico to Cibola on May 16, 2018").
[4] "On January 15, 2019, the First Judicial District Court of New Mexico appointed Plaintiff the Personal Representative of the Wrongful Death Estate of Roxsana Hernandez pursuant to 1978 NMSA, § 41-2-3. *In the Matter of the Wrongful Death Action on Behalf of the Survivors of Roxsana Hernandez, Deceased*, No. D-101-CV-2019-00075." FAC ¶ 18.

medical assessments prior to transport, and denied [Hernandez] access to medication, adequate

food, water, bathroom facilities, and access to medical care during transport[.]"  *Id*. at ¶¶ 116–17.

On May 17, 2018, at approximately 1:15 AM, CoreCivic accepted custody and booked

Hernandez into CCCC.  *Id*. ¶ 118.  At 7:25 AM, Hernandez received an intake screening from an

onsite medical provider, and two and half hours later underwent a full medical examination, which

resulted in Hernandez being transported by ambulance to Cibola General Hospital.  *Id*. ¶ 134.

After performing various physical examinations, Cibola General Hospital determined that it could

not provide the necessary level of care and therefore transferred Hernandez via air ambulance to

Lovelace Medical Center in Albuquerque, New Mexico, where Hernandez died seven days later.

*Id*. ¶¶ 136–151.

Plaintiff alleges, *inter alia*, that while in NM Defendants' custody (1) NM Defendants

violated the Rehabilitation Act by failing to make reasonable accommodations for Hernandez, an

HIV positive immigration detainee, *id*. ¶¶ 168–86, (2) NM Defendants violated ICE Health Service

Corps ("IHSC") Directives, Performance Based National Detention Standards ("PBNDS"), the

applicable regulations and licensing requirements, and the terms of its contracts with ICE by failing

to timely assess Hernandez's medical fitness, *id*. ¶¶ 187–210, and (3) NM Defendants' negligence

directly contributed to Hernandez's death.  *Id*. ¶¶ 313–65.

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of

the complaint."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).  In considering a Rule

12(b)(6) motion a court must "accept as true all well-pleaded factual allegations in a complaint

and view [those] allegations in the light most favorable to the [non-moving party]."  *Smith v.*

*United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).  The allegations must "state a claim to relief

that is plausible on its face." *Id.* (quoting *Ridge at Red Hawk L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).  "The claim is plausible only if it contains sufficient factual allegations to allow the court to reasonably infer liability." *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018) (citing *Iqbal*, 556 U.S. 662, 678 (2009)).  The term "plausible" does not mean "likely to be true." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  The factual allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555—i.e., "that discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).  A mere "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

### A. Rehabilitation Act (Count I)

The elements of a Rehabilitation Act claim are: "(1) that the plaintiff is disabled under the Act; (2) that he would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency); and (4) that the program has discriminated against the plaintiff." *Sullivan v. Univ. of Kansas Hosp. Auth.*, 2021 WL 303142, at *2 (10th Cir. Jan. 29, 2021) (unpublished) (quoting *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004)).  Here, NM Defendants challenge only the third element, whether they received federal financial assistance.  That is, NM Defendants maintain that "federal financial assistance," as construed by a majority of courts, means "the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided," Mot. 5,

4

therefore the "contractual arrangements, such as those between ICE, CoreCivic, and TransCor, by which TransCor and CoreCivic transport and/or house immigration detainees at CCCC in exchange for agreed-upon rates, are not subsidies." *Id*. at 6.

Plaintiff disagrees, arguing that the "Tenth Circuit has adopted a 'government intention' test to assess whether a particular piece of funding qualifies as federal financial assistance." Resp. 4 (quoting *DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990) (citing *Jacobson v. Delta Airlines*, Inc., 742 F.2d 1202, 1208–09 (9th Cir.1984), cert. dismissed, 471 U.S. 1062 (1985))). According to Plaintiff, the FAC alleges that NM "Defendants' contracted activities were subject to agency directives that evidence the Department of Homeland Security's ("DHS") intent to hold [NM] Defendants accountable to Rehabilitation Act standards." *Id*. at 5 (citing FAC ¶¶ 162, 163, 175). Plaintiff believes "[i]mposition of Section 504 liability" on federal contractors is consistent with Supreme Court authority, which has found "Section 504 coverage as being 'a form of contractual cost of the recipient's agreement to accept the federal funds,'" and therefore "supports the conclusion that DHS and ICE intended to provide Defendants federal financial assistance." *Id*. at 6 (quoting *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986)). Lastly, Plaintiff directs the Court to 8 U.S.C. § 1103, entitled Powers and Duties of the Secretary, the Under Secretary, and the Attorney General, specifically §§ 1103(a)(11)(A), (B), for the proposition that the federal government intended to provide TransCor and CoreCivic federal financial assistance, i.e., subsidies, for transporting and housing immigration detainees. *Id*. at 6–7. Plaintiff's arguments are unpersuasive.

To begin, the Court agrees with NM Defendants: "[c]ourts interpreting [section] 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's

compensation of an entity for services provided."  Mot. 5 (quoting *Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 9–11 (D. D.C. 2016)); *see also Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005) ("Generally, 'to determine the applicability of [the Rehabilitation Act], [a court] must determine whether the government intended to give [the defendant] a subsidy,' as opposed to compensation." (quoting *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990), cert. denied, 498 U.S. 1074 (1991))); *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 787–88 (6th Cir. 1996) (finding defendant received federal financial assistance for purposes of Rehabilitation Act liability after finding that defendant's receipt of federal money was subsidized assistance rather than a "quid pro quo for its services as a contractor").

Here, Plaintiff alleges only the following to establish that NM Defendants received a subsidy:

1. At all times material to this Complaint, TransCor contracted with CoreCivic to perform transportation services for CoreCivic in fulfillment of CoreCivic's contract with ICE to manage immigration detention centers across the United States, including Cibola in Milan, New Mexico.  *Id*. ¶ 40.

2. Pursuant to its contracts with ICE, TransCor was charged with transporting [Hernandez] from Albuquerque, New Mexico to Cibola on May 16, 2018, and thereby TransCor was responsible for [Hernandez's] custody and care during that time.  *Id*. ¶ 41.

3. At all times material to this Complaint, CoreCivic contracted with ICE to manage immigration detention facilities across the United States, including Cibola.  *Id*. ¶ 44.

4. As a DHS agency component and according to a DHS agency self-assessment for Rehabilitation Act compliance, ICE's contracted activities and those of its contractors are subject to the Rehabilitation Act's non-discrimination provision under Section 504.  *Id*. ¶ 175.

Clearly, these allegations—which allege only a valid contractual relationship between NM Defendants and ICE—do not establish that it was plausible that NM Defendants received a subsidy to transport and house Hernandez.  If the Court accepts these threadbare allegations for that

proposition, it would amount to allowing a plaintiff to always assert a plausible Rehabilitation Act claim under the *Twombly/Iqbal* test by merely pleading a valid federal contract. The standard demands more. For example, Plaintiff does not include a good faith allegation that NM Defendants actually received a subsidy, or that Congress intended—with at least some mention of the appropriate statutory framework—to subsidize contractors for their participation in ICE's streamlined transfer process, here the transportation and housing of immigration detainees at a privately owned facility in New Mexico.[5] And Plaintiff's arguments to the contrary do not cure the FAC's infirmities.

Plaintiff first argues that the contracts at issue incorporate the strictures of the Rehabilitation Act through ICE's PBNDS, Resp. 5–6, because NM Defendants admit "that CoreCivic owns and operates CCCC; that CoreCivic houses immigration detainees at CCCC pursuant to an Intergovernmental Service Agreement between ICE and Cibola County and a Management Agreement between Cibola County and CoreCivic." DEFENDANTS TRANSCOR AND CORECIVIC'S ANSWER TO FIRST AMENDED COMPLAINT (Doc. 28) ¶ 118. Fatal to this argument, however, is that Plaintiff fails to explain how ICE's alleged incorporation of its PBNDS (and the requirements of the Rehabilitation Act) demonstrates that Congress *intended to subsidize* NM Defendants. Rather the logical inference in the light most favorable to Plaintiff is that ICE is incorporating the PBNDS only to prevent federal contractors from discriminating against immigration detainees. These are two very different things. Plaintiff cannot simply circumvent the express subsidy requirement of Section

---

[5] Plaintiff does allege that (1) "TransCor received federal funds for [] services pursuant to its contracts with ICE," FAC ¶ 42, (2) "CoreCivic received federal funds for [] services pursuant to its contracts with ICE, *id*. ¶ 46, and (3) NM "Defendants operated detention transportation programs that transported [Hernandez] or detention centers that housed [Hernandez] for ICE, and all received federal funds for doing so." *Id*. ¶ 179. However, these allegations establish only that NM Defendants were paid for the services that they provided. These allegations do not establish that NM Defendants received federal financial assistance.

504, i.e., the federal assistance threshold, by arguing that contractors or political subdivisions who may or may not receive subsidies are nonetheless subject to Rehabilitation Act liability simply because ICE expects them comply with certain provisions of that act.   There must be plausible and not just conceivable subsidization to sustain a private cause of action under Section 504.   Still, in a strained attempt to make up the difference, Plaintiff cites *Paralyzed Veterans*, a case that does not bear the weight Plaintiff attributes to it.

To illustrate, Plaintiff states that "imposition of Section 504 liability on IGSA facilities and CDFs is consistent with *Paralyzed Veterans*' stated rationale for Section 504 coverage as being 'a form of contractual cost of the recipient's agreement to accept the federal funds,' and supports the conclusion that DHS and ICE intended to provide Defendants federal financial assistance."   Resp. 6 (quoting *Paralyzed Veterans*, 477 U.S. at 605).   This quotation, however, was made in the context of determining who the proper *recipient* of federal assistance was under the Airport and Airway Improvement Act of 1982 and the Airport and Airway Development Act of 1970, either airlines as potential indirect beneficiaries or airport operators as direct recipients of the funds, and not whether the funds at issue actually constituted federal financial assistance.[6]   Or put another way, this dicta clarified only that the Rehabilitation Act applies to recipients "who are in a position to accept or reject [the obligations of Section 504] as a part of the decision whether or not to 'receive' federal [financial assistance]."   *Paralyzed Veterans*, 477 U.S. at 606.   Thus, Plaintiff's quoted language does not support the conclusion that NM Defendants actually received a subsidy here. The Supreme Court explained in *Paralyzed Veterans* that the determination of whether a recipient

---

[6] Indeed, as the Supreme Court explained: "The United States provides financial assistance to airport operators through grants from a Trust Fund created by the Airport and Airway Development Act of 1970.  The Government also operates a nationwide air traffic control system.  This case presents the question whether, by virtue of such federal assistance, § 504 is applicable to commercial airlines."  *Paralyzed Veterans of Am.*, 477 U.S. at 599.

receives federal financial assistance comes from "*the terms of the underlying grant statute*." *Id.* at 604 (emphasis added). Thus, the Court rejects Plaintiff's argument under *Paralyzed Veterans*.

Plaintiff next relies on 8 U.S.C. §§ 1103(a)(11), 1231(g) for the proposition that § 504 applies to NM Defendants as recipients of federal financial assistance. Section 1103(a)(11) states:

> The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—
>
> (A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and
>
> (B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

8 U.S.C. §§ 1103(a)(11)(A) and (B). In turn, § 1231(g), entitled Places of Detention, reads:

> (1) In general
>
> The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service--Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.
>
> (2) Detention facilities of the Immigration and Naturalization Service
>
> Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider *the availability for* purchase or *lease of any existing prison, jail, detention center*, or other comparable facility suitable for such use.

§ 1231(g) (emphases added).

The plain language and interplay of these provisions do not support Plaintiff's argument. To be sure, § 1103(a)(11)(A), in all its glory, is a Congressional authorization allowing the DHS to make payments to a state or political subdivision that enters into an agreement with ICE to house federal immigration detainees. That is, it grants the authority to *contract* with states and local entities to procure "necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law." But authorization to contract does not plausibly establish intent to subsidize. That Subsection B allows for cooperative agreements also does not tilt the scales in favor of finding plausible governmental intent to subsidize detention centers in toto.

Plaintiff argues that 31 U.S.C. § 6305, entitled Using Cooperative Agreements, is the 500-pound gorilla needed to break the scale in her favor. Resp. 7.[7] However, § 6305 simply explains that cooperative agreements are used only to "transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States *instead of acquiring (by purchase, lease, or barter)* property or services for the direct benefit or use of the United States Government." § 6305 (emphasis added). But 8 U.S.C. § 1231, a linchpin in the immigration detention framework, grants DHS the authority to "expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention," but prior to doing so "[DHS] shall consider the *availability for purchase or lease of any existing prison, jail, detention center,* or other comparable facility suitable for such use." §

---

[7] Plaintiff also cites 2 C.F.R § 200.24, which states a cooperative agreement is "a legal instrument of financial assistance between a Federal awarding agency or pass-through entity and a non–Federal entity that, consistent with 31 U.S.C. 6302–6305 . . . ." Resp. 7.

1231 (emphasis added).  Therefore, at best, these statutes allow DHS to utilize multiple avenues to accomplish its detention needs, but they do not create an inference nor support Plaintiff's argument that the government *intended to subsidize* detention facilities under the Immigration and Nationality Act.

To that end, merely alleging that TransCor and CoreCivic contracted with ICE to transport and detain Hernandez, FAC ¶¶ 40, 41, 44, 175, falls short of the quantum necessary to plausibly allege NM Defendants received federal financial assistance.  The Court therefore will grant NM Defendants' Motion, and because Plaintiff did not request leave to amend—even after NM Defendants put her notice that they seek dismissal with prejudice, see Mot. 7—will dismiss with prejudice Count I against NM Defendants.  *See also Doe v. Heil*, 533 F. App'x 831, 846-847 (10th Cir. 2013) (unpublished) ("Although leave to amend should be liberally granted, a trial court is not required *sua sponte* to grant leave to amend prior to making its decision to dismiss.") (alteration omitted and internal quotation omitted)

### B.  *Negligence Per Se (Count II)*

Negligence per se consists of four elements: (1) There must be a statute or regulation which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute or regulation, (3) the plaintiff must be in the class of persons sought to be protected by the statute or regulation, and (4) the harm or injury to the plaintiff must generally be of the type the Legislature through the statute sought to prevent.  *Cobb v. Gammon*, 389 P.3d 1058, 1073 (N.M. Ct. App. 2017).  "Negligence per se exists only where a statutory or regulatory provision imposes an absolute duty to comply with a specific requirement."  *Id*. (citing *Heath v. La Mariana Apartments*, 180 P.3d 664, 666 (N.M. 2008). The statute or regulation also "must specify a duty that is distinguishable from the ordinary standard of care."  *Id*. (quoting

*Thompson v. Potter*, 268 P.3d 57, 66 (N.M. Ct. App. 2011)).

Plaintiff's negligence per se claim is based on "IHSC Directives, Performance Based National Detention Standards, the applicable regulations and licensing requirements, and the terms of [NM] Defendants' contract(s) with ICE." FAC ¶ 190.

NM Defendants first assert that Plaintiff cannot rely on IHSC directives because "negligence per se is not applicable to 'an entity's alleged failure to comply with internal rules or policies." Mot. 8 (quoting *Valdez-Barela v. Corr. Corp. of Am. and Corizon Health, Inc.*, 2019 WL 3766391, at *9 (N.M. Ct. App. July 16, 2019)).  Defendants further argue that the alleged "violation of the terms of [the ICE] contract does not establish negligence per se." *Id.* (citing *Grassie v. Roswell Hosp. Corp.*, 258 P.3d 1075 (N.M. Ct. App. 2011) and *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 750 P.2d 118 (N.M. 1988)).  Lastly, Defendants note that Plaintiff fails to "identify any statutes [that TransCor and CoreCivic] are alleged to have violated. And although she references unspecified 'regulations,' she fails to identify the particular regulations at issue." *Id.*

In response, Plaintiff asserts that "Congress mandated ICE to require federal contractors, including these Defendants, to comply with the PBNDS pursuant to an Appropriations Bill, 114 H. Rpt. 668 at 35," therefore, the "PBNDS [have] the 'force and effect of statute' for purposes of the four-part [negligence per se] test."  Resp. 10–11 (citation omitted).  Similarly, Plaintiff asserts that 8 C.F.R. §§ 235.3(e) and 287.8(d) both impose a duty sufficient to support her negligence per se claim.  The Court disagrees with Plaintiff.

At the outset, the Court notes that Plaintiff failed to address NM Defendants' arguments regarding the terms of the applicable ICE contracts and whether IHSC Directives can provide the basis for a negligence per se claim. Therefore, Plaintiff has consented to NM Defendants' Motion

in this regard.[89]  Now turning to ICE's PBNDS, Plaintiff claims Appropriations Bill, 114 H. Rpt. 668 at 35 (adopted July 6, 2016), gives the PBNDS the force and effect of a statute.  Specifically, Plaintiff maintains that the "Appropriations Bill" provides:

> Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 Prison Based National Detention Standards (PBNDS) and requirements related to the Prison Rape Elimination Act (PREA), including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance. *The Committee expects ICE to refrain from entering into new contracts or IGSAs that do not require adherence to the PREA and 2011 PBNDS standards.*

Resp. 11–12 (emphasis added by Plaintiff) (quoting 114 H. Rpt. 668 at 35 (adopted July 6, 2016)).

Unfortunately, this "statute" is not what Plaintiff represents it to be.  Rather, 114 H. Rpt. 668 is a House Committee report that accompanied the actual appropriations bill, H.R. 5634, which itself does not include the above language or mention the PBNDS.  Equally as concerning as this misrepresentation is that Plaintiff does not address that the House Committee report only refers to the PREA and PBNDS generally, it does not prescribe certain actions or define a standard of conduct.  *See Archibeque v. Homrich*, 543 P.2d 820, 825 (N.M. 1975) ("there must be a statute which prescribes certain actions or defines a standard of conduct").  Moreover, negligence per se cannot be established through the attenuated incorporation of generalized standards into a federal

---

[8] The Court's Local Rules provide that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ 7.1(b). Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument. Furthermore, under Tenth Circuit law, failing to respond constitutes waiver. *See, e.g., Cole v. New Mexico*, 58 F. App'x 825, 829 (10th Cir. 2003) (unpublished) (argument waived when not raised in initial response to motion to dismiss); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (unpublished) (plaintiff abandoned claim when failed to respond to arguments made in support of summary judgment).

[9] But even if the Court did not find that Plaintiff waived her arguments here, they nonetheless are without merit.  See *Valdez-Barela*, 2019 WL 3766391, at *9 (no authority establishes that negligence per se can be based on internal policies); *Grassie*, 258 P.3d at 1093 (contract cannot establish standard of conduct for negligence per se).

contract. *See Grassie*, 258 P.3d at 1093.  Consequently, the court will reject Plaintiff's attempted reliance on a House Committee report, which clearly does not carry the force and effect of a statute, for obvious reasons, nor does it meet the other requirements for negligence per se under New Mexico law.

Plaintiff's last two attempts at throwing statutes at the wall, both of which do not appear in the FAC, are similarly unpersuasive.  First, Plaintiff directs the Court to 8 C.F.R. § 287.8, which sets the "standards for enforcement activities" that "must be adhered to by every *immigration officer involved in enforcement activities*."  § 287.8 (emphasis added).  On its face, this statute does not impose an absolute duty on NM Defendants because it applies only to immigration officers of the United States, and Plaintiff fails to include any allegations that NM Defendants can be classified as such.  Nonetheless, Plaintiff argues that § 287.8(d), entitled Transportation, applies to NM Defendants:

> Vehicle transportation. All persons will be transported in a manner that ensures the safety of the persons being transported. When persons arrested or detained are being transported by vehicle, each person will be searched as thoroughly as circumstances permit before being placed in the vehicle. The person being transported shall not be handcuffed to the frame or any part of the moving vehicle or an object in the moving vehicle. The person being transported shall not be left unattended during transport unless the immigration officer needs to perform a law enforcement function.

§ 287.8(d).  Even assuming this statute imposes an absolute duty, it cannot apply to CoreCivic because Plaintiff has not alleged that CoreCivic transported Hernandez.  Similarly, the allegations in the FAC do not make it plausible that TransCor violated this section.  Absent are allegations that any detainee was restrained on the bus trip from Albuquerque to Cibola, let alone that Hernandez was handcuffed "to the frame or any part of the moving vehicle or an object in the moving vehicle."  Thus, § 287.8(d) cannot supply a plausible basis for Plaintiff's negligence per se claim.

14

The Court reaches the same conclusion with respect to 8 C.F.R. § 235.3(e), which states

Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities.  Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention.  Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage.  These are:
    (1) 24–Hour supervision,
    (2) Conformance with safety and emergency codes,
    (3) Food service, and
    (4) Availability of emergency medical care.

§ 235.3(e).  NM Defendants argue that this statute speaks only to "contractual duties," and therefore cannot support a claim for negligence per se.  The Court agrees.

First, as with § 287.8(d), section 235.3(e) applies only to the DHS, it does not impose an absolute duty on NM Defendants such that it can be used as a substitute for the standard of care. Indeed, § 235.3(e) exists only to constrain "ICE's discretion to decide where to house pre-removal detainees." *Newbrough v. Piedmont Reg'l Jail Auth.*, 2012 WL 169988, at *4 (E.D. Va. Jan. 19, 2012) (discussing discretionary function under Federal Tort Claims Act).  Second, § 235.3(e) does not "define with specificity what is reasonable in a particular circumstance, such that the jury does not have to undertake that inquiry."  *Potter*, 268 P.3d at 66 (quoting *Heath*, 180 P.3d at 666). Instead, § 235.3(e) defines a duty "in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances[.]"  *Id*. (citation omitted).  To be sure, imposing a vague duty to conform with safety and emergency codes adds little if nothing to the general standard of care. *See Thompson*, 268 P.3d at 66.  And the three other criteria would leave the jury scrambling to determine how a facility complies with the statute.  For example, (1) does there need to be a dining hall or are cold meals sufficient, (2) can the facility utilize video surveillance, and (3) what exactly

does emergency medical care consist of?

Lastly, irrespective of its applicability to NM Defendants, Plaintiff fails to include good faith fact assertions that would even make § 235.3(e) relevant here.  For starters, this section cannot apply to TransCor because it does not operate a correctional facility, it is not under contract to house immigration detainees, and Plaintiff has not alleged otherwise.  Additionally, § 235.3(e) cannot apply to CoreCivic because Plaintiff failed to include plausible allegations that CCCC, i.e., CoreCivic, fails to meet the four mandatory criteria for usage: (1) 24–Hour supervision, (2) Conformance with safety and emergency codes, (3) Food service, and (4) Availability of emergency medical care.  Rather, Plaintiff alleges that CoreCivic monitored Hernandez, provided Hernandez with sustenance, and rendered medical treatment in its onsite medical unit.  *See* FAC ¶¶ 119, 120, 123–134.

Simply put, alleging a separate count of negligence per se in addition to garden variety negligence does not grant a plaintiff the ability to scattershot statutes in a response brief in an attempt to easily establish a breach of the duty of care.  To comply with the federal pleading standards, the statute must be alleged and supported by fact assertions that plausibly establish under New Mexico law its relevance and applicability.  Because Plaintiff has failed to request leave to amend, the Court will dismiss with prejudice Count II against NM Defendants.

### C. NM Defendants' Hiring Practices (Counts XIV and XVI)

1) Parties' Arguments

Lastly, NM Defendants contend that Plaintiff fails to state claims for negligent hiring and retention because the FAC does not plausibly establish that "TransCor and CoreCivic employees involved in transporting and housing Hernandez were unfit in any way." Mot. 11. NM Defendants likewise assert that Plaintiff's negligent training and supervision claims must be dismissed because

"Plaintiff does not allege any particular deficiencies in either TransCor's or CoreCivic's training programs, or any histories of misbehavior by the employees involved in transporting and housing Hernandez at [CCCC] that would suggest a failure to properly supervise them."  Mot. 12. According to NM Defendants, Plaintiff simply assumes that "because Hernandez was injured, the employees must have been unfit," and or "improperly trained and supervised." Mot. 11–12.  Thus, NM Defendants argue that Plaintiff failed to allege enough facts in support of these claims to put them (as supervisors) on notice, and they cite *Linkewitz v. Robert Heath Trucking, Inc.*, 2013 WL 12138884 (D.N.M. Aug. 13, 2013), as their authority.

For her part, Plaintiff maintains that NM Defendants are attempting to "collapse all the facts alleged in the FAC as the isolated acts of one bad apple," Resp. 17, an argument Plaintiff believes that "this Court has previously rejected" in *Lucero v. CoreCivic*, Inc., 2019 WL 4918780, at *2 (D.N.M. Oct. 4, 2019).  Resp. 16.  Additionally, "even if there [is] a bright-line rule that a single incident of wrongdoing is insufficient to make out a cause of action under negligence," Plaintiff argues that "the FAC alleges facts regarding the repeated and multiple instances of wrongful conduct by multiple employees over the course of several days."  *Id*. at 17.  In sum, Plaintiff believes she has alleged sufficient facts to support a plausible inference of negligent hiring, retention, training, and/or supervision.  The Court disagrees in part.

    2)  Fact Assertions

Putting aside Plaintiff's conclusory recitation of these elements, *see, e.g.*, FAC ¶¶ 327–332, 337, 357–358, 364, Plaintiff alleges that (1) TransCor employees "took [Hernandez] . . . by bus from the ICE CAP facility in Albuquerque to Defendant CoreCivic's Cibola County detention center," *id*. ¶ 111, (2) "[t]hroughout this trip, [Hernandez] continued to be visibly and gravely ill and suffering," *id*. ¶ 112, (3) Hernandez "required immediate medical assistance that TransCor employees failed to provide," *id*. ¶ 114, and (4) "employees transported her on May 16, 2018 from

the ICE CAP facility in Albuquerque, New Mexico to Cibola despite lacking the required medical documentation to and failed to provide her with medical care despite her visible illness and multiple requests for medical attention . . . no TransCor employee sought medical help for [Hernandez] during the six hours she was in their custody and care." *Id.* ¶ 326.

With respect to CoreCivic, Plaintiff asserts that it's employees (1) booked Hernandez into CCCC, *id.* ¶ 118, (2) took Hernandez to a medical waiting room, *id.* ¶ 119, (3) failed to promptly render Hernandez medical care from 2:23 a.m. to 7:25 a.m., *id.* ¶ 123, (4) transferred Hernandez to a medical isolation room due to a suspected tuberculosis infection, *id.* ¶ 128, (5) transported Hernandez in a wheelchair to an ambulance, *id.* ¶ 134, (6) kept Hernandez shackled to a hospital bed except when medical personnel needed them to be removed for certain medical procedures, *id.* ¶ 144, (7) guarded Hernandez at all times and checked at least every 20 minutes to be sure the restraints were secured, *id.* ¶ 145, (8) removed Hernandez's restraints only after receiving approval to remove them, *id.* ¶ 146, and (9) kept Hernandez shackled until cardiac arrest. *Id.* ¶ 147. Additionally, Plaintiff maintains that (1) Defendant CoreCivic breached its duty by negligently hiring, retaining, training and supervising the employees who failed to provide Hernandez with immediate medical assistance and who kept Hernandez shackled while in the hospital, even when Hernandez was completely incapacitated; (2) Defendant CoreCivic failed to hire competent employees, hired incompetent employees who failed to follow the safety guidelines required of all federal contractors with ICE, negligently retained these employees, and/or failed to adequately train and supervise the employees who repeatedly breached their duty of care to Hernandez; and (3) Defendant CoreCivic conducted inadequate management, training, supervision and enforcement of regulations, policies and contract provisions regarding the treatment and medical care of detainees. *Id.* ¶¶ 357–58.

18

3)  Analysis

Under New Mexico law, to prove a claim of negligent hiring, retention, supervision and training, a plaintiff must allege facts that make it plausible that the defendant employed the employee in question, that the defendant knew or should have known that hiring, retaining, and/or supervising the employee would create an unreasonable risk of injury to a plaintiff, that the defendant failed to use ordinary care in hiring, retaining, and or supervising the employee, and that the defendant's negligence in hiring, retaining, and/or supervising the employee was a cause of the plaintiff's injury.  UJI 13–1647 NMRA; *Lessard v. Coronado Paint and Decorating Center, Inc.*, 168 P.3d 155, 165–68 (N.M. Ct. App. 2007).

a)  Hiring and Retention

To begin, Plaintiff's allegations plausibly establish negligent behavior by TransCor and CoreCivic employees.  But these allegations alone do not make it plausible that either TransCor or CoreCivc *knew or should have known* that hiring and retaining the unnamed employees at issue would create an unreasonable risk of injury to Hernandez.  For example, with regard to TransCor, there are no allegations that it failed to follow proper hiring protocol nor that these "employees" (rather than named and identified specific employees) had spotty backgrounds.  *See, e.g., Los Ranchitos v. Tierra Grande, Inc.*, 861 P.2d 263, 269 (N.M. Ct. App. 1993) ("Nothing in the responding affidavits filed by Plaintiff sets forth facts indicating that Defendant failed to properly investigate Gerber's background, experience, or character prior to her hiring. Nor has Plaintiff pointed to facts indicating that, at the time Gerber was initially employed, she was untrustworthy or had a record of prior criminal conduct. Thus, we affirm the trial court's order dismissing Plaintiff's claim of negligent hiring.").  Additionally, Plaintiff has not alleged prior instances of misconduct.  *See Spencer v. Health Force, Inc.*, 107 P.3d 504, 511 (N.M. 2005) (employee had

19

history of stealing medication from patients).  But more importantly, the above allegations do not plausibly establish that any of TransCor's employees were unfit to perform their job, a necessary requirement to support a claim for negligent hiring and retention.  *Valdez v. Warner*, 742 P.2d 517, 520 (N.M. Ct. App. 1987) ("In this case, there was evidence from which a jury could have found that the owner of the bar was negligent in hiring Warner, with his background of violent behavior, for a job where he would be in constant contact with members of the public, most of whom would have been drinking and many of whom might tend to be argumentative.").  At bottom, the determination of "[w]hether the hiring or retention of an employee constitutes negligence depends upon the facts and circumstances of each case," *F & T Co. v. Woods*, 594 P.2d 745, 749 (N.M. 1979), and the facts as alleged here do not plausibly support either theory against TransCor.

Similarly, Plaintiff fails to plausibly establish that either theory (hiring or retention) is applicable to CoreCivic.  Absent are fact allegations that CoreCivic failed to follow proper hiring protocols or that the employees had red flags sufficient to create a plausible inference that CoreCivic knew or should have known that hiring or retaining the employees at issue created an unreasonable risk to Hernandez.  *See Los Ranchitos*, 861 P.2d at 269.  Plaintiff also does not allege facts that plausibly establish CoreCivic's employees were unfit to perform their duties.  *Valdez*, 742 P.2d at 520.  Rather, Plaintiff pleads only two things: (1) a plausible case of negligence against CoreCivic employees and (2) threadbare conclusions of negligent hiring and retention against CoreCivic.  But, singularly or collectively, Plaintiff's recitation of the elements and fact assertions against CoreCivic's employees, whatever merit they have, are insufficient to establish a plausible negligent hiring and retention claim against CoreCivic.  *Woods*, 594 P.2d at 749.

b)  Training and Supervision

The Court reaches a different conclusion with respect to Plaintiff's claims that TransCor

negligently trained and supervised the employees who transported Hernandez.  In sum, Plaintiff asserts that " TransCor conducted inadequate management, training, supervision and enforcement of regulations, policies and contract provisions regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees with medical needs during transport."  FAC ¶ 330.  Although borderline conclusory, in addition to this allegation, Plaintiff's fact assertions specific to negligent training and supervision, *see id*. ¶¶ 328–330, coupled with TransCor's employees' alleged conduct, *id*. ¶¶ 111–17, allow the Court to draw a reasonable inference that TransCor failed to properly train and supervise its employees on how to safely transport immigration detainees.  Specifically, because the FAC identifies purported deficiencies, i.e., TransCor's failure to train and supervise its employees on  (1) conducting fitness for travel screening before transporting, (2) rending aid to detainees with emergent medical issues, and (3) the provision of adequate food, water, medications, and restroom access during transport, it is plausible that TransCor negligently trained and supervised its employees.  Compare *Linkewitz v. Robert Heath Trucking, Inc.*, 2013 WL 12138884, at *6 (D.N.M. Aug. 13, 2013) ("The amended complaint does not allege what these purported deficiencies in training and supervision actually were—there is nothing, for example, saying that RHT improperly supervised Delores Hites by failing to monitor her driving logs or that RHT improperly trained Delores Hites on proper semi-tractor safety.").  Accordingly, Plaintiff's negligent training and supervision claim against TransCor may proceed at this juncture.

But Plaintiff is not able to nudge from the conceivable to the plausible her claim that CoreCivic negligently trained and supervised its employees.  To illustrate, Plaintiff alleges that CoreCivic negligently trained and supervised "the employees who failed to provide [Hernandez]

21

with immediate medical assistance" and "kept [Hernandez] shackled" while in the hospital.  FAC 357.  As a general matter, Plaintiff includes no authority to even establish that hand-cuffing an immigration detainee who is in custody pursuant to federal law and has a prior order of removal from the United States, even while in a hospital receiving treatment, can constitute a plausible claim of negligence.  Nonetheless, unlike the allegations against TransCor, which identify specific training deficiencies, Plaintiff—with a single broad brush stroke—conclusorily asserts that CoreCivic failed to train and supervise according to "regulations, policies and contract provisions regarding the treatment and medical care of detainees."  *Id*. 358.  This is insufficient to establish plausibility.  Accordingly, the Court will dismiss with prejudice Plaintiff's claim that CoreCivic negligently trained and supervised its employees.

## IV.   CONCLUSION

Plaintiff fails to state a claim under the Rehabilitation Act against NM Defendants.  Plaintiff's allegations do not make it plausible that NM Defendants received a subsidy to transport or house Hernandez.  Similarly, Plaintiff failed to plausibly allege a claim of negligence per se against NM Defendants.  The FAC included only cursory allegations, and the multiple federal statutes Plaintiff relies on fail to make up the difference.  Finally, Plaintiff fails to assert sufficient facts to support claims of negligent hiring and retention against NM Defendants but does manage to nudge from the conceivable to the plausible her claim that TransCor negligently trained and supervised its employees.

IT IS ORDERED THAT

1.   NM Defendants' MOTION FOR PARTIAL DISMISSAL (Doc.32) IS GRANTED IN PART and DENIED IN PART;

2.   Count I of Plaintiff's First Amended Complaint (Doc. 9) brought against NM

Defendants is dismissed with prejudice;

3.  Count II of Plaintiff's First Amended Complaint brought against NM Defendants
    is dismissed with prejudice;

4.  Count XIV of Plaintiff's First Amended Complaint, with respect to negligent hiring
    and retention, brought against TransCor is dismissed with prejudice.  TransCor's
    request to dismiss Count XIV with respect to negligent training and supervision is
    DENIED; and

5.  Count XVI of Plaintiff's First Amended Complaint brought against CoreCivic is
    dismissed with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE