**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**Joleen K. Youngers**,
as the Personal Representative of the
Wrongful Death Estate of Roxsana
Hernandez,

Plaintiff,

v.

Civil Action No. 20-cv-00465-JAP-JHR

**Management & Training Corporation,**
**LaSalle Corrections Transport LLC,**
**LaSalle Corrections West LLC,**
**LaSalle Management Company LLC,**
**Global Precision Systems LLC,**
**TransCor America LLC, and**
**CoreCivic, Inc.,**

Defendants.

---

**MOTION FOR RECONSIDERATION OF APRIL 19, 2021 COURT ORDER**
**AND FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND TO JOIN**
**DEFENDANT UNITED STATES TO ACTION**

---

Plaintiff Joleen K. Youngers ("Plaintiff"), by and through her counsel of record, respectfully requests this Court to: (1) reconsider its order entered on April 19, 2021 (Doc. 59, the "Order") dismissing certain claims with prejudice and, instead, dismiss those claims *without* prejudice; (2) grant Plaintiff leave to file a Second Amended Complaint ("SAC") pursuant to Federal Rules of Civil Procedure 15(a) and 21; and (3) permit Plaintiff to add the United States as a Defendant to this action. In support of this Motion for Reconsideration and for Leave to File Second Amended Complaint (the "Motion"), Plaintiff states as follows:

**RELEVANT PROCEDURAL HISTORY**

On May 13, 2020, Plaintiff filed a complaint in this action ("Original Complaint") asserting various claims related to the in-custody death of Roxsana Hernandez ("Roxsana"), a 33-year-old

transgender woman who was detained by the United States after she presented herself for asylum at the San Ysidro Port-of-Entry on May 9, 2018. The Original Complaint asserted various claims against Defendants TransCor America, LLC ("TransCor"), CoreCivic, Inc. ("CoreCivic," and together with TransCor, the "NM Defendants"), Management & Training Corporation ("MTC"), LaSalle Corrections West, LLC ("LaSalle West"), LaSalle Corrections Transport, LLC ("LaSalle Transport"), LaSalle Management Company, LLC ("LaSalle Management," and collectively with LaSalle Transport and LaSalle West, "LaSalle"), and Global Precision Systems, LLC ("GPS") (collectively, the "Contractor Defendants"). All Contractor Defendants are private contractors hired by the United States of America ("U.S.") as part of its federal Streamlined Transfer Process ("STP") which detains and transports, among others, asylum seekers.

On August 13, 2020, Plaintiff filed a First Amended Complaint ("FAC") as a matter of right, pursuant to Fed. R. Civ. P. 15(a). (*See* Doc. 9). On October 23, 2020, the NM Defendants filed a Motion For Partial Dismissal (Doc. 32) ("Defendants' Motion") seeking to dismiss several counts of the FAC pursuant to Fed. R. Civ. P. 12(b)(6), including: Count I (Section 504 of the Rehabilitation Act), Count II (negligence per se), Count XIV (negligent hiring, retention, training, and supervision against TransCor), and Count XVI (negligent hiring, retention, training, and supervision against CoreCivic). On December 7, 2020, Plaintiff filed an Opposition to the Defendants' Motion ("Opposition to Motion"). (Doc. 48). On January 22, 2021, the NM Defendants filed a reply in further support of Defendants' Motion (the "Reply"). (Doc. 53).

On April 19, 2021, this Court entered judgment granting in part the Defendants' Motion, dismissing with prejudice FAC Count I (Section 504 of the Rehabilitation Act claim as asserted against the NM Defendants), Count II (negligence per se as asserted against the NM Defendants), and Count XVI (negligent hiring, retention, training, and supervision as asserted against Defendant

CoreCivic). (*See* Order at 22-23). With respect to FAC Count XIV as asserted against Defendant TransCor, the Court dismissed Plaintiff's negligent hiring and retention claims with prejudice, but denied dismissal of Plaintiff's negligent training and supervision claims as asserted against TransCor. (Order at 23). As to the counts of the FAC dismissed with prejudice, the Court dismissed these claims with prejudice based on Plaintiff's failure to include a specific request in the Opposition to Motion for leave to amend the FAC should Defendants' Motion be granted. (Order at 11).

Plaintiff's Motion seeks to remedy certain deficiencies outlined in the Court's Order. The proposed SAC, which is annexed as **Attachment A** hereto, seeks to address and cure the pleading concerns raised in the Order regarding Counts I and XVI. Plaintiff does not seek reconsideration of the Court's dismissal of Count II (negligence per se) or the partial dismissal of Count XIV (dismissing the negligent retention and hiring claims against TransCor, but allowing the negligent training and supervision claims to proceed).

Plaintiff also seeks leave to amend to add an additional Defendant to the SAC—the U.S. The U.S. contracted with all Contractor Defendants for secure custody and transportation of Roxsana as part of the U.S.'s STP program to facilitate Roxsana's access to the USCIS fear-based interview program and EOIR adjudicative program that she was legally entitled to. The U.S. was not previously named as a party to this action as the statute of limitations applicable to the claims against the Contractor Defendants would have expired before Plaintiff would have been able to exhaust the administrative remedies required for her Federal Tort Claims Act ("FTCA") claims to proceed against the U.S. The proposed SAC seeks to assert the following claims against the U.S. via the FTCA for the wrongful death of Roxsana: Negligence, False Imprisonment, Intentional Infliction of Emotional Distress, Negligent Hiring, Retention, Training, and Supervision, and state

law claims under the California Constitution, Art. 1, § 1, the California Civil Rights Acts, Cal. Civil Code §43, Cal. Civil Code §51 (the Unruh Civil Rights Act), Cal. Civil Code § 52.1 (the Bane Civil Rights Act), and Cal. Gov. Code Section 845.6.

## ARGUMENT

## I.  PLAINTIFF'S MOTION FOR RECONSIDERATION SHOULD BE GRANTED IN THE INTERESTS OF JUSTICE

### A.  STANDARD OF REVIEW FOR A MOTION FOR RECONSIDERATION

A court order resolving fewer than all of the claims against all of the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b). The Tenth Circuit has held that trial courts have discretion to reconsider interlocutory orders and are not bound by the stricter standards found in Fed. R. Civ. P. 59(e) or 60(b). *Trujillo v. Bd. of Educ. of Albuquerque Public Schools*, 212 F. App'x 760 (10th Cir. 2007); *see also Trujillo v. Bd. of Educ. of the Albuquerque Public Schools*, 470 F. Supp. 2d 1270, 1275 (D.N.M. 2005), *aff'd and remanded on other grounds*, 212 F. App'x 760 (10th Cir. 2007).

### B.  THE ORDER SHOULD BE RECONSIDERED SO THAT COUNTS I AND XVI ARE DISMISSED WITHOUT PREJUDICE AND MAY BE RE-PLED

Plaintiff's Motion seeks reconsideration of the Court's dismissal of Counts I and XVI (as to negligent supervision and training only against CoreCivic) with prejudice to instead be dismissed *without* prejudice. The Court dismissed Count I and Count XVI with prejudice solely based on Plaintiff's failure to request leave to amend in Plaintiff's Opposition Motion in the event that Defendants' Motion was granted. (Order at 11). The Court did not reach the issue of whether these claims could be cured by amendment of Plaintiff's FAC. Weighing the gravity of the dismissal of Plaintiff's claims with the prejudice caused by Plaintiff's inadvertent failure to plead the right to amend, Plaintiff respectfully submits that reconsideration is warranted here. Plaintiff's

failure to seek leave to amend in the event that the Court granted Defendants' Motion was inadvertent, not substantive in nature, and did not pertain to the merits of the case. Additionally, Plaintiff has collected additional facts to support Count I and Count XVI (only as it relates to negligent training and supervision by CoreCivic), which are further detailed *infra,* in Section II.B.2. Plaintiff believes these additional facts cure the deficiencies noted by this Court in its Order as related to these Counts. *See Forman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (Rule 15 was promulgated to provide "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.") (citation omitted).   For the foregoing reasons, Plaintiff respectfully requests that this Court reconsider its Order and dismiss Count I and Count XVI (only as it relates to negligent training and supervision of CoreCivic) *without* prejudice so that Plaintiff may re-plead those counts in an effort to cure the deficiencies noted in the Order.

## II.    PLAINTIFF'S MOTION TO AMEND SHOULD BE GRANTED AS AMENDMENT IS NOT FUTILE AND DOES NOT PREJUDICE THE DEFENDANTS

### A.    STANDARD OF REVIEW FOR MOTION TO AMEND

Federal Rule of Civil Procedure 15(a) instructs a court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "[D]istrict courts may withhold leave to amend only for reasons such as 'undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 588 F.3d 1161, 1166 (10th Cir. 2009); *see also Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 948 (10th Cir. 2018). When a claim is dismissed under Fed. R. Civ. P. 12(b)(6), the court should grant leave to amend freely "if it appears at all possible that the

plaintiff can correct the defect." *Triplett v. LeFlore County, Okla.*, 712 F.2d 444, 446 (10th Cir. 1983) (citation omitted).

As to the addition of the U.S. as a defendant, Federal Rule of Civil Procedure 21 provides, in relevant part, that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. "A motion to add a party is governed by Fed. R. Civ. P. 15(a)." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) ("To the extent that Plaintiff's motion to supplement sought the addition of a party, it is controlled by Rule 15(a) because it is actually a motion to amend."); *Vincoy by & through Vincoy v. U.S.*, No. CIV 97-0296 JC/RLP, 1998 WL 36030929, at *1 (D.N.M. Jan. 8, 1998) (applying Rule 15(a) standard "[b]ecause there has not been a showing of undue delay, bad faith, dilatory motive, undue prejudice or futility of amendment" and thus Plaintiff is entitled to amend the complaint to add a new party defendant); *see also Hayes v. SmithKline Beecham Corp.*, 2008 WL 5003567, at *2 (N.D. Okla. Nov. 20, 2008) (applying the undue delay, bad faith, futility, and undue prejudice factors to a motion to amend to add a party).

## B.   GRANTING LEAVE TO AMEND COUNT I AND COUNT XVI IS NOT FUTILE

Plaintiff's Motion to Amend the FAC should be granted, as the proposed amendment of Count I and Count XVI (only as related to negligent training and supervision by CoreCivic) is not futile. Plaintiff has collected additional facts that Plaintiff believes will cure the pleading deficiencies identified by this Court in its prior Order.

The proposed SAC alleges the following additional facts in support of Counts I and XVI to render those claims sufficiently pled pursuant to the standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A court is empowered to reconsider its prior rulings when new facts are available. *See Trujillo*, 212 F. App'x at 766 (finding that the District Court's reconsideration of its prior grant of summary judgment

was not an abuse of discretion because it was based on additional facts and therefore the law of the case doctrine was inapplicable); *see also Major v. Benton*, 647 F.2d 110, 111-12 (10th Cir. 1981).

### 1.    Count I – Section 504 of the Rehabilitation Act

This Court's Order held that Plaintiff failed to assert a plausible Rehabilitation Act claim against the NM Defendants because the allegations in the complaint "do not establish that it was plausible that the NM Defendants received a subsidy to transport and house Hernandez." (Order at 6). Plaintiff seeks leave to amend to add additional facts and an alternative legal basis in the SAC that support finding that all Contractor Defendants, including the NM Defendants, both carried out federally conducted activities and also received federal financial assistance in the form of a subsidy from the federal government, all of which support invocation of the protections afforded by Section 504 of the Rehabilitation Act.[1] *See, e.g.*, SAC at ¶¶ 27, 31, 37, 39, 43, 47, 51, 55-65, 67, 114, 124, 132, 157, 166, 202, 230, 232-247.

First, the SAC further alleges that Contractor Defendants received federal subsidies for participating in the STP program and were responsible for administering a federal program of which the detention and transportation of Roxsana was a part, thus not relying on their receipt of federal funds under their contracts for services with the U.S.  *See, e.g.*, *id.* Further, ICE makes clear its intent to subsidize the Contractor Defendants by way of its waiver program, which permits

---

[1] Section 504 of the Rehabilitation Act protects people with disabilities from discrimination in (1) federally assisted or (2) federally conducted programs:  "No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ***or under any program or activity conducted by any Executive agency*** . . . ." 29 U.S.C. § 794 (emphasis added). In order to determine the applicability of Section 504 within the Tenth Circuit, courts principally look at "the government's intention" to provide a subsidy. *See DeVargas v. Mason & Hangar-Silas Mason Co*, 911 F2d 1377 (10th 1990).

its contractors to seek waivers of compliance with the PBNDS and other applicable standards, and also from the terms of their contracts with ICE which incorporate those standards. *See* SAC ¶ 236.[2] ICE frequently grants such waivers when compliance with standards would cause its private contractors to incur costs which in turn diminish their profits.[3] Thus, the U.S.'s waiver program evidences ICE's intent to subsidize its contractors within the meaning of Section 504—it allows U.S. contractors to waive requirements with ICE standards and contract terms where compliance would be, among other things, too costly for the contractors, thereby resulting in a subsidy to those contractors, including to the Contractor Defendants, and provides a back door for providing federal financial assistance beyond ICE's procurement contracts. SAC ¶ 236.[4]

---

[2] *See* OIG, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*, at 9-10 (Jan. 29, 2018), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf (finding that ICE's waiver program permits its contractors to indefinitely fail to comply with the PBNDS and other applicable standards as required by law and their contracts, including those applicable to healthcare and safety, noting that within the two-year period reviewed by OIG, ICE granted 96 percent of requested waivers and, out of 65 requests, only three had set expiration dates) (last visited May 6, 2021); *see also* OIG, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, p. 11-14 (Jun. 26, 2018), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf (reporting ICE's grant of waivers to its contractors leads to contractors' chronic lack of compliance with mandatory standards as required by their contracts and insufficient corrective measures) (last visited May 6, 2021).

[3] *See, e.g.,* National Immigrant Justice Center, *The Dark Money Trail Behind Private Detention: Immigration Centers of America-Farmville* (Oct. 2019), *available at* https://immigrantjustice.org/research-items/policy-brief-dark-money-trail-behind-private-detention-immigration-centers-america (last visited May 6, 2021) (reporting that, since 2013, an ICE contractor has been granted a waiver of the PBNDS requirement that detention facilities provide, at a minimum, one toilet for every 12 male detainees or one for every 8 female detainees where compliance would require the expenditure of $400,000 and 30 days to complete).

[4] ICE has granted such waivers to at least CoreCivic, LaSalle, and GPS, waiving their compliance with ICE standards in effect during May 2018 at Cibola, San Luis Regional Detention Center, and El Paso Service Processing Center ("SPC"), respectively, when Roxsana was in the care and custody of these Contractor Defendants. *See ERO Custody Management Division Inspection Waiver Master File*, U.S. Immigration and Customs Enforcement Facility Inspections (2019), https://www.ice.gov/doclib/facilityInspections/2019waivers.xlsx (last accessed May 11, 2021).

Second, the SAC alleges that the U.S. was directly involved in and intricately intertwined with the Contractor Defendants in conducting the federal STP of Roxsana to such an extent that the Contractor Defendants were sufficiently interconnected with the U.S. to be engaged in a federally conducted program or activity, which is an alternate basis for enforcement of Section 504 against them. *See, e.g.*, SAC at ¶¶ 27, 31, 37, 39, 43, 47, 51, 55-65, 67, 114, 124, 132, 157, 166, 202, 230, 232-247. The federal STP program in which the Contractor Defendants participated with ICE was a "program or activity conducted by any Executive agency" under the plain language of Section 504. 29 U.S.C. § 794.[5] The very nature of the STP program inextricably intertwined the Contractor Defendants with ICE in such a way that all were involved in carrying out this federally-conducted program to transport Roxsana from the California Port-of-Entry to Cibola. *See, e.g.*, SAC at ¶¶ 41, 60-64, 93-94, 96, 158, 234-236, 426-427. ICE employees were directly involved with Roxsana's STP, working alongside and with employees of the Contractor Defendants at various points of the journey. SAC at ¶¶ 41, 60-64, 96, 125, 133, 138, 158, 235-236. ICE ERO officers took custody of Roxsana at the airport in Mesa, Arizona and during the plane ride on May 15, 2018 to El Paso, Texas. SAC at ¶¶ 125, 133. Similarly, El Paso SPC is an ICE facility and Defendant GPS stopped at the ICE Criminal Alien Program ("CAP") facility in Albuquerque for a "meet and greet" to pick up additional people to be transported during the STP. SAC at ¶¶ 41,

---

(last visited May 11, 2021). Furthermore, GPS is a minority-owned business pursuant to 13 C.F.R. Part 124 *et. seq.*, which entitles GPS to various benefits, including federal financial assistance. *See* SAC ¶ 236; *see* GLOBAL PRECISION SYSTEMS, https://sites.beringstraits.com/gps/13 CFR §120.375 (last visited May 6, 2021). As such, these Defendants received federal financial assistance from ICE.

[5] *See* Margo Schlanger, *Narrowing The Remedial Gap: Damages For Disability Discrimination In Outsourced Federal Programs,* The University Of Chicago Law Review Online (2021) https://Lawreviewblog.Uchicago.Edu/2021/03/05/Schlanger-Detention/ (last visited May 6, 2021) (arguing that Section 504 provides an alternative and underutilized theory of liability against private contractors of the federal government under Section 504 by way of their participation in federally-conducted activity).

138, 154, 159, 235-236. Further, and notably, all the activities by the Contractor Defendants described in the SAC were completely regulated by federal policies, standards, and regulations. Thus, both the U.S. and the Contractor Defendants were inextricably involved in the STP of Roxsana, a federal program and/or activity. SAC at ¶¶ 41, 60-64, 96, 125, 133, 138, 158, 235-236. Given these facts, Section 504 applies to the conduct of the Contractor Defendants.

Finally, Plaintiff also seeks leave to amend to assert the additional facts that all Contractor Defendants not only discriminated against Roxsana in violation of Section 504 of the Rehabilitation Act based on Roxsana's known disability (positive HIV status), but also that Roxsana was discriminated against based upon Defendants' employees' perception of Roxsana as having a disability because she was transgender. *See, e.g.*, SAC at ¶¶ 7, 68, 102, 115, 125, 133, 158, 166, 202, 233-257. This issue was not addressed in the Court's Order. Pursuant to 42 U.S.C.S. § 12102(1)(c), the term "disability" (for purposes of the Rehabilitation Act) includes not only discrimination based upon a known disability, but also discrimination based on the perception (or misperception) of having a disability. *See id.* at ¶ 240. The SAC newly asserts that all Contractor Defendants perceived Roxsana as having a disability because she was transgender and/or on the basis of some other perceived disability related to her transgender status and discriminated against her on these bases. *See e.g.*, SAC at ¶¶ 7, 67, 70, 114, 124, 132, 157, 166, 202, 233-247. The SAC also restates a fact previously provided in the FAC that because Roxsana was transgender, she was specifically sent—via the STP—to Cibola County Correctional Center ("Cibola"), which is owned and operated by CoreCivic, because Cibola had a specific transgender housing unit. *See id.* at ¶ 64. These newly pleaded facts and legal theories adequately support Plaintiff's claim that Roxsana was discriminated against on account of her actual or perceived disability in violation of Section 504 of the Rehabilitation Act.  Thus, amendment of Count I of the FAC would not be futile.

2. **Count XVI – Negligent Training and Supervision Against Defendant CoreCivic**

The Order also held that the Plaintiff failed to allege a plausible negligent hiring, retention, training, and supervision claim against CoreCivic. Order pp. 20, 21-22. Plaintiff seeks to include additional facts that establish CoreCivic's negligence in supervising and training its employees (but not as to negligent hiring or retention). The additional facts asserted in the SAC that support this claim include:

- CoreCivic employees unreasonably, unlawfully, and, in violation of applicable standards of care, kept Roxsana shackled to her hospital bed by her wrists and/or ankles throughout her entire eight-day hospitalization (with brief exception for the momentary removal of her shackles to administer medical care at the request of medical personnel), despite the fact that Roxsana was not a flight or security risk. This was in violation of the federal Performance Based National Detention Standards ("PBNDS") and prevailing medical standards of care. These acts also resulted in the obstruction and delay of Roxsana's emergency and life-saving medical care and caused injuries to Roxsana's wrists and other parts of her body (*see* SAC at ¶¶193-194, 196-198, 200-201, 380-385);

- The provisions of the PBNDS that prohibited CoreCivic's employees' use of restraints on Roxsana, including Standard 2.15 *Use of Force and Restraints*[6] and the applicable sections of Standard 4.3 *Medical Care*,[7] address use of restraints for

---

[6] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011*, at 2.15(b)(1) p. 202, https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf (last visited April 26, 2021).

[7] *Id.* at § B(4) p. 202.

medical purposes and establish that CoreCivic violated its duty of care owed to Roxsana (*see* SAC at ¶¶ 380-385);

- CoreCivic employees maintained the restraints on Roxsana despite her treating physician explicitly requesting that CoreCivic employees remove them due to Roxsana's extreme discomfort and because she was clearly not a flight or security risk, as she had been medically paralyzed, had undergone a cardiac event and resuscitation, and was not only guarded by an armed CoreCivic officer but also by up to eight medical personnel while in critical condition (*see* SAC at ¶¶ 197, 383, 394). CoreCivic employees kept Roxsana restrained by handcuffs for over four hours while she was in this critical medical state, and only removed her restraints three hours before she was pronounced dead after yet another request by treating medical staff for her restraints to be removed to administer emergency medical treatment (*see* SAC at ¶¶ 197, 380, 383, 394);

- CoreCivic further delayed and obstructed Roxsana's receipt of life-saving medical procedures and treatment by requiring CoreCivic employees to take the time to call "central" to receive prior approval each time medical personnel requested that Roxsana's restraints be removed to administer emergency medical treatment (*see* SAC at ¶¶ 196, 201, 394, 407). This practice—which was well documented by CoreCivic's own employees—was consistently carried out by CoreCivic's employees who also physically guarded Roxsana around the clock from May 17, 2018 until the time of her death on May 25, 2018, establishing that CoreCivic managers not only supervised this practice, but authorized or condoned it (*see* SAC at ¶¶ 196-201, 394); and

- Facts evidencing that CoreCivic was aware of the need for additional and/or better training and supervision of its employees regarding their obligations pursuant to the PBNDS, including documentation by the federal government of the chronic and pervasive deficiencies of medical care provided by CoreCivic for other people detained at Cibola both prior to and after Roxsana in violation of the PBNDS (*see* SAC at ¶¶ 397, 403).

The foregoing additional facts establish a *prima facie* claim for negligent training and supervision of CoreCivic employees. The proposed amendments in the SAC are therefore not futile. As such, Plaintiff respectfully requests that the Court reconsider its dismissal of the negligent training and supervision claim against Defendant CoreCivic in Count XVI and grant leave to include the proposed facts in the proposed SAC.

### C. PLAINTIFF SHOULD BE PERMITTED TO ADD THE U.S. AS A DEFENDANT TO PROMOTE THE INTERESTS OF JUDICIAL ECONOMY AND THE EFFICIENT LITIGATION OF ALL CLAIMS

Plaintiff also seeks leave to amend the FAC to add the U.S. as a defendant to this action. When determining whether to allow amendment, it is proper for the Court to consider judicial economy and the most expeditious way to dispose of the merits of the litigation. *Pabst Brewing Co. v. Corrao,* 176 F.R.D. 552 (E.D. Wis. 1997), *aff'd*, 161 F.3d 434 (7th Cir. 1998).

Plaintiff seeks leave to amend the FAC to add the U.S. as a defendant to this action to promote judicial economy and efficient litigation of all claims. At the time that this action was initiated, Plaintiff was unable to name the U.S. as a defendant in the Original Complaint or the FAC due to administrative exhaustion requirements under the FTCA, the timing of which conflicted with the statute of limitations applicable to the claims asserted in the instant lawsuit against the Contractor Defendants, which statutory period would have expired had Plaintiff waited for the FTCA claims against the U.S. to become ripe. Plaintiff thus initiated this action against the

Contractor Defendants (without naming the U.S. as a party) to avoid the running of the limitations period for those claims, while Plaintiff awaited a final determination of her administrative FTCA claims against the U.S.

The FTCA requires that a claimant first present her claims to the appropriate federal agency before filing in federal district court. 28 USCS § 2675(a). Pursuant to this exhaustion requirement, on November 22, 2019, Plaintiff submitted an administrative complaint stating her claims for wrongful death, negligence, negligent hiring, retention, training, and supervision, intentional infliction of emotional distress, and failure to render medical care to the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"). *See* **Exhibit A**. On May 9, 2020, Plaintiff filed a supplemental administrative complaint to the same agencies adding claims for loss of chance of survival and false imprisonment, as well as additional facts that its employees exhibited animus towards Roxsana. *See* **Exhibit B**. On January 8, 2021, ICE denied Plaintiff's claims. *See* **Exhibit C**. Thus, all administrative exhaustion requirements were satisfied only as of January 8, 2021, at which time Plaintiff was properly positioned to assert her FTCA claims against the U.S. Because, Plaintiff's claims against the U.S. were not administratively exhausted when the instant case against the Contractor Defendants was initiated on May 13, 2020 (Original Complaint) or on August 13, 2020 (when the FAC was filed) (Doc. Nos. 1, 9), Plaintiff was not able to include the U.S. as a Defendant to this action at those times.[8]

---

[8] Furthermore, at the time Plaintiff filed the Original Complaint and the subsequent FAC, Plaintiff was also awaiting key documents from ICE and DHS pursuant to a related Freedom of Information Act ("FOIA") request and subsequent litigation in the Northern District of California. *See Transgender Law Center. v. U.S. Immigr. & Customs Enf't*, C.A. No. 3:19-cv-03032-SK, 2020 WL 7382113, at *8 (N.D. Cal. Nov. 24, 2019) (the "FOIA Action"). Documents sought in the FOIA Action are material to the events at issue in the instant action. However, due to the government agencies' repeated delays complying with the timing requirements of the FOIA,

Granting leave to amend the FAC to include the U.S. as a defendant would promote judicial economy and efficient litigation of this action. Plaintiff is within the statutory limitation period to file a separate FTCA action, but instead seeks to add the U.S. as a party to the instant action. This is due to the relatedness of the claims asserted against all parties, as the Contractor Defendants were retained by the U.S. to participate in the federal STP program for the detention and transportation of Roxsana. If Plaintiff's motion to amend to add the U.S. as a party to this action is denied, Plaintiff will be required to file a separate, but related, complaint to assert her claims against the U.S. In lieu of filing another action (and a potential subsequent motion to consolidate), Plaintiff believes that it would be in the best interest of the Court and all parties to add the U.S. as a defendant to this action via the SAC, as it would be the most efficient use of judicial resources.

### D.   GRANTING PLAINTIFF LEAVE TO AMEND THE FAC WOULD NOT UNDULY PREJUDICE DEFENDANTS OR THE U.S.

"In the absence of a specific factor, such as flagrant abuse, bad faith, futility of amendment, or truly inordinate and unexplained delay, prejudice to the opposing party is the key factor to be evaluated in deciding motion to amend." *Taylor as next friend of J.T. v. Johnson*, 2000 WL 36739863, at *1 (D.N.M. Apr. 10, 2000) (citations omitted). Prejudice is typically found only where the amendment unfairly affects the defendants "in terms of preparing their defense to the amendment." *Minter*, 451 F.3d at 1208. This often occurs "when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Id*. "Any amendment invariably causes some 'practical prejudice,' but leave to amend is

---

Plaintiff's receipt of these critical documents was delayed. *Id*. at *7-8 (granting declaratory judgment to requester plaintiffs finding that "Defendants' delay here . . . abused the FOIA process[]" and violated the timing requirements under the FOIA). To date, Plaintiff still lacks requested documents and has appealed to the Ninth Circuit to obtain them. *See Transgender Law Center et al. v. Immigration and Customs Enforcement, et al.*, Case No. 20-17416 (9th Cir. 2021).

not denied unless the amendment would work an injustice to the defendants." *Koch v. Koch Indus.*, 127 F.R.D. 206, 210 (D. Kan. 1989) (citing *Patton v. Guyer*, 443 F.2d 79, 89 (10th Cir. 1971).

The Contractor Defendants will not be unduly prejudiced if Plaintiff is granted leave to amend. The SAC adds additional facts and alternative legal theories related to Count I (Section 504 of the Rehabilitation Act) and Count XVI (negligent training and supervision as related to CoreCivic), which are directly related to facts and legal theories that were already asserted in the FAC. *See Gillette v. Tansy,* 17 F.3d 308, 313 (10th Cir. 1994) (finding no evidence of prejudice when the "Petitioner's [amended] claims track the factual situations set forth in his [original] claims"); *R.E.B., Inc. v. Ralston Purina Co.,* 525 F.2d 749, 751–52 (10th Cir.1975) (finding no prejudice when "[t]he amendments did not propose substantially different issues"). Thus, all Contractor Defendants, including the NM Defendants, are fully apprised of these claims and the underlying facts that support them and do not have to prepare to defend any new claims. Moreover, CoreCivic would not be prejudiced by the assertion of the additional facts in support of Count XVI, as not only are these facts directly related to facts previously alleged in the FAC, but also because most of these news facts are gathered from CoreCivic's own documents.

The Contractor Defendants are also not prejudiced by the addition of the U.S. as a defendant to this action. To the contrary, having all claims against all parties involved in the transportation and detention of Roxsana before the same Court would promote judicial economy and efficient resolution of Plaintiff's claims. The Contractor Defendants all transported and/or detained Roxsana by way of their contracts with the U.S., and each was inextricably intertwined with the U.S. in the STP process to detain and transport Roxsana. Granting Plaintiff leave to amend the FAC would thus be advantageous to both the U.S. and the Contractor Defendants because they would receive the same discovery, be privy to the same facts, and have the opportunity to bring

any cross claims that may have arisen from the same series of events at issue. Although not a party to this action, the U.S. was also already placed on notice that it would be added as a defendant in this action through the related FTCA administrative complaint. The U.S. thus has familiarity with the facts of this case and should have known that it would likely be named as a party to this action. Additionally, since this case is still in its infancy (discovery has not yet begun and the Rule 16 Scheduling Conference was only recently set for June 28, 2021), the U.S. has ample time to prepare for this litigation. Thus, neither the Contractor Defendants, including the NM Defendants, nor the U.S. will suffer undue prejudice if leave to amend is granted.

### E.   PLAINTIFF'S REQUEST FOR LEAVE TO AMEND THE FAC IS TIMELY AND WOULD NOT CAUSE UNDUE DELAY TO THIS LITIGATION

Plaintiff filed the Original Complaint less than a year ago, amended the Original Complaint only once as of right, and promptly filed this Motion for leave to amend within 23 days after receipt of the Court's dismissal Order. *Compare with A.E. v. Mitchell*, 724 F.2d 864, 38 Fed. R. Serv. 2d (Callaghan) 425, 1983 U.S. App. LEXIS 14134 (10th Cir. 1983) (holding the lower court did not abuse its discretion in denying the plaintiff's motion to amend where it had already granted leave to do so three times, the fourth request was not made for nearly a year later, and the proposed amendment would have created a new cause of action with new parties). Plaintiff promptly filed this motion in good faith to cure the pleading deficiencies identified in the Order. Granting leave would not cause undue delay to the litigation, as proceedings are still in the early stages and discovery has not yet commenced. The deadline for parties to "meet and confer" to formulate a provisional discovery plan is not until June 7, 2021, and a Rule 16 conference is not scheduled until June 28, 2021. (Doc. 59).

Plaintiff's attorneys have contacted the attorneys for all Contractor Defendants about this Motion and were informed that GPS, TransCor and CoreCivic oppose the Motion to Reconsider

and to Amend, MTC takes no position as to Plaintiff's Motion for Reconsideration but opposes the filing of a Second Amended Complaint, and LaSalle takes no position as to Plaintiff's Motion for Reconsideration and to Amend in part because they did not have time to more thoroughly review the proposed SAC.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for Reconsideration and to Amend, allowing amendments to Counts I and XVI of the FAC and granting Plaintiff's motion for leave to add the U.S. as a party to this action.

May 12, 2021

*/s/   Daniel Yohalem*

Daniel Yohalem
Attorney at Law
1121 Paseo de Peralta
Santa Fe, New Mexico 87501
Phone: 505-983-9433 Fax 505-989-4844

Katherine Murray
Attorney at Law
P.O. Box 5266
Santa Fe, New Mexico 87502
Phone: 505-670-3943

Dale Melchert, *Pro Hac Vice*
Lynly Egyes *Pro Hac Vice*
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612

Kimberly A. Evans, *Pro Hac Vice*
Carla Agbiro, *Pro Hac Vice Forthcoming*
Grant & Eisenhofer P.A.
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7086
kevans@gelaw.com

Irene R. Lax, *Pro Hac Vice*
Grant & Eisenhofer P.A.

485 Lexington Avenue
New York, NY 10017
Tel: (646)-722-8512
ilax@gelaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT on May 12, 2021, I filed the foregoing electronically through the CM/ECF system, which caused all Defendants' counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Daniel Yohalem*
Daniel Yohalem

# **ATTACHMENT A**

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**Joleen K. Youngers**,
as the Personal Representative of the
Wrongful Death Estate of Roxsana
Hernandez,

Plaintiff,

Civil Action No. 20-cv-00465-JAP-JHR

v.

**Management & Training Corporation,**
**LaSalle Corrections Transport LLC,**
**LaSalle Corrections West LLC,**
**LaSalle Management Company LLC,**
**Global Precision Systems LLC,**
**TransCor America LLC,**
**CoreCivic, Inc., and**
**United States of America,**

Defendants.

## SECOND AMENDED COMPLAINT

## <u>INTRODUCTION</u>

1.       This action involves the heinous and willfully negligent failure of the United States of

America ("Defendant U.S." or "U.S.") and several of its contractors to provide lawful and humane

care for Roxsana Hernandez ("Roxsana"), a transgender asylum-seeker from Honduras living with

Human Immunodeficiency Virus ("HIV"), while transporting her from San Diego, California to

Milan, New Mexico. Roxsana was seeking asylum in the United States after being brutally raped and

targeted by gangs in her home country.

2.       Despite Roxsana visibly exhibiting symptoms of distress associated with her untreated

HIV throughout her four-state journey–including, but not limited to, nausea, vomiting, fever, diarrhea,

and severe fatigue–as well as the persistent pleas for help by Roxsana and those with whom Roxsana travelled, Defendants (the U.S. and the contractors charged with her custody) failed or refused to render her the timely care and medical intervention she required. In doing so, Defendants violated Roxsana's rights under the Federal Tort Claims Act, Section 504 of the Rehabilitation Act, state civil rights laws, and common law torts.

3.     Employees of Defendant U.S. and Defendants Management & Training Corporation ("MTC"), LaSalle Corrections West, LLC ("LaSalle Corrections"), LaSalle Corrections Transport, LLC ("LaSalle Transport"), LaSalle Management Company, LLC, ("LaSalle Management" and collectively with LaSalle Corrections and LaSalle Transport, the "LaSalle Defendants" or "LaSalle"), Global Precision Systems, LLC ("GPS"), TransCor America, LLC ("TransCor"), and CoreCivic, Inc. ("CoreCivic") (collectively, the "Contractor Defendants" and together with Defendant U.S., the "Defendants") were acting within the scope of their employment at all relevant times, including throughout the time that Roxsana was in their respective custody and control.

4.     Defendants are each vicariously liable for the intentional, negligent, and reckless acts and omissions committed by their employees. Defendants' employees were further aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana, especially given Roxsana's vulnerability while in Defendants' respective custody and control.

5.     Defendants allowed Roxsana to literally waste away:  she weighed only 89 pounds upon arriving at her final destination—CoreCivic's Cibola County Correctional Center in Milan, New Mexico ("Cibola").

6.     Defendants ignored the persistent demands for help and medical assistance made by Roxsana and the transgender asylum-seekers with whom Roxsana travelled.  Defendants further denied Roxsana access to asylum protection, reasonable accommodations for her disability, adequate

medical care, sufficient food and water, access to a restroom, and an opportunity to sleep.

7.     Defendants discriminated against Roxsana based on her disability (HIV) and/or because she was perceived by Defendants as having a disability (HIV and/or other disability), as well as on account of her status as a transgender[1] asylum seeker from Latin America. This discrimination resulted in Defendants' failure or refusal to render Roxsana the timely care and medical intervention she required, the opportunity to participate in the federal immigration process, and the denial of other essential services (*inter alia*, safe transport, food, water, bathroom facilities) to which she was entitled. Defendants also perceived Roxsana's feminine gender expression as a sign of her having a disability and discriminated against her as a result of that perception.

8.     Consequently, the Contractor Defendants violated Roxsana's rights under Section 504 of the Rehabilitation Act, and Defendant U.S. and Defendant MTC violated Roxsana's rights under the California civil rights provisions set forth below. The Contractor Defendants also violated their federal contracts, their own standards for care and transportation of detained immigrants, and the prevailing standards of care in California and New Mexico.

---

[1] "Transgender" is an adjective that refers to a person whose gender does not correspond with the sex assigned at birth. For example, a transgender woman has the persistent internal sense that she is a woman, despite being assigned the sex of "male" at birth. Prevailing medical and social science literature and research indicate that supporting transgender people to live authentically in accordance with their gender identity, rather than their sex assigned at birth, is critical to improving health and quality of life outcomes and to alleviate the symptoms of Gender Dysphoria, a diagnosis recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition, that many transgender people experience. *See, e.g.*, Cecilia Dhejne *et al.*, *Mental Health and Gender Dysphoria: A review of the literature*, 28 International Review of Psychiatry 44 (2016) (finding that access to transition-related care results in reduction of gender dysphoria and improved psychological health outcomes); Annelou de Vries *et al.*, *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014). Transgender people experience pervasive discrimination and disproportionately high rates of violence and abuse globally. *See, e.g.*, Sandy E. James *et al.*, National Center for Transgender Equality, The Report of the 2015 Transgender Survey (2016), available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF     (finding transgender people in the U.S. face disproportionately high rates of violence and discrimination, economic and housing insecurity, and criminalization).

9.     Each Defendant failed to provide an adequate medical assessment of Roxsana before transporting her, and Defendants further failed to provide Roxsana with medication and adequate food, water, access to bathroom facilities, and medical care, despite her known HIV-positive status, physical and emotional impairments, and rapidly deteriorating physical condition.

10.     It was foreseeable that Defendants' acts and omissions would increase the risk of Roxsana becoming severely ill, exacerbate her rapidly-deteriorating medical condition, cause her extreme emotional distress, and reduce her chance of survival.

11.     Because Defendants ignored both the persistent pleas for help from Roxsana and the requests for intervention from the transgender women with whom Roxsana travelled, she arrived at Cibola in septic shock, dehydrated, severely tachycardic, medically starving, febrile, and in the early stages of multiple organ failure.

12.     Simply put: from the outset, Roxsana was not in a condition to be transported or temporarily detained outside a medical facility, pursuant to Defendants' own policies and binding regulations. Defendants acted unreasonably and are liable for the suffering and death they caused Roxsana as a result of choosing to transport her, failing to provide her with adequate medical assessments prior to transport, and denying her access to adequate medication, medical care, food, water, and bathroom facilities during transport, despite her obvious, serious, and emergent medical needs.

13.     Defendants' discriminatory, negligent, and reckless acts and omissions: (a) caused Roxsana to suffer severe emotional and physical distress; (b) created an unreasonable risk that Roxsana's condition would deteriorate, especially in light of her known HIV-positive status; (c) caused Roxsana's condition to deteriorate; (d) diminished the opportunity for Roxsana's condition to improve; (e) caused her to lose her chance to survive and participate in the federal immigration

4

process; and (f) ultimately, caused her death.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity) over the state law claims against all private Defendants because the amount in controversy exceeds $75,000, exclusive of costs, and no Defendant is a citizen of New Mexico; under 28 U.S.C. § 1331 (federal question) as to the claims against all Defendants under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and under 28 U.S.C. § 1346(b) as to all claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1392(b)(2) because a substantial part of the acts, events, or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

16.     Plaintiff Joleen K. Youngers ("Youngers" or "Plaintiff") is an adult resident of the State of New Mexico.

17.     On January 15, 2019, the First Judicial District Court of New Mexico appointed Plaintiff as the Personal Representative of the Wrongful Death Estate of Roxsana Hernandez pursuant to 1978 NMSA, § 41-2-3. *In the Matter of the Wrongful Death Action on Behalf of the Survivors of Roxsana Hernandez, Deceased,* No. D-101-CV-2019-00075.

18.     Plaintiff sues in her capacity as Personal Representative of Roxsana's Wrongful Death Estate for all damages arising from Roxsana's pre-death suffering and injuries, as well as her wrongful death.

19.     Defendant U.S. is a sovereign entity responsible for the employees of the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"), who take into custody, detain, and transport individuals subject to

the civil detention authority of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1001 *et seq.*, and are responsible for the management, operation, and employees of facilities and entities that detain and transport such individuals pursuant to that authority.

20.     On November 22, 2019, Plaintiff submitted an administrative tort claim for damages arising out of Roxsana's arrest, detention, gross mistreatment in custody, and death as a result of the tortious acts and omissions of Defendant U.S.'s employees working for DHS, CBP, and/or ICE (the "Notice"). Plaintiff's administrative tort claim was received by all three agencies on November 25, 2019. Plaintiff submitted supplemental facts and amended the administrative claim on May 9, 2020.

21.     Plaintiff's administrative tort claim and supplemental claim provided the U.S. with a sum certain damages claim, all the facts necessary to enable the appropriate agencies to begin their own investigation into the conduct of DHS, CBP, and/or ICE employees, and alleged sufficient facts to provide notice of the theories of liability set forth in this Second Amended Complaint ("SAC").

22.     On January 8, 2021, Defendant U.S. denied the tort claims alleged by Plaintiff in her November 22, 2019 Notice. Plaintiff has not received a response to the supplemental facts and claims submitted to the United States on May 9, 2020.  The U.S. has waived sovereign immunity from private suit for the negligent and wrongful acts and omissions of government employees alleged herein.

23.     The negligent and wrongful acts and omissions of U.S. employees alleged herein occurred under circumstances whereby the U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred if it were a private person.

24.     Defendant MTC is a foreign, for-profit corporation originally incorporated in Delaware and maintaining its headquarters at 500 N. Marketplace Drive, Centerville, Utah 84014.

25.     At all times material to this SAC, MTC contracted with Defendant U.S., through its subcomponent ICE, to manage immigration detention facilities in Texas, New Mexico, and California,

including the Imperial Regional Detention Center in Calexico, California and to operate the Otero Processing Center in Chaparral, New Mexico.

26.     Pursuant to its contracts with ICE, MTC employees and/or agents ("employees") transported Roxsana from Imperial Regional Detention Center to San Luis Regional Detention Center in Arizona ("SLRDC") on May 14, 2018 or were otherwise responsible for Roxsana's transport and detention. Accordingly, MTC was responsible for Roxsana's custody and care during that time.

27.     MTC received federal funds for these services pursuant to its contracts with Defendant U.S. via ICE.  Upon information and belief, MTC also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

28.     MTC maintains a registered agent within New Mexico to accept service of process.[2]

29.     Defendant LaSalle Corrections is a corporation maintaining a corporate office located at 26228 Ranch Road 12 Dripping Springs, Texas 78620-4903 and, on information and belief, is a wholly-owned subsidiary of LaSalle Management. At all times material to this SAC, LaSalle contracted with Defendant U.S. via ICE to manage immigration detention facilities in Arizona, Texas, and Georgia, including SLRDC located in San Luis, Arizona.

30.     Pursuant to its contracts with ICE, LaSalle Corrections employees were charged with the custody and care of Roxsana while she was detained at SLRDC from May 14, 2018 to May 15, 2018, or were otherwise responsible for Roxsana's transport and detention.

31.     LaSalle Corrections received federal funds for these services pursuant to its contracts

---

[2] Located at 10 McGregor Range Road, Chaparral, NM 88081, date of appointment 12/18/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

with ICE. Upon information and belief, LaSalle Corrections also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

32.     LaSalle Corrections maintains a registered agent within New Mexico to accept service within the state.[3]

33.     At the time Plaintiff filed her original complaint LaSalle Corrections' website listed New Mexico as a state in which it maintains bed capacity for immigration detention.[4]

34.     Defendant LaSalle Transport is a corporation maintaining a corporate office located at 26228 Ranch Road 12 Dripping Springs, Texas 78620-4903 and, on information and belief, is an affiliate of LaSalle Corrections.

35.     At all times material to this SAC, LaSalle Transport contracted with Defendant U.S. via ICE to provide transportation services to detention facilities, including SLRDC located in San Luis, Arizona.

36.     Pursuant to its contracts with ICE, LaSalle Transport employees were charged with the custody and care of Roxsana while they transported her from SLRDC to the Mesa, Arizona airport on May 15, 2018, or were otherwise responsible for her transport and detention.

37.     LaSalle Transport received federal funds for these services pursuant to its contracts with ICE. Upon information and belief, LaSalle Transport also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive

---

[3] Located at 206 S. Coronado Ave, Espanola, NM 87532, date of appointment 04/26/2017. NEW MEXICO SECRETARY OF STATE CORPORATIONS AND BUSINESS SERVICES, https://portal.sos.state.nm.us/BFS/online/corporationbusinesssearch/CorporationBusinessInformation (last visited May 12, 2020).

[4] The following link has since been removed  http://www.lasallecorrections.com/our-locations-table/ (last visited May 12, 2020).

agency" within the meaning of Section 504(a).

38.     LaSalle Management is a corporation incorporated in Louisiana with a corporate office located at 810 Louisa St., Rayville, LA 71269. Upon information and belief, LaSalle Management is the parent company of LaSalle Corrections and LaSalle Transport and was contracted by Defendant U.S. via ICE to run detention facilities and provide staffing and transportation to ICE detention facilities through its subsidiaries, including Defendants LaSalle Corrections and LaSalle Transport. Employees of the LaSalle Defendants were charged with the custody and care of Roxsana from May 14, 2018 to May 15, 2018 pursuant to their contracts with ICE, or were otherwise responsible for her transport and detention.

39.     LaSalle Management received federal funds for these services pursuant to its contracts with ICE. Upon information and belief, LaSalle Management also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

40.     Defendant GPS is a limited liability company organized in Alaska and is a wholly-owned subsidiary of Bering Straits Native Corporation ("BSNC"), an Alaska Native Regional Corporation, with a business address located at 3301 C Street, Suite 400, Anchorage, Alaska 99503.

41.     At all times material to this SAC, GPS contracted with Defendant U.S. via ICE to provide food and transportation services at El Paso Service Processing Center, an ICE owned facility, in El Paso, Texas ("El Paso SPC").

42.     Pursuant to its contracts with ICE, GPS employees were charged with transporting Roxsana from the El Paso SPC to Albuquerque, New Mexico on May 16, 2018. Accordingly, GPS was responsible for Roxsana's custody and care during that time, or was otherwise responsible for Roxsana's transport and detention.

43.     GPS received federal funds for these services pursuant to its contracts with ICE. Upon information and belief, GPS also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

44.     Defendant TransCor is a limited liability company formed in Tennessee and is a wholly-owned subsidiary of Defendant CoreCivic.

45.     At all times material to this SAC, TransCor contracted with CoreCivic to perform transportation services for CoreCivic in fulfillment of CoreCivic's contract with Defendant U.S. via ICE to manage immigration detention centers across the United States, including Cibola in Milan, New Mexico.

46.     Pursuant to its contracts with CoreCivic and/or ICE, TransCor was charged with transporting Roxsana from Albuquerque, New Mexico to Cibola on May 16, 2018.  Accordingly, TransCor was responsible for Roxsana's custody and care during that time, or was otherwise responsible for Roxsana's transport and detention.

47.     TransCor received federal funds for these services pursuant to its contracts with CoreCivic and ICE. Upon information and belief, TransCor also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

48.     Defendant CoreCivic (formerly known as Corrections Corporation of America) is a corporation formed in Maryland and maintains its corporate headquarters at 5501 Virginia Way, Brentwood, Tennessee 37027-7680.

49.     At all times material to this SAC, CoreCivic contracted with Defendant U.S. via ICE to manage immigration detention facilities across the United States, including Cibola.

10

50.     Pursuant to its contracts with ICE, CoreCivic employees were charged with the custody and care of Roxsana while she was detained at Cibola from May 16, 2018 until she died at Lovelace Medical Center in Albuquerque, New Mexico on May 25, 2018. Accordingly, CoreCivic was responsible for her custody and care during that time, or was otherwise responsible for Roxsana's transport and detention.

51.     CoreCivic received federal funds for these services pursuant to its contracts with ICE. Upon information and belief, CoreCivic also received federal subsidies to support the conduct described herein and engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

## FACTS

### A.     ROXSANA'S CONDITION SHORTLY AFTER ARRIVAL IN THE UNITED STATES

52.     Two days after Roxsana arrived at the San Ysidro Port-of-Entry, medical staff at the facility found Roxsana to be in weak physical condition and unfit for travel and detention. The treating physician based this determination on Roxsana's medical history of untreated HIV and on her current symptoms of frequent productive cough, elevated temperature, emaciation, and elevated heart rate.

53.     The doctor ordered Roxsana be taken to the emergency room in fear that her symptoms were life-threatening. Treating medical staff at the emergency room confirmed Roxsana's diagnosis of untreated HIV and ordered that CBP and/or ICE medical providers supply her with medication to treat it. Despite Roxsana's weak physical condition and inadequate medical testing to determine the full nature and extent of her illness, CBP instead secured Roxsana's release from medical care and returned her to lockup. CBP then transferred Roxsana to ICE custody without providing her with medication to treat her HIV, as required pursuant to contract and ICE regulations.

54.     It was foreseeable that the failure to provide Roxsana with HIV medication and

adequate medical care, as well as adequate food, water, bathroom access, and rest would create an unreasonable risk that Roxsana would contract an additional illness or develop complications of her existing medical conditions and that her physical condition would worsen and deteriorate, resulting in severe emotional and physical distress, a diminished chance of her health improving, a lost chance of survival, and, ultimately, her death.

**B.     FEDERAL PROGRAMS UNDERLYING ROXSANA'S DETENTION AND TRANSPORTATION**

55.     At all times material to this SAC, Roxsana was confined subject to the civil detention authority of the INA, 8 U.S.C. §§ 1001 *et seq.*

56.     Roxsana was never charged with, nor imprisoned for, any criminal offense between the time she arrived at the San Ysidro Port-of-Entry on May 9, 2018 and the time she was pronounced dead in Albuquerque, New Mexico on May 25, 2018.

57.     Roxsana was detained and transported by agency components of DHS and its private contractors to facilitate the federal civil adjudication programs that would hear her claims for relief under the United States asylum and torture protection laws.

58.     When she lawfully presented herself at the Port-of-Entry in San Ysidro, Roxsana told officers of DHS agency component CBP, all of whom are agents of Defendant U.S., that she experienced past persecution in the form of sexual harassment, rape, and physical abuse by MS-13 gang leaders in Honduras and that she feared persecution, torture, and death on account of her gender expression if forced to return.

59.     Roxsana's statements to CBP officials triggered a federal legal obligation by DHS agency components CBP, ICE, and the United States Citizenship and Immigration Services ("USCIS") to provide her with a Credible Fear Interview, or, at a minimum, a Reasonable Fear Interview.

60.     From May 14, 2018 through May 17, 2018, Defendants shuttled Roxsana and more

than a dozen other transgender asylum-seekers on a multi-leg journey that stretched from San Ysidro, California to San Luis, Arizona to El Paso, Texas, and then finally to Milan, New Mexico via ICE's "Streamlined Transfer Process" ("STP").[5]

61.     According to ICE, the STP is an "established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities"[6] and "requires coordination across several Enforcement and Removal Operations ("ERO") field offices but results in efficient processing and transport of the large number of Aliens entering the U.S. at the San Ysidro POE."[7]

62.     The purpose of the detention facilitated by ICE's STP is to allow subjects' participation in federal adjudicative programs, including the fear-based interview process and EOIR adjudication of claims for fear-based protection from deportation.

63.     Each Contractor Defendant knew that it participated in a portion of the STP to transport Roxsana to her final destination in Milan, New Mexico.

64.     ICE ERO identified Cibola as the "appropriate" facility for Roxsana as part of the STP because of its dedicated transgender housing unit there.[8]

---

[5] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT OFFICE OF PROFESSIONAL RESPONSIBILITY, *Detainee Death Review of Jeffry [sic] HERNANDEZ (JICMS #201807481)* at p. 4 n. 34 (hereinafter, "Roxsana's Detainee Death Review"); *see also* https://www.ice.gov/doclib/foia/reports/ddrHernandezJeffryAkaHernandezRoxsana.pdf.

[6] Roxsana's Detainee Death Review at p. 4 n. 34.

[7] *Id.*

[8] *But see* Mica Rosenberg & Ted Hasson, "Exclusive: Serious health care lapses found in U.S. detention center housing transgender migrants," *Reuters* (Mar. 2, 2020) ("Federal inspections of the U.S. government's only dedicated detention unit for transgender immigrants last year found hundreds of unanswered requests for medical attention, poor quarantine procedures and deficient treatment for mental illnesses and other chronic diseases, Reuters has learned. . . . The problems, [ ] led to the transfer of all detainees to other facilities in January[.]"), *available at* https://tinyurl.com/ReutersCibola (last visited May 6, 2021).

C.   DETENTION AT SAN YSIDRO PORT-OF-ENTRY AND THE DECISION TO TRANSPORT ROXSANA TO CIBOLA

65.     On May 9, 2018, Roxsana and 17 other transgender asylum seekers presented themselves at the U.S./Mexico border San Ysidro Port-of-Entry in California via its main pedestrian lane. Roxsana was taken into custody by CBP at that time.

66.     When she was taken into CBP custody, Roxsana requested to see a doctor for an infection. This request was ignored. Neither CBP nor any other DHS agency conducted a medical evaluation of Roxsana when she was taken into custody, despite DHS's own requirement that all people taken into custody be provided a comprehensive medical screening within 12 hours.

67.     Upon being taken into custody by CBP, Roxsana was repeatedly mistreated as a result of her physical impairments, her being perceived as having physical impairments including because of her gender identity and expression, her national origin, and her status as an asylum-seeker from Honduras. Roxsana and the other Latin American asylum seekers were placed in a holding cell, colloquially known as the "Ice Box" or "Hieleras" due to its unbearably cold temperatures. While detained in the "Ice Box," Roxsana and the other people detained there were required to sleep on the ground, close to one another, with nothing but a flimsy aluminum blanket to keep warm. Employees of Defendant U.S. subjected Roxsana to these conditions and failed to provide her with the medical care she needed because they did not want to provide her with the opportunity for asylum because of her HIV disability, national origin, female gender presentation, and transgender status.

68.     After being placed in the "Ice Box," Roxsana's health visibly declined. Roxsana coughed so much that she could not breathe properly and had trouble sleeping. She vomited regularly and had nasal drainage and green phlegm. Roxsana suffered body aches, stomach pain, and headaches. Roxsana confided in another detained asylum seeker that "I am not sure if I will be able to survive this place" or words to that effect.

69.     While detained in the "Ice Box," Roxsana complained to U.S. employees that the food she was given caused her abdominal pain, diarrhea, and vomiting, which U.S. employees ignored. Roxsana and the other detained asylum seekers were given only 3-5 minutes to eat at each mealtime. On at least one occasion, a U.S. employee threw food at Roxsana and the other detained asylum seekers rather than handing it to them.

70.     After the second day of being confined in the "Ice Box," Roxsana could no longer eat and could only drink juice. U.S. employees ignored Roxsana's inability to eat. At one point during a meal, at least one U.S. employee yelled "fucking queers, be quiet" at Roxsana and the other detained transgender asylum seekers.

71.     During the first few days that Roxsana was detained in the "Ice Box," other people detained there complained to U.S. employees about the extreme cold temperature in the holding cell and informed these U.S. employees that Roxsana was very sick and needed medical attention. U.S. employees ignored the complaints about the cold temperatures, Roxsana's poor health, and Roxsana's visible signs of deterioration requiring immediate medical intervention.

72.     One detained asylum seeker informed a U.S. employee, who upon information and belief was referred to as "Bosch," that Roxsana needed medical attention. Another detained asylum seeker translated this request into English, informing Bosch that Roxsana was "sick, very sick." In response, Bosch verbally abused and harassed the asylum seekers making the reports on behalf of Roxsana. At one point, Bosch responded with words to the effect of "You shouldn't have come to this country if you're sick. It's not our responsibility to take care of you. If something happens to you, it's not our fault!"

73.     This same U.S. employee (*i.e.*, Bosch) was responsible for deciding whether the detained asylum seekers would be permitted to move around within the facility. Bosch repeatedly

ignored requests by these detained asylum seekers to exit a room or would slam the door in their faces.

74.     The people detained also repeatedly told other U.S. employees that Roxsana was sick and needed medical attention. One person in custody with Roxsana knocked on the window when a CBP officer passed her cell and said words to the effect of "medico, muy mal compañera" (which means "doctor, very bad friend" in Spanish) in an effort to inform the officer that Roxsana needed to be seen by a doctor and was in bad condition. Another CBP officer told a person in detention that the doctor only visited the facility when she felt like it, and that the officers had no authority and could not help her.

75.     On or about May 11, 2018, the persons detained in the "Ice Box" engaged in a lunch strike, demanding that U.S. employees provide Roxsana with medical attention and increase the temperature in the holding cell due to the adverse effect of the extremely cold temperatures on Roxsana's health. Instead, these U.S. employees closed the door and lowered the cell's temperature even further.

76.     During this lunch strike, the detained asylum seekers asked to speak with the U.S. employee in charge of the facility. A U.S. employee, who the asylum seekers believed to be the director of the facility, came to speak to them. This U.S. employee informed the asylum seekers that they needed to eat or they would become ill. The asylum seekers pointed out that they were already sick and directed him to Roxsana and her visibly worsening health.

77.     After this discussion, DHS law enforcement officials took Roxsana and another woman detained there to be seen by the on-site physician. After Roxsana was taken out of the cell to receive medical attention, the U.S. employee named "Bosch" verbally dismissed the seriousness of Roxsana's deteriorating health to the other detained asylum seekers by telling them that Roxsana just had a cough.

16

78.     On or around May 11, 2018, a CBP law enforcement officer met with Roxsana to perform a health screen to determine whether Roxsana should be detained by ICE in general population. This U.S. employee failed to use an interpreter to communicate with Roxsana, as Roxsana did not speak English. This U.S. employee also completed an ICE Health Services Corps in Processing Health Screening Form for Roxsana, which documented that Roxsana was HIV positive, but wrongly entered "no" for all other medical and mental health questions. The form also wrongly indicated that Roxsana was fit for placement in general population based on this incomplete and inaccurate information.

79.     The onsite physician, another U.S. employee, met with Roxsana and noted that she reported that she was diagnosed with HIV five months earlier and for the past month had suffered weight loss, recurring vomiting, and diarrhea. This physician further documented that Roxsana appeared emaciated and ill, that she complained of a headache and cough, had an elevated temperature of 99.5 degrees Fahrenheit, and was tachycardic with a pulse of 134. This DHS on-site physician did not document whether an interpreter was used to communicate with Roxsana. DHS is required to provide interpretation services for communication with people in custody with limited English proficiency, such as Roxsana.[9] All forms given to Roxsana by DHS employees while in custody were in English.

80.     This DHS physician also found that Roxsana was not medically fit for transportation or to be moved to ICE general population detention due to her untreated HIV, fever, and chills. This physician then referred Roxsana to Scripps Medical Hospital in Chula Vista ("Scripps") to rule out the possibility of tuberculosis, which would prevent her from being able to travel, and to be assessed for

---

[9] Executive Order 13166 (EO 13166), *Improving Access to Services for Persons with Limited English Proficiency*, (August 11, 2000).

sepsis, a life-threatening condition, as well as pneumonia and/or bronchitis.

81.     On May 11, 2018, CBP law enforcement officers transported Roxsana and another woman detained there to Scripps. During transport and while at Scripps, Roxsana was visibly weak and unwell. Despite these visible symptoms and weak condition, these CBP officers kept Roxsana shackled with handcuffs, ankle cuffs, and a chain around her waist. Roxsana remained shackled in this manner even while she was undergoing medical examination—which is not a customary or condoned practice during medical examinations of people in detention.

82.     Two CBP officers remained present throughout the medical intake and assessment of Roxsana conducted by Scripps medical providers. These U.S. employees wrongly obstructed the examination and treatment of Roxsana by failing to arrange for an interpreter and by providing incomplete, inaccurate, and untimely information regarding Roxsana's physical condition and deteriorating health.

83.     Instead of arranging for a Spanish interpreter for Roxsana, one of the CBP officers who spoke limited Spanish poorly interpreted for Roxsana and obstructed her receipt of medical care by providing incomplete, inaccurate, and untimely information regarding Roxsana's physical condition and deteriorating health.

84.     Because of the interference by the CBP officers who failed to provide Roxsana with an interpreter, improperly and inadequately attempted to translate for her, and provided incomplete, inaccurate, and untimely information, Scripps medical providers did not take Roxsana's weight, did not assess her for dehydration, and did not document how long Roxsana had suffered from her cough, which was the stated reason for her referral to Scripps hospital. Due to the interference of CBP officers and the incomplete information provided through inadequate interpretation, Scripps medical providers even wrongly documented that Roxsana had not experienced weight loss, despite the DHS

18

physician's documenting that she appeared emaciated that same day.

85. The medical records show that there was little to no direct communication between Roxsana and the Scripps medical providers. Due to the interference and misinformation provided by the CBP officers and their failure to provide Roxsana with an interpreter, Roxsana was improperly medically assessed by Scripps medical providers based on incomplete, inaccurate, and untimely information.

86. The Scripps physician, Beverly Harrell Bruder, M.D., completed her assessment of Roxsana without even discovering that Roxsana was HIV-positive. Roxsana's HIV status was only documented as an addendum to Dr. Bruder's examination notes, after Dr. Bruder had conditionally cleared Roxsana for travel. By the time Dr. Bruder learned that Roxsana was HIV-positive, Roxsana had already been conditionally medically cleared for detention and transport based on the incomplete information provided by CBP employees.

87. Before learning of Roxsana's HIV positive status, Dr. Bruder initially documented in Roxsana's medical records that there was no evidence of tuberculosis on the chest X-ray, "although that does not completely rule it out and [the patient] is cleared for travel and incarceration from that standpoint. However, if they want full evaluation for tuberculosis, they were going to be needing to do a blood test, but that is not done here in the emergency department."

88. An addendum to Dr. Bruder's exam notes states: "I was just told by the immigration customs agent that they were told by Mr. Hernandez-Rodriguez that he has HIV, although he is on no medication for it, so he will definitely need to follow up with the Jail/customs Medical for this."

89. Despite this addendum by Scripps medical providers and Roxsana's alarming vital signs while at Scripps, CBP and ICE did not provide Roxsana with **any** follow up medical care. The medical records show that while at Scripps, Roxsana's blood pressure was 91/61 and she was

tachycardic with a heart rate of 120.

90.     DHS medical providers knew or should have known that an x-ray is an insufficient diagnostic tool to rule out tuberculosis in patients who are HIV-positive, who instead require a blood or sputum test to accurately rule out tuberculosis. In other words, the statement by the Scripps physician clearing Roxsana for detention and transport was based on incomplete and inaccurate information rendering that initial clearance invalid, and was conditioned on further testing and receipt of HIV medication.

91.     Scripps medical providers inappropriately diagnosed Roxsana with bronchitis and gave her Tylenol for her fever, a Z-Pak of antibiotics, and an albuterol inhaler. It is unclear whether Roxsana ever received the Z-Pak, and she had no medication with her as she traveled to Cibola, as evidenced by the fact that no medications were noted on the medical summary that Defendant U.S. provided to the Contractor Defendants for Roxsana's transport. Upon returning to the "Ice Box" from Scripps, DHS officers proceeded to limit Roxsana's access to the prescribed inhaler and restricted Roxsana's use of it to one time per day while she was in CBP custody.

92.     Upon returning to the "Ice Box" from Scripps, Roxsana received no follow up medical care and was not seen by another medical professional. The U.S. failed to follow the recommendations of the Scripps physician and failed to adequately screen Roxsana for tuberculosis or any co-infections. No CBP, ICE, or DHS employee or contractor ever completed a laboratory evaluation for Roxsana. The U.S. did not take any steps to measure Roxsana's CD4 count or viral load, nor did they complete a blood count. The U.S. did not complete a comprehensive medical/social/family history, assess Roxsana's level of nutrition and hydration, or provide Roxsana with HIV medication, all of which constitute violations of the prevailing standards of care for HIV-positive patients. Defendant U.S.'s employee law enforcement officers who returned Roxsana to the "Ice Box" knew that the medical

clearance Roxsana had received from Scripps was conditioned on her being provided additional medical testing and examination. Defendant U.S.'s continued detention and transport of her in contradiction of her known medical needs was taken intentionally and within the scope of these officers' employment.  Defendant U.S.'s law enforcement officers had a duty under PBNDS regulations and U.S. policy to provide Roxsana with necessary medical care and did not have the lawful discretion to order her detention and transport once they knew about the medical determination that she needed further testing and examination.

93.     On May 12, 2018, ERO San Diego requested approval from ERO El Paso to transfer Roxsana from California to the Cibola facility in Milan, New Mexico via STP.

94.     That same day, an ICE ERO Supervisory and Detention and Deportation Officer in Albuquerque, New Mexico approved the request.

95.     U.S. employees, including but not limited to CBP officers, knew or should have known that the initial medical clearance for travel from Scripps was invalid and improper because it stated in Roxsana's medical records that the x-ray performed was insufficient to rule out tuberculosis. Nevertheless, CBP continued to detain Roxsana and transferred her to ICE ERO custody on May 13, 2018.

96.     On May 13, 2018, after the ICE ERO transfer of Roxsana and the other detained transgender asylum seekers to Cibola was approved, an ICE employee wrote in an email chain about them that "[t]hey will be transferred from the [San Ysidro Port of Entry] directly to the [El Paso Area of Responsibility] arrangements have been made with the receiving office to have a complete medical evaluation upon arrival. Therefore they will not need certain medication at the time of transport i.e. HIV medication."

97.     Roxsana's medical summary, which was created by U.S. employees and was supposed

to accompany her during transport from California to Milan, New Mexico, did not mention the medications prescribed to Roxsana or any of the follow up medical care recommended by either the DHS on-site physician or by the Scripps medical providers on May 11, 2018.

98.   Roxsana was thus transported across four states to Cibola, while in the custody and control of the U.S. and the Contractor Defendants without any of the medications prescribed for her on May 11, 2018. Moreover, no U.S. employee or agency or Contractor Defendant provided Roxsana with antiretroviral medication to treat her HIV before she died.

99.   Defendant U.S., through subcomponents CBP and ICE, chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments and care prior to transport, denied her access to medication, and impaired or obstructed Roxsana's access to necessary medical care while in transport. These U.S. employees failed to ensure that she traveled with adequate medication, an accurate medical summary, adequate food, water, and bathroom facilities, and access to medical care despite her obvious suffering, weak physical condition, and serious medical needs.

100.   Roxsana's detention by CBP and ICE became unlawful once CBP and/or ICE knew or should have known that Roxsana was medically unfit for detention and transportation.  This conduct by Defendant U.S. law enforcement officers, as described in this section of the SAC, was taken while, at all material times, acting within the scope of their employment.  In addition, these Defendant U.S. employees' conduct was intentional and not an exercise of any lawful discretionary authority.

101.   Based upon the foregoing facts, Defendant U.S. discriminated against Roxsana on account of her sex and/or gender, actual and/or perceived disabilities, and/or her national origin and/or race in violation of state and federal law.

### D.   MTC BUS RIDE FROM SAN YSIDRO, CALIFORNIA TO SAN LUIS, ARIZONA

102.    On or about May 14, 2018, Roxsana left CBP lockup in San Ysidro, California and entered the custody of ICE, which is the federal DHS agency component responsible for civil detention and administrative processing of asylum-seekers for deportation.

103.    The same day–May 14, 2018–Defendant MTC took Roxsana and 12 other transgender asylum-seekers by bus from the San Ysidro Port-of-Entry lockup to Imperial Regional Detention Facility in Calexico, California, arriving at approximately 2:30 p.m. The drive took approximately two hours.

104.    About an hour later, at approximately 3:30 p.m., MTC employees loaded Roxsana and the other asylum seekers back onto a bus and drove them to SLRDC in San Luis, Arizona, which facility is owned and operated by the LaSalle Defendants.

105.    The asylum seekers, including Roxsana, arrived at SLRDC at approximately 5:30 p.m. local time that same day.

106.    Throughout her journey in MTC's care from San Ysidro to Calexico, while in Calexico, and during her journey from Calexico to San Luis, Arizona, Roxsana exhibited visible signs of deterioration requiring immediate medical intervention.

107.    MTC denied Roxsana and those detained with her food, water, and restroom access throughout their transfer. Roxsana was also handcuffed throughout the duration of the transfer.

108.    At one point during the MTC transfer, Roxsana asked MTC employees to use the restroom and to remove her handcuffs in order to do so. The MTC employees denied both requests.

109.    Another person MTC transported alongside Roxsana advocated for MTC's employees to remove Roxsana's handcuffs so she could use the restroom, but MTC again denied the request.

110.    MTC employees responsible for transporting Roxsana and others instructed her and

her fellow asylum seekers that if they need to use the restroom while in transit, they should simply urinate on themselves.

111.    The seats on the bus that MTC used to transport Roxsana and her fellow asylum seekers were stained and smelled like urine.

112.    Despite knowing of Roxsana's obvious, serious, and emergent medical needs during the entire time she was in MTC's custody, MTC failed to provide her with medical care or assistance to alleviate her suffering.

113.    MTC chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessment prior to transport, and denied her adequate food, water, bathroom facilities, and access to medication and medical care during transport, despite her deteriorating health condition and obvious, serious, and emergent suffering and medical needs.

114.    MTC employees discriminated against Roxsana on account of her disability (HIV) and/or because she was perceived by MTC employees as having a disability (HIV and/or other perceived disabilities). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

E.    DETENTION AT LASALLE'S SAN LUIS REGIONAL DETENTION FACILITY

115.    When the MTC bus arrived at SLRDC, owned and operated by the LaSalle Defendants, in San Luis, Arizona, the LaSalle Defendants took custody of, and therefore responsibility for, the well-being of Roxsana and the people travelling with her.

116.    At SLRDC, several of Roxsana's fellow asylum seekers, who had been separated earlier in their journey to the United States, found themselves reunited at the facility and traveled together to Cibola.

117.     One asylum seeker who had last seen Roxsana in Tijuana a few days earlier was shocked by how much Roxsana's health and well-being had significantly declined.

118.     This asylum seeker described Roxsana's condition in San Luis as appearing very weak and pale, almost yellow in pallor, with dark circles under her eyes.

119.     During the few hours that Roxsana was at SLRDC, Roxsana used the bathroom several times to vomit or spit up phlegm.

120.     Roxsana was so weak from fever that she spent most of her time at SLRDC lying on the floor, coughing.

121.     During her time at SLRDC, Roxsana became so ill that she could not eat and had to use the restroom approximately every fifteen minutes because she had significant and persistent diarrhea.

122.     Roxsana told a fellow asylum seeker that she felt like she was going to die.

123.     Roxsana was detained at SLRDC for approximately six and a half hours.

124.     Despite knowing of and observing her obvious, serious, and emergent medical needs, the LaSalle Defendants failed to provide Roxsana with medical care or assistance to alleviate her suffering while at SLRDC. Employees of the LaSalle Defendants discriminated against Roxsana on account of her disability (HIV) and/or because she was perceived by the LaSalle Defendants as having a disability (HIV and/or other perceived disability). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

F.     **LaSalle Bus Ride from San Luis, Arizona to the Mesa, Arizona Airport**

125.     At or around midnight on May 15, 2018, employee officers of the LaSalle Defendants

25

loaded Roxsana and approximately 25 other transgender asylum seekers bound for Cibola onto a bus and drove them to the Mesa, Arizona airport, arriving around 4:00 a.m. local time, where ICE ERO took custody of Roxsana.

126.    Roxsana was very ill during this four-hour bus ride and pleaded for help to another asylum seeker who sat with her, telling her that she did not know if she was going to survive the journey.

127.    During the bus ride, a LaSalle employee threatened Roxsana and her fellow asylum-seekers, saying words to the effect of, "[b]ehave, because if you don't something bad is going to happen."

128.    During the bus ride, another asylum-seeker specifically asked LaSalle employees for medical help for Roxsana in both English and Spanish. LaSalle's employees ignored her.

129.    When they arrived at the airport, one of the other asylum seekers being transported by LaSalle alongside Roxsana told a LaSalle employee with beige pants and long red hair that Roxsana was very sick and needed immediate medical attention. This LaSalle employee refused to respond to her and ignored her request. During her approximately five-hour stay in the Mesa airport, Roxsana remained in LaSalle's custody, and LaSalle failed to provide Roxsana with any medical care or any assistance to alleviate her obvious, severe suffering and deteriorating health.

130.    Despite LaSalle's knowledge of Roxsana's obvious, serious, and emergent medical needs, LaSalle did not provide her with medical care or assistance to alleviate her suffering during the entire time Roxsana was in LaSalle's custody and control.

131.    LaSalle chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her adequate food, water, bathroom facilities, and access to medication and medical care during transport, despite her deteriorating health

26

condition and obvious, serious, and emergent suffering and medical needs.

132.    LaSalle employees discriminated against Roxsana on account of her disability (HIV) and/or because she was perceived by LaSalle as having a disability (HIV and/or other perceived disability). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

133.    The flight from Mesa, Arizona arrived at approximately 2:48 p.m. local time in El Paso, Texas. ICE ERO officers, and employees of Defendant, U.S., maintained custody of Roxsana for the duration of the flight. Upon arrival, ICE officers and/or those contracted by ICE then took Roxsana and the rest of the passengers by bus to the El Paso Service Processing Center ("El Paso SPC"), operated by Defendant U.S. subcomponent ICE, arriving around 3:15 p.m. local time.

134.    Upon arrival, several of the other transgender asylum seekers travelling with Roxsana asked the U.S. employees at El Paso SPC for Roxsana to receive medical attention. The U.S. employees replied that, because Roxsana was only at the facility overnight and the doctor had already left for the day, Roxsana could not receive medical care there.

135.    Roxsana remained at the El Paso SPC for approximately 18 hours. There, Roxsana was able to rest for the first time since leaving the CBP facility at the San Ysido Port-of-Entry and after twenty-seven hours of travel. At approximately 5:00 a.m., Roxsana and her fellow asylum seekers were awakened by ICE officers or their contracted staff and told to eat breakfast.

136.    Roxsana attempted to eat the meal provided, but ended up vomiting and then went back to sleep.

137.    By this time, Roxsana appeared gravely ill to all around her.

### G.     GPS Bus Ride from El Paso, Texas to Albuquerque, New Mexico

138.     On May 16, 2018 at around 9:00 a.m. local time, officers from Defendant GPS loaded Roxsana and approximately 29 other detained immigrants onto a GPS bus for transport from El Paso, Texas to the ICE Criminal Alien Program ("CAP") facility owned and operated by Defendant, U.S., in Albuquerque, New Mexico.

139.     That day, the temperature reached 97 degrees before noon in El Paso.

140.     Each person on the bus was provided only one 8-ounce bottle of water and a single sandwich to last the entire five-and-half hour journey.

141.     Roxsana sat by herself in the back of the bus.

142.     The detained passengers on GPS's bus became very thirsty and hungry and repeatedly asked GPS employees for water.

143.     The first two times that the detained passengers asked for water, GPS's employees ignored them.

144.     The third time, a GPS employee with grey hair said in Spanish: "ya callanse" which means "shut up." At one point, the GPS employees stopped at a fast food restaurant, obtained food and drinks for themselves, and then ate their food on the bus in front of the hungry and thirsty detained passengers they transported.

145.     If any of the passengers on the GPS bus needed to use the restroom, they had to plead with GPS's employees to allow them to do so. During this trip, GPS employees frequently ignored these requests and only occasionally escorted a detained passenger to a toilet bowl in the back of the bus that was concealed from others only by a curtain. There was no toilet paper. The GPS employees would not remove any detained person's handcuffs to use the toilet.  When the bus swayed, the waste in the toilet would spill out of the bowl so that the whole bus reeked of urine and feces.

146. During this trip, Roxsana asked a GPS employee for water, but the employee told her he did not speak Spanish.

147. At another point, the same GPS employee asked why Roxsana and others on the bus left their country if they were sick, in reference to Roxsana's visible illness and noticeably deteriorating state of health.

148. During this trip and while on the GPS bus, Roxsana had a fever and produced a significant amount of phlegm.

149. Roxsana carried some tissue or toilet paper to blow her nose. Sometimes her sputum was bloody.

150. Roxsana felt dizzy and extremely exhausted, and her stomach hurt badly.

151. At times, it was unclear to the other asylum seekers transported with Roxsana whether she was sleeping or was unconscious because she would become periodically unresponsive.

152. During this GPS bus ride, another detained passenger asked at least two different GPS employees for medical assistance for Roxsana approximately five times.

153. One GPS employee claimed he did not understand Spanish, and the other GPS employees did not respond to any of these requests for medical assistance for Roxsana.

154. At approximately 2:30 p.m. local time, the GPS bus arrived at an ICE CAP facility in Albuquerque, New Mexico, where employees from various detention facilities assumed custody for the detained persons that GPS had transported, including Roxsana.

155. Despite GPS's knowledge of Roxsana's obvious, serious, and emergent medical needs during the entire time Roxsana was in GPS's custody and control, GPS did not provide her with medical care or assistance to alleviate her suffering.

156. GPS chose to transport Roxsana in the condition she was in, failed to provide her with

adequate medical assessments prior to transport, and denied her adequate food, water, bathroom facilities, and access to medication and medical care during transport, despite her noticeably deteriorating state of health and obvious, serious, and emergent suffering and medical needs.

157. GPS employees discriminated against Roxsana on account of her disability (HIV) and/or because she was perceived by GPS as having a disability (HIV and/or other perceived disability). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

158. Employees of Defendants GPS, TransCor and U.S. convened at the ICE CAP facility for a "meet and greet" to pick up and drop off people in their custody to be taken to various detention facilities including Roxsana as part of the STP.

H. TRANSCOR TRIP FROM ALBUQUERQUE TO CIBOLA

159. Defendant TransCor employees took Roxsana and 28 other transgender asylum seekers by bus from the ICE CAP facility in Albuquerque to Defendant CoreCivic's Cibola detention center, arriving around 8:13 p.m. local time on May 16, 2018.

160. Throughout this trip, Roxsana continued to be visibly and gravely ill and suffering.

161. Roxsana remained unable to eat.

162. Roxsana required immediate medical assistance that TransCor employees failed to provide.

163. From approximately 8:13 p.m. until no later than 1:15 a.m., Roxsana awaited booking while in TransCor's custody and care at Cibola.

164. Despite TransCor's knowledge of Roxsana's noticeably deteriorating state of health and obvious, serious, and emergent medical needs during the entire time Roxsana was in TransCor's

30

custody and control, TransCor did not provide her with medical care or assistance to alleviate her suffering.

165.     TransCor chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her adequate food, water, bathroom facilities, and access to medicine and medical care during transport, despite her obvious, serious, and emergent suffering and medical needs.

166.     TransCor employees discriminated against Roxsana on account of her disability (HIV) and/or because she was perceived by TransCor as having a disability (HIV and/or other perceived disability). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

## I.     DETENTION BY CORECIVIC AT CIBOLA

167.     On or around May 17, 2018, at approximately 1:15 a.m., employees of CoreCivic, the company that contracted with Cibola County, New Mexico to run the Cibola facility for ICE, booked Roxsana into the Cibola facility.

168.     At approximately 2:23 a.m., CoreCivic employees took Roxsana and others to a medical waiting room to spend the night.

169.     Roxsana lay on the floor, only getting up to use the restroom or drink a beverage officers brought to her around 4:00 a.m.

170.     Roxsana was so weak and ill that she became delirious.

171.     It became apparent to those around her that she was beginning to lose her mental capacity.

172.     Nevertheless, CoreCivic employees and contractors in the medical unit failed to

31

promptly render her medical care from 2:23 a.m. to 7:25 a.m.

173.  At approximately 7:25 a.m., CoreCivic employees finally presented Roxsana to an onsite medical provider who conducted an intake screening.

174.  Roxsana received electrolytes and Ensure at approximately 8:08 a.m. CoreCivic then returned her to a holding cell, where she rested on the floor, unable to sit up.

175.  At approximately 8:58 a.m., another CoreCivic employee from the medical staff entered the waiting area used as a holding cell and assisted Roxsana to her feet.

176.  At approximately 9:00 a.m., CoreCivic's medical providers documented that Roxsana was running a 102-degree Fahrenheit fever and was visibly shaking.

177.  CoreCivic employees transferred Roxsana to a medical isolation room while she waited for treatment because they suspected she had tuberculosis.

178.  Around 10:00 a.m., a CoreCivic-contracted onsite medical provider examined Roxsana.

179.  She weighed 89 pounds at the time of this exam.

180.  The CoreCivic-contracted medical provider diagnosed Roxsana with dehydration, starvation, extreme weight loss, muscle wasting, untreated HIV, fever, and cough.

181.  The CoreCivic-contracted medical provider noted Roxsana's physical tremor, low blood pressure of 81/61, rough breathing sounds, and increased white phlegm mucus excreted in abnormally large quantities.

182.  The CoreCivic-contracted medical provider ordered Roxsana's immediate transport to the Cibola General Hospital Emergency Room to determine whether she was suffering from pneumonia or some other infection and to provide her with intravenous fluids.

183.  At approximately 11:08 a.m., CoreCivic employees transported Roxsana in a

32

wheelchair to an ambulance.

184.    Roxsana arrived at Cibola General Hospital around 11:44 a.m. on May 17, 2018.

**J.    ROXSANA SUCCUMBS TO ILLNESS AFTER NEARLY A WEEK IN THE HOSPITAL**

185.    Based on physical examination findings by providers at Cibola General Hospital, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock (a life-threatening condition), dehydration, HIV infection, nodular pulmonary disease, lymphadenopathy, anemia, and thrombocytopenia.

186.    On May 17, 2018, at approximately 6:25 p.m., Cibola General Hospital requested transfer of Roxsana to Lovelace Medical Center in Albuquerque, New Mexico because Roxsana required a higher level of care than Cibola General Hospital could provide.

187.    Three hours later, at approximately 9:38 p.m., Roxsana was airlifted by helicopter ambulance to Lovelace Medical Center because ground transport would take significantly longer and medical staff deemed it essential to provide Roxsana immediate medical care due to her low blood pressure, low body weight, and septic shock diagnosis.

188.    Within ten hours of first being seen on an emergency basis at Cibola General Hospital for the symptoms she suffered while Defendants transported her across four states, Roxsana was airlifted to a trauma center for emergency medical treatment for her life-threatening illnesses.

189.    Seven days later, on May 25, 2018 at 3:32 a.m., Roxsana was pronounced dead.

190.    During her hospitalization at Lovelace Medical Center, Roxsana was diagnosed with AIDS.

191.    After she died, Roxsana was diagnosed with Multi-Centric Castleman's Disease, which affects the lymph nodes and related tissues but is treatable with a variety of therapies, including anti-viral medication, chemotherapy, and immunotherapy.

192.    When Roxsana died on May 25, 2018, a doctor from Cibola General Hospital told investigators that the actions taken by the time Roxsana arrived at Cibola were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

193.    Roxsana spent her final days of life chained with handcuffs to a Lovelace Medical Center hospital bed by CoreCivic guards around the clock from May 17, 2018 until May 25, 2018 when she died.

194.    Throughout her hospitalization, CoreCivic employees unreasonably kept Roxsana shackled to her hospital bed by her wrists and ankles, except when medical personnel needed them removed to administer certain medical procedures, in violation of ICE's use-of-force policies and prevailing medical standards of care. CoreCivic's shackling of Roxsana caused Roxsana significant pain and discomfort and delayed the treating medical staff's provision of medical care to her.

195.    At least one armed CoreCivic employee guarded Roxsana at all times during her hospital stay and checked to be sure Roxsana's restraints were secured at least every 20 minutes. CoreCivic's shackling of Roxsana was not reasonable because, as a consequence of her extremely serious medical condition and immobility, at no time was Roxsana a safety or a flight risk.

196.    Each time medical staff needed CoreCivic employees to remove Roxsana's restraints so that they could administer certain medical procedures, including life-saving procedures like CPR and other necessary resuscitation, the CoreCivic employee on duty first would make a call to "central" to receive supervisory approval for removal of Roxsana's restraints, and only once approved would the CoreCivic employee proceed to remove the restraints. This significantly delayed Roxsana's medical care.

197.    CoreCivic employees kept Roxsana shackled to her hospital bed even after her treating medical providers medically paralyzed her—including when she first went into cardiac arrest and

throughout the hospital staff's first round of attempts to resuscitate her. Hours prior, the treating physician asked for her shackles to be removed, noting that Roxsana was "very uncomfortable" and "not going anywhere."

198.     Roxsana suffered deep tissue bruising as a result of CoreCivic's shackling of her. A preliminary autopsy report showed extensive regions of deep soft tissue and musculature hemorrhage on Roxsana's wrists, not externally visible, which are typical of handcuff injuries.  Roxsana also suffered other injuries as revealed by autopsy reports including an occipital scalp hematoma.

199.     Despite CoreCivic's knowledge of Roxsana's rapidly and noticeably deteriorating health condition and obvious, serious, and emergent medical needs, CoreCivic did not provide Roxsana with the urgent medical care she desperately needed or otherwise provide sufficient assistance to alleviate her suffering until 10 hours after Roxsana's arrival at Cibola when she was first taken into CoreCivic's custody.

200.     Despite the absence of any legitimate security justification, CoreCivic unnecessarily condemned Roxsana to spend her last waking hours of life on this earth in chains.  CoreCivic employees used unreasonable force on Roxsana by keeping her shackled and restrained to her hospital bed, despite the fact that she was neither a flight risk nor presented any threat to officers.

201.     CoreCivic also repeatedly delayed, hindered, and obstructed Roxsana's medical treatment, including life-saving emergency medical care, at the hospital by requiring CoreCivic employees guarding Roxsana to first call their superiors and obtain permission for Roxsana's shackles to be removed, and only upon receiving said permission actually removing these restraints. CoreCivic further obstructed Roxsana's medical care by acting as the arbiter of the treatment she would receive, including lifesaving treatment, in violation of the PBNDS.

202.     CoreCivic employees discriminated against Roxsana on account of her disability (HIV)

and/or because she was perceived by CoreCivic as having a disability (HIV and/or other perceived disability). Roxsana actually suffered impairments that substantially limited her in the performance of major life activities and/or Defendants perceived Roxsana as suffering from an impairment that substantially limited her in the performance of major life activities.

### K.   APPLICABLE DUTIES AND STANDARDS OF CARE

203.   According to the applicable Performance Based National Detention Standards ("PBNDS"):  "As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions."[10] Furthermore, these standards require that:  "Detainees shall receive continuity of care from the time of admission to time of transfer, release or removal. Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based providers as medically-appropriate."[11]

204.   Had Roxsana received the proper health care screening within 12 hours of entering custody, as required by ICE policy, the controlling regulations and licensing standards, the terms of Defendants' contracts, and Defendants' duty of care, she, more likely than not, would have had a greater chance of survival. Defendants are jointly and severally liable for her death and for the pre-death pain and suffering they caused Roxsana. In the alternative, Defendants are each liable for their negligent and reckless acts and omissions, and those of their respective employees, which increased

[10] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011*, at 4.3 https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf (last visited May 13, 2020).
[11] *Id.*

36

the risk that Roxsana's condition would deteriorate and diminished her chance of survival.

205.    The PBNDS and ICE Air Operations Handbook require that detainees be assessed for their medical fitness for travel before being transported, that each detainee be transported with at least 7 days' worth of all prescribed medications (30 days' worth of HIV medication), and that detainees be given adequate food and water and access to medical care, including prescribed medications and medical treatment for acute and emergent medical conditions.

206.    The PBNDS further provide:

> If a detainee becomes ill while in transit, the assigned transportation staff shall take appropriate action and alert the receiving office in order to prepare to handle the situation. If a detainee becomes ill while in transit and the illness requires immediate medical treatment (e.g., in the event of a heart attack), assigned transportation staff shall request assistance from the nearest medical facility, local law enforcement agencies and emergency services. The transportation staff shall initiate life-saving procedures as time-appropriate, proceeding if security permits. The closest ICE/ERO office shall prepare procurement paperwork and make arrangements for hospitalization, security, etc.[12]

207.    This standard also requires that officers adhere to the regular detention nutrition standards and provide meals on trips longer than 6 hours.[13] Further, "[o]fficers shall consider when the detainees last ate before serving meals and snacks. Special considerations shall be given to [...] detainees who have medical conditions."[14] This standard mandates that "[t]he crew shall maintain a constant supply of drinking water and ice in the water container(s), along with paper cups."[15] They further require that all staff transporting people in ICE custody maintain the "utmost professionalism"

---

[12] UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *2011 Operations Manual ICE Performance-Based National Detention Standards 1-3 Transportation By Land*, at 46 (2011), https://www.ice.gov/doclib/detention-standards/2011/1-3.pdf.

[13] *Id.* at 43.

[14] *Id.*

[15] *Id.*

and the sanitation of the vehicle.[16]

208.    IHSC directives also required that Roxsana receive a medical assessment prior to travel, medication and appropriate treatment, continuity of care, and a medical escort for her travel, all of which Defendants failed to provide. Moreover, the IHSC directive regarding "Special Needs Patients" requires that people transferred with HIV, such as Roxsana, receive a suitability assessment for transfer based upon their medical record, receipt of a 30-day supply of HIV medication, and scheduled appropriate follow-up medical appointments.[17] This directive also requires that, when staff identify a person to be transferred who has a special need, such as HIV, that the staff person notify ICE. Defendants, who were subject to this directive as "custody officers,"[18] failed to adhere to these requirements and did not provide Roxsana with any of these safety measures prior to transporting her.

209.    The IHSC directive regarding "Care of Chronic Conditions" outlines the requirements of ICE and ICE-contracted facilities to care for people in their custody living with chronic conditions.[19]  This directive requires that health staff refer people with chronic health conditions in detention to an appropriate medical provider and for the medical provider to enroll the detained person in a chronic care program to "decrease the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function"[20] and to "assure stability."[21]

210.    IHSC Directive 03-32 / ERO Directive No. 11853.33 outlines the obligations of ICE and ICE contractors, including the Contractor Defendants, to identify and respond to significant

---

[16] *Id.* at 44.

[17] IHSC Directive 03/11 / ERO Directive No. 11742.2 re Special Needs Patients 4.5.

[18] *Id.* at ¶ 7.

[19] IHSC Directive 03-03 / ERO Directive No. 11737.3.

[20] *Id.* at ¶ 4.

[21] *Id.* at ¶ 4-3.

illnesses of those in their custody.[22] This directive requires staff to place any qualifying person in their custody on the Significant Detainee Illness ("SDI") list and immediately bring any emergent conditions to the attention of appropriate medical providers.[23] Qualifying conditions to be placed on the SDI list include, but are not not limited to, people diagnosed with life-threatening conditions, including sepsis and severe complications from AIDS.[24]

211.    ICE Policy 11022.1 requires that the complete medical record, medical summary, and at least 7 days of medication accompany any person transferred within ICE custody.[25] Moreover, IHSC Directive 03/11 / ERO Directive No. 11742.2 requires 30 days' worth of medication for any detained person that has HIV.[26]

212.    Section 5-11 of ICE Policy 11022.1 provides: "[t]he transporting officer may not transport a detainee without the Medical Transfer Summary. The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary."[27]

213.    Defendant U.S. was also bound to comply with U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search, a comprehensive set of standards that regulate every aspect of Roxsana's custody and transport in the United States.[28]  These standards

---

[22] IHSC Directive 03-32 / ERO Directive No. 11853.33 – Significant Detainee Illness.

[23] *Id.* at ¶ 4.

[24] *Id.* at ¶ 4-3(a),(g).

[25] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *ICE Policy 11022.1, 10-11* (Jan. 4, 2012).

[26] ICE Health Services Corps*, IHSC Directive 03/11 / ERO Directive NO 11742.2 re Special Needs Patients,* ¶ 4-5 at 5 (March 24, 2016).

[27] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *ICE Policy 11022.1, 10-11* (Jan. 4, 2012).

[28] U.S. CUSTOMS AND BORDER PROTECTION, *National Standards on Transport, Escort, Detention, and Search* (Oct. 2015) https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (last visited May 5, 2021).

include:

**Section 1.4** requires CBP employees to treat all detainees "with dignity and respect," prohibits discrimination on the basis of "all forms of protected status under federal law, regulation, Executive Order, or policy" and prohibits the use of excessive force.

**Section 1.7** requires CBP to provide reasonable accommodations for a detainee's known or reported mental, physical and/ or other special needs and requires "[a]ll instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend."

Section 2.4 requires CBP, prior to transporting a detainee, to conduct a "transport assessment to evaluate each detainee's safety, … medical or mental health issues and level of risk to themselves…." "Officers/Agents assigned transport or escort duties must be informed of any known adverse assessment pertaining to a detainee being transported or escorted." "Officers/Agents must be alert to medical symptoms such as coughing, fever, diarrhea, rashes or emaciation, in addition to obvious wounds, injuries, cuts, bruising or bleeding, heat related injury or illness, and dehydration. Any observed or reported injury or illness must be reported, and **appropriate medical care must be provided** or sought in a timely manner." Finally, "officers/agents must be alert to non-verbal cues exhibited by detainees that might indicate that the detainee is in mental or physical distress."

Section 2.9 requires CBP to take immediate action "[i]f an emergency situation is life-threatening." "If a detainee becomes ill or injured prior to boarding the vehicle or while in transit, officers/agents must alert the receiving office. If deemed appropriate, emergency medical services must be notified."

**Section 2.10** requires "officers/agents must ensure that all appropriate documentation accompanies the detainee including all appropriate medical records and medication…."

**Section 3.11** requires CBP to follow the medical decisions made by medical practitioners, including as to medical release or fitness for travel.

**Section 4.3** requires that upon a detainee's entry into any CBP hold room, "[o]bserved or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner."

**Section 4.44** requires CBP to use restraints in a "humane and professional" manner.

**Section 4.10** requires that [e]mergency medical services will be called immediately in the event of a medical emergency (e.g., heart attack, difficulty breathing) and the call will be documented in the appropriate electronic system(s) of record." "Medication … in the detainee's possession during general processing in a properly identified container with the specific dosage indicated, must be self-administered under the supervision of an officer/ agent." "At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation."

**Section 4.13** requires food and water should never be used as a reward or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled). "CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability." "Reasonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations." "Extra efforts may be required to ensure an at-risk detainee's ability to

comprehend officer/agent instructions, questions and applicable forms (such as age and/or developmentally appropriate communication, translation/ interpretation services).

214.     At all relevant times, Defendants were also subject to the DHS Directive for Rehabilitation Act compliance and the Rehabilitation Act's non-discrimination provision under Section 504,[29] as they administered a federal program under the Act.[30]

215.     Defendants had a duty under the applicable PBNDS, the regulations and licensing standards, IHSC Directives, the U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search, the DHS Directive on compliance with Section 504 of the Rehabilitation Act, and the terms of the contracts entered into between the Defendant Contractors and ICE to follow and satisfy these standards.

216.     Because Roxsana was in Defendants' complete custody and control at all times and did not have the authority or ability to provide for her own basic needs, including food, water, restroom access, medication, or access to medical care, Defendants had a heightened duty to provide these necessities to Roxsana and to prevent unreasonable risk of harm to her.

217.     Each Defendant acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, and denied her adequate food, water, bathroom facilities, and access to medication and medical care during transport, despite her noticeable and apparent deteriorating state of health

---

[29] DEPARTMENT OF HOMELAND SECURITY, *Instruction On Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment)*, https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited May 13, 2020).

[30] Margo Schlanger, *Narrowing the Remedial Gap: Damages for Disability Discrimination in Outsourced Federal Programs,* University of Chicago Law Review Online (2021), https://lawreviewblog.uchicago.edu/2021/03/05/schlanger-detention/.

and her obvious, serious, and emergent suffering and medical needs.

218.   Defendants' discriminatory, intentional, negligent, and reckless acts and omissions increased the risk that Roxsana would contract additional illnesses or develop complications of her existing medical conditions, particularly in light of her known HIV-positive status, and caused her condition to deteriorate, diminishing her chance of improved health, and causing her to lose her chance to survive.

219.   Even in the absence of these federally-imposed standards, each Defendant had a non-discretionary and non-delegable duty under the laws of each state to render emergency medical aid for a person in their care, regardless of whether it was for transportation or detention.[31]

220.   According to prevailing standards of care within the medical community, anyone presenting at an Emergency Department that has the medical history of Roxsana and presents with the concerning and abnormal vital signs she exhibited upon examination should be admitted to the hospital. According to prevailing medical guidelines for the care of people diagnosed with HIV: "[e]very patient with HIV entering into care should have a complete medical history, physical examination, and laboratory evaluation and should be counseled regarding the implications of HIV infection" to assess the patient's baseline health and monitor the effectiveness of treatment.[32] This is critical because of the high prevalence of co-infections found in patients diagnosed with HIV. "The Panel on Antiretroviral Guidelines for Adults and Adolescents recommends initiating ART [anti-retroviral therapy] immediately (or as soon as possible) after HIV diagnosis in order to increase the

---

[31] Cal. Civ. Code § 2100 (West) and *Restatement (Second) Torts*, Section 314A(4).

[32] *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV*, developed by the DHHS Panel on Antiretroviral Guidelines for Adults and Adolescents – A Working Group of the Office of AIDS Research Advisory Council (OARAC), at B https://clinicalinfo.hiv.gov/sites/default/files/guidelines/documents/AdultandAdolescentGL.pdf (last visited May 7, 2021).

uptake of ART and linkage to care, decrease the time to viral suppression for individual patients, and improve the rate of virologic suppression among persons with HIV."[33]

221.    After her return from Scripps, Roxsana was not seen by a medical professional. No CBP, DHS, or ICE employee, nor any Contractor Defendant, ever provided her with a comprehensive evaluation to determine her baseline health or to screen for any co-infections. No CBP, ICE, or DHS employee, nor any Contractor Defendant, ever completed a laboratory evaluation for Roxsana, including by failing to:  measure her CD4 count, viral load, conduct a blood count, complete a comprehensive medical/social/family history, or screen her for co-infections, all of which are typical and recommended standard testing for patients diagnosed with HIV under prevailing medical standards of care.

222.    No CBP, DHS, or ICE employee, nor any of the Contractor Defendants, ever provided Roxsana with any antiretroviral medication to treat her HIV before she died.

## CLAIMS FOR RELIEF

### COUNT ONE AGAINST ALL CONTRACTOR DEFENDANTS
#### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

223.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

224.    Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability: (1) in any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the U.S. Postal Service. 29 U.S.C. § 794.

225.    Under Section 504, "[n]o qualified individual with a disability in the United States shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise

---

[33] *Id.* at E-1.

be subjected to discrimination under any program or activity conducted by the Department [of Homeland Security.]" 6 C.F.R. § 15.30(a); *accord* 28 C.F.R. § 39.130 (covering EOIR); *see also* 29 U.S.C. § 794.

226.    Section 504 not only forbids discrimination against individuals with disabilities, but it also requires executive agencies, such as DHS, to ensure that its agency components and their contractors alter their policies and practices to ensure individuals with disabilities do not suffer discrimination as a result of their disability.

227.    Section 504 requires DHS and the Contractor Defendants (by virtue of their providing DHS with a program or activity conducted by DHS, subsidies received from Defendant U.S. to conduct this program or activity, and their contracts with the U.S. and its agency subcomponents) to make reasonable accommodations (modifications) to their programs, services, or activities, unless such accommodations would constitute a fundamental alteration or undue hardship.

228.    Section 504 imposes an affirmative obligation on all Contractor Defendants to ensure that their programs and services are accessible to people with disabilities, including by providing reasonable accommodations.

229.    The requirements of Section 504 apply to the immigration benefits and proceedings that noncitizens may seek under the INA.

230.    Section 504 prohibits all Contractor Defendants from discriminating against people in ICE custody, including Roxsana, on the basis of any actual or perceived disabilities.

231.    As a DHS agency component, and according to a DHS agency self-assessment for Rehabilitation Act compliance, ICE's contracted activities and those of its contractors, including the Defendant Contractors, are subject to the Rehabilitation Act's non-discrimination provision under

Section 504.[34]

232.    Roxsana was an individual with a disability—HIV. The Contractor Defendants knew or should have known that she was disabled. Roxsana informed at least one U.S. employee that she had HIV and her serostatus was documented in her medical records. The Contractor Defendants discriminated against Roxsana on account of her disability (HIV) and/or because they perceived her as having a disability (HIV or other perceived disability, including any disability Defendants perceived Roxsana to have on the basis of her feminine gender expression and/or transgender status). Roxsana suffered impairments that substantially limited her performance of major life activities and/or the Contractor Defendants perceived Roxsana as suffering from a physical or mental impairment that substantially limited her in the performance of major life activities.

233.    The Contractor Defendants expressed discriminatory animus toward Roxsana based on her actual or perceived HIV status and toward Roxsana and other asylum seekers because they were transgender.

234.    Roxsana was entitled to the benefit of a fair and safe credible or reasonable fear-based interview process through USCIS and an adjudicative proceeding to either pursue her claims for relief as substantiated by an asylum officer or obtain Immigration Judge review of a negative determination. Roxsana was also entitled to the benefit of safe transportation and detention through participation in ICE's STP, which was created to facilitate access to these immigration interview and adjudicative programs.

---

[34] DEPARTMENT OF HOMELAND SECURITY, *Instruction On Nondiscrimination For Individuals With Disabilities In DHS-Conducted Programs And Activities (Non-Employment)*, https://www.dhs.gov/sites/default/files/publications/dhs-instruction-nondiscrimination-individuals-disabilities_03-07-15.pdf (last visited May 13, 2020); *see also* Instruction on Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements.").

235.    ICE contracted with all the Contractor Defendants for secure transportation and/or detention of Roxsana as part of the STP to facilitate access to the USCIS fear-based interview program and the EOIR adjudicative program required by law.  STP was a program carried out by Defendant U.S. through its agency ICE and the Contractor Defendants.  ICE did not merely have the Contractor Defendants acting as its agent throughout Roxsana's detention and transport, but ICE was directly involved at various points in the journey.  For example, ICE ERO officers took custody of Roxsana for the plane ride from Arizona to Texas, the El Paso SPC is an ICE facility, and GPS stopped at the ICE CAP facility in Albuquerque to pick up additional asylum-seekers.  Throughout Roxsana's detention and transport from the border to New Mexico via the U.S.'s STP program, the activities of the Contractor Defendants were intricately intertwined with Defendant U.S.'s activities, and, in reality, they collectively engaged in a "program or activity conducted by [an] Executive agency" within the meaning of Section 504(a).

236.    Each of the Contractor Defendants were a part of the federal STP detention transportation program that transported Roxsana and/or owned and operated detention centers that housed Roxsana for ICE. All of the Contractor Defendants received federal funds for participating in ICE's STP program. In addition, all of the Contractor Defendants were responsible for administering a federal program of which the detention and transportation of Roxsana was a part. The Contractor Defendants' detention and/or transportation of Roxsana was part of a federally-conducted program and activity operated pursuant to the Defendant U.S.'s civil detention authority under INA, 8 U.S.C. §§ 1001 *et seq.* Finally, on information and belief, each of the Contractor Defendants received subsidies from the federal government that were used in its unlawful conduct toward Roxsana, including, but not limited to, through ICE's waiver program, whereby ICE granted waivers to Contractor Defendants to circumvent compliance with certain standards in their contracts if doing so would pose

47

a cost or time to implement by Contractor Defendants. Defendant GPS received federal Small Business Association benefits including, upon information and belief, obtaining sole source contracts from the federal government that are not subject to the same competitive bidding process that allowed it to conduct its business as part of the STP program.

237.     Each of the Contractor Defendants discriminated against Roxsana because of her HIV disability by failing to make reasonable accommodations for her disability. In addition, each of the Contractor Defendants discriminated against Roxsana on the basis of her actual and/or perceived disabilities by ignoring her obvious and serious medical needs and denying her access to services for which she was otherwise qualified.

238.     The Contractor Defendants each failed to properly train and supervise their transportation and detention employees. Their employees were not adequately trained or supervised in the care, detention, and/or transportation of persons detained that are living with HIV. The Contractor Defendants also failed to properly train and supervise their employees regarding the care, transportation, and detention of individuals who are transgender, including non-discriminatory conduct against people who express their gender identity[35] differently from the sex they were assigned at birth. Rather, persons detained and transported by the Contractor Defendants that identified as transgender, including Roxsana, were discriminated against because employees of the Contractor Defendants perceived them as having a disability.

239.     The Contractor Defendants knew or should have known that failure to adequately accommodate the medical needs of people in immigration detention who are HIV positive would likely lead to serious health risks, including death, and other violations of the federally-protected rights

---

[35] "Gender identity" refers to a person's internal sense of one's own gender and is recognized by medical and psychology communities.

of such people in detention. The Contractor Defendants were deliberately indifferent to the likelihood

of harm to such detainees, like Roxsana, and failed to take steps to prevent such harm.

240.    The Contractor Defendants knew or should have known that their employees required

additional training because of the multiple incidents, prior to Roxsana's detention and transport, where

persons detained and within their custody suffered abuse, died, or were severely injured due to the

Contractor Defendants' employees' failure to provide timely and adequate medical care, other basic

life necessities, and access to services to which they were otherwise qualified.[36]

---

[36] *See, e.g.,* IMMIGRATION CUSTOMS ENFORCEMENT, Detainee Death Review – Rafael Barcenas Padilla.
JICMS#201605426, https://www.ice.gov/doclib/foia/reports/ddr-Barcenas.pdf (last visited May 8,
2021) (reporting the death of a man detained at Otero Processing Center, run by Defendant MTC,
from bronchopneumonia after he requested medical attention on multiple occasions, beginning on
March 7, 2016, where MTC employees failed to order necessary medication and equipment); HUMAN
RIGHTS WATCH, *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration
Detention*, (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-
dangerously-substandard-medical-care-immigration#_ftn222 (last visited May 8, 2021) (reporting the
death of Igor Zyazin, who died on May 1, 2016 at Otay Mesa detention center, run by Defendant
CoreCivic, after being held at San Luis Regional Detention Center run by Defendant LaSalle, where
employees at both facilities failed to provide him with medical care, despite his documented heart
condition and repeated complaints of chest pains and feeling ill.); *Estate of Cruz-Sanchez by & through
Rivera v. United States*, No. 17-CV-569-AJB-NLS, 2019 WL 4508571, at *6 (S.D. Cal. Sept. 17, 2019),
*reconsideration denied*, 2020 WL 3868495 (S.D. Cal. July 9, 2020) (denying defendants' motion for
summary judgment of surviving wife's wrongful death claim for the death of her former husband,
Gerardo Cruz-Sanchez, who died at Otay Mesa Detention Center on March 1, 2016 from pneumonia,
after staff failed to provide him with medical care despite his inability to eat for a week and vomiting
blood and repeated requests for medical attention. The Southern District Court of California found
that Defendant CoreCivic had a duty to provide medical care to those in its custody and found that a
material issue of fact existed as to whether a CoreCivic's employee had received adequate training to
respond to medical emergencies because he admitted he could not remember); THE AMERICAN CIVIL
LIBERTIES UNION, *Fatal Neglect: How ICE Ignores Deaths in Detention*, (February 2016),
https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf (last visited
May 8, 2021) (reporting the death of Mauro Rivera, a man living with HIV, while in custody at El Paso
Processing Center, where Defendant GPS maintains a contract with ICE to staff the facility. Mr.
Rivera died from disseminated cryptococcosis, an infection associated with immune-suppressed
individuals, following staff's inadequate medical screenings of Mr. Rivera, failure to transfer Mr.
Rivera's critical medical information, and their failure to timely address Mr. Rivera's emergent medical
needs.); *Curtis v. TransCor Am., LLC*, 877 F. Supp. 2d 578, 579 (N.D. Ill. 2012) (wrongful death lawsuit
involving the death of Joseph Curtis, who died in June 2009 from heat stroke after Defendant
TransCor transported him in 95 degree weather without air conditioning); *Kinslow v. Transcor Am.*,

241.    On repeated occasions, employees or agents of each of the Contractor Defendants refused requests from Roxsana and her fellow detained asylum seekers to provide Roxsana with medical assistance and other disability accommodations that she sought and needed, thereby discriminating against her on account of her disability and/or perceived disabilities.

242.    The Contractor Defendants also failed to make reasonable accommodations in the form of timely medical assessments, timely access to medical care, access to life-saving medication, adequate food, water, and bathroom access, and/or specialized transport, and further denied Roxsana access to the services for which she was otherwise qualified on account of her disability and/or perceived disabilities in violation of the Rehabilitation Act.

243.    The Contractor Defendants further failed to make reasonable accommodations for Roxsana, a non-English speaker, by failing to provide adequate Spanish language translation services during Roxsana's detention and transport, including but not limited to: (i) during Roxsana's medical assessments and follow up medical care, and (ii) their failure to obtain an accurate medical history summary and other necessary medical documentation and life-saving medication during transport. Roxsana was denied access to these necessary services for which Roxsana was otherwise qualified on account of her disability and/or perceived disabilities in violation of the Rehabilitation Act.

244.    Because of her actual disability and/or perceived disabilities, the Contractor Defendants denied Roxsana the medical care, safe transportation, safe detention, and fear-based determination and review services for which she otherwise qualified. Because of her actual disability and/or perceived disabilities, the Contractor Defendants further denied Roxsana access to adequate

---

*LLC*, No. CIV A 06 C 4023, 2006 WL 3486866, at *1 (N.D. Ill. Dec. 1, 2006), *aff'd sub nom.*, *Kinslow v. Pullara*, 538 F.3d 687 (7th Cir. 2008) (dismissed *pro se* complaint of Jimmy Kinslow for failing to properly plead section 1983 claim, who sued Defendant TransCor for rendering his Hepatitis C treatment ineffective after its employees failed to provide him with medical attention during his transportation over 6 days, causing him severe pain and deterioration of his medical condition.).

food, water, and bathroom access, timely access to medical services, Spanish language translation services during Roxsana's medical assessments, follow up medical care, and an accompanying accurate medical summary, other necessary medical documentation, and life-saving medication during transport for which she was otherwise qualified and entitled.

245.    The discriminatory decisions and conduct made on account of Roxsana's disabilities and/or her perceived disabilities by non-medical employees of the Contractor Defendants resulted in the denial of timely medical services, life-saving medication, adequate food, water, and bathroom access, opportunity to rest, safe transportation, safe detention, and fear-based determination and review services for Roxsana, which she was otherwise qualified and entitled to receive.

246.    The Contractor Defendants knew or should have known that these acts and omissions would result in harm to Roxsana and/or were deliberately indifferent to the likely harm that would result to Roxsana from the discriminatory acts and omissions of their employees and their refusal to provide reasonable accommodations and access to programs and services for which Roxsana was otherwise qualified and entitled.

247.    As a result of the Rehabilitation Act violations of each of the Contractor Defendants, Plaintiff is entitled to compensatory and punitive damages.

### COUNT TWO AGAINST DEFENDANT MTC
#### NEGLIGENCE

248.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

249.    Defendant MTC was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from an unreasonable risk of harm.

250.    Defendant MTC owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in MTC's physical custody and

control.  Defendant MTC further placed Roxsana in danger by choosing to detain and transport her when she was in a severely vulnerable physical and emotional condition.

251.    Defendant MTC also owed Roxsana a duty of care as a common carrier pursuant to California Civil Code Section 2100, Restatement (Second) Torts Section 314A(4), and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

252.    Defendant MTC's employees were acting within the scope of their employment at all relevant times when Roxsana was in the custody and control of MTC. Roxsana's symptoms of cough, fatigue, weakness, excessive phlegm, and fever were so severe that her illness was noticeable and obvious to Defendant MTC's employees. In fact, MTC employees had actual knowledge of Roxsana's serious and rapidly-deteriorating health, as both Roxsana and her fellow asylum-seekers repeatedly requested medical help from MTC employees. Defendant MTC's employees also knew or should have known that Roxsana was HIV-positive and also at risk for contracting additional illnesses and/or developing complications of her existing medical condition. It was known and foreseeable that failing to provide Roxsana with an adequate medical assessment before detaining and transporting her, failing to provide her prescribed or other necessary medication(s), and failing to provide Roxsana with obviously necessary medical care would create an unreasonable risk of Roxsana's physical and emotional condition deteriorating, resulting in her death.

253.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care and custody of Defendant MTC presented a serious and obvious medical need.

254.    Defendant MTC acted unreasonably and breached its duty of care to Roxsana when it chose to detain and transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments prior to transport, transported her despite lacking the required medical

documentation and medication, denied her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs, denied her access to adequate food, water, bathroom facilities, inhumanly instructed Roxsana and the other asylum seekers to urinate on themselves, and failed to comply with applicable federal rules, regulations, and contractual requirements for the treatment of detained persons when MTC's employees transported Roxsana from San Ysidro, California to SLRDC in San Luis, Arizona.

255.    It was foreseeable that these acts and omissions of Defendant MTC's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

256.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant MTC and its employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive, and, ultimately, death.

257.    Defendant MTC's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

258.    Defendant MTC is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of its employees throughout the time that Roxsana was in the custody and control of Defendant MTC. Defendant MTC's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

## COUNT THREE AGAINST DEFENDANT MTC
### NEGLIGENT TRAINING AND SUPERVISION

259.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

260.    Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need. Roxsana's illness was obvious to Defendant MTC's employees because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, phlegm and fever. Roxsana's and her fellow asylum-seekers' repeated requests for medical help from MTC's employees further evidenced the urgency of Roxsana's deteriorating health and her urgent need of medical assistance.

261.    Employees of Defendant MTC, who were charged with Roxsana's custody and care pursuant to Defendant MTC's contract(s) with ICE, had a duty to Roxsana to ensure she was free from unreasonable risk of harm when they detained her and later, on May 14, 2018, when they transported her by bus from California to SLRDC.  Defendant MTC's employees also owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendant MTC's physical custody and control. In addition, Defendant MTC owed Roxsana a heightened duty of care because MTC placed Roxsana in danger by choosing to transport her when she was in an obvious and severely vulnerable physical and emotional condition. Defendant MTC also owed Roxsana a duty of care as a common carrier pursuant to California Civil Code Section 2100, Restatement (Second) Torts Section 314A(4), and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

262.    Defendant MTC negligently failed to adequately train and supervise its employees regarding: (i) how to appropriately screen individuals placed in their custody and care for fitness of travel; (ii) the necessity and requirement of providing adequate food, water, medication, and restroom

access; (iii) the requirement of ensuring required and necessary documentation is obtained related to Roxsana's transfer, as well as securing possession of all necessary prescribed medications; and, (iv) how to adequately and appropriately respond to emergent medical problems during transport. Defendant MTC failed to adequately train, manage, supervise, and discipline those employees who repeatedly breached their duty of care to Roxsana. MTC employees failed to summon medical care, despite Roxsana's obvious and apparent illness and rapidly deteriorating physical condition. MTC employees also cruelly refused to allow Roxsana to use the restroom during the journey and instructed the asylum seekers they were transporting, including Roxsana, to urinate on themselves, exacerbating Roxsana's mental anguish, suffering, and her rapidly deteriorating health.  Further, these MTC employees failed to provide sufficient water and food to Roxsana during this transfer, also exacerbating her weakness, illness, suffering, and her rapidly deteriorating health.

263.    Defendant MTC breached its duty of care to Roxsana by failing to use ordinary care in training, managing, and supervising its employees who transported Roxsana.  Defendant MTC also failed to use ordinary care in enforcing the regulations, policies, and contract provisions described herein regarding transfer and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detainees' medical needs during transport.

264.    Defendant MTC's employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care, denied her sufficient food, water and restroom access, and forced Roxsana and the other asylum seekers to urinate in their bus seats when they performed their contracted duties to transport Roxsana.

265.    Defendant MTC knew or should have known that its inadequate training and supervision of its own employees and additional failure to enforce required policies adopted to ensure

the health and safety of those detained would create an unreasonable risk of harm to detainees, like Roxsana, in its custody and control.

266.     Defendant MTC knew or should have known that such acts and omissions were unlawful under ICE policies and state and federal law.  Defendant MTC knew or should have known that the employees who transported the asylum seekers were likely to cause harm to the individuals in MTC's custody because MTC failed to provide sufficient food and water for the trip, failed to sufficiently train and supervise their employees, failed to address the conduct of its employees in requiring the detained persons being transported to urinate in their bus seats, causing the bus seats to be stained with urine prior to Roxsana's transport, and failed to address the obvious fact that its employees were abusing their authority. By failing to take any action, MTC ratified such cruel, inhumane behavior. Not a single employee who transported Roxsana provided her with medical care, adequate food, water, or restroom access.

267.     Defendant MTC's repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted an intentional, reckless, and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by Defendant MTC's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and ultimate death.

268.     Defendant MTC had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to adequately train and supervise its employees, including failure to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health noticeably and significantly deteriorated while in Defendant MTC's custody and control. Defendant MTC has engaged in similar acts of negligence with respect to individuals in

its employees' care, custody, or control on occasions prior to Roxsana's custody and transport.[37]

269.    Upon information and belief, Defendant MTC has not disciplined nor taken any corrective action against any of its employees for these unreasonable and unlawful acts and omissions. Defendant MTC knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons in its custody and control, including Roxsana.

270.    Defendant MTC's acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT FOUR AGAINST DEFENDANT MTC
### FAILURE TO SUMMON MEDICAL CARE FOR PRISONERS, UNDER Cal. Gov. Code § 845.6

271.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

272.    Roxsana's aggressively developing illness while in the custody of Defendant MTC presented a serious medical need. Her persistent symptoms of fever, cough, excessive phlegm, fatigue, vomiting, diarrhea, and weight loss were visibly and readily apparent from the time she was taken into CBP custody until her death, including to people who are not medically trained.

273.    Employees of Defendant MTC, who were charged with Roxsana's custody and care, were acting within the scope of their employment when they transported her from California to SLRDC on May 14, 2018 and failed to summon medical care despite her alarming and visible

---

[37] *See, e.g.*, IMMIGRATION CUSTOMS ENFORCEMENT, Detainee Death Review – Rafael Barcenas Padilla. JICMS#201605426, https://www.ice.gov/doclib/foia/reports/ddr-Barcenas.pdf (last visited May 8, 2021) (reporting the death of a man detained at Otero Processing Center, run by Defendant MTC, from bronchopneumonia after he requested medical attention on multiple occasions, beginning on March 7, 2016, where MTC employees failed to order necessary medication and equipment).

symptoms evidencing her deteriorating health. Roxsana's symptoms of cough, fatigue, weakness, vomiting, excessive phlegm, and fever were so severe that her illness was obvious, even to a lay person. Furthermore, Roxsana's and the other asylum seekers' repeated requests for medical help to Defendant MTC's employees evidenced the urgency of Roxsana's rapidly deteriorating condition.

274.    Defendant MTC's employees' repeated refusals to provide urgent and necessary medical care to Roxsana constituted intentional, reckless, and negligent disregard for Roxsana's life.

275.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant MTC's employees, Roxsana experienced foreseeably severe physical and emotional pain and suffering and lost her chance to live, in violation of state law.

276.    Defendant MTC's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

### COUNT FIVE AGAINST DEFENDANT MTC
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

277.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

278.    Defendant MTC's employees outrageously denied Roxsana the basic necessities of medical care, food, water, and restroom access throughout the duration of her transport from California to SLRDC, a journey that lasted approximately 5 hours, from 12:30 p.m. until 5:30 p.m. Roxsana, who was gravely ill and experiencing recurring vomiting and diarrhea, asked the officers wearing beige color uniforms to use the restroom and to remove her handcuffs so that she could safely use the restroom during the ride while the bus was moving.  Despite this, and in conscious disregard of her safety, MTC's employees refused and instructed Roxsana and the other detained persons travelling with her, to urinate on themselves. The bus seats were stained and smelled like

urine.

279.    This extreme and outrageous conduct by MTC employees constituted reckless disregard for the severe emotional distress they caused Roxsana.

280.    When they arrived at SLRDC, Roxsana used the restroom approximately every fifteen minutes. When she was not using the restroom, she laid on the floor from fatigue, coughing.

281.    Multiple times, Roxsana and other detained persons requested medical care for Roxsana from the MTC employees transporting them. The employees ignored their pleas and one responded "shut up!" None of the MTC employees responsible for transporting Roxsana and the other detained persons arranged for or provided Roxsana with any medical care.

282.    When Roxsana arrived at SLRDC, several detained persons who had originally presented for asylum at the U.S. POE with Roxsana, but had been separated at the border, were reunited. Many of these individuals were shocked by Roxsana's ill appearance and how quickly and significantly her health had declined.

283.    As a direct and proximate cause of MTC's employees' malicious, wanton, reckless, and negligent acts, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.  On multiple occasions, including while in MTC custody, Roxsana confided in other asylum seekers that she did not believe she would survive in CBP and ICE custody.

284.    MTC is vicariously liable for the intentional infliction of emotional distress caused by its employees.  At all material times, MTC's employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

285.    Defendant MTC's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be

punished with an award of punitive damages.

## COUNT SIX AGAINST THE LASALLE DEFENDANTS
### NEGLIGENCE

286.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

287.     The LaSalle Defendants were charged with Roxsana's custody and care pursuant to their contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

288.     LaSalle owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in these contractors' physical custody and control.  LaSalle further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition with rapidly deteriorating health.

289.     LaSalle's employees were acting in the scope of their employment at all relevant times when Roxsana was in their custody and control.  Roxsana's symptoms of cough, fatigue, weakness, excessive phlegm, and fever were so severe that her illness was noticeable and obvious to LaSalle's employees. In fact, LaSalle employees had actual knowledge of Roxsana's serious and rapidly-deteriorating health, as both Roxsana and her fellow asylum-seekers repeatedly requested medical help from LaSalle employees, further evidencing the urgency of Roxsana's deteriorating health and her need of medical assistance. LaSalle's employees knew or should have known that Roxsana was HIV-positive, and that, where left untreated, she would suffer from deteriorating physical health, and that she was also at risk for contracting additional illnesses and/or developing complications of her existing medical condition.

290.     It was known and foreseeable that failing to provide Roxsana with an adequate medical assessment before transporting her, failing to provide her with prescribed medication(s), and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical

condition deteriorating, resulting in her death.

291.    Roxsana's obviously deteriorating physical and emotional condition and her aggressively developing illness while in the care of LaSalle presented a serious and obvious medical need.

292.    The LaSalle Defendants breached their duty of care by failing to provide Roxsana with emergent medical care on May 14 and 15, 2018, when they transported Roxsana and detained her at SLRDC and their employees witnessed Roxsana laying on the floor, coughing, and frequently using the restroom because she was suffering from severe diarrhea and vomiting. LaSalle's failure to provide Roxsana with medical care was a blatant violation of both the standards required by federal and state law and ICE's requirement that this Contractor Defendant conduct a medical screening of any detained person within 12 hours of taking that individual into ICE custody, as Roxsana arrived at SLRDC around 5:30 p.m. May 14, 2018 and her flight to El Paso departed at approximately 9:00 a.m. on May 15, 2018.  The LaSalle Defendants acted unreasonably and breached their duty of care when their employees chose to transport and detain Roxsana in the medically-unstable condition she was in, failed to provide her with adequate medical assessments and required medications prior to transport, transported her despite lacking the required medical documentation or medications, and denied her access to medical care during transport and detention, despite her obvious, serious, and emergent suffering and medical needs.

293.    It was foreseeable that these acts and omissions of LaSalle's employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and death.

294.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of LaSalle's employees, Roxsana suffered severe and foreseeable physical and

emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

295.     LaSalle's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

296.     The LaSalle Defendants are vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of LaSalle's employees throughout the time that Roxsana was in their custody and control. LaSalle's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in LaSalle's custody and control.

### COUNT SEVEN AGAINST LASALLE DEFENDANTS
#### NEGLIGENT TRAINING AND SUPERVISION

297.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

298.     Roxsana's aggressively developing illness while in the custody of LaSalle presented a serious medical need. Roxsana's illness was obvious to LaSalle's employees because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, excessive phlegm, and fever. Furthermore, both Roxsana's and her fellow asylum-seekers' repeated requests for medical help to LaSalle's employees further evidenced the urgency of Roxsana's deteriorating health and her urgent need of medical assistance.

299.     Employees of LaSalle, who were charged with Roxsana's custody and care pursuant to LaSalle's contract(s) with ICE, had a duty to Roxsana to ensure that she was free from unreasonable risk of harm when they detained her on May 14, 2018 at SLRDC, and later, on May 15, 2018, when they transported Roxsana by bus to the airport. LaSalle's employees also owed Roxsana a heightened

duty of care to protect her from harm because of the special relationship created when Roxsana was placed in LaSalle's physical custody and control. In addition, LaSalle owed Roxsana a heightened duty of care because LaSalle placed Roxsana in danger by choosing to transport her when she was in an obvious and severely vulnerable physical and emotional condition.

300.    LaSalle negligently failed to adequately train and supervise its employees regarding:  (i) how to appropriately screen individuals placed in its custody and care for fitness for travel before transporting such detained persons; (ii) the requirement of ensuring required and necessary documentation is obtained related to Roxsana's transfer, as well as securing possession of all necessary prescribed medications; (iii) the necessity and requirement of providing medication, adequate food, water, and restroom access; and (iv) how to adequately and appropriately respond to emergent medical problems during custody and transport.  LaSalle failed to adequately train, manage, supervise, and discipline the employees who repeatedly breached their duty of care to Roxsana.  Further, these LaSalle employees failed to provide sufficient water and food to Roxsana during her transfer, exacerbating her weakness, illness, and suffering.

301.    The LaSalle Defendants breached their duty of care to Roxsana by failing to use ordinary care in training, managing, and supervising its employees who detained and transported Roxsana.  LaSalle also failed to use ordinary care in enforcing the regulations, policies, and contract provisions described herein regarding the detention, transfer and transport of detained persons, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and responding to detained persons' medical needs during transport.

302.    LaSalle's employees were acting within the scope of their employment when, on May 14, 2018, Roxsana was in their custody and care, and they failed to provide immediate medical attention when they witnessed her lying on the floor coughing at SLRDC and frequently using the

restroom due to vomiting and diarrhea. LaSalle's employees were also acting within the scope of their employment when, on May 15, 2018, they transported Roxsana to the airport and refused to provide her with medical care, despite her obvious need for medical assistance and multiple requests for help (from both Roxsana and other detained persons). They were also acting within the scope of their employment when they denied Roxsana sufficient food, water, and restroom access, and one LaSalle employee transporting Roxsana threatened the detained persons, saying words to the effect of: "behave because if you don't something bad is going to happen."

303.    LaSalle knew or should have known that its inadequate training and supervision of its own employees and additional failure to enforce required policies adopted to ensure the health and safety of those detained and transported would create an unreasonable risk of harm to detainees, like Roxsana, in their custody and control.

304.    LaSalle knew or should have known that such acts and omissions were unlawful under ICE rules and state and federal law.  LaSalle knew or should have known that the employees who transported Roxsana were likely to cause harm to her when they failed to provide her with medical care because there were high-level LaSalle employees/officials on site at SLRDC when Roxsana was refused care. LaSalle knew or should have known that the employees who transported the asylum seekers were likely to cause harm to the individuals in LaSalle's custody because LaSalle failed to sufficiently train and supervise its employees, failed to address the conduct of its employees in verbally abusing the asylum seekers, and failed to address the obvious fact that their employees were abusing their authority.  By failing to take any action, LaSalle ratified such cruel, inhumane behavior. Not a single employee who transported Roxsana or witnessed her lying on the ground with fatigue at SLRDC provided her with medical care, medication, or relief from her suffering, despite her and others' pleas for care and assistance.

305.    LaSalle's repeated refusals to provide medical care and the basic necessities for Roxsana's safety and well-being constituted an intentional, reckless, and negligent disregard for Roxsana's life. The unlawful and repeated denial of medical care by LaSalle's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

306.    LaSalle had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to adequately train and supervise its employees, including failure to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health noticeably and rapidly deteriorated while in LaSalle's custody and control. LaSalle has engaged in similar acts of negligence with respect to individuals in its employees' care, custody, or control on occasions prior to Roxsana's custody and transport.[38]

307.    Upon information and belief, the LaSalle Defendants have not disciplined nor taken any corrective action against its employees for these unreasonable and unlawful acts and omissions. LaSalle knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons, including Roxsana, in its custody and control.

308.    Defendants LaSalle's acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

---

[38] HUMAN RIGHTS WATCH, *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration#_ftn222 (last visited May 8, 2021) (reporting the death of Igor Zyazin, who died on May 1, 2016 at Otay Mesa detention center, run by Defendant CoreCivic, after being held at San Luis Regional Detention Center run by Defendant LaSalle, where employees at both facilities failed to provide him with medical care, despite his documented heart condition and repeated complaints of chest pains and feeling ill.).

## COUNT EIGHT AGAINST DEFENDANT GPS
### NEGLIGENCE

309.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

310.    Defendant GPS was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

311.    Defendant GPS owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the GPS's physical custody and control.  Defendant GPS further placed Roxsana in danger by choosing to detain and transport her when she was in a severely vulnerable physical and emotional condition.

312.    Defendant GPS's employees were acting in the scope of their employment throughout the time that Roxsana was in the custody, care, and control of GPS.  Roxsana's symptoms of cough, fatigue, weakness, excessive phlegm, and fever were so severe that her illness was noticeable and obvious to Defendant GPS's employees. Defendant GPS's employees knew or should have known that Roxsana was HIV-positive, and where left untreated, would cause deteriorating health, and that she was also at risk for contracting additional illnesses and/or developing complications of her existing medical condition. Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests for medical help to GPS's employees further evidenced the urgency of Roxsana's deteriorating health and her need of urgent medical assistance. It was foreseeable that failing to provide Roxsana an adequate medical assessment before transporting her, failing to secure and provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.  In fact, GPS employees had actual knowledge of Roxsana's deteriorating physical health, as one GPS employee asked the asylum seekers, including Roxsana, why they would come to this country if they were sick, or words to that effect.

313.     Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care and custody of Defendant GPS presented a serious and obvious medical need.

314.     Defendant GPS acted unreasonably and breached its duty of care when it:  (i) chose to transport Roxsana in the condition she was in, (ii) transported her despite lacking the required medical documentation and prescribed medications, (iii) failed to provide her with adequate medical assessments prior to transport; (iv) denied her access to medical care during transport, despite her obvious, serious, and emergent suffering and medical needs; (iv) denied her access to adequate food, water, and bathroom facilities, especially on a significantly hot day in a vehicle without air conditioning; (v) denied Roxsana adequate restroom access; and (vi) failed to comply with applicable federal rules, regulations, and contractual requirements for the treatment of detained persons when GPS employees transported Roxsana from El Paso SPC on May 16, 2018 to the ICE CAP facility in Albuquerque, New Mexico.

315.     It was foreseeable that these acts and omissions of Defendant GPS's employees would increase the risk of, and actually cause, harm to Roxsana, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, and ultimately, death.

316.     As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant GPS's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

317.     Defendant GPS's employees' acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

318.     Defendant GPS is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of Defendant GPS's employees throughout the time that Roxsana was in the custody and control of Defendant GPS. Defendant GPS's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant GPS's custody and control.

### COUNT NINE AGAINST DEFENDANT GPS
#### NEGLIGENT TRAINING AND SUPERVISION

319.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

320.     Roxsana's aggressively developing illness while in the custody of Defendant GPS presented a serious medical need. Roxsana's illness was obvious to Defendant GPS's employees because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, phlegm, and fever.

321.     Employees of Defendant GPS, who were charged with Roxsana's custody and care pursuant to Defendant GPS's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm when they transported her on May 16, 2018 from El Paso SPC to the ICE CAP facility in Albuquerque, New Mexico. Defendant GPS owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendant GPS's physical custody, care, and control. In addition, Defendant GPS owed Roxsana a heightened duty of care because it placed Roxsana in danger by choosing to transport her when she was in an obvious and severely vulnerable physical and emotional condition.

322.     Defendant GPS breached its duty by negligently training and supervising the employees who transported Roxsana and who failed to provide her with immediate medical assistance, despite her illness and deteriorating physical condition. Defendant GPS failed to adequately train and

supervise its employees to ensure that they followed required safety guidelines and procedures. Defendant GPS also negligently failed to adequately train and supervise its employees, who repeatedly breached their duty of care to Roxsana.

323.    Defendant GPS's negligence included the failure to adequately train and supervise its employees regarding: (i) how to appropriately screen individuals placed in their custody and care for fitness of travel before transport; (ii) the necessity and requirement of providing adequate food, water, medication, and restroom access; (iii) the requirement of ensuring required and necessary documentation is obtained relating to Roxsana's transfer, as well as securing possession of all necessary prescribed medications; and (iv) how to adequately and appropriately respond to emergent medical problems during transport.

324.    Defendant GPS failed adequately train its staff to render aid to detained persons with emergent medical issues and failed to follow through and/or enforce its policies related to detainees with medical needs.

325.    Defendant GPS conducted inadequate management, training, supervision, and enforcement of regulations, policies, and contract provisions regarding transfer and transport of detained persons, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detained persons with medical needs during transport.

326.    Defendant GPS knew or should have known that its inadequate hiring, training, and supervision, including its failure to enforce required policies and procedures, would create an unreasonable risk of harm to detained persons, like Roxsana, in GPS's custody and control.

327.    Defendant GPS failed to use ordinary care in training, managing, and supervising its employees who transported Roxsana, and Defendant GPS failed to use ordinary care in enforcing the

regulations, policies, and contract provisions described herein regarding transfer and transport of detained persons, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to any detained persons' medical needs during transport.

328.    Defendant GPS breached its duty of care by failing to provide Roxsana with immediate medical care during transport, despite Roxsana's and the other asylum seekers' repeated requests for medical attention for her.

329.    Defendant GPS's employees also breached their duty of care by failing to provide sufficient food and water—providing only an 8-ounce bottle of water for a journey that lasted almost six hours on a day that reached 97 degrees, medication(s), and access to restrooms, resulting in Roxsana's mental anguish, pain and suffering, exacerbation of her illness, lost chance of survival, and ultimately, death.

330.    Defendant GPS's employees were acting within the scope of their employment when they refused to provide Roxsana with medical care and denied her sufficient food, water, and restroom access, as GPS was contracted to transport her.

331.    Defendant GPS knew or should have known that such acts and omissions were unlawful under ICE rules and state and federal law.  Defendant GPS knew or should have known that employees who transported the asylum seekers were likely to cause harm to individuals in GPS's custody because GPS failed to provide sufficient food and water for the trip and knew how many people they were responsible to transport.  GPS knew or should have known that adequate food was not provided, considering GPS employees stopped to eat lunch themselves, while not providing any food for Roxsana and the other detained persons. Not a single GPS employee who transported Roxsana provided medication(s), medical care, or adequate food, water, and restroom access.

332.     Defendant GPS's repeated refusals to provide medical care and the basic necessities for Roxana's safety and well-being constituted an intentional, reckless, and negligent disregard for Roxana's life. The unlawful and repeated denial of medical care by Defendant GPS's employees, who were charged with Roxana's custody and care, was the actual and proximate cause of Roxana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

333.     Upon information and belief, Defendant GPS has not disciplined nor taken any corrective action against its employees for these unreasonable and unlawful acts and omissions. Defendant GPS knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons in its custody and control.

334.     Defendant GPS had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to adequately train and supervise its employees, including failure to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health noticeably and significantly deteriorated while in Defendant GPS's custody and control.  Defendant GPS has engaged in similar acts of negligence with respect to individuals in its employees' care, custody, or control on occasions prior to Roxana's custody and transport.[39]

335.     Defendant GPS's acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxana's rights and life, and should be punished with an award of punitive damages.

---

[39] THE AMERICAN CIVIL LIBERTIES UNION, *Fatal Neglect: How ICE Ignores Deaths in Detention*, (February 2016), https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf (last visited May 8, 2021) (reporting the death of Mauro Rivera, a man living with HIV, while in custody at El Paso Processing Center, where Defendant GPS maintains a contract with ICE to staff the facility. Mr. Rivera died from disseminated cryptococcosis, an infection associated with immune-suppressed individuals, following staff's inadequate medical screenings of Mr. Rivera, failure to transfer Mr. Rivera's critical medical information, and their failure to timely address Mr. Rivera's emergent medical needs.)

## COUNT TEN AGAINST DEFENDANT GPS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

336.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

337.     Defendant GPS's employees denied Roxsana adequate food, water, and restroom access for the duration of the five and a half hour bus ride, departing from El Paso SPC at approximately 9:00 a.m. until arrival at the ICE CAP facility in Albuquerque, New Mexico around 2:30 p.m. GPS's employees gave each person transported, including Roxsana, one 8-ounce bottle of water and one sandwich to last the entire five-and-half hour journey on the bus without air conditioning on a day that reached 97 degrees Fahrenheit.  The detained persons, including Roxsana, were dehydrated and hungry. They repeatedly asked for additional water and food. In response to the first two times such requests were made, the GPS officers ignored them. The third time, an officer with grey hair said in Spanish: "ya callanse" which means "shut up." At some point during this trip, Roxsana asked an officer for water, but the officer told her that he did not speak Spanish. At one point during the trip, GPS employees stopped at a fast food restaurant to get themselves food and then ate on the bus in front of all of the hungry and thirsty detained persons, including Roxsana.

338.     If any person detained had to use the restroom, they had to plead with the GPS employees repeatedly, and even then the GPS employees largely ignored their requests. Occasionally, a GPS employee escorted a detained person to a toilet bowl without any water in it, at the back of the bus, which had only a curtain separating the toilet from the rest of the bus. There was no toilet paper and GPS's employees refused to uncuff those they transported while using this toilet on a moving bus. When the bus would sway, the waste in the toilet would spill. The entire bus smelled of sewage.

339.     Roxsana sat by herself in the back of the bus. At another point, the same GPS employee who told the asylum seekers to "shut up" asked why they left their country if they were sick,

in reference to and acknowledging Roxsana's visible illness. Roxsana had a fever and lots of phlegm and carried tissue or toilet paper to blow her nose. Sometimes her sputum was bloody. Roxsana felt dizzy and extremely exhausted, and she was so despondent it was unclear to those around her whether she was unconscious or she was sleeping.

340.    During this bus ride, another detained person requested medical attention for Roxsana from at least two different GPS employees approximately five times. One GPS employee claimed to not understand the requests for assistance, which were communicated in Spanish, and the other GPS employee refused to respond to any request for assistance for Roxsana from this detained person.

341.    These acts and omissions of Defendant GPS's employees were extreme and outrageous under the circumstances.

342.    The extreme and outrageous conduct by Defendant GPS's employees, namely failure to seek medical care and refusal to provide adequate food, water, and restroom access, constituted a conscious or reckless disregard for the severe emotional distress they caused Roxsana.

343.    As a direct and proximate cause of the malicious, wanton, reckless and negligent acts and omissions of Defendant GPS's employees, Roxsana experienced severe physical and emotional pain and suffering, and mental anguish. On multiple occasions, including during transport by GPS, Roxsana confided to other detained persons that she did not believe she would survive in CBP and ICE custody.

344.    Defendant GPS is vicariously liable for the intentional infliction of emotional distress caused by its employees. At all material times, GPS employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody, care, and control.

345.    When Roxsana finally arrived at Cibola on May 16, 2018, she was experiencing

73

multiple organ failure. The following morning, when she was finally medically screened, Roxsana weighed a mere 89 pounds and was diagnosed with muscle wasting, severe dehydration, untreated HIV, fever, and cough. The examining medical provider noted Roxsana's physical tremor, low blood pressure of 81/61, rough breathing sounds, and increased white phlegm excreted in abnormally large quantities. Roxsana died on May 25, 2018, and a doctor from Cibola General Hospital stated that the actions taken by the time Roxsana arrived at Cibola were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

346.    Defendant GPS' employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT ELEVEN AGAINST DEFENDANT TRANSCOR
### NEGLIGENCE

347.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

348.    Defendant TransCor was charged with Roxsana's custody and care pursuant to its contract(s) with ICE and had a duty to ensure Roxsana was free from unreasonable risk of harm.

349.    Defendant TransCor owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the company's physical custody and control. Defendant TransCor further placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

350.    Defendant TransCor's employees were acting in the scope of their employment throughout the time that Roxsana was in their custody and control. Roxsana's symptoms of cough, fatigue, weakness, excessive phlegm, and fever were so severe that her illness was noticeable and obvious to Defendant TransCor's employees. Defendant TransCor's employees knew or should have

74

known that Roxsana was HIV-positive, which left untreated would cause deteriorating physical health, and that she was also at risk of contracting additional illnesses and/or developing complications of her existing medical condition. Furthermore, both Roxsana's and her fellow asylum-seekers' repeated requests to TransCor's employees for medical help for Roxsana further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance. It was foreseeable that failing to provide Roxsana an adequate medical assessment before transporting her, failing to provide her prescribed medication, and failing to provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

351.    Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant TransCor presented a serious and obvious medical need.

352.    Defendant TransCor acted unreasonably and breached its duty of care when it chose to transport Roxsana in the condition she was in, transporting her despite lacking the required medical documentation and medication, failing to provide her with adequate medical assessments prior to transport, denying her access to medical care during transport despite her obvious, serious, and emergent suffering and medical needs, and denying her access to adequate food, water, and bathroom facilities. Defendant TransCor further failed to comply with applicable federal rules, regulations, and contractual requirements for the treatment of detainees when its employees transported Roxsana from the ICE CAP facility in Albuquerque, New Mexico to Cibola, despite Roxsana's visible and urgent illness.

353.    It was foreseeable that these acts and omissions of Defendant TransCor's employees would increase the risk of, and actually cause, harm to Roxsana, including mental anguish, pain, and suffering, exacerbation of her illness, deterioration of her physical condition, and ultimately, death.

354.     As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant TransCor's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

355.     Defendant TransCor's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

356.     Defendant TransCor is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of Defendant TransCor's employees throughout the time that Roxsana was in the custody and control of Defendant TransCor. Defendant TransCor's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant TransCor's custody and control.

## COUNT TWELVE AGAINST DEFENDANT TRANSCOR
### NEGLIGENT TRAINING & SUPERVISION

357.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

358.     Roxsana's aggressively developing illness while in the custody of Defendant TransCor presented a serious medical need.  Roxsana's persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea, fever, and weight loss were obvious and visibly apparent, including to people who are not medically trained and to Defendant TransCor's employees.

359.     Employees of Defendant TransCor, who were charged with Roxsana's custody and care pursuant to Defendant TransCor's contract(s) with ICE, had a duty to ensure Roxsana was free

from unreasonable risk of harm when they transported her from the ICE CAP facility in Albuquerque, New Mexico to Cibola. Defendant TransCor owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in Defendant TransCor's physical custody, care, and control. In addition, Defendant TransCor had a heightened duty of care because it placed Roxsana in danger by choosing to transport her when she was in a severely vulnerable physical and emotional condition.

360.    Defendant TransCor breached its duty of care to Roxsana when its employees transported her on May 16, 2018 from the ICE CAP facility in Albuquerque, New Mexico to Cibola, despite lacking the required medical documentation, and failed to provide her with prescribed medications and medical care, despite her visible illness and multiple requests for medical attention. Roxsana and the other asylum seekers arrived at the ICE CAP facility at approximately 2:30 p.m. and did not arrive at Cibola until 8:13 p.m. During those almost six hours, Roxsana was critically ill. During transport, other detained persons reported it was unclear whether Roxsana was asleep or unconscious during the trip to Cibola. When she arrived at Cibola, other asylum-seekers reported Roxsana was losing her mental capacity because of her illness. Despite these visible signs and symptoms, no TransCor employee sought medical help for Roxsana during the six hours she was in their custody, control, and care.

361.    Defendant TransCor breached its duty to Roxsana by negligently training and supervising its employees who transported Roxsana and who failed to provide her with immediate medical assistance, despite her obvious illness and deteriorating physical condition.  Defendant TransCor failed to adequately train and supervise the employees who repeatedly breached their duty of care to Roxsana.

362.    Defendant TransCor's negligence included the failure to adequately train and supervise

its employees regarding: (i) how to appropriately screen individuals placed in their custody and care for fitness of travel before transport; (ii) the necessity and requirement of providing adequate food, water, medication, and restroom access; (iii) the requirement of ensuring required and necessary document was obtained regarding Roxsana's transfer, as well as securing possession of all necessary prescribed medications; and (iv) how to adequately and appropriately respond to emergent medical problems during transport.

363.    Defendant TransCor failed to follow through and/or enforce its required policies related to detained persons with medical needs.

364.    Defendant TransCor conducted inadequate management, training, and supervision of its employees by failing to enforce applicable regulations, policies, and contract provisions regarding transfer and transport of detained persons, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detained persons with medical needs during transport.

365.    Defendant TransCor knew or should have known that its inadequate training and supervision of its employees, including its failure to enforce its required policies, would create an unreasonable risk of harm to detained persons, like Roxsana, in its custody and control.

366.    Defendant TransCor failed to use ordinary care in training, managing, and supervising its employees who transported Roxsana and in enforcing the regulations, policies, and contract provisions described herein regarding transfer and transport of detained persons, including pre-transport fitness for travel assessments, the provision of adequate food, water, medications, and restroom access during transport, and responding to detained person's medical needs during transport.

367.    Defendant TransCor's employees were acting within the scope of their employment when they refused to provide Roxsana with immediate medical care and denied her sufficient food,

water, and restroom access, as they were contracted by ICE to transport her.

368.    Defendant TransCor knew or should have known that such acts and omissions were unlawful under ICE rules and state and federal law.

369.    The unlawful and repeated denial of medical care by Defendant TransCor's employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

370.    Upon information and belief, Defendant TransCor has not disciplined nor taken any corrective action against its employees for these unreasonable and unlawful acts and omissions. It was foreseeable and Defendant TransCor knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons in its custody and control.

371.    Defendant TransCor had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health deteriorated while in Defendant TransCor's custody and control. Defendant TransCor has engaged in similar acts of negligence with respect to individuals in its employees' care, custody, or control on occasions prior to Roxsana's custody and transport.[40]

372.    Defendant TransCor's acts and omissions were intentional, wanton, malicious and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished

---

[40] *Curtis*, 877 F. Supp. 2d at 579 (wrongful death lawsuit involving the death of Joseph Curtis, who died in June 2009 from heat stroke after Defendant TransCor transported him in 95 degree weather without air conditioning); *Kinslow v. Transcor Am., LLC*, 2006 WL 3486866, at *1, *aff'd sub nom.*, *Kinslow*, 538 F.3d 687 (dismissed *pro se* complaint of Jimmy Kinslow for failing to properly plead section 1983 claim, who sued Defendant TransCor for rendering his Hepatitis C treatment ineffective after its employees failed to provide him with medical attention during his transportation over 6 days, causing him severe pain and deterioration of his medical condition.)

with an award of punitive damages.

## COUNT THIRTEEN AGAINST DEFENDANT CORECIVIC
### NEGLIGENCE

373.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing
paragraphs.

374.     Defendant CoreCivic was charged with Roxsana's custody, control, and care pursuant
to its contract(s) with ICE and had a duty to ensure Roxsana was free from an unreasonable risk of
harm.

375.     Defendant CoreCivic owed Roxsana a heightened duty of care to protect her from
harm because of the special relationship created when Roxsana was placed in the company's physical
custody, care, and control. Defendant CoreCivic further placed Roxsana in danger by choosing to
transport her when she was in a severely vulnerable physical and emotional condition.

376.     Defendant CoreCivic's employees were acting in the scope of their employment
throughout the time that Roxsana was in their custody and control.  Roxsana's symptoms of cough,
fatigue, weakness, excessive phlegm, and fever were so severe that her illness was obvious to
Defendant CoreCivic's employees. Defendant CoreCivic's employees knew or should have known
that Roxsana was HIV-positive, which if left untreated would result in her deteriorating physical
health, and that she would also be at risk for contracting additional illnesses and/or developing
complications of her existing medical condition. Furthermore, Roxsana's and her fellow asylum-
seekers' repeated requests to CoreCivic's employees for medical help for Roxsana further evidenced
the urgency of Roxsana's deteriorating health and her need of medical assistance.

377.     It was foreseeable that failing to provide Roxsana with an adequate medical assessment
before transporting her, failing to secure and provide her with prescribed medication(s), and failing to
provide Roxsana with medical care would create an unreasonable risk of Roxsana's physical condition

deteriorating, resulting in her death.

378. Roxana's obviously deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant CoreCivic presented a serious and obvious medical need.

379. Defendant CoreCivic breached its duty of care to Roxsana by making Roxsana sleep on the floor in the medical waiting wing from approximately 2:00 a.m. until the onsite physician came to work at approximately 7:30 a.m., rather than provide her with immediate and urgently necessary medical care on May 16, 2018, despite the fact that she was experiencing the early stages of multiple organ failure. Despite arriving at Cibola at approximately 8:00 p.m. the day prior, Roxsana was not provided a suitable place to rest for the night, exacerbating her already fragile condition.

380. Defendant CoreCivic further breached its duty of care to Roxsana by unreasonably keeping her shackled throughout her eight-day hospitalization, delaying and obstructing medical providers' provision of emergency and life-saving care, and causing deep tissue injuries to her wrists and ankles from unnecessary restraints, as well as pain and suffering. CoreCivic employees kept Roxsana shackled to her hospital bed even after she was medically sedated, unconscious, and went into cardiac arrest on May 24, 2018 for over four hours against the requests of her treating physician to uncuff her. This practice was not only a violation of the PBNDS, as Roxsana was gravely ill, emaciated and weak and guarded around the clock by an armed officer negating any possibility that she could pose a flight or security risk, but also a violation of the prevailing standards of medical care. CoreCivic's employees further violated the PBNDS, which provide "[r]estraints shall be applied for the least amount of time necessary to achieve the desired behavioral objectives," that this be done in "consultation with medical staff" as well as its mandate that "[s]taff shall use only that amount of force necessary and reasonable to gain control of a detainee." CoreCivic's employees shackling of Roxsana

also violated prevailing standards of care within the medical profession for civil detainees like Roxsana

who pose no security or flight risk.

381.    PBND Standard 2.15(b) provides: "Instruments of restraint shall be used only as a

precaution against escape during transfer; for medical reasons, when directed by the medical officer;

or to prevent self-injury, injury to others, or property damage. Restraints shall be **applied for the least

amount of time necessary to achieve the desired behavioral objectives**."[41] Further, it states:

"Staff shall use **only that amount of force necessary and reasonable to gain control of a

detainee**."[42]

382.    The PBNDS Standard 4.3 addresses restraints for medical purposes:

> Restraints for medical or mental health purposes may be authorized **only** by the
> facility's CMA or designee, **after determining that less restrictive measures are not
> appropriate**. In the absence of the CMA, qualified medical personnel may apply
> restraints upon declaring a medical emergency. Within one hour of initiation of
> emergency restraints or seclusion, qualified medical staff shall notify and obtain an
> order from the CMA or designee. a. The facility shall have written procedures that
> specify: 1) the conditions under which restraints may be applied; 2) the types of
> restraints to be used; 3) the proper use, application and medical monitoring of
> restraints; 4) requirements for documentation, including efforts to use less restrictive
> alternatives; and 5) after-incident review. The use of restraints requires documented
> approval and guidance from the CMA. Record-keeping and reporting requirements
> regarding the medical approval to use restraints shall be consistent with other
> provisions within these standards, including documentation in the detainee's A-file,
> detention and medical file.[43]

383.    Defendant CoreCivic unreasonably shackled Roxsana throughout her custody and

hospitalization, despite the fact that she was not a flight or security risk given that she was a gravely

---

[41] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011*, at 2.15(b)(1) p. 202, https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf (last visited April 26, 2021) (emphasis added).

[42] *Id.* at § B(4) p. 202 (emphasis added).

[43] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *Performance Based National Standards 2011*, Standard 4.3 at § Y p. 275-6, https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf (last visited April 26, 2021) (emphasis added).

ill, small, and largely immobile person throughout the duration of her custody. The day she was hospitalized, Roxsana weighed only 89 pounds and was transported to Lovelace Medical Center by helicopter and wheelchair precisely because of her frail condition. Furthermore, she was rendered immobile by way of the IV she was connected to while in the hospital and was guarded around the clock by an armed officer at her bedside. CoreCivic egregiously kept Roxsana continuously shackled, even after the treating doctor asked for her cuffs to be removed because Roxsana was "very uncomfortable" and clearly "not going anywhere." In addition to the armed officers who were by her side around the clock, Roxsana also was surrounded by up to 8 medical staff during her final hours the night before she passed away. Despite all of these safeguards that foreclosed any remote possibility of escape, CoreCivic employees cruelly put Roxsana back in handcuffs at 8:25 p.m. on May 24, 2018, minutes after medical staff sedated and medically paralyzed her. Approximately an hour and a half later, Roxsana suffered the first cardiac event, still shackled to the bed, and hospital staff resuscitated her using various life-saving measures, including CPR—a procedure that involves chest compressions that frequently breaks ribs. CoreCivic kept Roxsana shackled while unconscious, on life support, and in critical condition for over four hours before, around 12:30 a.m., medical staff requested—yet again—that CoreCivic's employees remove them in case she underwent additional cardiac arrests— which she did.

384.   Defendant CoreCivic's employees' practice of shackling Roxsana violated the PBNDS because (1) any of the stated lawful objectives contemplated by the PBNDS were completely irrelevant and unnecessary (*i.e.*, "precaution against escape during transfer; for medical reasons, when directed by the medical officer; or to prevent self-injury, injury to others, or property damage"); (2) it was not "applied for the least amount of time necessary to achieve the desired behavioral objectives;" (3) it was unnecessary "to gain control of" Roxsana, thereby violating the PBNDS mandate that "only that

amount of force necessary and reasonable" be used; and (4) CoreCivic employees erroneously failed to consider whether less restrictive measures were appropriate, in violation of the PBNDS, and did not employ this practice at the request of medical personnel as required; rather, CoreCivic continued to shackle Roxsana in direct defiance of treating medical providers' repeated requests to remove them. As a direct result of these unlawful practices, Roxsana experienced severe pain and suffering and deep tissue injuries on her wrists, and upon information and belief, other injuries incidental to resuscitation attempts while handcuffed to her bed.

385.    This practice employed by CoreCivic's employees of shackling Roxsana was also contrary to prevailing medical standards in the profession for medical treatment of people in civil detention, such as Roxsana. Medical standards of care do not condone the use of non-medical restraints unless necessary for the safety of the patient, staff, and medical providers.  A policy statement issued by the American College of Emergency Physicians states that restraint on patients should be administered after a "careful assessment establishes that the patient is a danger to self or others by virtue of a medical or psychiatric condition and when verbal de-escalation is not successful."[44]  When non-medical restraints are administered, the treating physician should be able to evaluate whether appropriate care can be delivered with shackles in place.[45] If the physician determines that the restraints need to be removed, officials are then responsible for determining an alternative manner to secure, or not secure, the patient in a manner that does not interfere with standards of medical care.[46]

---

[44] AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, *Policy Statement: Use of Patient Restraints* (2020).

[45] *See* Lawrence A. Haber et. al., *Acute Care for Patients Who Are Incarcerated: A Review,* 179 JAMA Internal Medicine Rev. 1561, 1563 (2019)

[46] *See id.*

386.    The acts and omissions of Defendant CoreCivic, including but not limited to, failing to provide Roxsana with her prescribed medication(s), failing to provide Roxsana with prompt medical care, keeping Roxsana unnecessarily shackled during her hospitalization, and failing to comply with applicable federal rules, regulations, and contract requirements for the treatment of detained persons, despite Roxsana's visible illness and multiple requests for medical attention, breached its duty of care.

387.    It was foreseeable that failing to provide Roxsana her prescribed medication(s) and failing to provide her with immediate medical care would create an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

388.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

389.    Defendant CoreCivic's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

390.    Defendant CoreCivic is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of Defendant CoreCivic's employees throughout the time that Roxsana was in the custody and control of Defendant CoreCivic. Defendant CoreCivic's employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant CoreCivic's custody and control.

## COUNT FOURTEEN AGAINST DEFENDANT CORECIVIC
### NEGLIGENT TRAINING AND SUPERVISION

391.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

392.    Roxsana's aggressively developing illness while in the custody of CoreCivic presented a serious medical need. Roxsana's persistent symptoms of cough, phlegm, fatigue, vomiting, diarrhea, fever, and weight loss, were visibly apparent to people who are not medically trained, including to Defendant CoreCivic's employees.

393.    Employees of Defendant CoreCivic, who were charged with Roxsana's custody and care pursuant to Defendant CoreCivic's contract(s) with ICE, had a duty to ensure Roxsana was free from unreasonable risk of harm.  Defendant CoreCivic owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was placed in the CoreCivic's physical custody and control. In addition, Defendant CoreCivic owed Roxsana a heightened duty of care because it placed Roxsana in danger by failing to promptly conduct a medical assessment and medical care when she was in a severely vulnerable physical and emotional condition.

394.    Defendant CoreCivic breached its duty of care to Roxsana when its employees made Roxsana wait almost twelve hours before receiving medical attention after arriving at Cibola, despite the fact that she was experiencing the early stages of multiple organ failure. Defendant CoreCivic breached its duty of care to Roxsana when its employees made Roxsana sleep in the medical waiting wing on the floor from approximately 2:00 a.m. until the onsite physician came to work the next day around 7:30 a.m., rather than provide her with immediate medical care on May 16, 2018. Defendant CoreCivic further breached its duty of care to Roxsana by unreasonably keeping her shackled throughout her hospitalization in violation of its own binding standards for use of restraints, and delaying and obstructing medical providers' provision of emergency and life-saving care, causing her

severe pain, suffering, and injuries to her wrists and ankles from the unnecessary restraints. CoreCivic employees kept Roxsana shackled to her hospital bed for approximately four hours even after she was medically sedated, unconscious, and went into cardiac arrest on May 24, 2018, in defiance of her treating doctor's request to remove them. CoreCivic knew that its employees engaged in this excessive use of force, as every employee guarding Roxsana called "central" to receive permission from superiors each time they removed her restraints.

395.    CoreCivic employees were acting within the scope of their employment when they detained Roxsana and failed to provide her with immediate medical care, and when they kept Roxsana shackled to her hospital bed throughout her hospitalization, causing her additional physical injury and delaying and obstructing her receipt of medical care.

396.    Defendant CoreCivic breached its duty by negligently training and supervising its employees who failed to provide Roxsana with immediate medical assistance, despite her illness and rapidly deteriorating physical condition, and who kept her shackled to her hospital bed during her hospitalization, even when she was completely incapacitated and unconscious. Defendant CoreCivic failed to train and supervise its employees, who failed to follow the safety guidelines required of all companies that contract with ICE, who, as a result, repeatedly breached the duty of care owed to Roxsana.

397.    Defendant CoreCivic conducted inadequate management, training, and supervision of its employees, including failing to enforce required regulations, policies and contract provisions regarding the treatment and medical care of detained persons. Defendant CoreCivic was on notice of the need for more or different training and better supervision, as the deficiencies at Cibola—

particularly its medical care—were well documented when Roxsana was in CoreCivic's custody[47] and have since been documented by ICE.[48]

398.    Defendant CoreCivic knew or should have known that its inadequate training and supervision of its employees, including failing to enforce required policies, would create an unreasonable risk of harm to detained persons, like Roxsana, in its custody and control.

399.    Defendant CoreCivic knew or should have known that such acts and omissions were unlawful under ICE rules and state and federal law.

400.    Defendant CoreCivic's unlawful and repeated denial of medical care and unnecessary shackling of Roxsana by Defendant CoreCivic's employees who were charged with Roxsana's custody and care were the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, and, ultimately, death.

401.    As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana experienced severe and foreseeable

---

[47] *See, e.g.*, OFFICE OF DETENTION OVERSIGHT, *Performance-Based National Detention Standard Enforcement and Removal Operations ERO El Paso Field Office Cibola County Detention Center Milan, New Mexico January 9-11, 2018*, (Jan. 2018) https://www.ice.gov/doclib/foia/odo-compliance-inspections/cibolaCountyCorrectionalCenterComplianceInspectionMilanNmJan09_11_2018.pdf (last visited May 6, 2021) (reporting several deficiencies identified at Cibola to comply with the PBNDS including medical care and use of force and restraints from an unannounced inspection during January of 2018.); Seth Freed Wessler, *The Feds Will Shut Down the Troubled Private Prison in a 'Nation' Investigation, The facility is among several in which our reporting has uncovered dozens of deaths that involved substandard medical care,* The Nation (Aug. 15, 2016) https://www.thenation.com/article/archive/feds-will-shut-down-troubled-private-prison-in-nation-investigation/(last visited Apr. 26, 2021) (reporting on the Federal Bureau of Prisons (cancelling its contract with Defendant CoreCivic to house federal prisoners at Cibola in light of the chronic deficiencies of Cibola's medical care).

[48] DEPARTMENT OF HOMELAND SECURITY ICE HEALTH SERVICE CORPS, *Final Report of Findings* (the findings of an ICE investigation into Cibola's compliance with the PBNDS, noting several deficiencies in Cibola's medical care, including understaffing of licensed medical professionals, failure to timely provide comprehensive medical exams, and lack of training to respond to medical emergencies based on site visits conducted in May and December 2019).

physical and emotional pain and suffering, rapidly declining health, lost chance of survival, and ultimately, death.

402.    Upon information and belief, Defendant CoreCivic has not disciplined nor taken any corrective action against its employees for these unreasonable and unlawful acts and omissions. It was foreseeable and Defendant CoreCivic knew or should have known that such acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons, including Roxsana, in its custody and control.

403.    Defendant CoreCivic had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health rapidly deteriorated while in Defendant CoreCivic's custody and control. Defendant CoreCivic has engaged in similar acts of negligence with respect to individuals in its employees' care, custody, or control on occasions prior to Roxsana's custody.[49]

404.    Defendant CoreCivic's acts and omissions were intentional, wanton, malicious, and/or

---

[49] HUMAN RIGHTS WATCH, *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention*, (June 20, 2018), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration#_ftn222 (last visited May 8, 2021) (reporting the death of Igor Zyazin, who died on May 1, 2016 at Otay Mesa detention center, run by Defendant CoreCivic, after being held at San Luis Regional Detention Center run by Defendant LaSalle, where employees at both facilities failed to provide him with medical care, despite his documented heart condition and repeated complaints of chest pains and feeling ill.); *Estate of Cruz-Sanchez*, 2019 WL 4508571, at *6, *reconsideration denied*, No. 17-CV-569-AJB-NLS, 2020 WL 3868495 (denying defendants' motion for summary judgment of surviving wife's wrongful death claim for the death of her former husband, Gerardo Cruz-Sanchez, who died at Otay Mesa Detention Center on March 1, 2016 from pneumonia, after staff failed to provide him with medical care despite his inability to eat for a week and vomiting blood and repeated requests for medical attention. The Southern District Court of California found that Defendant CoreCivic had a duty to provide medical care to those in its custody and found that a material issue of fact existed as to whether a CoreCivic's employee had received adequate training to respond to medical emergencies because he admitted he could not remember).

exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

## COUNT FIFTEEN AGAINST DEFENDANT CORECIVIC
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

405.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

406.     When Roxsana finally arrived at Cibola on May 16, 2018, she was experiencing multiple organ failure. The following morning, when she was finally medically screened, Roxsana weighed a mere 89 pounds and was diagnosed with muscle wasting, severe dehydration, untreated HIV, fever, and cough. The examining medical provider noted Roxsana's tremor, low blood pressure of 81/61, rough breathing sounds, and increased white phlegm excreted in abnormally large quantities. Roxsana died on May 25, 2018, and a doctor from Cibola General hospital stated that the actions taken by the time Roxsana arrived at Cibola General hospital were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.

407.     Defendant CoreCivic's employees outrageously ignored Roxsana's dire health condition when they detained her at Cibola on May 16, 2018, making her wait almost twelve hours and forcing her to spend the night in the waiting area of the medical wing when she was experiencing the early stages of multiple organ failure and losing her mental capacity, rather than immediately provide her with urgent medical care when she arrived at the facility.  In addition, CoreCivic's employees cruelly kept Roxsana, who weighed 89 pounds and was extremely weak and emaciated, shackled in handcuffs on her ankles and wrists to her hospital bed throughout the entire duration of her hospitalization from May 17 through May 24, 2018, even when Roxsana was at times unconscious or otherwise unresponsive. Defendant CoreCivic kept Roxsana handcuffed even after she was medically paralyzed and went into cardiac arrest on May 24, 2018, hours before her death, and in direct

defiance of requests from her treating doctor to remove them. CoreCivic's employees who guarded Roxsana around the clock called "central" every time medical providers needed to remove her shackles to administer care, including emergency medical care, delaying and obstructing her receipt of this critical care.

408.    Defendant CoreCivic's cruel treatment caused Roxsana deep tissue injuries on her wrists, extreme emotional and physical suffering, and mental anguish.

409.    These acts and omissions by CoreCivic's employees were extreme and outrageous under the circumstances and constituted a conscious and/or reckless disregard for the severe emotional distress they caused Roxsana.

410.    As a direct and proximate cause of the malicious, wanton, reckless, and negligent acts and omissions of Defendant CoreCivic's employees, Roxsana experienced severe physical and emotional pain and suffering and mental anguish.

411.    Defendant CoreCivic is vicariously liable for the intentional infliction of emotional distress caused by its employees.  At all material times, CoreCivic employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

412.    Defendant CoreCivic's employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life, and should be punished with an award of punitive damages.

### COUNT SIXTEEN AGAINST DEFENDANT U.S.
#### NEGLIGENCE

413.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

414.    At all times material to the SAC, Defendant U.S. was charged with Roxsana's custody

91

and care and had a duty to ensure Roxsana was free from unreasonable risk of harm.

415.    Defendant U.S. owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was taken into the physical custody and control by DHS, CBP, and ICE, all agents of the U.S. Defendant U.S. further placed Roxsana in danger by denying her adequate medical care and choosing to transport and detain her when she was in a severely vulnerable physical and emotional condition.

416.    Defendant U.S. also owed Roxsana a duty of care as a common carrier pursuant to California Civil Code Section 2100, Restatement (Second) Torts Section 314A(4), and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

417.    Defendant U.S.'s employees were acting in the scope of their employment throughout the time Roxsana was in the custody and control of DHS, CBP, and ICE.  Roxsana's symptoms of cough, fatigue, weakness, excessive phlegm, and fever were so severe that her illness was obvious to Defendant U.S.'s employees. Defendant U.S.'s employees knew or should have known that Roxsana was HIV-positive, which if left untreated would likely result in her deteriorating physical health, and that she was also at risk for contracting additional illnesses and/or developing complications of her existing medical condition. Furthermore, Roxsana and her fellow detained asylum-seekers' repeated requests to U.S. employees for medical help for Roxsana further evidenced the urgency of Roxsana's deteriorating health and her need of medical assistance. It was foreseeable that failing to provide Roxsana with a timely and adequate medical assessment before transporting her, failing to provide her prescribed medication, failing to provide her with HIV medication, failing to provide an adequate medical summary and medications to accompany Roxsana during transport through an arduous journey across four states, and failing to provide Roxsana with adequate food, water, opportunity to rest, restroom access, and medical care, despite evident and noticeable signs of illness, would create

an unreasonable risk of Roxsana's physical condition deteriorating, resulting in her death.

418.   Roxsana's deteriorating physical and emotional condition and her aggressively developing illness while in the care of Defendant U.S. presented a serious and obvious medical need. Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when it (i) failed to provide Roxsana with a medical exam within 12 hours of being taken into custody , and in only doing so after the other asylum seekers at the port of entry engaged in civil disobedience, in violation of U.S. CUSTOMS AND BORDER PROTECTION, *National Standards on Transport, Escort, Detention, and Search* Section 4.3[50], (ii) chose to deny Roxsana access to a Spanish interpreter during her medical assessment at Scripps and throughout her interactions with treating physicians, in violation of Sections 1.7[51] and 4.13[52] (iii) provided incomplete, inaccurate, and untimely information to Scripps medical providers regarding Roxsana's medical history and physical condition, (iv) chose to ignore the recommendations of the Scripps physician and deny Roxsana necessary medical testing, in violation of Section 3.1[53] (v) failed to timely disclose Roxsana's HIV-positive status to the Scripps physician, and (vi) acted as though the

---

[50] Section 4.3 requires that upon a detainee's entry into any CBP hold room, "[o]bserved or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner." CUSTOMS AND BORDER PROTECTION, *National Standards on Transport, Escort, Detention, and Search*, (2015).

[51] *Id.* at Section 1.7 requires CBP to provide reasonable accommodations for a detainee's known or reported mental, physical and/ or other special needs and requires "[a]ll instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend."

[52] *Id.* at Section 4.13 provides in pertinent part: "Reasonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations." "Extra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms (such as age and/or developmentally

appropriate communication, translation/ interpretation services).

[53] *Id.* at Section 3.11 requires CBP to follow the medical decisions made by medical practitioners, including as to medical release or fitness for travel.

initial conditional clearance for Roxsana to travel and be detained provided by the Scripps doctor was valid when it knew or should have known that such clearance was contingent and conditioned on additional testing and was furthermore based on incomplete and/or inaccurate information.

419. Defendant U.S. also acted unreasonably and breached its duty of care to Roxsana when it (i) failed to follow the recommendations of the Scripps physician to adequately screen Roxsana for tuberculosis or any co-infections, (ii) failed to provide her with HIV medication, and (iii) instructed the Contractor Defendants to likewise violate the binding standards concerning medical screenings, testing, and care. No CBP, ICE, or DHS employee ever completed a laboratory evaluation for Roxsana or took any steps to measure Roxsana's CD4 count, viral load, or complete a blood count.  No CBP, ICE, or DHS employee ever assessed Roxsana's levels of nutrition and hydration. Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees kept Roxsana shackled for the duration of her medical exam at Scripps in violation of Section 4.44[54] and prevailing standards of medical care.[55]

420. Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when it failed to complete a comprehensive medical/social/family history for Roxsana or screen her for co-infections in violation of the prevailing standards of care for HIV-positive patients.

421. Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees failed to provide Roxsana, as a person with limited English proficiency, with (i) DHS forms

---

[54] *Id.* at Section 4.44 requires CBP to use restraints in a "humane and professional" manner.

[55] *See* AMERICAN PSYCHOLOGICAL ASSOCIATION, *End the Use of Restraints on Incarcerated Women and Adolescents during Pregnancy, Labor, Childbirth, and Recovery* (2017) (explaining that the use of restraints interferes with physical examination maneuvers); Hilary Pickles et. al., *Physical Restraint and the Protection of the Human Rights of Immigration Detainees in Hospitals*, 15 Clinical Medicine 334, 334-36 (2015) (cautioning that the use of nonmedical restraints should be avoided unless absolutely necessary in light of the documented dangers of restraints to patients receiving care.)

in Spanish or (ii) language interpretation as required by law, thereby obstructing Roxsana's medical care and ability to understand her rights or effectively advocate for herself.

422.    Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees returned Roxsana to the CBP facility at the Port-of-Entry without supportive care, such as intravenous fluids and medical monitoring, despite her evident illness and alarming vital signs, which under prevailing medical standards clearly indicated that she should be hospitalized and was in no state to be safely detained or transported.

423.    Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees detained Roxsana at the CBP facility at the Port-of-Entry for six days when the facility was only authorized to detain people seeking entry into the U.S. for up to 72 hours. Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees served her spoiled food causing her pain, and exacerbation of her condition, including ongoing vomiting and diarrhea in violation of Section 4.13.[56]

424.    Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when its employees obstructed her right to continuity of medical care by failing to provide the required medical documentation necessary to transport and detain her in violation of Sections 2.10[57] and 2.4[58] of the

---

[56] *Id.* at Section 4.13 requires food and water should never be used as a reward or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled): "CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability." "Reasonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations." "Extra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms (such as age and/or developmentally appropriate communication, translation/ interpretation services)."

[57] *Id.* at Section 2.10 which requires "officers/agents must ensure that all appropriate documentation accompanies the detainee including all appropriate medical records and medication…."

[58] *Id.* at Section 2.4 which requires CBP, prior to transporting a detainee, to conduct a "transport assessment to evaluate each detainee's safety, … medical or mental health issues and level of risk to

applicable CBP standards. Roxsana's medical summary, which was created by U.S. employees and was supposed to accompany her throughout her transport from California to Milan, New Mexico, did not mention the medications prescribed to Roxsana or any of the follow up medical care recommended by the DHS on-site physician or by Scripps medical providers on May 11, 2018.

425.     Defendant U.S., through CBP and ICE, chose to transport Roxsana in the condition she was in, failed to provide her with adequate medical assessments and care prior to transport, denied her access to medication(s), and impaired or obstructed Roxsana's access to necessary medical care while in transport by failing to ensure that she traveled with adequate medication, an accurate medical summary, adequate food, water, and bathroom facilities, and access to medical care, despite her obvious suffering, weak physical condition, and serious medical needs in violation of several CBP Standards.[59]

426.     ICE contracted with all the Contractor Defendants for secure and safe transportation and/or detention of Roxsana as part of the STP to facilitate access to the USCIS fear-based interview

---

themselves…." "Officers/Agents assigned transport or escort duties must be informed of any known adverse assessment pertaining to a detainee being transported or escorted." "Officers/Agents must be alert to medical symptoms such as coughing, fever, diarrhea, rashes or emaciation, in addition to obvious wounds, injuries, cuts, bruising or bleeding, heat related injury or illness, and dehydration. Any observed or reported injury or illness must be reported, and **appropriate medical care must be provided** or sought in a timely manner." Finally, "officers/agents must be alert to non-verbal cues exhibited by detainees that might indicate that the detainee is in mental or physical distress."

[59] *Id*.; Section 2.9 which requires CBP to take immediate action "[i]f an emergency situation is life-threatening." "If a detainee becomes ill or injured prior to boarding the vehicle or while in transit, officers/agents must alert the receiving office. If deemed appropriate, emergency medical services must be notified." Section 4.10 requires that [e]mergency medical services will be called immediately in the event of a medical emergency (e.g., heart attack, difficulty breathing) and the call will be documented in the appropriate electronic system(s) of record." "Medication … in the detainee's possession during general processing in a properly identified container with the specific dosage indicated, must be self-administered under the supervision of an officer/ agent." "At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation."

program and the EOIR adjudicative program, as required by law.

427.    Roxsana was entitled to the benefit of a fair and safe fear-based interview process through USCIS and an adjudicative proceeding to either pursue her claims for relief as substantiated by an asylum officer or obtain Immigration Judge review of a negative determination. She was also entitled to the benefit of safe transportation and detention through participation in ICE's STP, which was created to facilitate access to these immigration interview and adjudicative programs.

428.    The negligent and wrongful acts and omissions of U.S. employees described herein occurred under circumstances where the U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred as though it were a private person.

429.    Defendant U.S. acted unreasonably and breached its duty of care to Roxsana when it chose to transport and detain her in the condition she was in, failed to provide her with adequate medical assessments prior to transport, chose to transport her without HIV medication or her prescribed medications and the required medical documentation, denied her access to adequate medical care before transport, instructed those responsible for transporting Roxsana that they did not need to provide her with HIV medication, failed to provide her with medical care when she was detained at El Paso SPC, despite her dire health, and failed to comply with applicable federal rules, regulations, and contractual requirements for the treatment of detained persons when its employees transported Roxsana from CBP to ICE custody and then into the physical custody of ICE contractors, including the Contractor Defendants.

430.    It was foreseeable that these acts and omissions of Defendant U.S.'s employees would increase the risk of harm to Roxsana and cause her harm, including mental anguish, pain and suffering, exacerbation of her illness, deterioration of her physical condition, loss of chance of survival, and ultimately, death.

431.     As a direct and proximate cause of the intentional, malicious, reckless, and negligent acts and omissions of Defendant U.S.'s employees, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

432.     Defendant U.S.'s employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life.

433.     Defendant U.S. is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of Defendant U.S.'s employees throughout the time that Roxsana was in the custody and control of Defendant U.S. Defendant U.S.'s employees were aided in agency to commit such acts against Roxsana by their total control over, care, and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

## COUNT SEVENTEEN AGAINST DEFENDANT U.S.
### NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION

434.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

435.     Roxsana's aggressively developing illness while in the custody of Defendant U.S. presented a serious medical need. Roxsana's illness was obvious to Defendant U.S.'s employees because she was exhibiting persistent and worsening symptoms of cough, fatigue, weakness, vomiting, excessive phlegm, and fever. Furthermore, Roxsana's and her fellow asylum-seekers' repeated requests to U.S.'s employees for medical help for Roxsana further evidenced the urgency of Roxsana's deteriorating health and her need of urgent medical assistance.

436.     Employees of Defendant U.S., who were charged with Roxsana's custody and care, had a duty to ensure Roxsana was free from unreasonable risk of harm when they detained her and arranged to transport her across four states from California to New Mexico. Defendant U.S.'s

98

employees also owed Roxsana a heightened duty of care to protect her from harm because of the special relationship created when Roxsana was taken into Defendant U.S.'s physical custody, care, and control. In addition, Defendant U.S. owed Roxsana a heightened duty of care because it harmed Roxsana and/or placed Roxsana in significant risk of harm by choosing to transport her when she was in an obvious and severely vulnerable physical and emotional condition. Defendant U.S. also owed her a duty of care as a common carrier pursuant to California Civil Code Section 2100, Restatement (Second) Torts Section 314A(4) and as an entity involved in government prisoner transport pursuant to California Government Code Section 845.6.

437.    The negligent and wrongful acts and omissions of Defendant U.S. as described herein occurred under circumstances where Defendant U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred as though it were a private person.

438.    Defendant U.S.'s negligence included the failure to adequately hire, train, and supervise its employees, including : (i) how to appropriately and timely respond to the emergent medical needs of detained persons, including Roxsana; (ii) how to appropriately screen individuals placed in their custody and care for fitness of travel before clearing any detained person for transport; (iii) the necessity of providing adequate interpreter services; (iv) how to provide adequate follow-up medical care for ill and medically vulnerable detained persons; (v) the necessity and importance of providing language interpretation and DHS forms in Spanish as required by law; (vi) appropriate and professional treatment of detained asylum seekers, including Roxsana and the other asylum seekers she was travelling with; (vii) the provision of adequate food, water, medication (including its own protocols for providing HIV medication to HIV positive detainees), and (viii) the necessity and importance of securing and/or providing the documentation required to transfer any detained person. Defendant U.S. failed to hire competent employees who followed the safety guidelines required of all

ICE and CBP employees, negligently retained them, and/or failed to adequately train, manage, supervise and discipline the employees who repeatedly breached the duty of care they owed to Roxsana. These employees failed to summon medical care, despite Roxsana's blatant and obvious illness and deteriorating physical condition, obstructed Roxsana's medical examination and treatment, failed to provide adequate follow-up medical care, despite Roxsana's known HIV-positive status and the recommendations of the treating Scripps physician, failed to provide adequate food, water, and medication access, exhibited animus to Roxsana and the other asylum seekers, and failed to provide the required transfer documentation, impairing Roxsana's ability to receive medical care during transport and exacerbating her weakness, illness, and suffering.

439.     These U.S. employees cruelly refused to respond to repeated complaints by Roxsana and other detained persons that Roxsana was ill and her condition was significantly and rapidly deteriorating, ignored Roxsana's inability to eat or to not vomit what little food she did consume, instructed those responsible for her transport that they did not need to provide her with HIV or any other medication, and further intentionally or recklessly lowered temperatures in the "Ice Box" holding facility in retaliation to the complaints of detained persons, thus exacerbating Roxsana's mental anguish, suffering, and physical health.

440.     Defendant U.S. breached its duty of care to Roxsana by failing to use ordinary care in hiring, training, managing, and supervising its employees who were responsible for Roxsana while she was in DHS custody, including her access to food, water, medication, and medical care. Defendant U.S. also failed to use ordinary care in enforcing the regulations, policies, and contract provisions described herein regarding detention, transfer, and transport of detainees, including pre-transport fitness for travel assessments, the provision of adequate food, water, medication(s), medical care, and responding to the medical needs of detained persons, including Roxsana, during their detention and

transport.

441.     Defendant U.S.'s employees were acting within the scope of their employment when they refused to provide Roxsana with medical care, despite her obvious illness and deteriorating physical condition, failed to provide adequate follow up medical care, despite her known HIV-positive status and the recommendations of the treating Scripps physician, failed to provide adequate food, water, and medication access, and failed to provide the required transfer documentation, impairing Roxsana's ability to receive medical care during detention and transport and exacerbating her weakness, illness, and suffering.

442.     Defendant U.S. knew or should have known that its inadequate hiring, retention, training, and supervision of its employees, including its failure to enforce required policies, would create an unreasonable risk of harm to detained persons, like Roxsana, in its custody, care, and control.

443.     Defendant U.S. knew or should have known that such acts and omissions were unlawful under ICE policies and the law of the state in which such acts and omissions occurred, among other applicable state and federal laws, rules, and regulations.  Defendant U.S. knew or should have known that its employees who detained and transported detained persons did in fact cause harm, or were likely to cause harm, to them because Defendant U.S. failed to provide necessary interpreter services, adequate food, water, medical care, medication access, and required transfer documentation, failed to sufficiently train and supervise these employees, failed to address the conduct of its employees that denied Roxsana necessary medical treatment, interpreter services, adequate food, water and medication, and failed to address the obvious and notorious abuse of authority by its employees. By failing to take any action, Defendant U.S. ratified such cruel, inhumane behavior.

444.     Defendant U.S.'s repeated refusals to provide medical care and the basic necessities for Roxsana's safekeeping constituted intentional, reckless, and negligent disregard for Roxsana's life.

The unlawful and repeated denial of medical care by Defendant U.S.'s employees, who were charged with Roxsana's custody and care, was the actual and proximate cause of Roxsana's foreseeable severe pain, suffering, rapidly declining health, loss of chance of survival, and, ultimately, death.

445.    Defendant U.S. had a pattern and practice of endorsing the negligent acts and omissions of its employees by failing to conduct thorough and objective reviews and/or enforcement of corrective measures when a detained person's health deteriorated while in Defendant U.S.'s custody and control. Defendant U.S. has engaged in similar acts of negligence with respect to individuals in its employees' care, custody, or control on occasions prior to Roxsana's custody and transport.[60]

446.    Upon information and belief, Defendant U.S. has not disciplined nor taken any corrective action against its employees for these unreasonable and unlawful acts and omissions. Defendant U.S. knew or should have known that its employees acts and omissions were unlawful and would create and unreasonable risk of harm to detained persons, including Roxsana, in its custody, care, and control.

447.    Defendant U.S.'s acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life.

### COUNT EIGHTEEN AGAINST DEFENDANT U.S.
#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

448.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

449.    Defendant U.S.'s employees outrageously denied Roxsana access to the basic

---

[60] *See, e.g.*, U.S. House of Representatives Committee on Homeland Security Majority Staff Report *ice detention facilities Failing to Meet Basic Standards of Care*, (Sept. 21, 2020) https://homeland.house.gov/imo/media/doc/Homeland%20ICE%20facility%20staff%20report.pdf (last visited May 8, 2021) (finding widespread and chronic deficiencies of detention centers to meet required standards and the failure of DHS and ICE to utilize the oversight tools available).

necessities of adequate medical care, medication, food, and water while she was in CBP and ICE custody. Defendant U.S. repeatedly denied the requests of Roxsana and other detained persons for medical care for Roxsana and ignored Roxsana's obvious and serious medical needs.

450.    When she was taken into CBP custody, Roxsana made a request to U.S. employees to see a doctor for an infection. Roxsana's request to see a doctor was ignored.

451.    While detained at the holding facility known as the "Ice Box," Roxsana and the other transgender asylum seekers slept on the ground.

452.    After being placed in the "Ice Box," Roxsana's health visibly declined. Roxsana coughed so much that she could not breathe properly and had trouble sleeping. Roxsana vomited regularly and had nasal drainage and green phlegm.

453.    While detained in the "Ice Box," Roxsana complained to employees of Defendant U.S. that the food she was given caused her abdominal pain, diarrhea, and vomiting. U.S. employees at the "Ice Box" ignored Roxsana's complaints of pain and illness. Roxsana and the other detained transgender asylum seekers were given an unreasonable 3-5 minutes to eat the entirety of their meal at each mealtime and, on at least one occasion, an employee of Defendant U.S. threw food at the asylum-seekers rather than handing it to them.

454.    After the second day that she was detained in the "Ice Box," Roxsana was unable to eat, as she could not hold any food in her stomach due to her chronic vomiting and diarrhea, and could only tolerate drinking juice. U.S. employees ignored Roxsana's inability to eat. One U.S. employee yelled at Roxsana and the other transgender asylum seekers, "Fucking queers, be quiet."

455.    Defendant U.S.'s employees at the "Ice Box" ignored the detained persons' complaints about the severely cold temperatures, Roxsana's poor health, and the visible and serious signs of Roxsana's physical deterioration requiring immediate medical intervention.

456.    Defendant U.S.'s employees verbally abused and harassed the detained persons, including Roxsana, slamming doors in their faces, telling them words to the effect of "You shouldn't have come to this country if you're sick. It's not our responsibility to take care of you," and further intentionally or recklessly lowering the already unbearably cold temperature in the facility in retaliation to the complaints of detained persons.

457.    It was only after the other detained persons staged a hunger strike on Roxsana's behalf and refused to eat that CBP officers finally took Roxsana to receive medical attention.

458.    When Roxsana was finally taken to Scripps, CBP officers outrageously delayed and obstructed Roxsana's medical care by failing to provide an interpreter, providing incomplete, inaccurate, and untimely information to Scripps medical providers regarding Roxsana's medical history and physical condition, including failing to timely disclose Roxsana's HIV-positive status, and by keeping her in shackles and restrained throughout her medical exam—a practice not customary for medical examinations of persons in ICE custody. CBP employees further outrageously chose to ignore the recommendations of the treating Scripps physician and denied Roxsana necessary follow-up medical care and proceeded as though the initial conditional clearance for Roxsana to travel provided by the Scripps doctor was valid, when CBP employees knew or should have known that it was based on incomplete and inaccurate information and was contingent and conditioned on additional follow-up medical care.

459.    Upon returning to the "Ice Box" following her visit to Scripps Hospital, Defendant U.S. outrageously failed to provide Roxsana with adequate follow-up medical assessments and treatment prior to transport, denied or otherwise impaired her access to the medication that was prescribed by the doctor she had just seen at Scripps, and further impaired Roxsana's access to medical treatment while in transport by failing to ensure that she traveled with adequate medication, an

accurate medical summary, and adequate food, water, bathroom facilities, and access to medical care, despite her obvious suffering, weak physical condition, and serious medical needs.

460.    The extreme and outrageous conduct by U.S. employees constituted reckless disregard for the severe emotional distress they caused Roxsana.

461.    The negligent and wrongful acts and omissions of U.S. employees described herein occurred under circumstances where Defendant U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred as though it were a private person.

462.    As a direct and proximate cause of Defendant U.S.'s employees' malicious, wanton, reckless, and negligent acts, Roxsana experienced severe physical and emotional pain and suffering, and mental anguish.  On multiple occasions, Roxsana confided in other caravan members that she did not believe she would survive in CBP and ICE custody.

463.    Defendant U.S. is vicariously liable for the intentional infliction of emotional distress caused by its employees.  At all material times, Defendant U.S.'s employees were aided in agency by the substantial power and authority afforded to them to control almost every aspect of Roxsana's life while she was in their custody and control.

### COUNT NINETEEN AGAINST DEFENDANT U.S.
#### FALSE IMPRISONMENT

464.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

465.    The detention by CBP and ICE became unlawful and unreasonable as soon as CBP and/or ICE knew or should have known that Roxsana was medically unfit for detention and transportation.

466.    Roxsana was subjected to nonconsensual, intentional confinement by the DHS.

467.    DHS and its agency components, CBP and ICE, had no lawful privilege to detain and

transport Roxsana once U.S. employees knew or should have known that Roxsana was medically unfit for detention and transportation. DHS acted unreasonably in continuing to detain and transport Roxsana once U.S. employees knew or should have known that Roxsana was medically unfit for detention and transportation.

468.    The negligent and wrongful acts and omissions of U.S. employees described herein occurred under circumstances where the U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred as though it were a private person.

469.    U.S. employees working for DHS, CBP, and/or ICE who were responsible for detaining and transporting Roxsana are law enforcement officers under 28 U.S.C.A. Section 2680(h), pursuant to 8 U.S.C.A. Section 1357 and 8 C.F.R. Section 287.1(e), and were acting within the scope of their employment.   In addition, their conduct was intentional and not an exercise of any discretionary authority.

470.    On or around May 11, 2018, a CBP law enforcement officer met with Roxsana to perform a health screen to determine whether Roxsana should be detained in general population in ICE. This U.S. employee failed to use an interpreter to communicate with Roxsana, who only spoke Spanish. Despite this fact, this U.S. employee completed an ICE Health Services Corps in Processing Health Screening Form for Roxsana. This U.S. employee documented that Roxsana was HIV positive, but wrongly entered "no" for all other medical and mental health questions, and wrongly indicated that she was fit for placement in general population based on this incomplete and inaccurate information. This clearance for placement in general population was invalid and directly contradicted by the findings of the DHS onsite physician.

471.    Because of Roxsana's HIV positive status, the onsite physician, another U.S. employee, met with Roxsana. This DHS physician noted that Roxsana reported that she was diagnosed with HIV

106

five months earlier and suffered weight loss, recurring vomiting, and diarrhea for the past month. This physician further documented that Roxsana appeared emaciated and ill, that she complained of a headache and cough, had an elevated temperature of 99.5 degrees Fahrenheit, and was tachycardic with a pulse of 134.

472.    This DHS physician found that Roxsana was not medically fit for transportation or to be moved to ICE general population detention due to her untreated HIV, fever, and chills. The DHS physician thus referred Roxsana to Scripps Hospital to rule out the possibility of tuberculosis, which would prevent her from being able to travel. This physician further referred Roxsana to Scripps to be assessed for sepsis, a life-threatening condition, and to assess whether she had pneumonia or bronchitis.

473.    The medical records show that there was little to no direct communication between Roxsana and the Scripps medical providers. Due to the interference of the CBP officers who failed to provide Roxsana with an interpreter, Scripps medical providers assessed Roxsana based on incomplete, inaccurate, and untimely information.

474.    The Scripps physician, Beverly Harrell Bruder, M.D., completed her assessment of Roxsana without even discovering that Roxsana was HIV-positive. Roxsana's HIV status was only documented as an addendum to Dr. Bruder's examination notes. By the time Dr. Bruder learned that Roxsana was HIV-positive, Roxsana had already been conditionally medically cleared for detention and transport based on the incomplete information provided by CBP employees.

475.    DHS medical providers knew or should have known that an x-ray, which is what Scripps medical providers solely relied upon, is an insufficient diagnostic tool to rule out tuberculosis in patients who are HIV-positive. Rather, a blood or sputum test is required to accurately rule out tuberculosis in patients with HIV. Thus, the statement by the Scripps physician clearing Roxsana for

detention and transport was based on incomplete and inaccurate information rendering that initial clearance invalid. No adequate screening for tuberculosis was ever conducted prior to Roxsana being transported from California to New Mexico.

476.    Defendant U.S. employees, including CBP officers, knew or should have known that the initial conditional medical clearance for travel from Scripps was invalid because it states in Roxsana's medical records that the x-ray performed was insufficient to rule out tuberculosis. Nevertheless, CBP continued to detain Roxsana and transferred her to ICE ERO custody on May 13, 2018.

477.    As a direct and proximate cause of the unlawful and unreasonable continued detention and transport of Roxsana after Defendant U.S. knew or should have known that she was medically unfit for detention and transport, Roxsana suffered severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, lost access to the adjudicative actions of her asylum claim to which she was entitled, lost the chance for her condition to improve and for her to survive and, ultimately, caused her death.

478.    Defendant U.S.'s employees' acts and omissions were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life.

479.    Defendant U.S. is vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of Defendant U.S.'s employees throughout the time that Roxsana was in the custody and control of Defendant U.S. Defendant U.S.'s employees were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in Defendant's custody and control.

### COUNT TWENTY AGAINST DEFENDANTS U.S. AND MTC
#### VIOLATIONS OF CALIFORNIA CIVIL RIGHTS LAWS

480.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing

paragraphs.

481.    At all material times, Defendants U.S. and MTC were charged with Roxsana's custody and care and had a duty to ensure Roxsana was free from unreasonable risk of harm.

482.    Defendants U.S. and MTC violated Roxsana's rights under the California Constitution, Art. 1, § 1 Cal. Civil Code § 43, Cal. Civil Code § 51 (the Unruh Civil Rights Act), Cal. Civil Code § 52.1 (the Bane Civil Rights Act), and Cal. Gov. Code Section 845.6.  Roxsana's rights to protection from bodily restraint, harm, and insult; freedom from discrimination on account of her national origin, immigration status, transgender status, actual and/or perceived disabilities, and medical condition; freedom from unlawful detention; provision of all accommodations and services appropriate to her national origin, immigration status, transgender status, disabilities, and medical condition; and the provision of necessary medical care were clearly delineated and plainly applicable under the circumstances.

483.    The negligent and wrongful acts and omissions of Defendant U.S. described herein occurred under circumstances in which Defendant U.S. would be liable to Plaintiff in accordance with the law of the place where the acts or omissions occurred as though it were a private person.

484.    The negligent and wrongful acts of Defendants U.S. and MTC described herein unlawfully restrained and harmed Roxsana in violation of her rights under Cal. Civ. Code § 43.

485.    The negligent and wrongful acts of the employees of Defendants U.S. and MTC described herein unlawfully discriminated against Roxsana and denied her accommodations, advantages, facilities, privileges, and services to which she was entitled, which she was denied on account of her sex, citizenship, immigration status, color, national origin, ancestry, race, transgender status, primary language, actual and/or perceived disability, and medical condition in violation of her rights under Cal. Civ. Code § 51 (the Unruh Civil Rights Act) and Cal. Civ. Code § 52.

486.     The negligent and wrongful acts of Defendants U.S. and MTC described herein unlawfully interfered and attempted to interfere with Roxsana's California constitutional and statutory rights in violation of the Bane Act, Cal. Civil Code § 52.1 and Cal. Civ. Code § 52.  Defendants U.S. and MTC interfered with Roxsana's rights secured by state constitutional and statutory prohibitions and guarantees through intimidation and coercion inherent in Roxsana's false imprisonment and complete dependence on the U.S. and MTC for medical care and the necessities for survival throughout the time that she was in the custody and control of DHS. The negligent and wrongful acts of Defendants U.S. and MTC as described herein caused the unlawful failure to furnish, obtain, and/or summon immediate and necessary medical care for Roxsana while she was in the custody of Defendants U.S. and MTC in violation of Cal. Gov't. Code § 845.6.

487.     The violation of Roxsana's rights secured by California's Constitution and statutes as set forth in this SAC by Defendants U.S. and MTC were the direct and proximate cause of Roxsana suffering, severe and foreseeable physical and emotional pain and suffering, rapidly declining health, deterioration of her physical condition, the lost chance for her condition to improve, the lost chance for her to survive and, ultimately, death.

488.     The acts and omissions of the employees of the U.S. and MTC were intentional, wanton, malicious, and/or exhibited a deliberate and conscious disregard for Roxsana's rights and life.

489.     Defendants U.S. and MTC are vicariously liable for the intentional, malicious, reckless, and negligent acts and omissions of their respective employees throughout the time that Roxsana was in the custody and control of Defendants U.S. and MTC. The employees of Defendants U.S. and MTC were aided in agency to commit such acts against Roxsana by their total control over and custody of Roxsana and by her extreme physical and emotional vulnerability while in the custody and control of Defendants U.S. and MTC.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

1.     Enter judgment in favor of Plaintiff and against all Defendants;

2.     Award Plaintiff compensatory damages against all Defendants and punitive damages against the Contractor Defendants in amounts to be determined at trial;

3.     Award Plaintiff reasonable attorneys' fees and costs; and

4.     Award Plaintiff such further relief as the Court deems just, equitable, and appropriate.

## JURY DEMAND

Plaintiff hereby demands that the claims in this matter be tried before a jury.


Respectfully submitted,

/s/ DANIEL YOHALEM
Daniel Yohalem
Attorney at Law
1121 Paseo de Peralta
Santa Fe, New Mexico  87501
Phone: 505-983-9433  Fax 505-989-4844

Katherine Murray
Attorney at Law
P.O. Box 5266
Santa Fe, New Mexico 87502
Phone: 505-670-3943

Dale Melchert *Pro Hac Vice*
Lynly Egyes *Pro Hac Vice*
Transgender Law Center
P.O. Box 70976
Oakland, CA 94612

Kimberly A. Evans *Pro Hac Vice*
Irene Lax *Pro Hac Vice*
Carla Agbiro *Pro Hac Vice Forthcoming*
Grant & Eisenhofer P.A.
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 622-7086

*Attorneys for Plaintiff*