# <u>EXHIBIT A</u>

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Homeland Security; Immigration and Customs Enforcement; Customs and Border Protection; Enforcement and Removal Operations | Joleen K. Youngers as personal representative of the estate of Roxsana Hernandez<br>228 Griffin St.<br>Santa Fe, NM 87501 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 02/18/1985 | Single | 05/09/2018 | 05/25/2018 | |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

See attached.

9.                                                                  PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10.                                                          PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attached.

11.                                                                    WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See attached. | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| | | 15,000,000 | 15,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *[signature]* | 510-407-5367 | 11/22/19 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes  ☒ No   | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

19. Do you carry public liability and property damage insurance?   ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in Item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

I.    Submit to Appropriate Federal Agency:

Office of the General Counsel
U.S. Department of Homeland Security
Washington, D.C. 20528

U.S. Customs & Border Protection
Office of the Chief Counsel
1300 Pennsylvania Avenue
N.W. Washington, D.C. 20229

U.S. Immigration & Customs Enforcement
Office of the Principal Legal Advisor
500 12th Street, S.W.
Mail Stop 5900
Washington, D.C. 20536

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

## II.   OVERVIEW

Claimants, Jenny Margoth Hernandez Rodriguez,[1] the sister of Roxsana Hernandez, on behalf of Roxsana's surviving siblings, and Joleen K. Youngers,[2] the Administrator of Roxsana's Wrongful Death Estate,[3] submit this administrative tort claim for damages arising out of Roxsana's arrest, detention, gross mistreatment in custody, and death as a result of the tortious acts and omissions described herein.

## III.   FACTS

The following section sets forth the facts Claimants have been able to gather to date through interviews, public records requests, and open-source reporting. It does not, however, encompass the full universe of facts Claimants would present at trial. Ongoing litigation under the Freedom of Information Act ("FOIA") in the Northern District of California, and New Mexico's Inspection of Public Records Act ("IPRA") in State Of New Mexico First Judicial District Court Santa Fe County, continues to yield additional documentary evidence on a rolling basis.[4]  In an effort to facilitate the agency's pre-suit analysis of their claims, Claimants will, upon request, provide additional Bates-stamped documents and supporting evidence to substantiate the facts laid out below. While Claimants have made every effort to identify all legally relevant facts necessary to allow the United States to administratively process their claims, they expressly reserve the right to supplement those facts should they be forced to file their claims in federal court, and to expand upon the legal claims outlined in **Section IV.**

### A.   THE LIFE AND DEATH OF ROXSANA HERNANDEZ

Roxsana Hernandez Rodriguez (hereinafter "Roxsana") was born in Comayagua, Honduras to a family that makes and sells tortillas for a living. She had many siblings and cared tremendously about her family and did her best to support them.

From an early age Roxsana knew she was a girl despite being assigned the sex of "male" at birth. This became clear to her family when Roxsana was around the age of 11. As a transgender[5]

---

[1] Authorization to File Administrative Tort Claim Jenny Margoth Hernandez Rodriguez, annexed hereto as **Exhibit A.**

[2] Authorization to File Administrative Tort Claim Joleen K. Youngers, annexed hereto as **Exhibit B.**

[3] Order Appointing Joleen K. Youngers as Personal Representative of the Wrongful Death Estate of Roxsana Hernandez annexed hereto as **Exhibit C.**

[4] *Transgender Law Center et. al v. Immigration and Customs Enforcement et. al,* No. 3:19-cv-03032-SK (N.D.C.A. filed May 31, 2019); *Joleen K. Youngers v. CoreCivic,* D-101-CV-2019-02799 (Filed 10/23/19 in the New Mexico First Judicial District Court Santa Fe County).

[5] "Transgender" is an adjective that refers to a person whose gender does not correspond with the sex assigned at birth. For example, a transgender woman has the persistent internal sense that she is a woman despite being assigned the sex of "male" at birth. Prevailing medical and social science literature and research indicates that supporting transgender people to live authentically in accordance with their gender

2

woman, Roxsana adopted the feminine name of "Roxsana" and used feminine titles and pronouns. She dressed herself and styled her hair to reflect her true gender.

Despite surviving brutal violence, including being kidnapped and shot by one of the most dangerous Mexican cartels, Roxsana remained a very hopeful and strong person. She was known for her generosity both materially, always sharing her food and belongings, and in spirit, offering words of comfort and faith.[6] Even during her last days living, while she was incredibly ill, she lent great moral support and courage to the other transgender women detained alongside her.[7]

In 2018, Roxsana was forced to leave her beloved family in Honduras and flee to the United States. As a transgender woman Roxsana faced high levels of violence in her home country. Approximately five months before joining a caravan of migrants from Central and South America, Roxsana was raped and forced into prostitution against her will by several members of MS-13 in Siguatepeque, Honduras.[8] She reported she had to flee because they were searching for her.[9] "Trans people in my neighborhood are killed and chopped into pieces, then dumped inside potato bags," Roxsana told reporters before her death.[10] She joined the caravan of migrants in Spring 2018 for this reason to seek asylum in the United States.

---

identity is critical to improving health and quality of life outcomes and to alleviate the symptoms of Gender Dysphoria, a diagnosis recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition, that many transgender people live with. *See, e.g.,* Cecilia Dhejne et al., Mental Health and Gender Dysphoria: A review of the literature, 28 International Review of Psychiatry 44 (2016) (finding that access to transition-related care results in reduction of dysphoria and improved psychological health outcomes); Annelou de Vries et al., Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment, 134 Pediatrics 696 (2014). Transgender people face pervasive and disproportionately high rates of violence and abuse globally. *See, e.g.,* Sandy E. James et al., National Center for Transgender Equality, The Report of the 2015 Transgender Survey (2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF (finding transgender people in the U.S. face disproportionately high rates of violence and discrimination, economic and housing insecurity, and criminalization).
[6] Translated Transcript of Interview with Roxsana Hernandez by Katie Schlecter, (2016), Claimants__000006-8, annexed hereto as **Exhibit D**. Video footage of interview *available at*: https://drive.google.com/file/d/1gmk3fQoarZ1sxYQNmUpn1uXYWPFQRGo6/view.
[7] Much of the factual allegations made in the instant complaint are based upon the affidavits of other transgender women who were also a part of the caravan and travelled with Roxsana and were detained alongside her. Such affidavits are shall be provided as needed during litigation.
[8] Lovelace Medical Records, at Claimants__000039 annexed hereto as **Exhibit E**; and Documents from Customs and Border Protection at Claimants__000788 annexed hereto as **Exhibit F**.
[9] 2019-ICLI-00053 279.
[10] Adolpho Flores, *A Transgender Woman Who Was Part Of The Migrant Caravan Has Died In ICE Custody,* BUZZFEED NEWS, (May 31, 2018) https://www.buzzfeednews.com/article/adolfoflores/a-transgender-woman-who-was-part-of-the-migrant-caravan-has#.bdrkL3QgG.

### B. MIGRANT CARAVAN AND ONSET OF SYMPTOMS

On or around March 25, 2018, Roxsana met up with several of the other transgender asylum seekers in the migrant caravan in Tapachula, Chiapas, Mexico. The asylum seekers who travelled with Roxsana reported that while in Chiapas, Roxsana appeared to be in good health. By April 5, 2018, the group reached Puebla, Mexico. By the time they reached Hermosillo, other asylum seekers with Roxsana (hereinafter "caravanners") reported Roxsana began to sleep more, and sometimes vomited after eating. On or around April 20, 2018, the caravan arrived in Tijuana, Mexico. At this time other caravanners noticed that she developed a cough and nasal drainage. Roxsana sought and received legal advice regarding her claims from legal workers at Al Otro Lado's Tijuana office.

### C. DETENTION AT SAN YSIDRO PORT OF ENTRY

On May 9, 2018, Roxsana and 17 transgender asylum seekers presented themselves at the U.S./Mexico border port of entry in San Ysidro, California via its main pedestrian lane. Roxsana was taken into custody by Customs and Border Protections (CBP). Roxsana did not have any medications with her when she arrived. There was no medical screening.[11] Roxsana requested to see a doctor for an "infection" without specifying what kind,[12] however, Roxsana disclosed her HIV status to another caravanner in confidence.

### D. "ICE BOXES"

Roxsana and the caravanners were placed in a holding facility colloquially known as the "Ice Box," or "Hieleras" for its unbearably cold temperatures. While detained there, they slept on the ground.

The caravanners reported that while in Tijuana, Roxsana seemed relatively fine, but after being placed in the "Ice Box," her health visibly declined. She coughed so much that she could not breathe properly and had trouble sleeping. The caravanners reported that Roxsana vomited regularly, had body-, stomach- and headaches, nasal drainage and green phlegm.[13] Roxsana confided in another caravanner saying "I am not sure if I will be able to survive this place," or words to similar effect.

Roxsana complained that the food they gave her caused her abdominal pain, diarrhea and vomiting.[14] Other caravanners detained with Roxsana reported that the food was raw, including eggs and tortillas,[15] which caused them to experience stomach pain as well.[16] They were given 3-5 minutes to eat at each meal time and one time an officer threw food at the caravanners rather

---

[11] Affidavit of Charlotte Antonio Alvarenga Garcia, annexed hereto as **Exhibit G.**
[12] *Id.*
[13] *Id.*
[14] Id.
[15] *Id.*
[16] *Id.*

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

than serve them. After the second day in the Ice Box, Roxsana stopped eating and could only drink apple juice. At one point, when the caravanners went to eat, at least one DHS law enforcement official yelled, "Fucking queers, be quiet."

### i.   Repeated Pleas for Immediate Medical Assistance.

During the first couple of days after Roxsana arrived, other caravanners began complaining to law enforcement officials when they did rounds about the cold air conditioning, and informed them that Roxsana was sick and needed medical attention. One reported that Roxsana told one officer named "Bosch" that she needed medical attention. Another transgender asylum seeker translated in English saying "she is sick, very sick." In response, Officer Bosch was verbally abusive and went out of his way to harass the caravanners. At one point, he responded to the requests for medical attention with words to the effect of "you shouldn't have come to this country if you're sick. It's not our responsibility to take care of you. If something happens to you it's not our fault!"[17]

This officer was responsible for allowing caravanners to move in the facility. He would frequently ignore their requests to exit a room or slam the door in their faces.[18]

The caravanners repeatedly told other officers that Roxsana needed medical attention as well. When DHS officers passed their cell, one caravan member knocked on the window and said words to the effect of, "medico, muy mal companera" in Spanish. Despite her and her friends' multiple efforts to get medical attention they never received a substantive response. One of the officers responded to her that the doctor comes to the facility whenever she pleases, that they did not have any authority, and they could not help her. Another caravanner detained with Roxsana reported that she observed other people in the Ice Box receiving medicine during mealtimes but Roxsana was never given any.[19]

It was only after the caravanners went on lunch strike, refusing to eat, that officials took Roxsana to receive medical care. On or around Friday May 11, 2018 the caravanners refused to eat lunch and told the officer in charge that Roxsana needed medical attention. They also asked for a larger space and to lower the air conditioning because of the adverse effect on Roxsana's health. Instead, the guards closed the door and reduced the cell's temperature even more, apparently to punish them for requesting help for Roxsana. During the lunch strike, caravanners demanded to speak with a high-level official. An official, whom caravanners believed to be the director of the facility, came to speak with them. He told them they had to eat, or they would get sick. They responded that they were already sick, pointing out Roxsana's illness.[20] Following the discussion between the caravanners and the higher-ranking official, DHS law enforcement officials took Roxsana and

---

[17] **Exhibit G.**
[18] *Id.*
[19] *Id.*
[20] *Id.*

another caravanner to the hospital. Afterwards, officer Bosch mocked them saying Roxsana merely had a cough and that they should not be alarmed.[21]

### ii. Health Screening by DHS Officials

On or around May 11, 2019, a CBP law enforcement officer met with Roxsana to screen her health to be detained in general population in Immigration and Customs Enforcement (ICE).[22] He did not use an interpreter to communicate with Roxsana.[23] The officer completed an ICE Health Services Corps (IHSC) In Processing Health Screening Form for Roxsana, indicating she was HIV positive, entering "no" for all medical and mental health questions, and indicating she was fit for placement in general population. Because of her HIV status, the onsite physician met with Roxsana and noted the following about her health: Roxana reported she was diagnosed with HIV five months earlier and suffered weight loss, recurring vomiting, and diarrhea for the past month; Roxsana appeared emaciated and ill; she complained of a headache and cough; and she had an elevated temperature of 99.5 and was tachycardic with a pulse of 134. The doctor did not indicate whether or not they used interpretation for this exam.[24]

The examining doctor did not find Roxsana medically fit for transportation or to be moved to ICE detention, noting her untreated HIV, fever and chills.[25] Rather than provide her with HIV medication the Doctor referred Roxsana to Scripps Medical Hospital in Chula Vista ("Scripps") to rule out the possibility that she had tuberculosis,[26] a requirement for travel.[27] The physician also referred her to be assessed for sepsis, a life-threatening condition, and to assess whether she had pneumonia or bronchitis.[28]

### iii. Transfer to Emergency Department at Scripps Medical Center Chula Vista

DHS law enforcement officers transported Roxsana and another caravanner to the Emergency Department at Scripps. She was shackled with handcuffs, ankle cuffs and a chain around her waist.[29] Roxsana was visibly weak.[30] At Scripps' Emergency Room a nurse took Roxsana and the

---

[21] *Id.*

[22] 2019-ICLI-00053 660.

[23] *Id.*

[24] 2019-ICLI-00053 660 footnote 24.

[25] Documents from DHS Office of Civil Rights and Civil Liberties, at Claimants__000798 annexed hereto as **Exhibit H**.

[26] A treatment authorization request form states Roxsana's diagnosis as: "HIV positive no meds fever chills T.B. rule out" and under course of treatment states: "clear for incarceration and travel." 2019-ICLI-00053 68.

[27] ICE Air Operations Handbook 2019-ICLI-00053 34.

[28] *Id.* at 660-661.

[29] **Exhibit G**.

[30] *Id.*

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

other caravanner's vitals in what appeared to be a hallway. Two DHS law enforcement officers from the hieleras were present. They did not use an interpreter, but one of the officers spoke broken Spanish and attempted to interpret, albeit poorly.[31]

Roxsana told the health care provider she was HIV-positive and without medication. The doctor responded they were sorry but they could not assist her with that and that she would need to seek treatment elsewhere.[32] Roxsana's HIV status is noted it in her records, which states that Roxsana should "follow up with Jail/ICE Medical for this."[33]

Medical providers diagnosed Roxsana with bronchitis and gave her Tylenol for her fever, a Z-Pak of antibiotics and an albuterol inhaler.[34] The treating medical provider stated: "No clinical evidence of TB normal chest Xray." The medical provider did not take Roxsana's weight, did not assess her level of dehydration, and did not document any information about the length of time Roxsana had been coughing—the reason she was sent to the emergency room.[35]

When Roxsana returned from the hospital, DHS officers limited Roxsana's access to medications and rarely administered them to her. They took the inhaler away and would restrict her from using it to one time a day.

Reviewing her case after she died, the DHS Office for Civil Rights and Civil Liberties (CRCL) highlighted its concern that on May 11, 2019, DHS' records indicate—quite impossibly—that Roxsana was both *not* medically cleared for transport and also *was* cleared for transport on the same day without explanation.[36]

Neither CBP nor ICE ever provided Roxsana with medication to treat her HIV before she died.[37]

### E.  TRANSFER TO ICE ERO CUSTODY

On May 12, 2018, ERO San Diego requested approval from ERO El Paso to transfer Roxsana to Cibola County Correctional Center ("CCCC") via a "streamlined transfer process," which, according to ICE, is an "established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities" and

---

[31] *Id.*
[32] *Id.*
[33] Scripps Medical records Claimants__000825, annexed hereto as **Exhibit I; Exhibit G.**
[34] **Exhibit I** at Claimants__000824.
[35] *Id.* Pltf_ Claimants__00082-37.
[36] The short-form report states: "The report's medications section contains a hand-written 'No,' and a checked-box next to 'Not medically cleared for transport and incarceration.' Conversely, another document created by [redacted] on the same date clears Ms. Hernandez for transport and detention." **Exhibit H** at Claimants__000798.
[37] Detainee Death Review 2019-ICLI-00053 290.

"requires coordination across several ERO field offices but results in efficient processing and transport of the large number of Aliens entering the U.S. at the San Ysidro POE."[38]

That same day, an ICE ERO Supervisory Detention and Deportation Officer in Albuquerque, New Mexico, approved the request.[39] ERO identified CCCC as the "appropriate" facility for Roxsana because of its dedicated transgender housing unit.[40]

On May 14, 2018, CBP transferred Roxsana to ICE ERO custody.[41]

### F.   TRAVEL TO SAN LUIS EMERALD DETENTION FACILITY

On the morning of May 14, 2018, DHS law enforcement officers fed the caravanners burritos. Roxsana was not able to eat and only drank apple juice. During the journey from the Ice Box to Cibola, Roxana became weaker and increasingly unable to eat—if she did, she either vomited or had diarrhea. Her face became very pale and she slept a lot.

After breakfast, MTC officers—the transportation company contracted to transport detainees—took Roxsana and 12 caravanners by bus from the San Ysidro Port of Entry by LaSalle Corrections Transport LLC at around 12:30 p.m.[42] They stopped at Imperial Regional Detention Facility in Calexico, California around 2:30 p.m.[43] About an hour later, at around 3:30pm, Roxsana and the caravanners were loaded back onto a bus and taken to San Luis Regional Detention Center in San Luis, Arizona. They arrived around 5:30 p.m.[44] Roxsana and her fellow detainees were denied food or water or restroom access throughout their transfer.

Roxsana asked the officers with beige color uniforms to use the restroom and to remove her the handcuffs in order to do so; they refused. Another caravanner and friend of Roxsana's also advocated for officials to remove her cuffs so Roxsana could use the restroom, but officials again denied the request.  If anyone needed to use the bathroom, the officials responsible for transporting the caravanners instructed, they should urinate on themselves.[45] The seats were stained and smelled like urine as a result.[46] Neither the LaSalle nor, MTC officers provided Roxsana with medical care.[47]

---

[38] 2019-ICLI-00053 661.
[39] *Id.*
[40] *Id.*
[41] 2019-ICLI-00053 662.
[42] Transport Trip Log LaSalle Corrections Transport LLC, ICLI—00053 401.
[43] *Id.*
[44] *Id.*
[45] **Exhibit G.**
[46] *Id.*
[47] 2019-ICLI-00053 270.

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

### G. Detention at the San Luis Regional Detention Facility

At the San Luis facility, several caravanners who had been separated earlier in their journey found themselves reunited on the way to CCCC.[48] One caravanner who had last seen Roxsana in Tijuana was shocked by how much Roxsana's health and spirits had declined. She described Roxsana as very weak and pale, almost yellow in pallor, with dark circles under her eyes. During the few hours they were at San Luis, another caravanner saw Roxsana go to the bathroom about three times to vomit or spit up phlegm. Roxsana was so weak with a fever she lay on the floor, coughing. Officers saw her struggling and they never offered her medical assistance.

The caravanners were fed beans with shredded meat and rice. Because Roxsana was so ill she did not eat and only drank tea. One caravanner reported that Roxsana told her she had diarrhea and would go to the bathroom every fifteen minutes and said she felt like she was going to die.

Despite her manifest symptoms and urgent need for medical care, Roxsana received no medical attention while at San Luis.

### H. Transfer to El Paso Detention Facility

At or around midnight on May 15, 2018, LaSalle Corrections Transport officers loaded Roxsana and approximately 25 other caravanners onto a bus and drove them to the Mesa, Arizona airport around 4:00 a.m.[49]

Roxsana pleaded for help to a caravanner who sat with her, saying words to the effect of "help me! I don't know if I'm going to survive."

When they got to the bus a female officer threatened the caravanners, saying words to the effect of "behave because if you don't something bad is going to happen." During the bus ride another asylum seeker asked the transportation officers for medical help for Roxsana in both English and Spanish. Again, they ignored her.

At the airport, one caravanner told an officer with beige pants and long red hair that Roxsana was very sick and needed medical attention, but the officer refused to respond.

#### i.    ICE Air Operations

ICE Air Operations Handbook requires that: "Any detainee requiring prescription medication will be medicated prior to acceptance by the Flight Nurse or the [Flight Officer in Charge]. Prescribed medications must be delivered to the Flight Nurse. Detainees requesting medication must have at

---

[48] **Exhibit G.**
[49] SLRDSC Transport Trip Log, 2019-ICLl-00053 401-402.

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

least a seven-day supply of appropriate dosages prior to boarding. Whenever possible, prescription medications should be stapled with the ICE Medical Summary (or equivalent medical form)."[50]

Further, the ICE Air Operations Handbook provides, "detainees transferred from one detention facility to another diagnosed with HIV/AIDS must be provided a 30-day supply of medication, as ordered by the prescribing authority."[51]

Despite these clear and unambiguous guidelines in ICE's binding, non-discretionary policies, Roxsana received no HIV medication despite her documented HIV-positive status and clearly apparent and emergent illness.[52]

Roxsana was visibly ill for the entire airborne journey. Once Roxsana and the caravanners boarded the plane, officers gave them 2 ham sandwiches, Kraft cheddar cheese and a small bottle of water. Roxsana ate half of a sandwich and immediately vomited it up into a vomit bag.

Roxsana told her friend who was sitting with her that the reason she did not eat was because, whenever she did, she would vomit. When another caravanner asked for medical attention for Roxsana from the law enforcement officers who gave them food, an officer responded that there was nothing she could do. None of the officers appeared to speak Spanish.

A few hours later during her transit, Roxsana vomited again twice. Whereas first time, she had only vomited the sandwich, the following two times she vomited phlegm. After she vomited, officers denied Roxsana water.

During the plane ride Roxsana, continued to visibly suffer the effects of her fever and produced lots of phlegm, which was sometimes yellow, sometimes black. Roxsana told other caravanners that she felt very ill and like she was going to faint. At times she looked to them as though she was about to lose consciousness. Despite her clear and visible illness, caravan members reported that Roxsana wanted to survive and had a positive attitude.

At one point, Roxsana asked for permission to use the restroom. An officer pushed her down violently back into her seat. A caravanner also asked an officer to uncuff Roxsana to use the restroom, but they refused.

The CBP and ICE employees who arranged Roxsana's transport from San Ysidro to Cibola County Correctional Center admitted to foregoing their own medical procedures required by the ICE Air Operations Handbook. On May 13, 2018 the employee wrote: "arrangements have been made with the receiving office to have a complete medical evaluation upon arrival. Therefore they will not need certain medication at the time of transport i.e. HIV medication." [53]

---

[50] 2019-ICLI-00053 43.
[51] *Id.* At 44.
[52] Detainee Death Review 2019-ICLI-00053 290.
[53] 2019-ICLI-00053 603.

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

The flight departed at 9 a.m [54] and arrived around 2:48 p.m..[55] The caravanners were then taken by bus to El Paso Service and Processing center ("ELPSPC"), which arrived around 3:15 p.m .[56]

## I.   EL PASO SERVICE PROCESSING CENTER

The evening they arrived at the El Paso Service Processing Center, the caravanners finally received food. This was the first time they were fed since the ham sandwiches on the plane. They ate hamburgers and drank a blue beverage. Roxsana only ate the lettuce from the hamburger and drank one cup of the blue liquid. During her short stay at the El Paso facility, Roxsana vomited every time she ate.

Despite her severe and visible illness, and her documented medication vulnerability, Roxsana was not seen by any medical staff.

## J.   TRAVEL TO CIBOLA COUNTY CORRECTIONAL CENTER

On May 16, 2018, detention officers woke the caravanners up around 5 a.m. and gave them breakfast, which consisted of bread, coffee, and something that looked like oatmeal, but had meat and salad mixed into it. Roxsana ate some bread and drank some coffee. She looked very ill. After, she vomited and slept for a bit.

At around 9 a.m., Roxsana and 29 other caravanners embarked on a five-and-half hour bus trip from El Paso to Cibola.[57] Each person transported received an 8-ounce bottle of water. Roxsana sat by herself in the back. The caravanners were very thirsty. They repeatedly asked for water. The first two times the guards ignored them. The third time, an officer with grey hair said in Spanish: "ya callanse" which means "shut up." At another point the same officer asked why they left their country if they were sick.

At some point during this trip Roxsana asked an officer for water, but the officer told her he did not speak Spanish. Roxsana had a fever and lots of phlegm and carried tissue or toilet paper to blow her nose. Sometimes her sputum was bloody. Roxsana felt dizzy and extremely exhausted, and her stomach hurt badly.

During this bus ride[58] another caravanner requested medical attention for Roxsana from at least two different officers approximately five times. One officer did not understand the Spanish and the other officer did not respond to any of her requests.

---

[54] 2019-ICLI-00053 599.
[55] Id.
[56] Id.
[57] 2019-ICLI-00053 592.
[58] The affidavit is unclear whether this was bus from San Luis or the bus to El Paso was but it seems most likely this is from the El Paso airport to the detention center.

At approximately 2:30 p.m. the bus arrived at an ICE CAP facility in Albuquerque, New Mexico where officers from the various detention facilities took those transported, including Roxsana into custody.[59] Twenty-nine caravanners were transported from ICE CAP to Cibola County Correctional Center arriving around 8:13 p.m.[60]

## K. DETENTION AT CIBOLA COUNTY CORRECTIONAL CENTER

On May 17, 2018 at 1:15 a.m. ICE officers booked Roxsana into Cibola detention facility.[61] At 2:23 a.m. they took Roxsana and other caravanners to a medical waiting room where they lay on the floor until someone brought them a beverage at around 4:08 a.m.[62] Roxsana drank the beverage and then used the restroom minutes later.[63] Officers gave them breakfast there at around 6 a.m.[64]

At around 7:25 a.m., CCCC officials finally presented Roxsana to an onsite medical provider who conducted an intake screening. During the intake screening, the provider signed and stamped two Medical Summary of Federal Prisoner/Alien in Transit forms to document his review, one from San Luis detention facility and the other from El Paso detention facility. The former did not indicate whether or not Roxsana was cleared for tuberculosis. The section for documenting current medical issues on both forms was left blank.[65] Neither form was signed or dated.[66] The provider also signed the IHSC In-Processing Health Screening form completed on May 11, 2018 by a CBP Officer with all negative findings except for a handwritten note that states, "HIV positive/NO MEDS".[67]

They gave Roxsana electrolytes and Ensure at or around 8:08 a.m., and then returned to the holding cell, where she rested on the floor.[68]

At 8:58 a.m. another medical staff person entered the waiting room and assisted Roxana to her feet.[69] At 9:00 a.m. Roxsana ran a 102-degree fever.[70] CCCC officials transferred her to a medical isolation room while she waited for treatment.[71]

---

[59] 2019-ICLI-00053 274.
[60] *Id.*
[61] Core Civic Intake File at Claimants__000852, annexed hereto as **Exhibit K**.
[62] 2019-ICLI-00053 275.
[63] *Id.*
[64] *Id.*
[65] 2019-ICLI-00053 585, 275-276.
[66] *Id.* at 276.
[67] *Id.*
[68] 2019-ICLI-00053 277.
[69] *Id.*
[70] *Id.*
[71] *Id.*

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

Around 10:00 a.m., a medical provider examined Roxsana. She weighed 89 pounds.[72] The provider diagnosed her with dehydration, starvation,[73] extreme weight loss, muscle wasting,[74] untreated HIV, fever and cough.[75] The examining medical provider noted Roxsana's tremor,[76] low blood pressure of 81/61,[77] rough breathing sounds,[78] and increased amount of white phlyem (mucus excreted in abnormally large quantities). The provider ordered transport to Cibola General Emergency Room[79] to rule out an opportunistic infection, [80] pneumonia, and to provide her with intravenous fluids.[81]

At 11:08 a.m. CCCC officials transported Roxsana in a wheelchair to an ambulance.

## L. CIBOLA GENERAL HOSPITAL

CCCC officers transported Roxsana by ambulance to Cibola General Hospital's Emergency Room. They arrived around 11:44 a.m.[82] Roxsana had an extremely high fever, low blood oxygen and remained tachycardic. Her blood pressure continued to be as low as 80/52. [83]

Treating medical staff at the hospital gave her intravenous fluids, gave her Tylenol for her fever, ordered laboratory and imaging diagnostic tests and performed an EKG.[84] At approximately 6:08 p. m. treating medical providers gave Roxsana broad spectrum antibiotics.[85]

Based on physical examination findings, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock—a life threatening condition—dehydration, HIV infection, nodular pulmonary disease, lymphadenopathy, anemia, and thrombocytopenia. [86]

At around 6:25 p.m. Cibola General requested transfer to Lovelace Medical Center because

---

[72] 20 19-ICLl-0 0053 492.
[73] 2019-ICLl-00053 540.
[74] 2019-ICLl-00053 278.
[75] **Exhibit L** at Claimants__000867, 879.
[76] 2019-ICLl-00053 497.
[77] 20 19-ICLl-0 0053 492.
[78] 2019-ICLl-00053 278-289.
[79] **Exhibit L** at Claimants__000881-2, 000879, 000867-8.
[80] 2019-ICLl-00053 536-540.
[81] 2019-ICLl-00053 278.
[82] 2019-ICLl-00053 280, 619-625.
[83] Roxsana's vital signs were documented within the following ranges: temperature 104.9 to 101.1; pulse 92 to173; respirations 9 to 36; blood pressure 80/52 to 102/65; and pulse oxygen 88 to 100 percent. 2019-ICLl-00053 514.
[84] Cibola General Hospital Medical Records at Claimants__000989, 000998, annexed hereto as **Exhibit M**; 2019-ICLl-00053 280.
[85] **Exhibit M** at Claimants__000998.
[86] 2019-ICLl-00053 281.

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

Roxsana required a higher level of care than Cibola General could provide.[87] At approximately 9:38 p.m., PHI Air Medical airlifted Roxsana via helicopter ambulance to Lovelace medical center because ground transport would take significantly longer and medical staff deemed it inappropriate given Roxana's low blood pressure and bodyweight,[88] and septic shock diagnosis. [89]

## M. LOVELACE MEDICAL CENTER

The helicopter landed at 10:05 p.m. and hospital personnel took Roxsana to the intensive care unit ("ICU") where she remained until her death on May 25, 2018.[90]

Medical providers at Lovelace put Roxsana in an isolation negative pressure room in the ICU because her low blood counts made her vulnerable to opportunistic infections and because they did not know her TB status.[91]

Her treatment plan included consulting with infectious disease specialists and administering broad spectrum antibiotics.[92] While Roxsana's hydration improved on IV fluids, she continued to be febrile for days, and septic.[93]

On May 18, 2018 an infectious disease specialist, Joseph Gorvetzian saw Roxsana.[94] Imaging from Cibola General Hospital revealed pulmonary nodules and several enlarged lymph nodes.[95]

During Roxsana's time at Lovelace, treating medical providers ruled out a TB work-up. Between May 18th and 20th, 2018, Roxana's condition improved. She experienced fewer fevers and on her fourth day, treating medical providers took her off broad spectrum antibiotics.[96] However, on May 21st, Roxsana's health began to decline again after treating medical providers biopsied materials from a lymph node. That night, Roxsana's fever spiked again. On May 23rd, Roxsana had a fever all day and that night she had a fever of 104.5[97] and pulse exceeding 150. [98] On the following day, Roxsana experienced difficulty breathing.[99]

At around 1:00 p.m. on the 24th treating medical providers ordered a diagnostic thoracentesis—a

---

[87] 2019-ICLI-00053 544, 571, 575-578.
[88] 2019-ICLI-00053 281.
[89] 2019-ICLI-00053 568, 570.
[90] 2019-ICLI-00053 282.
[91] 2019-ICLI-00053 687.
[92] 2019-ICLI-00053 687.
[93] 2019-ICLI-00053 506.
[94] Lovelace Medical Recordsat Claimants__000041, annexed hereto as **Exhibit E.**
[95] *Id.* at Claimants__000041.
[96] *Id.* at Pltf_000314.
[97] 2019-ICLI-00053 691.
[98] 2019-ICLI-00053 690.
[99] *Id.*

14

procedure to remove fluid from between the lung and chest wall. [100] Instead, the medical providers who performed the procedure conducted a bilateral *therapeutic* thoracentesis removing 750 and 900 cc of fluid from Roxana's left and right lungs respectively.[101] After the procedure, Roxsana struggled to breath even more, and her lungs began to collapse. At around 6:45 p.m. hospital staff put her on a ventilator[102] and intubated her to ensure she received oxygen.[103] That evening, treating medical providers sedated Roxsana, who was in critical condition.

Roxsana went into cardiac arrest at 10:41 p.m. Treating medical staff attempted to resuscitate her by administering CPR, chest compressions, and epinephrine but she repeatedly coded. By a 3:32 a.m. on May 25 Roxsana had coded ten times. At 3:32 a.m. two physicians pronounced Roxsana dead.[104]

Throughout her hospitalization, ICE law enforcement officers shackled Roxsana at her wrists and both ankles to her hospital bed except when medical personnel needed to remove them for certain medical procedures.[105] At least one, armed ICE officer guarded Roxsana at all times and checked that her restraints were secured every twenty minutes. When medical staff needed ICE officers to remove her restraints, the officer on duty would call "central" in order to receive approval to remove them,[106] delaying her receipt of medical care. ICE officers kept Roxsana shackled even after treating medical providers medically paralyzed her [107] and when she first went into cardiac arrest.[108]

During an interview by DHS's External Reviews and Audit Unit after Roxsana died, a  doctor from Cibola General hospital told investigators that the actions taken by the time Roxsana arrived at CCCC were "too little, too late" and she was "way beyond" their ability to provide her with meaningful care.[109]

## N. AUTOPSY REPORTS

After her death, the Office of Medical Investigator ("OMI") conducted a preliminary autopsy at ICE's request and concluded that Roxsana died from cardiac arrest and complications related to HIV. The conducting examiner did not perform deep-tissue dissections.[110]

---

[100] **Exhibit E** at Claimants__000125, 000184.
[101] *Id.* at Claimants__000278.
[102] *Id.* at Pltf_000345. Claimants__000456, Claimants__000136
[103] *Id.* at Claimants__000053, 000270.
[104] *Id.* at Claimants__000154; Death Certificate annexed hereto as **Exhibit N**.
[105] 2019-ICLl-00053 343-396.
[106] *Id.*
[107] *Id.* at 387, 389.
[108] Id. at 389-391.
[109] 2019-ICLl-00053 281.

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

On June 8, 2018, Dr. Kris Sperry, a board-certified forensic pathologist, conducted a second autopsy, at the request of undersigned counsel on behalf of Roxsana's surviving siblings.[111]

The preliminary autopsy report found:

> The second autopsy disclosed evidence of physical abuse, with deep bruising (not evident externally) on the lateral right and left thoracic walls, more extensive on the right than on the left, with deep contusions extending on to the back, also more extensive on the right than on the left. The wrists also exhibited extensive regions of deep soft tissue and musculature hemorrhage, again not externally visible, which are typical of handcuff injuries. There was no evidence of sexual abuse.

> The cause of death is, at this writing, most probably severe complications of dehydration superimposed upon HIV infection, with the probable presence of one or more opportunistic infections. As the consequence of her immunocompromised condition, Ms. Hernandez Rodriguez was susceptible to the physiologic effects of untreated dehydration, initiated by severe diarrhea and vomiting. According to observations of other detainees who were with Ms. Hernandez Rodriguez, the diarrhea and vomiting episodes persisted over multiple days with no medical evaluation or treatment, until she was gravely ill.[112]

On April 8, 2019, OMI released a final autopsy report identifying the cause of death as "natural" and caused by HHV-8 associated multicentric Castleman's disease.[113] It also noted "A small occipital scalp hematoma was seen by computed tomography (CT) scan. The origin of this injury is unknown. There were fractures of multiple ribs and the sternum from cardiopulmonary resuscitation attempts. No other injuries were observed."[114]

On April 18, 2019 OMI released an Amended final autopsy report, changing the dates of six events reported upon in its final April 8 autopsy report.[115]

## O. LACK OF ICE OVERSIGHT CAUSING POOR HEALTH OUTCOMES

According to a report by Human Rights Watch, more people died in ICE detention in fiscal year 2017 than any year since 2009, due to "dangerously inadequate" care.[116] The report identifies three

---

[111] Dr. Kris Sperry, *Preliminary Autopsy Report*, (July 12, 2018), annexed hereto as **Exhibit O**.
[112] *Id.* at Claimants__001045.
[113] Dr. Kurt Nolte, *Final Autopsy Report*, NEW MEXICO OFFICE OF MEDICAL INVESTIGATOR, (April 8, 2019), annexed hereto as **Exhibit P**.
[114] *Id.* at Claimants__001049.
[115] Dr. Kurte Nolte, *Amended Autopsy Report,* NEW MEXICO OFFICE OF MEDICAL INVESTIGATOR, April 18, 2019, annexed hereto as **Exhibit Q**.
[116] HUMAN RIGHTS WATCH, *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care In Immigration Detention* (Jan. 20, 2108), https://www.hrw.org/report/2018/06/20/code-red/fatal-consequencesdangerously-substandard-medical-care-immigration (last visited May 30, 2019).

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

systemic failures in the provision medical care from these deaths, namely (1) unreasonable delays in the provision of care, (2) poor practitioner and nursing care, and (3) botched emergency responses.[117] A recent report by the Department of Homeland Security Office of Inspector General found that ICE maintains abysmal oversight of detention facilities without meaningful ability to correct violations, even when they present serious health risks.[118]

## IV. LIABILITY OF THE UNITED STATES

Based on the facts set forth above, Claimants contend the United States of America is liable for the acts and omissions of its officers based on, at minimum, the following theories under California, Arizona, New Mexico and/or Texas state law:

1. **Wrongful death** for unlawfully causing the death of Roxsana by failing to provide her with timely medical care, adequate nutrition, hydration, rest, access to the restroom, and an environment with an appropriate temperature, and loss of chance of survival for the same, as the agency charged with her care while she was in its custody; and, for the loss by Roxsana's siblings (claimants) of their sister, including loss of her companionship, and pecuniary and non-pecuniary losses.

2. **Negligence/Gross Negligence** for:
   - failing to provide Roxsana with adequate medical care despite the fact that she was visibly ill from the time she was taken into CBP custody until her death, and CBP and ICE knew she was HIV positive, and without antiretroviral medication, in violation of their own policies, causing her emotional distress, physical harm, and death; and
   - for failing to provide Roxsana with adequate food, hydration, rest, access to the restroom, and an environment with appropriate temperatures from the time she was taken into custody at the port of entry until her death, causing her emotional distress, physical harm, and death.

3. **Negligent Hiring, Negligent Training, Negligent Supervision and Negligent Retention** for hiring, retaining, and failing to supervise and train all ICE, CBP, IHSC, Correct Care Solutions employees and their contractors and subcontractors, who came into contact with Roxsana, and were responsible for her custody, care and transportation who:

---

[117] *Id.*

[118] DEPARTMENT OF HOMELAND SECURITY OFFICE OF INSPECTOR GENERAL, *ICE Does Not Fully Use Contracting Tools To Hold Detention Facility Contractors Accountable For Failing To Meet Performance Standards,* OIG 19-18 (Jan. 29. 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf (last visited May 30, 2019).

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

- failed to provide her with adequate medical care despite the fact that she was visibly ill from the time she was taken into CBP custody until her death, and CBP and ICE employees knew she was HIV positive and without antiretroviral medication, violating the agencies' own policies, causing her emotional distress, physical harm, and death; and
- failed to provide Roxsana with adequate food, hydration, rest, access to the restroom, and an environment with appropriate temperatures from the time she was taken into custody at the port of entry until her death, causing her emotional distress, physical harm, and death.

4.      **Failure to Provide Medical Care** for failing to provide or summon appropriate medical care for Roxsana as someone in the custody of ICE and CBP causing her emotional distress, physical harm, and death.

5.      **Medical Malpractice** for failing to provide adequate medical care to Roxsana failing to provide Roxsana with adequate medical care despite the fact that she was visibly ill, and her vital signs indicated she was in unwell, from the time she was taken into CBP custody until her death, and CBP and ICE knew she was HIV positive and without antiretroviral medication, in violation of their own policies, causing her emotional distress, physical harm, and death.

6.      **Intentional infliction of emotional distress** for failing to provide Roxsana with: adequate medical care, adequate food, hydration, rest, access to the restroom despite the fact that she vomited frequently and suffered from severe diarrhea; an environment with appropriate temperatures, and for restraining her in shackles even when she was medically paralyzed and dying—causing delay in the provision of medical care, from the time she was taken into custody at the port of entry until her transfer to hospital care, causing her to fear for her life and safety, extreme emotional distress, and exacerbating her demise.

7.      **Negligent Infliction of Emotional Distress** for failing to provide Roxsana with: adequate medical care, adequate food, hydration, rest, access to the restroom despite the fact that she vomited frequently and suffered from severe diarrhea; an environment with appropriate temperatures, and for restraining her in shackles even when she was medically paralyzed and dying—causing delay in the provision of medical care, from the time she was taken into custody at the port of entry until her transfer to hospital care, causing her to fear for her life and immediate safety, exacerbating her demise and causing her physical injury and extreme emotional distress.

8.      **Battery** for the unlawful application of force by ICE, CBP, IHSC, Correct Care Solutions employees and their contractors and subcontractors while in their custody resulting in physical injury.

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

9. **Assault** for the attempted unlawful application of force by ICE, CBP, IHSC, Correct Care Solutions employees and their contractors and subcontractors against Roxsana while she was in their custody causing Roxsana to fear for her safety, and causing her physical harm.

10. **Aggravated assault** for the willful unlawful application of force by ICE, CBP, IHSC, Correct Care Solutions employees and their contractors and subcontractors against Roxsana while in their custody resulting in physical injury.

## V. WITNESSES

| First Name | Middle name/ initial | Last Name | Position | Organization | Interaction with Roxsana |
|---|---|---|---|---|---|
| Jon | R. | Krohmer | MD, Assistant Director | ICE Health Service Corps. | Memo on healthcare authorization |
| Beverly | G. | Harrell-Bruder | MD | Scripps Mercy Hospital Chula Vista | Treating physician |
| Brian | | Reed | RN | Scripps Mercy Hospital Chula Vista | Screening RN |
| Peter | Frederick | Jost | MD | Scripps Mercy Hospital Chula Vista | Supervising physician |
| Trevor | D. | Nelson | MD | Scripps Mercy Hospital Chula Vista | Radiology Technologist |
| James | | | Witness | Scripps Mercy Hospital Chula Vista | Witness |
| Jeffrey | M. | Mazer | MD | Lovelace Medical Center | Accepted patient in transfer, treating physician |
| April | | Tafoya | RN | Lovelace Medical Center | Reviewed chart |

# **<u>EXHIBIT B</u>**

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

I.    Submit to Appropriate Federal Agency:

Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave., SE
Washington, D.C. 20528-0485

U.S. Customs & Border Protection
Office of the Chief Counsel
1300 Pennsylvania Avenue
N.W. Washington, D.C. 20229

U.S. Immigration & Customs Enforcement
Office of the Principal Legal Advisor
500 12th Street, S.W.
Mail Stop 5902
Washington, D.C. 20536

## II.    <u>INTRODUCTION</u>

On November 22, 2019, claimants, Jenny Margoth Hernandez Rodriguez, the sister of Roxsana Hernandez, on behalf of Roxsana's surviving siblings, and Joleen K. Youngers, the Personal Representative of Roxsana's  Wrongful Death Estate, submitted an administrative tort claim for damages arising out of Roxsana's arrest, detention, gross mistreatment in custody, and death as a result of the tortious acts and omissions of CBP and ICE employees. The complaints were received by all three agencies on November 25, 2018. Claimants, now submit the following supplemental facts and claims and amend their prior administrative complaint to include the following:

## III.    <u>SUPPLEMENTAL FACTS</u>

All records within the possession of ICE, CBP and DHS pertaining to Roxsana Hernandez including those received by our offices through the FOIA lawsuit TLC et. al v. ICE et. al, Case 3:19-cv-03032-SK (N.D.C.A. 2019) (2019—ICLI—000053 1 through 1543) are incorporated by reference in the instant complaint.

### A.  CBP's Interference With Roxsana's Medical Care At Scripps:

When CBP took Roxsana to Scripps Mercy Hospital in Chula Vista, California on May 11, 2018, two CBP officers from the Ice Box interfered with the medical providers' examination and treatment of Roxsana. They brought Roxsana in to rule out the possibility that she had a tuberculosis infection. These officers remained present and kept Roxsana shackled throughout the cursory exam. Rather than provide her with interpretation so she could speak directly to the

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

medical providers, Beverely Harrell Bruder, M.D. and Brian Reed, R.N., the officers primarily communicated with them. One of the officers spoke broken Spanish but was not fluent. The medical records alone clearly show that there was little to no communication between Roxana and the treating providers.

This explains why much of the information provided to Scripps was incomplete or untimely, including the fact that the Scripps nurses and physician completed and signed off on the entire visit without discovering Roxsana was HIV-positive. That note came only after ER physician signed her original note.

However, by that time, Roxsana had already been "medically cleared" for transport and detention based on the incomplete information CBP provided. Dr. Bruder wrote in Roxana's medical records from the visit: "No clinical evidence of TB normal chest Xray.[…] I explained to the customs agent that there is no clinical or radiographic appearance of tuberculosis, although that does not completely rule it out and [the patient] is cleared for travel and incarceration from that standpoint. However, if they want full evaluation for tuberculosis, they were going to be needing to do a blood test, but that is not done here in the emergency department."

An addendum to the exam notes by the Dr. Bruder states: "I was just told by the immigration customs agent that they were told by Mr. Hernandez-Rodrigue that he has HIV, although he is on no medication for it, so he will definitely need to follow up with the Jail/customs Medical for this."[1]÷

An X-ray is an insufficient diagnostic tool to rule out tuberculosis within patients living with HIV; a blood or sputum test is needed to accurately rule out tuberculosis. In other words, the clearance by Scripps to transport and detain Roxsana was based on misinformation rendering their initial clearance invalid. Neither CBP nor ICE performed a diagnostic blood or sputum test on Roxsana and neither "followed up with Jail/customs Medical" for HIV medication for Roxsana.

Furthermore, Roxsana's vital signs were highly alarming during this visit and despite this Roxsana was not admitted to the hospital nor provided any follow up medical care by CBP. Roxsana's medical records of the visit indicate her blood pressure was initially 91/61, and her heart rate 120, making her tachycardic—an elevated heart rate. Her temperature was 100.6. Despite her concerning vital signs, Roxsana was not admitted to the hospital for supportive care or treatment for HIV. Additionally, the medical provider did not take Roxsana's weight, did not assess her level of dehydration, and did not document any information about the length of time Roxsana had been coughing—the stated reason she was sent to the emergency room. These records even erroneously state that Roxsana had not experienced any weight loss, which is patently false; even the onsite doctor that Roxsana had seen earlier the same day noted that she appeared emaciated in her medical records from that exam.

    i.  **Standards of Care:**

---

[1] This quote from Roxsana's medical records misgendered her, incorrectly using masculine, rather than feminine pronouns.

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

Based upon standards of care within the medical community anyone presenting with the concerning vital signs exhibited by and with the medical history of Roxsana during an Emergency Department visit should be admitted to the hospital. According to prevailing medical guidelines for the care of people diagnosed with HIV: "Every patient with HIV entering into care should have a complete medical history, physical examination, and laboratory evaluation and should be counseled regarding the implications of HIV infection" to assess the patient's baseline health and monitor the effectiveness of treatment.[2] This is critical because of the high prevalence of co-infections within patients diagnosed with HIV. "The Panel on Antiretroviral Guidelines for Adults and Adolescents recommends initiating ART immediately (or as soon as possible) after HIV diagnosis in order to increase the uptake of ART and linkage to care, decrease the time to viral suppression for individual patients, and improve the rate of virologic suppression among persons with HIV." [3]

After her return from Scripps, Roxsana was not seen by a medical professional. She was never provided with a comprehensive evaluation to determine her baseline health and screen for any co-infections by any CBP, DHS or ICE personnel nor their contractors. No CBP, ICE, or DHS personnel nor their contractors ever completed a laboratory evaluation for Roxsana including measuring her CD4 count or viral load, nor a complete blood count; nor did they complete a comprehensive medical/social/family history, nor screen her for co-infections, all of which are recommended for patients diagnosed with HIV under prevailing medical standards of care.

Neither CBP nor ICE ever provided Roxsana with antiretroviral medication to treat her HIV before she died, as instructed by the treating doctor at Scripps and as recommended by standards of treatment.

**B.  Unlawful Detention:**

Because Dr. Bruder did not have complete and accurate information about Roxsana's medical condition, due to the CBP officers' interrereference with the medical exam she performed, her clearance for CBP/ICE to detain and transport Roxsana was erroneous. Under CBP's own standards, CBP should not have transferred Roxsana to ICE custody. CBP knew Roxsana was unfit for travel and incarceration because the onsite physician found her to be medically unfit. Subsequently, the screening by Scripps may as well have not happened because the providers at Scripps did not know Roxsana was living with untreated HIV and the method they used to determine her fitness for detention and TB status was insufficient for people living with HIV, rendering their medical findings and clearance, useless. CBP officers knew that the clearance was invalid because it states in Roxsana's medical records that the X-ray performed was insufficient to rule out tuberculosis. Nevertheless, CBP continued to detain Roxsana and transferred to ICE ERO's custody on May 13, 2018.[4]

---

[2]  Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV Developed by the DHHS Panel on Antiretroviral Guidelines for Adults and Adolescents – A Working Group of the Office of AIDS Research Advisory Council (OARAC) at B1.
[3] *Id.* At E-1.
[4] Claimants complaint submitted on November 22, 2019, states Roxsana entered ICE ERO's custody on May 14, 2018. However, ICE's records are inconsistent. It appears that on paper

SF-95 Continuation Form
Estate of Roxsana Hernandez Rodriguez

While CBP's detention of Roxsana was initially lawful pursuant to section 235(b)(1)(B)(iii)(IV) of the INA5 it became unlawful as soon as Roxsana was found medically unfit for detention and transportation.

### C. Unlawful Transportation:

On May 13, 2018, after ICE ERO approved transfer of Roxsana and the other caravanners to CCCC because of its dedicated transgender housing unit, ICE employee, Jaimee Doe,[6] wrote in an intra-agency email chain: "They will be transferred from the SYS POE [San Ysidro Port of Entry] directly to the ELP AOR, [El Paso Area of Responsibility] arrangements have been made with the receiving office to have a complete medical evaluation upon arrival. ***Therefore they will not need certain medication at the time of transport i.e. HIV medication***."[7]

CBP's Transfer and Escort standards 2.0 requires: "When transferring a detainee, officers/agents must ensure that all appropriate documentation accompanies the detainee including all appropriate medical records and medication as required by the operational office's policies and procedures."

The medical summary that accompanied Roxsana failed to mention the conditions noted at Scripps and by the physician who screened her on May 11, 2018 and the medications prescribed to her.

### D. ELPSPC

When Roxsana and the other caravanners arrived at El Paso Service Processing Center, ("ELPSPC") Roxsana asked ICE officers to see a doctor.[8] The officer responded that the doctor was not onsite until the next morning and because they were only staying one-night Roxsana would not be able to see the doctor.[9] A group of caravan members also asked ICE officers for medical attention for Roxsana and received the same response. Despite her severe and visible illness, and her documented medication vulnerability, ICE did not provide Roxsana with any medical help.[10] In its investigation after her death OPR ERAU's staff noted that ELPSPC was obligated to provide a medical screening for Roxsana because she was in their care for longer than 12 hours and failed to.[11]

---

Roxsana was transferred to ICE ERO's custody on May 13, 2014 however she was not taken into the agency's physical custody until May 14, 2018.

[5] provides that an alien in expedited removal "shall be detained pending a final determination of credible fear of persecution . . . ."

[6] The person's name is redacted in the email that ICE produced in response to undersigned counsel's FOIA request.

[7] 2019—ICLI—00053 9 [emphasis added].

[8] *See* Exhibit of Kristal Zambrano Aguilera annexed hereto as **Exhibit U.**

[9] *Id.*

[10] *Id.*

[11] 2019—ICLI—00053 731.

### i. PBNDS Standards

According to the applicable Performance Based National Detention Standards: "As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions."

In its review of Roxsana's death, Correct Care solutions noted "no explanation for the two-day delay in medical screening and tuberculosis screening can be offered." [12] Furthermore, these PBNDS require that: "Detainees shall receive continuity of care from the time of admission to time of transfer, release or removal. Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based providers as medically-appropriate."

Neither ICE nor CBP conducted a medical screening within 12 hours of assuming custody of Roxsana. Despite multiple attempts to receive adequate medical care by both herself and by the caravanners who advocated for her, Roxsana was not provided meaningful medical care despite her alarming vital signs and clearly apparent severe illness until she was experiencing early stages of multiple organ failure.

Roxsana's medical summary required to ensure continuity of care did not reflect the medical conditions recorded or medications prescribed to her during her visit to Scripps on May 11th in violation of these standards.

### E. CBP's Demonstrated Animus Towards Roxsana

There is in indicia that CBP officers who screened Roxsana for immigration options improperly demonstrated animus towards her and recommended her expedited removal as a result. Roxsana entered the United States on May 9, 2018 seeking asylum because she was targeted by MS-13 gang members as a transgender woman. They raped and tried to kill her approximately five to six months before entering the U.S. and Roxsana fled because she feared for her life. Roxsana explained this to the CBP officer who apprehended her when she entered the U.S. and during her credible fear interview on May 11, 2018. Yet, the CBP officer who apprehend her recommended expedited removal of her and the officer's supervisor approved the recommendation. In the Discretionary Authority Checklist for Alien Applicants this officer wrote under the section entitled "remarks": "likely to add to illegal population." [13] This is not a reason to recommend expedited removal under the INA and exhibits anti-immigrant sentiment.

Furthermore, during Roxsana's credible fear interview—an interview that that asylum seekers are entitled to assess the asylum seekers' fear of persecution or torture—the CBP officer conducting the interview, Jose Llanes, asked multiple questions about Roxsana's involvement with the migrant caravan and whether she received legal counseling about how to answer

---

[12] 2019—ICLI—00053 677.
[13] 2019—ICLI—00053 1466.

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

questions during the interview, rather than questions about her asylum claim and the violence she fled from. Despite the fact that Roxsana told the officer that gang members raped and tried to kill her months prior and that she feared for her life, the officer did not ask a single follow up question but asked several questions about whether she had ever received legal advice. Furthermore, he failed to ask all required questions during the interview to establish a prima facie asylum claim, including whether there was a place in Honduras where she would be safe. This is also indicia of the CBP officer's animus towards Roxsana as a migrant and part of the highly publicized caravan. In fact, one CBP officer in the ICE box, Bosch, called the caravanners "troublemakers" when they requested medical care for Roxsana.[14]

CBP officers also demonstrated their animus towards Roxsana and the other caravan members through their treatment of them while they were detained in the ice box. CBP officers called them "fucking queers," disregarded Roxsana's dire need for medical care, threw food at them at one point, and punitively increased the air conditioning when they requested to have it turned down, in violation of CBP's own rules.[15]

Roxsana did not receive a determination on her asylum claim when she died despite the fact that it was clearly meritorious. Had Roxsana been able to bring her asylum claim before an immigration judge, she most likely would have either been granted asylum or withholding of removal and been granted a waiver of inadmissibility. As a transgender woman living with HIV who was raped by one of the most dangerous gangs in Central America telling her they did it so she would "learn to be a man"[16] an immigration judge most likely would find Roxsana had a very well founded and credible fear of persecution.

These CBP officers abused their authority and discretion by recommending Roxsana be placed in expedited removal for reasons motivated by animus without giving her a meaningful opportunity to establish her claim. They relied upon improper considerations, namely discriminatory intent, as evidenced by both aforementioned forms as well as their disparaging and unlawful treatment of Roxsana while she was in custody.

### F.  Loss of Chance of Survival

Had Roxsana received the proper health care screening within 12 hours of entering custody as required by agency policy and prevailing standards of medical care she, more likely than not, would have survived. Because Multi-Centric Castleman disease (MCD), the disease Roxsana

---

[14] *See* **Exhibit U.**

[15] CBP Transport, Escort, Detention and Search standard 4.6, which provides: "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner."

[16] *See* **Exhibit G** of Administrative Complaint filed November 22, 2018.

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

was diagnosed with, is an aggressive disease, prognosis of patients diagnosed with MCD improves the sooner MCD patients begin treatment.

## IV. SUPPLEMENTAL LIABILITY OF THE UNITED STATES

Based on the facts set forth above, Claimants contend the United States of America is liable for the acts and omissions of its officers based on, at minimum, the following theories:

1. Loss of chance of survival under New Mexico state law. As a direct and proximate cause of CBP and ICE employees' unlawful acts and omissions including failure to provide her with timely and adequate medical care, Roxsana lost her chance to survive. By the time she received care her disease was too far progressed. Had Roxsana received a proper health care screening within 12 hours of entering CBP's custody she would more likely than not would have survived.

2. False Imprisonment California Law Cal.Civ.Code § 43 for unlawfully keeping Roxsana in detention after she was found medically unfit for detention and transportation on May 11, 2018 through the time of her death on May 25, 2018. Because CBP officers intervened in the medical care Roxsana received at Scripps hospital by failing to provide interpretation services and controlling the information that the treating medical providers received, Roxsana was erroneously cleared for detention based upon false information. Roxsana's detention, while initially lawful, became unsanctioned and unauthorized by law. The undisturbed finding that Roxsana was not medically fit for incarceration or transportation rendered her continued detention and transportation by CBP and ICE unlawful.

   As a direct and proximate cause of their discriminatory treatment of Roxsana and CBP and ICE's unlawful detention and transportation of her, Roxsana lost her chance to live and experienced severe pain and suffering and mental anguish from May 9, 2018 until May 25, 2018.

## V.   SUPPLEMENTAL WITNESSES

Kathleen Raquel Page, M.D. Infectious Disease Specialist Associate Professor of Medicine at John Hopkins University.

Jose Llanes CBP Officer

## VI.   SUPPLEMENTAL EXHIBITS

Affidavit of Kristal Zambrano Aguilera …......................................................................Exhibit U
Documents from CoreCivic.............................................................................................Exhibit V
Available at: https://tlcenter.box.com/s/1pfo8j5p7jjxrb5usx9fejol4ho51f6c

**SF-95 Continuation Form**
**Estate of Roxsana Hernandez Rodriguez**

# **EXHIBIT C**



*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th St. SW, Stop 5900
Washington, DC 20536-5900

**U.S. Immigration
and Customs
Enforcement**

January 8, 2021

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Joleen K. Youngers
228 Griffin St.
Santa Fe, NM 87501

      Re:    Federal Tort Claims Act administrative claim of Joleen K. Youngers as personal
                representative of the estate of Roxsana Hernandez

Dear Ms. Youngers:

      This correspondence is in reference to the receipt of your Standard Form 95 (Claim for
Damage, Injury or Death) (with attachments), filed as personal representative of the estate of
Roxsana Hernandez, dated November 22, 2019, against the Department of Homeland Security
(DHS), Customs and Borders Protection (CBP) and Immigration and Customs Enforcement
(ICE), the latter of which has been designated to decide the merits of the claim. Based on the
evidence before it, our decision is to deny the claim.

      This letter is furnished as notice that the agency has considered the claim and has denied
it. If you wish to file suit against the United States to recover any alleged damages or expenses
incurred, pursuant to Title 28, United States Code Annotated § 2401(b), you must do so in the
appropriate United States District Court no later than six months after the date of mailing of this
letter.

                                      Sincerely,

                                        José Javier Santos Mimoso
                                        Associate Legal Advisor