# EXHIBIT A

### EXPERT REPORT OF HARISH MOORJANI, M.D.

**Re:**    *Joleen K. Youngers v. Management & Training Company, et al.,*
**United States District Court for the District of New Mexico**
**Case No: 20-cv-00465-WJ-JMR**

I was asked to render expert opinions on behalf of CoreCivic and TransCor in connection with a lawsuit brought by Joleen K. Youngers as Personal Representative of the Wrongful Death Estate of Roxsana Hernandez.  This report summarizes the expert opinions I have formed and is based on a review of the records provided, as well as my education, experience, and training.

All of my opinions are made to a reasonable degree of medical probability unless otherwise noted.

**<u>Experience and Qualifications</u>:**

I hold board certification in both Infectious Diseases and Internal Medicine. My medical school training was completed at Maulana Azad Medical College in New Delhi, India in 1986. Subsequently, I completed my internal medicine residency training at the University of Medicine and Dentistry in New Jersey in 1992, and my fellowship specialty training in Infectious Diseases at Stony Brook University in New York in 1994.

Since then, I have been a full-time practicing Infectious Diseases/Internal Medicine attending physician in Briarcliff Manor, NY, with privileges at Northwell Phelps Hospital in Tarrytown, NY, Columbia Presbyterian Hudson Valley Hospital in Peekskill, NY, and Montefiore Mount Vernon Hospital in Mount Vernon, NY. Alongside this, I serve as a voluntary Clinical Assistant Professor of Medicine in the Infectious Disease Division at New York Medical College in Valhalla, NY.  I have served as the Medical Director of the inpatient unit for NY State Department of Corrections and Community Supervision ("NYSDOCCS") since 1998. I am also the Infectious Disease Consultant for the Westchester County Jail.

I primarily serve as the on-site Infectious Disease Consultant at NYSDOCCS, one of the largest correctional systems in the United States, with a capacity of approximately 31,000 detainees. I've worked in various units, including male and female general population (all security levels), infirmary units, mental health units, emergency room, intake facility, specialty clinic areas, and inpatient units at the hospital. My experience spans from frontline clinical duties to the Infection Control Department and includes the development of policies and procedures. As the Infectious Disease Consultant, I am responsible for consulting with NYSDOCCS to maintain and update facility policies on contagious diseases, handling outbreaks, clinical management of select infections, reporting to health agencies, sanitation, and environmental hygiene.

In my Infectious Diseases/HIV/Hepatitis C clinics at NYSDOCCS's various prison facilities, I provide assessment and management of infectious diseases, as well as managing or co-managing other primary medical and psychiatric/psychological concerns. A significant portion of my patients have documented chemical dependency problems, and a majority have a primary psychiatric diagnosis. I am actively involved in diagnosing and prescribing treatment for mental health concerns.

**CC_Hernandez015540**

At the Westchester County Jail infectious disease clinic, I care for HIV+ patients and serve over 1,000 under or uninsured members of the Westchester County community.

At the Montefiore Mount Vernon Hospital, I am the inpatient ward attending physician and I supervise a team of health care providers. We care for patients with a variety of conditions requiring hospitalization, including infectious diseases, chronic medical/social conditions, cancer, cardiac care, diabetes, lung disease, autoimmune disorders, mental health issues, dementia, pain management, neurologic conditions, skin problems, substance abuse/withdrawal, homelessness, and more.

For a detailed listing of professional publications and presentations, please refer to the attached Curriculum Vitae.

I charge $450/hour for document review and analysis, and $3,500 for a full day of testimony, plus travel expenses.

Over the previous four years, I have testified as an expert at a deposition or trial in only one matter: *Drew Daddono, as Personal Representative on behalf of the Estate of Stephanie Marie Miller v. Hoffman, et al.*, Case No. 8:21-cv-00315-WFJ-JSS (M.D. Fl. (Tampa Div.)).

**<u>Materials Reviewed:</u>**

I have reviewed the following documents in preparation of the Report:

- Plaintiff's Second Amended Complaint

- ICE Health Service Corps medical records (USA Youngers 645-660)

- Mobile Medical Group medical records, 5/11/18 (USA Youngers 665-668)

- Scripps Mercy Hospital ED medical records (USA Youngers 669-676/PL 12612-28)

- Scripps Mercy Hospital prescription records (USA Youngers 677-685)

- Medical Prisoner Transport, 5/15/18 (USA Youngers 697)

- Medical Prisoner Transport, 5/16/18 (USA Youngers 698)

- CCS-Cibola medical records (USA Youngers 699-721)

- CCCC Medical File (CC-Hernandez 30-138)

- Cibola General Hospital medical records (USA Youngers 772-778)

- Superior Ambulance medical records (USA Youngers 779-782)

- PHI Air Medical medical records (USA Youngers 783-791)

- Lovelace Medical Center (USA Youngers 792-1854)

- CCS Memo-Significant Event Notice, 5/25/18 (CC_Hernandez 1986-1987)

2

- New Mexico Office of the Medical Investigator ("OMI") Death Investigation Summary Amended, 4/8/19 (USA Youngers 1855-1886)
- OMI Report of Findings, 4/8/19 (CC_Hernandez 1878-1882)
- OMI Case Notes (PL 7384-7387)
- OMI Central Office Investigation (PL 12841-12843)
- OMI Deputy Field Investigation (PL 10147-1049)
- OMI Report of Death (PL 9936-9937)
- OMI Request-Response Review (PL 8033)
- OMI Internal Paper File (PL 11621-11754)
- OMI Emails (PL 9784-9904)
- NM Dept of Health Report of Findings (PL 12647-12651)
- NM Dept of Health Toxicology Report (PL 11800)
- ICE Detainee Death Report (CC_Hernandez 2365-2366)
- ICE Detainee Death Review (USA Youngers 1889-1904)
- ICE Mortality Review-Findings (USA Youngers 1905-1909)
- ICE OPR ERAU Finding (PL 1887-1888)
- ICE Referrals Consultation Hospital Transfer (USA Youngers 686-696)
- Plaintiff's Expert - Report by Dr. David Fajgenbaum, 6/28/23
- Photos identified in Appendix B – Faigenbaum Report
- Plaintiff's Expert - Report by Dr. Jeffrey Keller, 6/27/23
- Plaintiff's Expert – Report by Dora Schriro, 6/28/23
- Preliminary Autopsy Report Dr. Kris Sperry, 7/12/18
- Photos identified in Dr. Sperry's email (PL 15970-15993)
- Photos identified in Dr. Sperry's email (PL 16767-16768)
- Defendant LaSalle's Expert – Report of Dr. Chad Zawitz (LaSalle 5072-5126)
- Photos of Hernandez, taken at Point of Entry, 2014-2018 (USA Youngers 2260-2261)
- Creative Corrections Detainee Death Review: Jeffry Hernandez (USA Youngers 2558-81)
- Affidavit of Asylum Seeker – Oscar Tot Coc (PL17156-57)
- Affidavit of Asylum Seeker – Max Garcia (PL17158-60)
- Affidavit of Asylum Seeker – Miguel Orellana (PL17161)

3

- Affidavit of Asylum Seeker – Kristal Aguilera (PL17162-63)

- Affidavit of Asylum Seeker – Jorge Juarez (PL17164-65)

- Affidavit of Asylum Seeker – Aldari Larios (PL17166)

- Affidavit of Asylum Seeker – William Mesa (PL17167)

- Affidavit of Asylum Seeker – Freddy Arrollo (PL17168-69)

- Affidavit of Asylum Seeker – Samule Montes (PL17170)

- Affidavit of Asylum Seeker – Elmer Pavon (PL17171-72)

- Affidavit of Asylum Seeker – Julio Barahona (PL17173-74)

- Affidavit of Asylum Seeker – Jose Reyes (PL17175)

- Affidavit of Asylum Seeker – Wilson Osegueada (PL17176-77)

- Affidavit of Asylum Seeker – Wilson Alex Murillo (PL17178-79)

- Affidavit of Asylum Seeker – Nelson Alvarenga (PL17180)

- Affidavit of Asylum Seeker – Kristin Aguillar[1] (PL17181-82)

- Affidavit of Asylum Seeker – Eleazar Meja (PL17183)

- Affidavit of Asylum Seeker – Minor Sacaza (PL17184)

- Affidavit of Asylum Seeker – Oscar Jinienez (PL17185-86)

**<u>Synopsis of Events:</u>**

Roxsana Hernandez was a 33-year-old transgender woman from Honduras who entered the United States at the California-Mexico border on May 9, 2018. Ms. Hernandez was placed in the custody of the U.S. Customs and Border Protection ("CBP"), and eventually U.S. Immigration and Customs Enforcement ("ICE"). The Second Amended Complaint ("SAC") alleges that from approximately May 14, 2018 to May 17, 2018, Ms. Hernandez was transported from San Diego, California to CoreCivic's Cibola County Correctional Center ("CCCC") in Milan, New Mexico by various government contractors, to include: LaSalle Corrections Transport, LLC; LaSalle Corrections West, LLC; LaSalle Management Company, LLC; Global Precision Systems, LLC (and Asset Protection and Security Services, L.P.); TransCor America, LLC; and CoreCivic, Inc.[2]

Ms. Hernandez was in the physical custody and care of TransCor from approximately 6:25 p.m. to 8:43 p.m. on May 16, 2018 (less than 3 total hours) and CoreCivic from approximately 8:43 p.m. on May 16 until approximately 11:59 a.m. on May 17, 2018 (approximately 16 total hours).

The following is a brief timeline of Ms. Hernandez's time in custody.

---

[1] Spanish version
[2] My opinions relate only to TransCor and CoreCivic. I make no opinions with respect to the other government contractors.

CC_Hernandez015543

**May 9, 2018**: Ms. Hernandez presented to the San Ysidro port of entry as an undocumented alien from Honduras. Records note that she may have weighed 160 pounds, and that a meal was offered.

**May 11, 2018**: CBP Officer Llanes completed an ICE Health Services Corps ("IHSC") In-Processing Health Screening Form entering "no" for all medical and mental health questions and indicating Ms. Hernandez was fit for general population placement. The form noted that Ms. Hernandez was HIV+ with no medications.

Ms. Hernandez underwent a new patient comprehensive exam by Mark Olcott, MD, of Mission Medical Support. It was noted she was HIV+ diagnosed 5 months prior, and had fever, chills, headache, cough (with sputum), weight loss, vomiting, and diarrhea. Vitals: T: 99.5 / BP 112/70 / P: 134 / R: 18 / Sat: 99. She appeared emaciated and ill. No medications were noted.

Ms. Hernandez was transferred by Dr. Olcott to the Emergency Department at Scripps Mercy Hospital San Diego for chest x-rays and to rule out active infection and sepsis. It was noted by Dr. Olcott that she was "not medically cleared" for transport or detention.

Ms. Hernandez arrived at Scripps ED at approximately 3:22 p.m. The Reason for Referral Request was noted as "HIV+, no meds fever chills TB Rule Out." Vital signs were taken, and notes from Beverly G. Harrell-Bruder, MD, state she reported "cough productive of yellow sputum and subjective fever; being transferred and brought in to R/O TB. Needs clearance for transfer and incarceration. No TB exposure. Subjective fever and chills, but no weight loss or night sweats." Examination showed lungs with some mild end-expiratory wheezing, "cardiac" was normal, and chest x-rays were noted as negative for acute infiltrative process or active TB.

Dr. Harrell-Bruder diagnosed Ms. Hernandez with bronchitis and prescribed Tylenol, Z-pack (azithromycin) (5-day), and albuterol (10-day). Notes indicate that Dr. Harrell-Bruder explained to CBP officers that there was no clinical or radiographic appearance of TB, although TB was not completely ruled out. She noted that the blood test needed for a full TB evaluation could not be done in the ED and that Ms. Hernandez would have to follow up with facility medical personnel. Dr. Harrell-Bruder cleared Ms. Hernandez for travel and incarceration.

**May 12, 2018**: ICE/ERO (Enforcement and Removal Operations) San Diego requested transfer of 19 transgender detainees, including Ms. Hernandez, to CCCC under the "streamlined transfer process" because it had a dedicated transgender housing unit and experience housing transgender detainees. The transfer was approved on the same date.

**May 13, 2018**: There was an email from an ICE official timed 8:21 a.m. to ICE Air Charter Operations requesting 19 seats for transgender females. This email noted, "…arrangements have been made with the receiving office to have a complete medical evaluation upon arrival. Therefore they will not need certain medications at the time of transport; i.e., HIV medication."

CC_Hernandez015544

**May 14, 2018**: CBP transferred custody of Ms. Hernandez to ICE.

LaSalle Corrections transport officers from the San Luis Regional Detention Center ("SLRDC") picked up Ms. Hernandez and 18 other transgender detainees at the San Ysidro Point of Entry at approximately noon. The transport took approximately 6 hours, arriving at SLRDC at approximately 6 p.m., at which time Ms. Hernandez was placed in a holding cell. According to the "Detainee Death Review," because "their departure was imminent," the detainees, including Ms. Hernandez, were not medically screened at SLRDC.

**May 15, 2018**: Ms. Hernandez and a group of other detainees departed SLRDC by bus to Phoenix-Mesa Gateway Airport at around 12 a.m. The transport took approximately four hours and arrived at 4:00 a.m. She then boarded a flight to El Paso (time of departure unknown) and arrived in El Paso at 2:48 p.m. She was met by ICE personnel and turned over to Global Precision Systems for transport by bus to the El Paso Service Processing Center ("EPSPC").

The bus arrived at EPSPC at 3:15 p.m. Ms. Hernandez was placed in a housing unit pending transfer to CCCC the next day. The EPSPC healthcare personnel advised they had no record of her, and therefore no medical concerns were brought to their attention.

A U.S. DOJ Medical Summary of Federal Prisoner / Alien in Transit form notes that Ms. Hernandez departed from SLRDC on May 15, 2018 for CCCC. The form states, "*Detainee in ICE Custody Less than 72 Hours* Detainee transfer meets requirements per JPATS cabin crew policies and procedures manual 'Medical Regulations, Section D4.(a), page 33, regarding TB clearance.'" No medications or special needs were identified. This was stamped as received by Correct Care Solutions ("CCS")[3] Registered Nurse Randal Griffiths once Ms. Hernandez arrived at CCCC.

**May 16, 2018**: Ms. Hernandez was processed for transport from EPSPC to "ICE CAP" in Albuquerque between 8:30 and 9:45 a.m. She arrived at ICE CAP at 2:30 p.m. She was placed into custody of TransCor transport officers at approximately 6:25 p.m., and CCCC video surveillance footage shows that the bus arrived at CCCC's sallyport at approximately 7:59 p.m. After all detainees disembarked from the bus, they were escorted into CCCC at approximately 8:43 p.m. and were placed into holding cells. After that, all detainees started the intake and booking process, to include property inventory, facility orientation, and booking paperwork.

According to the Detainee Death Review report, a receiving officer at CCCC described Ms. Hernandez as "quiet and scared." This officer noted he does not speak Spanish but recalled Ms. Hernandez answering "no" when asked if she had medical problems. He observed it "seemed like she had the common cold and looked like she was under the weather." He said she "seemed to understand when he asked her other yes or no questions,

---

[3] All healthcare at CCCC was provided by CCS, not CoreCivic.

CC_Hernandez015545

answering no to each one." He said she was able to stand and walk on her own and did not lean on the table or counters for support.

**May 17, 2018**: Ms. Hernandez was booked into CCCC at approximately 1:15 a.m. All 19 transgender detainees, including Ms. Hernandez, were escorted to the medical waiting area at approximately 2:23 a.m. where all detainees put blankets on the floor and laid down. At 4:08 a.m., all detainees were provided with a beverage. At 4:11 a.m., Ms. Hernandez went to the waiting area bathroom, and then returned to the floor to lay down. At 6:00 a.m., breakfast was served, and Ms. Hernandez stood and walked to the door to retrieve a tray. She sat on the floor and appeared to have eaten the entire contents before returning the tray to staff at 6:14 a.m.

Ms. Hernandez was called out of the waiting room at approximately 7:26 a.m. Her vital signs were taken by a CCS dental assistant and were abnormal as follows: BP 81/61 / P: 136 / RR: 16 / T: 100.8. The dental assistant stated she observed Ms. Hernandez as ill-appearing and flagged her medical chart so that she would be the first detainee to receive medical intake screening that morning.

At approximately 7:35 a.m., CCS RN Griffiths conducted a medical intake screening and noted that Ms. Hernandez reported being diagnosed with HIV and hepatitis A. She also reported having a cough and experiencing a loss of appetite and weight loss. Spanish interpretation was provided. Ms. Hernandez later denied having hepatitis A. RN Griffiths administered a TB test and reviewed the accompanying IHSC In-Processing Health Screening form. There were no other medical documents that accompanied Ms. Hernandez to CCCC.

CCS RN Griffiths noted that she was not on medications. He noted that she appeared obviously ill and referred her to the physician. He also notified the CCS Director of Nursing, RN Diana Gonzales, and the CCS Health Services Administrator ("HSA"), Wendy Baca, of Ms. Hernandez's condition. HSA Baca informed CCS Mary Birdsong, MD, of Ms. Hernandez's condition by telephone, and Dr. Birdsong instructed HSA Baca to administer fluids and that she would be at the facility shortly to evaluate her.

At approximately 8:08 a.m., medical staff provided Ms. Hernandez with Ensure and Pedialyte. At approximately 9:06 a.m., medical staff placed her in an isolation room in the medical unit for her comfort while she waited to be examined by Dr. Birdsong.

At approximately 9:42 a.m., Dr. Birdsong, who is fluent in Spanish, examined Ms. Hernandez. Her abnormal vital signs were noted as: BP 81/61 / HR: 128 / RR: 20 / Temp: 102 / O2: 92%. It was noted that Ms. Hernandez was diagnosed with HIV+ six months prior with no medication. She reported weight loss for 4–6 months and a history of depression with difficulty sleeping. She was noted as transgender but was not taking hormones. She reported that she started her trip from Honduras in April 2018 and traveled through Mexico with little food or water. Upon physical examination, Dr. Birdsong found Ms. Hernandez emaciated with an increased amount of white phlegm and dry mucous membranes, poor skin turgor, muscle wasting, coarse breath sounds, and tachycardia. She

CC_Hernandez015546

determined that she suffered from dehydration, starvation, untreated HIV, fever, and cough.

Dr. Birdsong ordered her to be transported to the local hospital, Cibola General Hospital ("CGH"), for IV fluids, chest x-ray, and to rule out infection from Ms. Hernandez's compromised immune system. She ordered numerous lab and diagnostic tests to be completed at the hospital. According to the Detainee Death Review, Dr. Birdsong made the determination for her to be transported by facility van, rather than in an ambulance, because she believed the trip would be shorter by van.

At approximately 11:08 a.m., she was placed in a van for transport. She arrived at CGH's emergency room at 11:59 a.m. and was noted as alert, walking, and talking.

At CGH, she was rapidly assessed and determined to be in septic shock alongside multiple other secondary diagnoses. It was determined she needed a higher level of care than available at CGH. Air ambulance transport was coordinated to take her to Lovelace Medical Center ("Lovelace") in Albuquerque. She was airlifted to Lovelace and admitted to the ICU at 10:14 p.m.

**May 18, 2018:** Medical records show that Ms. Hernandez's laboratory blood test results were pending, and her hydration status was noted as improved. The treatment plan included consultation with infectious disease specialists and administration of broad-spectrum antibiotics (note that the diagnosis for Multicentric Castleman's Disease ("MCD") was not entertained). Ms. Hernandez received a CT scan of her abdomen with results pending.

**May 19, 2018**: Ms. Hernandez underwent a CT scan of her neck due to her enlarged lymph nodes. Inpatient workup for lymphadenopathy included suspicion for T-cell lymphoma (note that the diagnosis for MCD was not entertained) and that biopsy would be needed.

**May 21, 2018**: Surgical biopsy of axillary node performed. Remained in stable condition. Tested negative for TB.

**May 22, 2018**: Lumbar puncture performed. Remained in stable condition.

**May 23, 2018:** Received CT scan of her stomach and chest x-ray. Dr. Birdsong spoke with a Lovelace nurse who reported that Ms. Hernandez had a high fever and elevated pulse. Ms. Hernandez remained on oral antibiotics. Biopsy results were pending, but the lumbar puncture results were normal.

**May 24, 2018**: Hospital staff had ongoing suspicion for T-cell lymphoma or mycobacterium avium complex ("MAC"). It was noted that Ms. Hernandez was in serious condition with guarded prognosis. Blood cultures found no growth, indicating a low probability of blood infections caused by bacteria/fungi. Ms. Hernandez tested negative for malaria, parasites, and toxoplasmosis, and tested positive for syphilis. A chest x-ray found slight bilateral pleural effusion.

CC_Hernandez015547

Ms. Hernandez clinically decompensated following a thoracentesis later that day. The pathology report from the lymph node biopsy was provided to Lovelace physicians at 3:52 p.m., confirming MCD and Kaposi's sarcoma. There was no prior mention in the Lovelace medical records of MCD or any plan for imminent treatment of MCD after receipt of the pathology report.

After severe decompensation, Lovelace intubated Ms. Hernandez and she received another chest x-ray. At approximately 10:10 p.m., Ms. Hernandez developed bradycardia and pulseless electrical activity, and staff immediately initiated chest compressions and administered multiple doses of epinephrine.

**May 25, 2018**: At 12:48 a.m., Ms. Hernandez went into cardiac arrest. CPR was initiated, as well as an automated external defibrillator and medications to no avail. This reoccurred multiple times until death was pronounced at 3:32 a.m.

**Discussion and Opinions**:

1. **The care received by Ms. Hernandez at Scripps Mercy Hospital fell below the standard of care.**

I unequivocally agree with Dr. Zawitz's opinions that the care Ms. Hernandez received at the Scripps ED, particularly from Dr. Harrell-Bruder, fell below the standard of care and put Ms. Hernandez on a course that more likely than not delayed her ultimate diagnosis of MCD and treatment and could have potentially caused or contributed to her death.

On May 11, 2018, Ms. Hernandez presented to Dr. Olcott displaying signs of cachexia, malnutrition, emaciation, and a generally unwell appearance. She exhibited active coughing and various other physical symptoms, accompanied by markedly abnormal vital signs. I agree with Dr. Zawitz that most of her symptoms were likely due to her advanced untreated HIV (AIDS)[4] and MCD. They also were likely indicative of sepsis, which is a potentially life-threatening condition and requires immediate medical attention.

I agree with Dr. Zawitz's opinion that Dr. Olcott appropriately sent her offsite to the emergency room for a higher level of care to rule out infection and sepsis (particularly given her untreated HIV status, symptoms, and abnormal vital signs), and that this information was documented and sent with Ms. Hernandez to the Scripps ED. I agree that Dr. Olcott acted appropriately in not medically clearing Ms. Hernandez for transport or incarceration given her health status.

I agree with Dr. Zawitz's opinion that Dr. Harrell-Bruder's clinical assessment and physical examination of Ms. Hernandez, as well as her diagnosis of bronchitis and treatment plan, were

---

[4] HIV (human immunodeficiency virus) is a virus that attacks the body's immune system, and, if left untreated, can ultimately lead to AIDS (acquired immunodeficiency syndrome). There is no cure for HIV or AIDS, but management options are available. HIV makes a person significantly more vulnerable to other secondary infections and diseases.

CC_Hernandez015548

incomplete, incorrect, and fell below the standard of care. I agree with Dr. Zawitz's in-depth analysis of the timeframe and deficiencies in the care Ms. Hernandez received from Dr. Harrell-Bruder, which need not be repeated in full here.

Of note, Dr Harrell-Bruder was aware that Ms. Hernandez presented to the ED to rule out tuberculosis ("TB"), and yet Dr. Harrell-Bruder did not conduct a lymph node exam, a standard part of any TB assessment. She also failed to conduct rudimentary oral, skin, or neurologic examinations and failed to adequately check Ms. Hernandez's blood pressure. I agree with Dr. Zawitz that, aside from a chest x-ray, no other diagnostic tests were ordered to adequately rule out TB, and that a chest x-ray alone could not have done so. Although Dr. Harrell-Bruder noted that a blood test was needed to rule out tuberculosis conclusively, I, like Dr. Zawitz, know of no blood test that can rule out active TB.

What is perhaps most egregious is that Dr. Harrell-Bruder knew that Ms. Hernandez had untreated HIV but did nothing to explore her symptoms or abnormal vital signs by ordering further diagnostic testing. Instead, Dr. Harrell-Bruder noted that she would need to follow up with Jail/Customs Medical for this, which is the exact reason she had been sent to the Scripps ED in the first place. It is shocking that someone in Ms. Hernandez's state, and with known untreated HIV, was given a chest x-ray, diagnosed with bronchitis, told to "follow up," and was cleared for transport and detention with no further analysis or considerations. No IV fluids were started, no labs were ordered, and nothing else was considered in the differential diagnosis. I agree with Dr. Zawitz that Dr. Harrell-Bruder's diagnosis of "bronchitis" was grossly incorrect and did not align with the symptoms Ms. Hernandez presented with.

An internet search shows that Dr. Harrell-Bruder may be the Chief of Emergency Medicine at Scripps with over 38 years of experience. An emergency medicine physician with that much experience, particularly in a metropolitan area like San Diego, should have known that persons living with untreated HIV are medically complex and are at risk for a wide array of possible infections or diseases, and that further workup is almost always necessary when symptoms and vital signs are abnormal. She should have also known that Ms. Hernandez's vital signs were indicative of sepsis and that further tests and information were needed to rule it out and/or treat it.

Given San Diego's proximity to the international border, Dr. Harrell-Bruder is also presumably well aware that individuals who travel by foot to the United States can suffer from dehydration, malnourishment, and a myriad of other symptoms and ailments due to their arduous journeys. And many of those individuals, including Ms. Hernandez, originate from countries with a high rate of disease. By knowingly failing to rule out TB definitively, I agree with Dr. Zawitz that, at the very least, Dr. Harrell-Bruder potentially put every other person in proximity to Ms. Hernandez at risk.

At bottom, the appropriate course of action would have been to attempt to stabilize Ms. Hernandez's vital signs, hydrate/nourish her, rule out and treat sepsis, obtain baseline labs, conduct the appropriate TB rule-out, and to investigate her weight loss. Given her complex health status, a CT scan would have been appropriate, which could have revealed her enlarged lymph nodes and potentially prompted a biopsy, which could have ultimately led to a MCD diagnosis and a treatment plan.

CC_Hernandez015549

It is my opinion, based upon a reasonable degree of medical probability, that the actions and inactions of Dr. Harrell-Bruder fell below the standard of care and could have potentially altered Ms. Hernandez's ultimate outcome. Had Dr. Harrell-Bruder appropriately assessed Ms. Hernandez, medical providers at Scripps (or elsewhere in the surrounding area) could have ultimately diagnosed her with MCD days (and perhaps even a week) sooner than she was, which means that treatment could have been initiated that could have potentially saved her life. Of course, I cannot say with certainty whether Ms. Hernandez would have been appropriately diagnosed or properly treated had Dr. Harrell-Bruder adequately assessed her given her complex medical state, severe illness, and the difficulties associated with diagnosing MCD. I can, however, opine based on a reasonable degree of medical probability that, based on the circumstances of this case and timeline of events, Ms. Hernandez likely had one shot at potentially receiving the care and treatment she needed to change her ultimate outcome, and Dr. Harrell-Bruder deprived her of that opportunity.

Instead, Dr. Harrell-Burder simply "cleared" Ms. Hernandez for custody/transport. Because Dr. Olcott referred Ms. Hernandez to Scripps to rule out underlying illness or infection, Dr. Harrell-Bruder's "clearance" of Ms. Hernandez signaled to Dr. Olcott and ultimately CBP/ICE that she was only mildly ill, that she did not require immediate medical attention, and that she was well enough to be transported. There would have been little reason to question this assessment and recommendation from a higher-level care provider. Further, and discussed below, non-medical security personnel who encountered her during her transport would have likely believed and/or relied on this clearance and could not have understood the complexity and severity of Ms. Hernandez's underlying condition based upon her non-emergent outward symptoms.

Given Dr. Harrell-Bruder's failure to appropriately assess, examine, and test Ms. Hernandez at the Scripps ED, it is my opinion that Ms. Hernandez's underlying conditions remained unchanged or progressively worsened over the coming days until she was appropriately assessed by Dr. Birdsong at CCCC and was immediately transferred offsite to a hospital. Dr. Harrell-Bruder's conduct could have potentially caused or contributed to Ms. Hernandez's death.

2.  **Neither TransCor nor CoreCivic security personnel would have known or understood the severity of Ms. Hernandez's underlying conditions and could not have made medical determinations regarding her care.**

Ms. Hernandez was received by TransCor transport officers at approximately 6:25 p.m. on May 16, 2018. She was in TransCor's custody for approximately 3 hours until she arrived at CCCC and was placed into CoreCivic's custody at approximately 8:43 p.m. She remained in CoreCivic's custody for approximately 16 hours until she was transported offsite to CGH.

Based upon the records reviewed, there was no information with respect to Ms. Hernandez's health status, diagnoses, medications, or treatment plan (if any) provided to TransCor transport officers prior to or during her short transport, and there were no documents that would have otherwise put TransCor transport officers on notice of Ms. Hernandez's serious underlying conditions.

Likewise, there were no receiving documents that would have put non-medical CoreCivic security personnel on notice of Ms. Hernandez's health status once she arrived at CCCC. As indicated, a

11

CC_Hernandez015550

CCS nurse received some paperwork showing that Ms. Hernandez was HIV+ and was not taking medications. There is no indication that this paperwork was provided to any CoreCivic employee or that any CoreCivic employee was aware of Ms. Hernandez's underlying health status.

I agree with Dr. Zawitz that providing non-medical security personnel with confidential and protected health information, such as an HIV diagnosis or even bronchitis, would not have occurred. Health information is generally not accessible to non-medical security personnel (to include transport officers) because it violates the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Moreover, aside from providing certain health-related information to non-medical security personnel to assist in the management of inmates/detainees, there would be no reason to do so outside of operational necessity, as an inmate/detainee's private medical information would mean very little, if anything, to individuals who are not medically trained. It is therefore not at all surprising or outside the norm for non-medical security personnel to *not* have been provided with Ms. Hernandez's private health information, to include her HIV+ diagnosis. Indeed, it would be more concerning if Ms. Hernandez's confidential medical information was provided to TransCor or CoreCivic non-medical security personnel.

Even if a TransCor or CoreCivic officer was made aware of Ms. Hernandez's HIV+ status, it is unclear what an officer would have been expected to do with this information, as an individual's HIV+ status would not warrant emergency offsite medical care in and of itself, and non-medical security personnel could not have made decisions pertaining to Ms. Hernandez's care or treatment.

Because TransCor/CoreCivic non-medical security personnel would not have been notified of Ms. Hernandez's HIV+ status or other medical issues, it is my opinion, to a reasonable degree of medical probability, that they could not have been aware of the potential severity of Ms. Hernandez's underlying conditions based upon her appearance and the outward symptoms she exhibited. No layperson could know that Ms. Hernandez likely suffered from HIV, MCD, or sepsis based upon her generally ill appearance, coughing, fever, nasal drainage, diarrhea, or vomiting, even assuming they observed all of these symptoms. No TransCor or CoreCivic officer would have been aware of her abnormal vital signs. Transport officers and detention personnel were likely aware that many ICE detainees embark on exhausting journeys to the United States and could have assumed that someone who appeared underweight, ill, and exhausted, probably had done just that. No layperson could have known that Ms. Hernandez was clinically dehydrated or malnourished.

As Dr. Zawitz stated, security personnel rely on the determinations of medical personnel in clearing individuals in custody for travel and detention. As Dr. Zawitz also stated, it is likely that non-medical security personnel believed Ms. Hernandez had already been cleared by a medical professional based on an assessment. This is particularly true for TransCor transport officers, who only retained custody of Ms. Hernandez for at most three hours.

There is no indication from any records I have reviewed which show that Ms. Hernandez was suffering from openly emergent medical symptoms requiring an emergency response or immediate transport to an emergency room. In my experience, non-medical security personnel are most often trained to recognize "typical" emergent conditions, such as heart attack, stroke, and/or diabetic shock, which then requires them to initiate an emergency medical response by contacting facility medical personnel and/or by summoning emergency medical services. There is no record of Ms.

CC_Hernandez015551

Hernandez collapsing, fainting, or otherwise showing signs and symptoms of "emergent" medical conditions, such as a heart attack, diabetic shock, or stroke. There is also no record of her reporting or complaining to *any* CoreCivic security personnel that she was ill or that she needed emergency medical attention. Indeed, the records reviewed show that Ms. Hernandez was able to ambulate normally, talk, eat, drink, use the restroom, and move about the receiving and medical units while at CCCC.

I have reviewed the affidavits submitted by other detainees who were detained with or traveled alongside Ms. Hernandez. These affidavits show that all detainees, including Ms. Hernandez, were indeed provided with ample food and beverage during their detention and transport to CCCC. The affidavits provide the detainees' general observations of Ms. Hernandez and relay what Ms. Hernandez told them. These detainee affidavits generally state that Ms. Hernandez vomited and had diarrhea, had flu or cold-like symptoms, had a headache, did not look well, looked tired and weak, appeared skinny, slept a lot, coughed up phlegm, and had nasal drainage.

Two detainees stated that Ms. Hernandez never complained to any TransCor officer. (PL00017174, PL00017186). One detainee stated that during the night at CCCC, Ms. Hernandez did not complain about anything, she ate and drank water, and did not ask to see a doctor. (PLF00017172). One detainee claimed that Ms. Hernandez said she felt dizzy and complained of pain in her stomach. This detainee also stated that Ms. Hernandez began to lose "her mental capacity" while waiting to see medical at CCCC, but there is no indication that Ms. Hernandez requested medical care, or that this detainee requested medical care on her behalf and was ignored. (PLF00017163).[5]

While some detainees stated that Ms. Hernandez complained to them that she felt very sick, there is no indication that any detainee, aside for one, specifically requested medical care on her behalf to any TransCor or CoreCivic officer. The one detainee who stated that she requested medical care for Ms. Hernandez, only requested care once they were transferred to the medical unit at CCCC, but was told they had to wait for a provider, which was appropriate. One detainee claimed that they asked officials to give her medical attention, but officials told them she had to wait until she arrived at her destination to receive medical attention. It is unclear what "officials" this detainee is referring to. (PL00017179). In any event, Ms. Hernandez was evaluated by a medical doctor and transported to the local hospital within hours after her arrival at CCCC.

Thus, while trained medical personnel could likely have determined that Ms. Hernandez was severely ill, it cannot reasonably be stated that a non-medical layperson could have perceived anything more than mild illness. To somehow suggest that TransCor or CoreCivic officers should have known she had HIV, was in need of medication(s), and/or that she was not adequately treated or cleared at Scripps ED likewise has no basis.

It is my opinion, based upon a reasonable degree of medical probability, that neither TransCor nor CoreCivic security personnel were aware of or could have understood the severity of Ms. Hernandez's condition. Because none of the symptoms exhibited by Ms. Hernandez would be

---

[5] Nor is there any explanation as to what the detainee meant by stating that Ms. Hernandez began to "lose her mental capacity."

CC_Hernandez015552

expected to be deemed "emergent" by a layperson, there is nothing that should have prompted security personnel to initiate an emergency health response or to otherwise transport her to a hospital any sooner than she was on May 17, 2018.

### 3. **The medical care Ms. Hernandez received at CCCC, CGH, and Lovelace was reasonable under the circumstances and underscores the difficulty in obtaining an MCD diagnosis.**

As stated above, it is my understanding that CoreCivic did not employ medical providers at CCCC. All medical providers who evaluated and/or were otherwise involved in Ms. Hernandez's care at CCCC were employed by CCS.

Ms. Hernandez arrived at CCCC in Milan, New Mexico at approximately 8:43 pm on May 16, 2018. She was booked at 1:15 a.m. on May 17, and at 2:23 a.m., she was placed in a medical waiting room. At approximately 7 a.m., she was seen in intake screening by CCS RN Griffiths and a purified protein derivative ("PPD"), which is used to diagnose TB, was planted on the left forearm. She was flagged by medical staff as needing to be seen first and was evaluated by Dr. Birdsong before 10:00 a.m., when Dr. Birdsong arrived at the facility. Dr. Birdsong reviewed the receiving screen and noted that the patient was HIV+ for 6 months with no treatment. Dr. Birdsong also noted significant weight loss for 4–6 months. Ms. Hernandez stated to Dr. Birdsong that she started her trip in Honduras in April 2018 and the trip went through Mexico to the United States with "little food or water." Dr. Birdsong noted a blood pressure of 81/61 and oxygen saturation of 92%. Dr. Birdsong also noted several abnormalities on physical exam including whitish phlegm, dry mucous membranes, multiple carries, muscle wasting, and poor skin turgor. Dr. Birdsong did not use an interpreter since she herself spoke fluent Spanish. Dr. Birdsong noted a history of smoking for 15 years and a history of depression. Dr. Birdsong's assessment of Ms. Hernandez was of dehydration and untreated HIV in a transgender woman. Dr. Birdsong also noted fever and cough probably from infection secondary to HIV.

In my opinion, Dr. Birdsong performed a thorough comprehensive evaluation and correctly ordered Ms. Hernandez to be transferred to an emergency room immediately for IV fluids and further diagnostic testing.

Based on the encounter details provided by CCS providers on May 17, 2018, it would have been impossible to diagnose a rare disorder like MCD, or any lymphoma, at CCCC. The first order of business is to stabilize the patient, establish a differential diagnosis and start a diagnostic evaluation. In my 30 years of evaluating tens of thousands of HIV patients with sepsis during their first encounter in both the inpatient and outpatient setting, I have never listed lymphoma or MCD as the probable diagnosis. It is impossible and inconceivable to expect any primary care physician or ER provider to make this diagnosis at the outset on initial evaluation in a patient presenting with sepsis and HIV. This is further evidenced by the fact that it took seven days for providers at Lovelace to arrive at this diagnosis, which was only after a definitive diagnostic LN biopsy. It would have been impossible for a facility like CCCC to diagnose Ms. Hernandez with MCD without a referral to a specialist. The CCS providers at CCCC simply did not have the means or diagnostic tools to do so.

14

Ms. Hernandez arrived at CGH on May 17, 2018 at approximately 11:59 a.m. and was triaged as level 3 urgent. CGH providers made a preliminary diagnosis of septic shock and determined that she needed a higher level of care than that facility could provide, which again demonstrates the complexity of her condition.

Ms. Hernandez spent approximately eight days at Lovelace. After undergoing numerous diagnostic tests and imaging, including a surgical biopsy, medical personnel finally made a tentative diagnosis of MCD in the late afternoon of May 24, 2018 after receiving the biopsy results, a few hours before she severely decompensated and was placed on life support. Up to that point, there was not a single mention of MCD as a differential diagnosis as providers worked to stabilize her and to rule out other conditions. At the time of her death, there was no plan for treatment.

Castleman Disease ("CD") is a rare, nonclonal lymphoproliferative disorder having distinct subtypes depending on its etiology, pathology, and clinical presentation. It can affect lymph nodes of any region, imitating both benign and malignant malformations, including the neck, chest, abdomen, and pelvis.  There are two types: the more common Unicentric Castleman Disease ("UCD") and the less common MCD.

UCD or localized Castleman Disease causes enlargement of one or more lymph nodes in one area (region) of the body. The causes of UCD are unknown. MCD causes lymph node enlargement in multiple regions of the body. There are three categories of MCD: POEMS-associated MCD, HHV-8-associated MCD, and idiopathic MCD.

POEMS-associated MCD: POEMS is a rare blood disorder that sometimes accompanies MCD. POEMS gets its name from its associated signs and symptoms. They include polyneuropathy, organomegaly, endocrinopathy, monoclonal plasma cell disorder, and skin changes.

HHV-8-associated MCD: Human herpes virus-8 ("HHV-8") is a common virus. Most people who have it do not get sick.  HHV-8 infection can cause three neoplastic diseases: Kaposi's sarcoma, primary effusion lymphoma, and some forms of CD.  The incidence of HHV-8-associated MCD varies widely, but it is more common in individuals who are HIV+ or immunocompromised.

Idiopathic MCD (iMCD): The most common form of MCD is idiopathic. "Idiopathic" means that its causes are unknown.

The incidence of UCD is 16 per million patients/year and affects all age groups. The incidence of MCD is 5 per million patients/year. This makes CD, and particularly MCD, a very rare disorder.

The diagnosis of CD is always a challenge in clinical settings, as it does not have specific features that could be distinguished from other diseases causing lymphadenopathies. Therefore, the diagnosis should be finalized when the patient meets both major criteria, at least two of the minor criteria, and one laboratory abnormality, as outlined below.

<u>Major Criteria:</u>

CC_Hernandez015554

- Histopathologic screening of lymph nodes is done to assess a single node involvement (suggestive of UCD) or a multimode involvement (suggesting MCD) after excluding other infectious, malignant, and autoimmune disorders that exhibit their characteristic features in the lymph nodes. In addition, their characteristic lymph node features are also noted.
- The lymph node size must be enlarged.

Minor Criteria:

Laboratory Findings:
- Elevated CRP or ESR
- Anemia
- Thrombocytopenia or thrombocytosis
- Hypoalbuminemia
- Renal dysfunction or proteinuria
- Polyclonal hypergammaglobulinemia

Clinical Findings:
- B symptoms: fever, weight loss, night sweats, fatigue
- Splenomegaly or Hepatomegaly
- Fluid accumulation (edema, anasarca, pleural effusion)

Many treatment options are available for treating MCD, including surgery, cytotoxic chemotherapy with or without corticosteroids, and autologous stem cell transplantation (ASCT) with varying outcomes. Better results have been observed by targeting CD20 and IL-6 pathways and HHV-8 replication. None of these treatment options can be provided onsite at any correctional or detention facility in the United States unless a highly specialized cancer center is created inside the walls of that facility. I am not aware of the existence of any such oncology or hematology facility in any custodial setting in the United States.

Thus, in my opinion, and as further outlined below, the care provided at CCCC, CGH, and Lovelace was reasonable given the circumstances, and Ms. Hernandez's ultimate diagnosis of MCD seven days after she was admitted to Lovelace only underscores the fact that MCD is a very rare disease that is extremely difficult to diagnose, let alone treat.

**Rebuttal of Dr. Fajgenbaum's opinions.**

I adopt and incorporate Dr. Zawitz's rebuttal of Dr. Fajgenbaum's opinions in his expert report. I echo Dr. Zawitz's observation that Dr. Fajgenbaum has never worked in a custodial setting and is not an HIV/infectious disease specialist and therefore lacks the qualifications to opine on the standard of care with respect to HIV patients or correctional healthcare.

Dr. Fajgenbaum, Dr. Zawitz, and I agree that Ms. Hernandez's initial symptoms and her eventual cause of death were attributable to MCD, not HIV/AIDS. And while MCD is treatable in certain situations and clinical settings, I adopt and incorporate Dr. Zawitz's opinions that rituximab is not "readily available at medical centers nationwide." Contrary to Dr. Fajgenbaum's assertions, I know of no medical center in a correctional/detention setting (including NYSDOCCS) in the United

16

CC_Hernandez015555

States that carries rituximab. As Dr. Zawitz aptly stated, rituximab is not a routine treatment agent stocked everywhere; it is a monoclonal antibody typically administered through infusion, either in an inpatient setting, an IV infusion center, or, in specific clinical scenarios, as a subcutaneous injection. This medication is not "readily available."

I also agree with and adopt Dr. Zawitz's opinions rebutting Dr. Fajgenbaum's opinions that had Ms. Hernandez received "timely medical care at any time after her entrance into the United States on May 9, 2018, her MCD could have been controlled with readily available and known treatment protocols, including rituximab."   And I disagree with Dr. Fajgenbaum's assertion that KSHV/HHV-8-associated MCD is "highly treatable" due to the various complexities associated with Ms. Hernandez's particular case, including her diagnosis of septic shock.   Given the circumstances, including the incorrect diagnosis and lack of appropriate care Ms. Hernandez received at Scripps, it is impossible to opine that had Ms. Hernandez received "timely" care, she would have lived. Dr. Fajgenbaum's opinions also assume that she would have been diagnosed earlier than she was, which would have been a relative impossibility given the set of circumstances in this case.   As both Dr. Fajgenbaum and Dr. Zawitz recognized, MCD is extremely rare and requires a biopsy to diagnose, which takes days.   No medical provider at CCCC could have diagnosed her, and Dr. Fajgenbaum assumes that had Ms. Hernandez been taken to a hospital during her transport, that clinical medical providers were familiar with or would have considered MCD as part of their differential diagnosis. It took Lovelace approximately seven days to finally diagnose Ms. Hernandez with MCD after a biopsy and after ruling out various other conditions. To suggest that Ms. Hernandez would have been quickly diagnosed with MCD and immediately treated had she presented to Lovelace (or any other hospital) sooner is simply not supported.

I take great issue with Dr. Fajgenbaum's assertion that had the defendants transported Ms. Hernandez to an "advanced medical facility" such as Lovelace "just 8 hours earlier (or more)), then she would likely be alive today." First, Dr. Fajgenbaum is unclear as to this timeframe, and begs the question: 8 hours from what? Dr. Fajgenbaum then states that had *each of* the defendants taken her to a medical facility eight hours sooner, she would have been alive today. But this is fundamentally flawed and fails to define the purported impact or involvement of each defendant.

Next, Dr. Fajgenbaum opines that Lovelace "was on the verge of treating her if she had lived for just another 8 hours," but, as stated above, there was no plan for treatment after the MCD diagnosis was made, and this opinion further assumes that treatment could have even been started given Ms. Hernandez's fragile state. Dr. Fajgenbaum also completely ignores the fact that it took Lovelace *seven* days to make a diagnosis.  Prior to obtaining a pathology report from the surgical biopsy, there was no mention of MCD.  To somehow suggest that Ms. Hernandez's life hung in the balance due to a mere eight hours is speculative, to say the least. Indeed, the time it took for Lovelace to diagnose Ms. Hernandez only underscores the fact that it takes days, or even weeks, to consider MCD as a potential diagnosis, and largely depends on medical providers' awareness of the disease and the hospital's resources. As a self-proclaimed "leading authority" on CD, Dr. Fajgenbaum's failure to consider this in his opinion is concerning.

Dr. Fajgenbaum's failure to address the time it took Lovelace to administer a surgical biopsy is astonishing, and I agree with Dr. Zawitz's opinions on this point.  Dr. Fajgenbaum declares that Lovelace "did an excellent job evaluating Roxsana and closing in on the correct diagnosis," but

17

CC_Hernandez015556

even if it did, this does not negate the fact that a biopsy was not administered until May 21, three days after her admission. Dr. Fajgenbaum's "8-hour" opinion fails to consider this delay.

Moreover, in my opinion, it impossible to put a value on Ms. Hernandez's chance of survival. Even if she were started on rituximab prior to her death, it takes months for the immune system to rebuild itself, and there is no guarantee that treatment would have immediately been effective, no matter what date it was started.

I agree with Dr. Fajgenbaum's opinion that had Ms. Hernandez received timely and adequate medical care upon arrival to the United States, her survival chances would have increased. But Dr. Fajgenbaum ignores the fact that Ms. Hernandez *was* referred offsite to Scripps for a higher level of care on May 11, 2018, and was incorrectly and improperly assessed, evaluated, diagnosed, and cleared. Like Dr. Keller, Dr. Fajgenbaum places blame on the United States for failing to communicate Ms. Hernandez's medical history to Dr. Harrell-Bruder or to "follow up" with diagnostic testing, despite the fact that Ms. Hernandez was referred to Scripps for that very purpose. As discussed at length below, it was Dr. Harrell-Bruder's responsibility to obtain an accurate medical history. Her failure to do so, as well as her incorrect diagnosis of bronchitis, grossly deviated from the standard of care and deprived Ms. Hernandez of the opportunity to receive timely and adequate medical care.

Dr. Fajgenbaum's opinion that defendants did not provide Ms. Hernandez with appropriate and reasonable nutrition, hydration, or rest during the eight days she was in the defendants' custody is belied by the records and the affidavits of other detainees who were detained with her. Ms. Hernandez appears to have been provided with ample food and water, which she often refused, and the other detainees' affidavits show that Ms. Hernandez slept all the time. It is also unclear what "inhumane living conditions" Ms. Hernandez was forced to endure while in TransCor or CoreCivic's custody, or how this contributed to her death. Nevertheless, I can find no indication in the records that Ms. Hernandez's cause of death was due to lack of nutrition, hydration, rest, or "inhumane living conditions," and I disagree that lack of nutrition, hydration, rest, or "inhumane living conditions" caused Ms. Hernandez's death.

As stated above and below, I disagree with Dr. Fajgenbaum's assertions that laypeople, to include TransCor and CoreCivic non-medical officers, could have or should have recognized that Ms. Hernandez was dehydrated, malnourished, or otherwise in need of immediate medical attention based on the fact that none of these individuals were medically trained or qualified to make such a determination. Further, Dr. Fajgenbaum opines that during the TransCor transport, Ms. Hernandez was "visibly ill," but relies on a single detainee affidavit which stated she had a fever, a bad cough, and her head hurt. Dr. Fajgenbaum then opines that TransCor did not provide Ms. Hernandez any medical care or inform CCCC that she was "deathly ill." Having a fever, a cough, and a headache does not support an opinion that Ms. Hernandez was "deathly" ill, or even that she was visibly ill. There is nothing in the records indicating that any TransCor officer was aware of these symptoms, or that Ms. Hernandez or any other detainee complained or requested medical care.

Dr. Fajgenbaum takes it a step further and opines that TransCor should have taken Ms. Hernandez to a medical facility based on her "obvious" symptoms. Again, this opinion disregards the fact that

CC_Hernandez015557

none of the TransCor transport officers were qualified or trained to make this determination, and based on the reported symptoms, it was likely not considered a medical emergency warranting transport to a hospital. No layperson would have been able to spot symptoms of HIV/AIDS, MCD, or sepsis, and based upon my thirty plus years in correctional medicine, Ms. Hernandez's symptoms alone would not have prompted further action.

I vehemently disagree with Dr. Fajgenbaum's opinion that CBP should have started Ms. Hernandez on rapid-start HIV antiviral therapy immediately after she entered the United States. Given Ms. Hernandez's complex condition, unstable vital signs and tachycardia, and ultimate MCD diagnosis, it would have been reckless to do so and could have potentially killed her. At that point, her kidney and liver function had not been tested. If Scripps had performed adequate testing and determined functions were within normal limits, then perhaps this medication could have been started, but not before then. Moreover, even if Ms. Hernandez was medically cleared to start this medication, the fact of the matter was that she was ordered to be transferred to CCCC and it was prudent to wait until she reached her final destination to begin such an intensive therapy.

Finally, it is unclear how Dr. Fajgenbaum is qualified to opine that Ms. Hernandez experienced "significant pain and suffering" and emotional distress due to "unbearable thirst and hunger and knife-like pain" or because she was "shackled" by CoreCivic at Lovelace for seven days. First, Dr. Fajgenbaum claims that Ms. Hernandez was in severe pain and discomfort while at Lovelace. But Lovelace, a hospital, was certainly equipped to manage pain as necessary. It is unclear what Dr. Fajgenbaum is basing these opinions on aside from his own speculation.

Second, Dr. Fajgenbaum is not a correctional medicine expert and is likely not familiar with the practices and policies associated with transporting inmates or detainees offsite for medical care. In my experience, patients in custody are restrained and remain restrained during transport and hospitalization pursuant to facility policies and legitimate safety and security issues, and doing so is within the standard of care. In my experience, restraints do not interfere with medical care. And medical personnel are permitted to request removal of restraints, which requires approval from the custodial agency. The fact that Dr. Fajgenbaum believes there was "no reason" to restrain her, does not make it so. His opinion that "it is likely" that the restraints caused delays in performing CPR is not indicated anywhere in the records. Nor is there any indication that restraints interfered with her medical care in any way. And his opinions that restraining Ms. Hernandez at Lovelace was "unsupported by medical standards" and is "extremely likely to have led to emotional and physical suffering" are likewise inaccurate and speculative.

### Rebuttal of Dr. Keller's opinions.

I agree with and adopt Dr. Zawitz's opinions rebutting the opinions of Dr. Keller. I particularly disagree with Dr. Keller's opinion that Ms. Hernandez should have undergone an HIV screening test/diagnostic lab work and an "immediate" referral for treatment to an HIV clinic/specialist in addition to a full examination/workup for the reasons stated by Dr. Zawitz, and because it is neither pragmatic nor necessary to do so in a custodial setting. I would add that aside from the examination by Dr. Olcott, Ms. Hernandez was sent to Scripps ED for essentially a full workup, which, if done appropriately, would have assessed the status of her HIV and any underlying conditions. Dr. Olcott's referral to Scripps was indeed an "immediate" referral.

19

CC_Hernandez015558

I also disagree with Dr. Keller's opinion that Dr. Harrell-Bruder was not aware of Ms. Hernandez's HIV+ status, as this is blatantly contradicted by the medical records, the affidavit of another detainee who was purportedly with Ms. Hernandez at the hospital,[6] and the standard of care. Even if Dr. Harell-Bruder received no information from Dr. Olcott or CBP officers, she had a separate duty to adequately examine, evaluate, diagnose, and treat Ms. Hernandez, just as she would with anyone who presented from the community. That duty is not negated in any way by the actions or inactions of Dr. Olcott and CBP, and to suggest otherwise defies logic.

Dr. Keller also takes issue with the apparent lack of a Spanish translator at Scripps, which he opines the government should have provided, and which he further opines impacted Dr. Harrell-Bruder's ability to adequately assess Ms. Hernandez. A hospital so close to the Mexico border undoubtedly has qualified translators to communicate with patients in Spanish. Even if Scripps did not have a translator on-staff, there are language line services available that are commonly used by the medical community to communicate with non-English speaking patients. Again, Dr. Harell-Bruder had an affirmative duty to obtain Spanish translation. To suggest that Dr. Harrell-Bruder's conduct was excused due to the government's failure to communicate Ms. Hernandez's condition or to provide a Spanish translator is shocking. It was Dr. Harrell-Bruder's professional responsibility to obtain Ms. Hernandez's accurate and complete medical history as her patient. Her failure to do so is no one's responsibility but her own.

In any event, Dr. Keller appears to agree that Dr. Harrell-Bruder's TB assessment and her "clearance" of Ms. Hernandez for travel and detention, despite her abnormal vital signs at discharge, violated the standard of care. Yet, Dr. Keller does not place blame on Dr. Harrell-Bruder. Instead, he opines that had the United States communicated effectively with Dr. Harrell-Bruder, she *would have* known to complete a full physical examination and medical investigation. This opinion is indeed concerning and suspect, and it is unclear why she would have not completed a full physical examination and medical investigation regardless. What's more is that Dr. Keller appears to opine that had a full workup been completed at Scripps ED, she would have more likely than not been diagnosed and treated for MCD and could have survived. But to downplay Dr. Harrell-Bruder's responsibilities and inaction for the sake of placing blame on the United States goes against common sense. As does assuming that Dr. Harrell-Bruder *would have* conducted an adequate physical examination and medical investigation if only she was provided with certain information. Dr. Harrell-Bruder, as a medical doctor, had the responsibility to adequately assess, examine, diagnose, and treat her patient. She did not do that here, and her failure to do so more likely than not directly impacted Ms. Hernandez's ultimate outcome.

Dr. Keller's opinion that non-medical providers "should have known" that untreated HIV can lead to AIDS and that they should have known that "someone who was repeatedly vomiting and coughing so severely to cause difficulty breathing needs to be evaluated urgently by a medical

---

[6] Max (Charlotte) Antonio Albarenga Garcia submitted a written affidavit on November 18, 2019, stating that she accompanied Ms. Hernandez to the hospital on May 11, 2018, and that Ms. Hernandez "told the examining male nurse and a doctor she was HIV positive and not on any medicine. They responded that they were sorry but they could not help her and that she would have to go elsewhere for HIV medication." (PL00017159).

CC_Hernandez015559

professional" is similarly flawed.  It is not sufficient to opine that non-medical officers should have, in hindsight, recognized Ms. Hernandez's severe underlying illnesses based upon her mild outward symptoms given the fact that they are not trained or qualified medical providers and would not have had an obvious reason to refer her for emergency care.  As someone with experience in correctional medicine and HIV, Dr. Keller should be fully aware of these limitations, and he cannot place the burden on a layperson to make medical determinations.  Moreover, Dr. Keller acknowledges that Ms. Hernandez did not appear to be transferred with any documentation showing her medical condition, which belies his opinions that TransCor or CoreCivic security personnel should have known about her medical conditions.

Dr. Keller claims that Ms. Hernandez was "visibly ill" during her time in TransCor's custody, yet relies on affidavits of other detainees who noted she had a fever, bad cough, phlegm, and her head hurt.  Being "visibly ill" with a fever, headache, or cough, does not objectively warrant emergency medical attention, particularly because the transport was only 1.5 hours long.  And contrary to Dr. Keller's opinions, there is no evidence from the affidavits that any of this information was relayed to TransCor personnel, or that Ms. Hernandez complained to them or requested medical attention. Dr. Keller's opinion that TransCor transport officers, all of whom are non-medical personnel, should have evaluated her and/or provided her with medical care, or should have notified the receiving facility of her medical condition, is fundamentally flawed for the reasons already stated. In my experience, transport officers did not travel with thermometers pre-COVID-19, and they have no way of measuring abnormal vital signs.

I also take issue with Dr. Keller's reliance on the affidavits of other detainees in piecing together the medical background in this case.  While the observations of other detainees are relevant to an extent, they are inherently unreliable and do not paint an entire picture, and cannot be given great weight from a medical standpoint as it cannot reasonably be disputed that none of those individuals were trained or qualified medical practitioners.

Dr. Keller's opinion that Ms. Hernandez was denied hydration, food, or medical care once she arrived at CCCC is again plainly contradicted by the records.  Indeed, records show that her basic needs were taken care of as she underwent the booking process, and there is nothing that could have been deemed emergent by non-medical CoreCivic security personnel so as to warrant an emergency medical response. At approximately 2:23 a.m., she was escorted to the medical department where she was again provided beverages and food.  She was checked on numerous times by medical personnel and was flagged as needing immediate evaluation once Dr. Birdsong arrived at the facility.  As already stated, she was thoroughly examined by Dr. Birdsong on the morning of May 17, 2018, at which time she was immediately referred to an offsite hospital.  The timeline of events is appropriate in a custodial setting and comported with PBNDS 4.3.V.J requiring that all detainees shall receive initial medical screening no later than 12 hours after arrival, and an evaluation by a qualified, licensed health care provider no later than two working days after arrival.

Again, Dr. Keller opines that CoreCivic was not provided with any medical documentation informing CCCC personnel about Ms. Hernandez's medical condition, which only belies his opinion that CoreCivic officers should have known she was in need of medical care.  Based on the very limited information provided to CCS providers, their assessment and evaluation of Ms.

21

Hernandez was appropriate and thorough. I could find no support in the records demonstrating that Ms. Hernandez exhibited signs of "medical distress" or emergent medical conditions while at CCCC to warrant an emergency medical response from CoreCivic security personnel. Indeed, the evidence shows that she was able to speak, eat, drink, and ambulate without difficulty. A general unwell appearance does not trigger an emergency response.

While I agree with Dr. Keller's opinions that Ms. Hernandez likely should never have been cleared to travel in the first place, that was not CoreCivic's or TransCor's responsibility to determine. I also disagree that either CoreCivic or TransCor could have evaluated her and/or administered HIV medication. I agree with Dr. Zawitz that administering HIV therapy is both risky and dangerous without taking the remainder of a patient's clinical context into consideration. Because Ms. Hernandez's vital signs were abnormal, the first course of action would have been to stabilize her, evaluate her, and then determine whether HIV therapy was necessary or whether other illnesses and/or diseases were present.

I agree that Ms. Hernandez likely had AIDS and MCD and was exhibiting signs of sepsis upon entrance into the United States, and that she was certainly dehydrated, malnourished, and suffered from symptoms such as cough, vomiting, and diarrhea. I also agree that the above-mentioned conditions are treatable, although I cannot say that Ms. Hernandez could have been successfully treated given her numerous complex issues. I disagree that Ms. Hernandez was not provided with "significant medical treatment" until May 17, 2018. Ms. Hernandez was referred to Scripps for a higher level of care, and they failed her. As already stated with respect to Dr. Fajgenbaum's opinions, Dr. Keller's opinions that had TransCor officers taken her to a hospital, she would have been immediately evaluated and treated and would have survived is flawed given the fact that Ms. Hernandez was *already* seen at a hospital on May 11, 2018, and given the great difficulty in diagnosing MCD. I also disagree that any CoreCivic or TransCor officer caused Ms. Hernandez significant pain and suffering by failing to provide her with medical intervention and treatment for the reasons already stated.

To summarize:

- In my opinion, had Dr. Harrell-Bruder properly assessed and examined Ms. Hernandez, she could have potentially been diagnosed with MCD within 7 days of being sent to the Scripps ED, which may have saved her life.

- In my opinion, TransCor and CoreCivic officers met or exceeded the standard of care, could not have anticipated Ms. Hernandez's outcome based on her outward symptoms, and did not cause or contribute to her death.

I reserve the right to amend or supplement the opinions in this report, as discovery is ongoing and as additional information becomes available for my review.

*Harish Moorjani*
_____
Harish Moorjani, M.D.
February 1st, 2024

CC_Hernandez015561

**Curriculum Vitae**

**Harish Moorjani**

| | |
|---|---|
| Address: | 302 Chappaqua Road<br>Briarcliff Manor, N.Y. 10510<br>Tel (914) 762-2276 Fax (914) 762-2894 |
| E-mail: | BUGMD@hotmail.com |

<u>Employment:</u>
Hudson Infectious Diseases Associates, P.C.
1994 – Present    Infectious Disease Consultant, NY State Department of Correction
Infectious Disease Consultant, Correct Care Solutions, Westchester County Jail
Supervising the management and treatment of HIV and Hepatitis in Corrections since 1994

05/14 – 05/20    Medical Director, Infectious Disease Clinic, Westchester Medical Center, Valhalla, NY

<u>Education:</u>
8/81 – 12/85    Bachelor of Medicine and Surgery Maulana Azad Medical College
New Delhi, India
4/4/87    M.B.B.S. University of Delhi, India
7/1/87    ECFMG No. 391 534 5

<u>Internship:</u>
Rotating Internship at Lok Nayak Jay Prackash Narayan & Associated Hospital New Delhi, India
7/87 – 7/88    Relocated
7/88 – 6/89    Internal Medicine, United Hospital Medical Ctr., Newark, NJ

<u>Residency:</u>
7/89 – 6/92    Internal Medicine, United Hospital Medical Ctr., and University Hospital of Medicine and Dentistry, Newark, NJ

<u>Fellowship:</u>
7/92 – 6/94    Infectious Diseases at SUNY, Stony Brook, NY

<u>Academic Appointments:</u>
1996-Present    Clinical Assistant Professor in Medicine
New York Medical College, Valhalla, NY

<u>Certification:</u>
1992-2023    Board Certified in Internal Medicine, American Board
Of Internal Medicine
1994-2024    Board Certified in Infectious Diseases, ABIM

<u>Licensure:</u>    New York State License: License No. 189202

<u>Hospital Affiliation:</u>
6-96 to Present    Attending Physician, Phelps Memorial Hospital Ctr.,
701 North Broadway, Sleepy Hollow, NY 10591

1

**CC_Hernandez015562**

| 8-94 to Present | Attending Physician, Hudson Valley Hosp. Ctr., 1980 Crompond Rd. Cortlandt Manor, NY 10566 |
| 10-03 to Present | Medical Director, In-patient Corrections Unit, Mount Vernon Hospital, Mt. Vernon, NY |
| 10-97 to Present | Consulting Physician, Northern Westchester Hosp. Ctr, 400 East Main St., Mt. Kisco, NY 10549 |
| 05-14 to 05-20 | Medical Director, Infectious Disease Clinic, Westchester Medical Ctr., NY Medical College, Valhalla, NY |

<u>Professional Membership:</u>

Infectious Disease Society of America
American Academy of HIV Medicine

<u>Research:</u>

| 1992-1993 | Macrophage Function with HIV Infection. SUNY at Stony Brook, NY |

Publications:

Moorjani H, Craddock BP, Morrison SA, Steigbigel RT: Impairment of phagosome-lysosome fusion in HIV-1infected macrophages. J AIDS and Human Retrovirology 13:18-22, 1996.

Moorjani H, Gardner P: International Travel Advice for Adults. Current Practice of Medicine, Vol. 2, VIII: 23.1-23.13. Churchill Livingston, Inc., 1996.

Moorjani H, Kapila R: Factitious Dermatoses: An enigma for the infectious disease consultant. Infect Med 1994; 11:81–82.

Moorjani H: Cardiovascular Disease in HIV-Infected Patients. Corrdocs 2009; Vol 12 Issue 1:7-9

Moorjani H, Koenigsmann C, Kim MJ, and. Spaulding AC. Prisoners treated for hepatitis C with protease inhibitor, New York, USA, 2012 [letter]. Emerg Infect Dis. 2015 Jan Vol 21 Number 1. http://dx.doi.org/10.3201/eid2101.141025

Bhatia R, Koenigsman C, Moorjani H. Hepatitis C Treatment With Ledipasvir-Sofosbuvir in the New York State Correctional System. Consultant360: Volume 59 - Issue 10 - October 2019. https://www.consultant360.com/article/gastroenterology/hepatitis-c-treatment-ledipasvir-sofosbuvir-new-york-state-correctional

Shojaie S, Le P, Preciado M, Moorjani H. Use of hydroxychloroquine in hospitalized patients with COVID-19 pneumonia: results of a retrospective study in a community hospital. *Consultant.* Published online April 30, 2020.

2

CC_Hernandez015563