# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**Joleen K. Youngers**, as the Personal
Representative of the Wrongful Death
Estate of Roxsana Hernandez,

          Plaintiff,

vs.

**Management & Training Corporation,
LaSalle Corrections Transport LLC,
LaSalle Corrections West LLC,
LaSalle Management Company LLC,
Global Precision Systems LLC,
TransCor America LLC,
CoreCivic, Inc.,**

          Defendants.

NO. 20-cv-00465-JAP-JHR

## <u>DEFENDANTS TRANSCOR'S AND CORECIVIC'S
EXPERT WITNESS DISCLOSURE STATEMENT</u>

Defendants TransCor America, LLC ("TransCor") and CoreCivic, Inc. ("CoreCivic"), through counsel, and pursuant to Federal Rule of Civil Procedure 26(a)(2) and the Court's September 1, 2023 Order (Doc. 293), hereby submit their Expert Witness Disclosure Statement. Defendants TransCor and CoreCivic reserve the right to supplement this disclosure as additional information, records, and deposition testimony become available.

1.    Harish Moorjani, M.D.
      302 Chappaqua Road
      Briarcliff Manor, N.Y. 10510
      (914) 762-2276

Harish Moorjani, M.D. is board-certified in the fields of Infectious Diseases and Internal Medicine and is licensed in the State of New York.  He is a full-time practicing Infectious Diseases/Internal Medicine attending physician in Briarcliff Manor, NY, with privileges at Northwell Phelps Hospital in Tarrytown, NY, Columbia Presbyterian Hudson Valley Hospital in Peekskill, NY, and Montefiore Mount Vernon Hospital in Mount Vernon, NY. He serves as a voluntary Clinical Assistant Professor of Medicine in the Infectious Disease Division at New York Medical College in Valhalla, NY.  Since 1998, he has served as the Medical Director of the inpatient unit for the New York State Department of Corrections and Community Supervision ("NYSDOCCS").  He is also the Infectious Disease Consultant for the Westchester County Jail.

He primarily serves as the on-site Infectious Disease Consultant at NYSDOCCS, one of the largest correctional systems in the United States with a capacity of approximately 31,000 detainees, and he has experience working in various units and with various populations. His experience spans from frontline clinical duties to the Infection Control Department and includes the development of policies and procedures. As the Infectious Disease Consultant, he is responsible for consulting with NYSDOCCS to maintain and update facility policies on contagious diseases, handling outbreaks, clinical management of select infections, reporting to health agencies, sanitation, and

environmental hygiene. Dr. Moorjani is qualified to render opinions as an infectious disease expert, as well as a correctional medicine expert, given his vast and unique experience in both fields. Dr. Moorjani's qualifications, experience, education, and publications are fully identified in his Curriculum Vitae attached to his report.

Dr. Moorjani is expected to testify regarding the decedent's complex underlying health conditions at the time she entered the United States on May 9, 2018, to the time she died on May 25, 2018 due to Multicentric Castleman Disease ("MCD") as a complication of AIDS. He will testify about his experience with MCD and HIV/AIDS patients, to include the potential difficulties in diagnosing and treating these conditions.

Dr. Moorjani will testify that the care received by the decedent at Scripps Mercy Hospital in San Diego on May 11, 2018, particularly from the emergency room physician, Dr. Beverly Harrell-Bruder, fell below the standard of care. Specifically, he will testify that her physical assessment of the decedent, her failure to order further diagnostic testing given her abnormal vital signs and her knowledge that the decedent was living with untreated HIV, her diagnosis of "bronchitis" despite no clinical evidence of bronchitis, and her "clearance" of the decedent for transport and detention was grossly inadequate and improper, and that it deprived the decedent of the opportunity to be further assessed and potentially diagnosed with and treated for sepsis, MCD, and/or HIV/AIDS. Dr. Moorjani will testify that had the decedent been properly assessed and

evaluated at Scripps, she could have had a greater chance of survival, although her outcome was still unclear given her complex underlying medical issues and fragile state.

Dr. Moorjani is expected to testify that TranCor and CoreCivic officers were likely not aware of the decedent's health status, including that she had untreated HIV, and could not make medical determinations as laypersons who were not medically trained. Dr. Moorjani will also testify that neither TransCor nor CoreCivic non-medical security personnel could have identified or understood that the decedent was suffering from severe illness based upon her outward symptoms or appearance alone. He will also testify that none of the symptoms exhibited by the decedent were indicative of an emergent medical situation requiring further action, up to and including transportation to a hospital. He will testify that no TransCor or CoreCivic employee caused or contributed to her death or otherwise impacted her ultimate outcome, and their actions met or exceeded the standard of care.

Dr. Moorjani will testify that the evaluation and care provided to the decedent at the Cibola County Correctional Center ("CCCC") by medical personnel employed by Correct Care Solutions ("CCS") were within the standard of care. He is expected to testify that the care she received at the Cibola General Hospital and Lovelace Medical Center was also reasonable given the circumstances. He is expected to testify that it took Lovelace seven days to ultimately diagnose the decedent with MCD and that there was no

treatment plan in place at the time of her death, which underscore the difficulties in assessing and diagnosing MCD.

Dr. Moorjani has prepared a report in this matter, disclosed concurrently with this disclosure statement, that contains a complete statement of all opinions and the bases for them, and outlines the documents, records, and/or information relied upon in forming his opinions. Dr. Moorjani also rebuts the opinions of Plaintiff's experts Dr. Fajgenbaum and Dr. Keller, and his rebuttal opinions are fully set forth in his written report. All of his opinions are stated within a reasonable degree of medical probability based upon the information he reviewed, as well as his education, training, knowledge, and experience. Dr. Moorjani's testimony and opinions will be consistent with the information contained in his report and any rebuttal report(s) he submits. He is expected to testify in accordance with his deposition testimony, if taken. Given the outstanding discovery in this case, Dr. Moorjani's opinions are subject to revision and/or supplementation should additional information be discovered.

      2.    Ann Bucholtz, M.D.
             357705 E 980 Rd.
             Prague, OK 74864
             (602) 740-5426

Ann Bucholtz, M.D. is a forensic pathologist who is board-certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. She is licensed in Arizona, Indiana, and West Virginia. She has over 30 years of experience, mostly as a Medical Examiner in various counties across the country, has performed over

7,500 autopsies, and has examined over 10,000 decedents. Dr. Bucholtz is semi-retired but works part-time for the West Virginia Chief Medical Examiner's Office as a forensic pathologist. Dr. Bucholtz's qualifications, experience, and education are fully identified in her Curriculum Vitae attached to her report.

Dr. Bucholtz will testify, based upon her review of the "Death Investigation Summary – Amended" authored by Kurt Nolte, MD, of the Office of the Medical Investigator for the State of New Mexico, the "Preliminary Autopsy Report" authored by Kris Sperry, MD, and the medical records, that there is no evidence that the decedent was physically abused at any time prior to her death. She will rebut the opinions of Dr. Sperry that hemorrhages noted on the decedent's back, side, and chest were due to "blunt force trauma . . . indicative of blows, and/or kicks, and possible strikes with blunt object." She will testify that the hemorrhages on the decedent's back were likely due to thoracentesis procedures on May 24, 2018, and that the hemorrhages on her chest and side were likely due to broken ribs and sternum caused by numerous rounds of CPR on May 24 and 25, 2018. She will also testify that the hemorrhages noted on the decedent's wrists were not unusual and were not indicative of abuse, trauma, or pain. She will opine about the decedent's severe illness and health status, including that she was suffering from poor coagulation, was prescribed blood thinners, and had a low platelet count, which meant she hemorrhaged easily. She is expected to testify regarding the numerous deficiencies in Dr. Sperry's report, namely, that he failed to mention either the

thoracentesis procedures or resuscitative efforts before arriving at his conclusion that the decedent was physically abused.

Dr. Bucholtz has prepared a report in this matter, disclosed concurrently with this disclosure statement, that contains a complete statement of all opinions and the bases for them, and outlines the documents, records, and/or information relied upon in forming her opinions. All of her opinions are stated within a reasonable degree of medical probability based upon the information she reviewed, as well as her education, training, knowledge, and experience. Dr. Bucholtz's testimony and opinions will be consistent with the information contained in her report and any rebuttal report(s) she submits. She is expected to testify in accordance with his deposition testimony, if taken. Given the outstanding discovery in this case, Dr. Bucholtz's opinions are subject to revision and/or supplementation should additional information be discovered.

3.      Jason Ellis
c/o Jacob B. Lee
Struck Love Bojanowski & Acedo, PLC
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), CoreCivic may call Jason Ellis as a witness at trial to present evidence under Federal Rules of Evidence 702, 703, and/or 705. Mr. Ellis has not been "retained or specifically employed to provide expert testimony in this case," nor is he an employee of CoreCivic whose duties regularly involve giving expert testimony. *See* Fed. R. Civ. P. 26(A)(2)(B). As such, Mr. Ellis is not required to produce a written report. *See* Fed. R. Civ. P. 26(A)(2)(C).

Mr. Ellis is currently the Managing Director of Operations for Business Unit One, Division One for CoreCivic.  He has been employed by CoreCivic for nearly 30 years and has been a Managing Director since 2014. As a Managing Director, the Wardens/Facility Administrators of seven correctional and detention facilities across the country report directly to Mr. Ellis.  His primary responsibility as Managing Director is to ensure that each facility in his division is operated in a safe, secure, and humane manner in compliance with applicable government contracts and federal, state, and local law. Prior to becoming a Managing Director, Mr. Ellis held multiple facility-level leadership positions, including Warden at three CoreCivic facilities, Assistant Warden at two CoreCivic facilities, and Chief of Security at two CoreCivic facilities.  He began his employment with Corrections Corporation of America (now CoreCivic) in 1993 as a corrections officer.

Mr. Ellis is expected to testify regarding his educational background and experience in corrections/detention settings, including but not limited to, his experience concerning safety and security in a detention setting; inmate/detainee population supervision and management; hiring, training, and supervision of correctional/detention staff; and compliance with correctional/detention industry standards, including the standards promulgated by the American Correctional Association ("ACA") and the 2011 ICE Performance-Based National Detention Standards ("PBNDS") (and its numerous revisions).  Mr. Ellis is also expected to testify regarding CoreCivic's policies and

procedures relevant to this case, including but not limited to, admission and orientation procedures, access to medical care, offsite transport procedures, security protocols and procedures for offsite medical care, use of restraints, and officer duties and responsibilities. Mr. Ellis will also testify regarding his personal knowledge of the events giving rise to this lawsuit.

Mr. Ellis is expected to testify regarding the stringent requirements of obtaining and maintaining ACA accreditation, as well as the subject matter the ACA reviews in association with accreditation. Mr. Ellis is expected to testify that CCCC is fully accredited by the ACA and was accredited at the time of the decedent's death in May 2018. He will testify that CCCC received a score of 100% compliance on all mandatory and non-mandatory standards during the 2018 ACA audit (October 29-31, 2018, site visit with accreditation awarded on January 14, 2019). Mr. Ellis may testify regarding the contents of the ACA accreditation report, including reported statistics.

Mr. Ellis is expected to testify that CCCC houses a population of ICE detainees pursuant to an Intergovernmental Service Agreement between ICE and Cibola County, and a Management Agreement between Cibola County and CoreCivic. CCCC is specifically designated by ICE for housing male and female transgender detainees, and has a specialized housing unit for each of these populations.

Mr. Ellis is expected to testify regarding the intake and orientation procedures at CCCC, including information regarding the procedures for requesting medical/mental

healthcare at the facility. He is expected to testify that inmates/detainees receive a copy of the CCCC inmate handbook, for which they sign an acknowledgment, that also explains the procedures for seeking healthcare. He is expected to testify that healthcare services are provided seven days a week, 24 hours per day at CCCC, and that CoreCivic contracted with Correct Care Solutions ("CCS"), which employed or contracted all medical staff and provided all health services (medical, dental, mental) at CCCC. Mr. Ellis will testify that CoreCivic did not provide medical care at the facility during the relevant timeframe and did not oversee or supervise the medical unit or CCS medical personnel. He will testify that at the time of the decedent's death, the medical department was fully staffed.

He is expected to testify that access to medical care begins immediately upon arrival at the facility. At intake, all detainees are searched and offered a shower before being dressed in a uniform. He will testify that any medical records accompanying the detainee are reviewed by medical personnel and an intake medical screening is performed in the medical intake examination room, which does not involve CoreCivic officers.

Mr. Ellis will testify that ICE assigned the decedent to CCCC. He will testify that CoreCivic did not have any involvement in this assignment, including clearing her for travel, her transport to CCCC, and determinations regarding her medical care prior to her arrival at CCCC. He will testify regarding what typically occurs once CoreCivic is put on notice that they are receiving new detainees at CCCC, including what information is

typically provided to CoreCivic officers. He will testify that CoreCivic personnel would not have been put on notice that the decedent had any underlying medical conditions or diagnoses prior to her arrival or at the time of her arrival at CCCC, and generally would not have been provided with or allowed access to her medical information as non-medical security personnel.

Mr. Ellis will testify that the decedent, along with 18 other transgender ICE detainees, arrived at CCCC via TransCor transport bus at approximately 8 p.m. on May 16, 2018. After restraints were removed, the detainees were escorted into the facility at approximately 8:43 p.m., at which time CoreCivic officers placed the detainees in a holding cell in the intake area. Over the next five hours, all detainees were processed into the facility in accordance with CoreCivic intakes policies, applicable PBNDS procedures, and in compliance with industry standards. Mr. Ellis is expected to testify regarding this process, which includes detainee classification, property inventory and issuance, facility orientation, paperwork and interviews, and an initial medical examination by CCS medical staff. He will testify that the time it took to process the detainees into the facility was typical and in alignment with policy, procedure, and industry standards.

Mr. Ellis will testify that all detainees, including the decedent, were provided with food, beverages, and access to restrooms during the intake process in accordance with policy and industry standards, which is confirmed by ICE's investigation into the death. Mr. Ellis will testify that Ms. Hernandez was officially booked into the facility at

approximately 1:15 a.m. on May 17, 2018.  At approximately 2:23 a.m., all 19 detainees were escorted to the medical waiting area for their initial medical intake screenings, where they were provided with blankets and were permitted to lay down on the floor while they waited.

Mr. Ellis will testify that the decedent's vital signs were taken at approximately 7:30 a.m. by CCS staff, and that at approximately 7:35 a.m., a CCS Registered Nurse conducted an initial medical intake screening with the aid of a Spanish interpreter.  He will testify that, by all accounts, the decedent did not have any medical records or medications on her person.  Even if she did, because CCCC officers are not medically trained, any medical records or medications would have been provided to CCS medical staff without being reviewed.  Mr. Ellis will testify that the decedent received an intake screening by medical staff within 12 hours after arrival at the facility in accordance with PBNDS 4.3(II).

He will testify that after the decedent's initial screening, medical personnel were aware that her vitals were abnormal, and she was placed in a medical isolation room (with a bed and fresh linens) for comfort.  Mr. Ellis will testify that the decedent was the first detainee to be seen by CCS physician Dr. Mary Birdsong (who is fluent in Spanish) at approximately 10 a.m. when she arrived at the facility that morning, at which time Dr. Birdsong ordered her to be transported by facility personnel to Cibola General Hospital.

He will testify that the decedent was timely transported offsite to Cibola General Hospital at approximately 11:08 a.m.

Mr. Ellis is expected to testify that CoreCivic officers are trained to recognize certain symptoms that are indicative of emergent medical issues, such as heart attack, fainting, loss of consciousness, heavy bleeding, stroke, or diabetic shock.  If an officer were to recognize any emergent issues, they are trained to immediately radio medical personnel and to perform certain life-saving measures (such as CPR) until medical personnel arrive on the scene and assume responsibility.   Outside of unusual circumstances, Mr. Ellis will testify that it is medical personnel, not CoreCivic security personnel, who ultimately make the determination to send detainees offsite for emergency medical care.  Mr. Ellis will testify that non-medical security personnel could not have made those determinations.

Mr. Ellis will testify that the decedent's symptoms were noted as cough, fever, weakness, loss of appetite, and weight loss.  It was also reported that she had a runny nose, was fatigued, had vomiting and diarrhea (although there is no evidence that this occurred at CCCC), and generally appeared ill.  An intake officer noted that it looked like she had the common cold.  Mr. Ellis will testify that, by all accounts, including a review of the Milestone surveillance footage, the decedent was alert and was able to speak, eat, drink, use the restroom, and ambulate without assistance.  Mr. Ellis will testify that there is no evidence that the decedent reported to any officer that she needed emergency

medical care or that any officer ignored her requests. There is also no evidence to suggest that officers were aware that she was "losing her mental capacity."

Mr. Ellis will testify that CoreCivic officers are trained to conduct counts of detainees in each area of the facility, including the medical unit, and are required to check for "living breathing flesh." Mr. Ellis will testify that CoreCivic officers would have routinely checked on the decedent during the entire intake process, and throughout the night when she waited in the medical unit, to ensure her safety and security. He will also testify that medical personnel are on-hand as soon as new arrivals enter the facility, and that intake officers are trained to summon medical personnel if it is clear that any new arrival is suffering from emergent medical symptoms as outlined above.

Mr. Ellis will testify that there is no evidence that the decedent was objectively suffering from emergent medical issues that would have prompted CoreCivic officers to call a medical emergency, summon medical personnel, or to otherwise perform life-saving measures. Mr. Ellis will testify that officers are not medically trained and are not qualified to recognize any underlying illnesses the decedent may have had at intake, and no officer would have known she was HIV+ unless she specifically provided this information. He will testify that CoreCivic officers are not equipped or trained to assess a detainee's vital signs, or to unilaterally determine whether a detainee needs immediate off-site medical care. Mr. Ellis will testify that CoreCivic officers, even if they observed the decedent's outward appearance and symptoms, would not have been put on notice of

an emergent situation, and they appropriately waited for medical personnel to assess and evaluate her.  Mr. Ellis will testify that the actions of CoreCivic officers at CCCC were within the standard of care.

Mr. Ellis will testify that the decedent was restrained during offsite transport and during her hospitalization at both Cibola General Hospital and Lovelace Medical Center pursuant to CoreCivic Policy 9-18, PBNDS, and standard detention practices.  He will testify that CoreCivic officers who were assigned to hospital posts removed restraints at the direction of medical personnel in accordance with Policy 9-18 but were required to obtain permission to do so pursuant to policy and the PBNDS.  Mr. Ellis will testify that there is no evidence that any CoreCivic officer in any way prevented and/or delayed medical care at either Cibola General Hospital or Lovelace Medical Center due to their alleged failure to remove the decedent's restraints in a timely manner.  Mr. Ellis will testify that at no point did CoreCivic officers engage in any use of force against the decedent, and that the handling of her, to include offsite transport and use of restraints while in the hospital, was appropriate and respectful in accordance with policy, PBNDS, and industry standards.

Mr. Ellis will rebut the opinions of Plaintiff's experts that the use of restraints on the decedent while hospitalized was unreasonable or violated CoreCivic policy or the PBNDS.  He will rebut Plaintiff's experts' opinions that CoreCivic failed to provide the decedent with medical screening at intake, that they failed to adequately treat her or

transport her offsite for medical attention, or that their conduct otherwise fell below the standard of care.  Mr. Ellis will testify in accordance with this deposition testimony, if taken.

CoreCivic reserves the right to supplement Mr. Ellis's disclosure to the extent that new information, testimony, or documents are obtained through the course of discovery in this case.

       4.      Michael Swinton
                  c/o Jacob B. Lee
                  Struck Love Bojanowski & Acedo, PLC
                  3100 W. Ray Road, Suite 300
                  Chandler, AZ 85226

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), TransCor may call Michael Swinton as a witness at trial to present evidence under Federal Rules of Evidence 702, 703, and/or 705.  Mr. Swinton has not been "retained or specifically employed to provide expert testimony in this case," nor is he an employee of TransCor whose duties regularly involve giving expert testimony.  *See* Fed. R. Civ. P. 26(A)(2)(B). As such, Mr. Swinton is not required to produce a written report.  *See* Fed. R. Civ. P. 26(A)(2)(C).

Mr. Swinton is TransCor's Vice President and Chief Operating Officer.  He will testify and offer opinion testimony based upon his extensive inmate/detainee transportation experience and military training regarding applicable federal regulations of detainee transport operations; the applicable standard of care for detainee transport operations; TransCor's policies, procedures and practices relating to detainee

transportation; the transport vehicles used by TransCor in transporting detainees; TransCor's hiring and training of its transportation specialists; and TransCor's contractual obligations relating to detainee transport. Mr. Swinton will also testify regarding his personal knowledge of the events giving rise to this lawsuit.

Mr. Swinton will testify that ICE assigned the decedent to CCCC, and that TransCor, which contracted to provide inter-facility transport services at CCCC, was assigned to transport her from the ICE CAP facility in Albuquerque, New Mexico to CCCC in Milan, New Mexico on May 16, 2018. He will testify that TransCor did not have any involvement in the decedent's assignment to CCCC, including clearing her for travel, her transport up to that point, and determinations regarding her medical care. He will testify regarding what typically occurs once TransCor is put on notice that they are transporting detainees, including what information is typically provided to TransCor officers prior to a trip. He will testify that TransCor personnel were not (and would not have been) put on notice of any medical issue prior to transport, and that ICE generally would not have provided TransCor with any detainee's health status, medical diagnoses, or information regarding medications and/or treatment. Accordingly, Mr. Swinton will testify that TransCor officers would have been unaware that the decedent suffered from chronic illness.

Mr. Swinton will testify that TransCor transport officers arrived at the ICE CAP facility at approximately 6:25 p.m. on May 16, 2018. He will testify that transport

officers conducted pre-trip procedures, including restraining detainees and loading them onto the bus, before departing the ICE CAP facility for CCCC.  Mr. Swinton will testify that the transport took approximately 1.5 hours, and that the transport bus arrived at CCCC at approximately 8 p.m. that evening.  Mr. Swinton will testify that after restraints were removed, the detainees were escorted into the facility at approximately 8:43 p.m., at which time CoreCivic officers placed the detainees in a holding cell.  Mr. Swinton will testify that TransCor officers had no further involvement with the decedent after they relinquished custody of her to CoreCivic officers.

Mr. Swinton will testify that given the very short transport, water would have been available to detainees, but food likely was not.  In addition, Mr. Swinton will testify that there is a restroom located on the transport bus which would have been available for detainee use upon request.

Mr. Swinton will testify that TransCor officers are trained to identify medical conditions requiring emergency treatment such as chest pain, shortness of breath, loss of consciousness, and lack of response, and that no such conditions were observed during the transport.  Mr. Swinton will testify that that there is no evidence that the decedent, or any detainee on her behalf, complained to any TransCor officer or otherwise requested medical care. Mr. Swinton will testify that while there are certain situations where TransCor officers would be required to transport a detainee to a medical facility for emergent care, this was not one of those situations based upon the decedent's outward

appearance and objective symptoms of cough, weight loss, fatigue, fever, and runny nose. Mr. Swinton will testify that even if TransCor officers did observe the decedent's appearance and/or symptoms, they are not trained or qualified medical providers, and would not have been able to identify any underlying serious illness. He will testify that the decedent's outward appearance and symptoms would not have prompted any TransCor officer to contact CCCC, as there was no indication that she was in any sort of medical distress, and there is no evidence that she suffered from vomiting or diarrhea during the transport. Mr. Swinton will testify that TransCor officers are not qualified or trained to take a detainee's vital signs and could not make medical determinations. He will testify that transport officers acted in accordance with their training and pursuant to TransCor policy and PBNDS and met or exceeded the standard of care. He will also testify that TransCor's training, hiring, and supervision of its officers on this particular transport met or exceeded the standard of care.

Mr. Swinton is expected to rebut Dora Schriro's opinions that TransCor failed to provide the decedent with medical care or transport to a medical facility. He is also expected to rebut Plaintiff's experts' opinions that TransCor officers failed to provide the decedent with food and water and should have notified CoreCivic that she was in emergent distress and needed urgent care. Mr. Swinton will testify in accordance with his deposition testimony, if taken.

TransCor reserves the right to supplement Mr. Swinton's disclosure to the extent that new information, testimony, or documents are obtained through the course of discovery in this case.

    5.    Rebuttal Experts, if necessary.

Dated: February 2, 2024        */s/ Dana Keene*
                        Daniel P. Struck, AZ Bar No. 012377
                        Jacob B. Lee, NM Bar No. 154613
                        Dana Keene, AZ Bar No. 033619
                        Anne M. Orcutt, AZ Bar No. 029387
                        STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                        3100 West Ray Road, Suite 300
                        Chandler, AZ 85226
                        Tel.: (480) 420-1600
                        Fax: (480) 420-1696
                        dstruck@strucklove.com
                        jlee@strucklove.com
                        dkeene@strucklove.com

                        Deborah D. Wells
                        Debra J. Moulton
                        KENNEDY, MOULTON & WELLS, P.C.
                        2201 San Pedro NE, Bldg. 3, Suite 200
                        Albuquerque, New Mexico 87110
                        Tel.: (505) 884-7887
                        Fax: (505) 884-7123
                        ddwells@kmwpc.com
                        dmoulton@kmwpc.com

                        *Attorneys for Defendants TransCor America, LLC and CoreCivic Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2024, a true and correct copy of **DEFENDANTS TRANSCOR'S AND CORECIVIC'S EXPERT WITNESS DISCLOSURE STATEMENT** was served by email upon counsel of record as follows:

Cynthia B. Morgan                  cmorgan@gelaw.com
Barbara J. Hart                    bhart@gelaw.com
Kathryne L. Hemmings               khemmings@gelaw.com
Ken Massey                         kmassey@gelaw.com
Dale Melchert                      dale@transgenderlawcenter.org
Lynly Egyes                        lynly@transgenderlawcenter.org
Daniel Yohalem                     daniel.yohalem@gmail.com
*Attorneys for Plaintiff*

Gregory D. Steinman               gds@madisonlaw.com
*Attorneys for Defendant Global Precision Systems LLC*

Adam D. Rafkin                     adr@rafkinlaw.com
*Attorney for LaSalle Defendants*

Brett C. Eaton                     brett.eaton@usdoj.gov
*Attorney for Defendant United States of America*

Robert F. Gentile                 rgentile@guebertlaw.com
Clinton E. Dow                    cdow@guebertlaw.com
*Attorneys for Third-Party Defendant Asset Protection and Security Services, L.P.*

*/s/ Kim Penny*