# EXHIBIT C

## *AMENDED* EXPERT REPORT OF HARISH MOORJANI, M.D.

Re:   *Joleen K. Youngers v. Management & Training Company, et al.,*
      United States District Court for the District of New Mexico
      Case No: 20-cv-00465-WJ-JMR

I was asked to render expert opinions on behalf of CoreCivic and TransCor in connection with a lawsuit brought by Joleen K. Youngers as Personal Representative of the Wrongful Death Estate of Roxsana Hernandez. This report summarizes the expert opinions I have formed and is based on a review of the records provided, as well as my education, experience, and training.

All of my opinions are made to a reasonable degree of medical probability unless otherwise noted.

**Experience and Qualifications:**

I hold board certification in both Infectious Diseases and Internal Medicine. My medical school training was completed at Maulana Azad Medical College in New Delhi, India in 1986. Subsequently, I completed my internal medicine residency training at the University of Medicine and Dentistry in New Jersey in 1992, and my fellowship specialty training in Infectious Diseases at Stony Brook University in New York in 1994.

Since then, I have been a full-time practicing Infectious Diseases/Internal Medicine attending physician in Briarcliff Manor, NY, with privileges at Northwell Phelps Hospital in Tarrytown, NY, Columbia Presbyterian Hudson Valley Hospital in Peekskill, NY, and Montefiore Mount Vernon Hospital in Mount Vernon, NY. Alongside this, I serve as a voluntary Clinical Assistant Professor of Medicine in the Infectious Disease Division at New York Medical College in Valhalla, NY. I have served as the Medical Director of the inpatient unit for NY State Department of Corrections and Community Supervision ("NYSDOCCS") since 1998. I am also the Infectious Disease Consultant for the Westchester County Jail.

I primarily serve as the on-site Infectious Disease Consultant at NYSDOCCS, one of the largest correctional systems in the United States, with a capacity of approximately 31,000 detainees. I've worked in various units, including male and female general population (all security levels), infirmary units, mental health units, emergency room, intake facility, specialty clinic areas, and inpatient units at the hospital. My experience spans from frontline clinical duties to the Infection Control Department and includes the development of policies and procedures. As the Infectious Disease Consultant, I am responsible for consulting with NYSDOCCS to maintain and update facility policies on contagious diseases, handling outbreaks, clinical management of select infections, reporting to health agencies, sanitation, and environmental hygiene.

In my Infectious Diseases/HIV/Hepatitis C clinics at NYSDOCCS's various prison facilities, I provide assessment and management of infectious diseases, as well as managing or co-managing other primary medical and psychiatric/psychological concerns. A significant portion of my patients have documented chemical dependency problems, and a majority have a primary psychiatric diagnosis. I am actively involved in diagnosing and prescribing treatment for mental health concerns.

CC_Hernandez017481

even if it did, this does not negate the fact that a biopsy was not administered until May 21, three days after her admission. Dr. Fajgenbaum's "8-hour" opinion fails to consider this delay.

Moreover, in my opinion, it is impossible to put a value on Ms. Hernandez's chance of survival. Even if she were started on antiviral treatment for HIV prior to her death, it takes months for the immune system to rebuild itself, and there is no guarantee that treatment would have immediately been effective, no matter what date it was started.[6]

I agree with Dr. Fajgenbaum's opinion that had Ms. Hernandez received timely and adequate medical care upon arrival to the United States, her survival chances would have increased. But Dr. Fajgenbaum ignores the fact that Ms. Hernandez *was* referred offsite to Scripps for a higher level of care on May 11, 2018, and was incorrectly and improperly assessed, evaluated, diagnosed, and cleared. Like Dr. Keller, Dr. Fajgenbaum places blame on the United States for failing to communicate Ms. Hernandez's medical history to Dr. Harrell-Bruder or to "follow up" with diagnostic testing, despite the fact that Ms. Hernandez was referred to Scripps for that very purpose. As discussed at length below, it was Dr. Harrell-Bruder's responsibility to obtain an accurate medical history. Her failure to do so, as well as her incorrect diagnosis of bronchitis, grossly deviated from the standard of care and deprived Ms. Hernandez of the opportunity to receive timely and adequate medical care.

Dr. Fajgenbaum's opinion that defendants did not provide Ms. Hernandez with appropriate and reasonable nutrition, hydration, or rest during the eight days she was in the defendants' custody is belied by the records and the affidavits of other detainees who were detained with her. Ms. Hernandez appears to have been provided with ample food and water, which she often refused, and the other detainees' affidavits show that Ms. Hernandez slept all the time. It is also unclear what "inhumane living conditions" Ms. Hernandez was forced to endure while in TransCor or CoreCivic's custody, or how this contributed to her death. Nevertheless, I can find no indication in the records that Ms. Hernandez's cause of death was due to lack of nutrition, hydration, rest, or "inhumane living conditions," and I disagree that lack of nutrition, hydration, rest, or "inhumane living conditions" caused Ms. Hernandez's death.

As stated above and below, I disagree with Dr. Fajgenbaum's assertions that laypeople, to include TransCor and CoreCivic non-medical officers, could have or should have recognized that Ms. Hernandez was dehydrated, malnourished, or otherwise in need of immediate medical attention based on the fact that none of these individuals were medically trained or qualified to make such a determination. Further, Dr. Fajgenbaum opines that during the TransCor transport, Ms. Hernandez was "visibly ill," but relies on a single detainee affidavit which stated she had a fever, a bad cough, and her head hurt. Dr. Fajgenbaum then opines that TransCor did not provide Ms. Hernandez any medical care or inform CCCC that she was "deathly ill." Having a fever, a cough, and a headache does not support an opinion that Ms. Hernandez was "deathly" ill, or even that she was visibly ill. There is nothing in the records indicating that any TransCor officer was aware of

---

[6] In my original report dated February 1, 2024, this opinion referred to rituximab instead of antiviral treatment for HIV. This was an inadvertent mistake, which was only realized once I reviewed Dr. Fajgenbaum's February 26, 2024, Expert Report Addendum. I agree with Dr. Fajgenbaum that the purpose of rituximab is not to rebuild the immune system.

CC_Hernandez017498